IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                    Case No. 09-20059

CASEY FRAKES,

                    Defendant.


              TRANSCRIPT OF TRIAL PROCEEDINGS
                        before
              HONORABLE JOHN W. LUNGSTRUM
                          on
              JULY  20 to JULY 23, 2009


                      APPEARANCES

For the Plaintiff:    Kim Martin
                      United States Attorney's Office
                      500 State Avenue
                      Kansas City, Kansas 66101

For the Defendant:    Michael R. Clarke
                      Clarke  & Wilson, LLC
                      1040 New Hampshire St.
                      Lawrence, KS 66044

INDEX

|  | PAGE | VOL |
|---|---|---|

MONDAY, JULY 20, 2009
MOTIONS IN LIMINE CONFERENCE                   4    1
TUESDAY, JULY 21, 2009
OPENING STATEMENTS (Omitted)                  34    1
PLAINTIFF'S EVIDENCE
JOHN HOWE
Direct examination by Ms. Martin              34    1
Cross examination by Mr. Clarke               72    1
WEDNESDAY, JULY 22, 2009
Cross examination by Mr. Clarke               83    1
Redirect examination by Ms. Martin            91    1
Recross examination by Mr. Clarke             94    1
TERRY WAYNE KELLEY
Direct examination by Ms. Martin             100    1
Cross examination by Mr. Clarke              107    1
Redirect examination by Ms. Martin           115    1
PAMELA S. FRAKES
Direct examination by Ms. Martin             119    1
Cross examination by Mr. Clarke              124    1
Redirect examination by Ms. Martin           129    1
Recross examination by Mr. Clarke            131    1
Redirect examination by Ms. Martin           131    1
JASON P. FRAKES
Direct examination by Ms. Martin             133    1
Cross examination by Mr. Clarke              141    1
JAMES DEAN KANATZAR
Direct examination by Ms. Martin             146    1
Cross examination by Mr. Clarke              191    1
Redirect examination by Ms. Martin           212    1
Recross examination by Mr. Clarke            215    1
TODD JAMES BEARD
Direct examination by Ms. Martin             221    1
Cross examination by Mr. Clarke              225    1
PETER LATHAM
Direct examination by Ms. Martin             227    1
CASEY FRAKES
Direct examination by Mr. Clarke             238    1
Cross examination by Ms. Martin              280    1
Redirect examination by Mr. Clarke           292    1
Recross examination by Ms. Martin            296    1
Redirect examination by Mr. Clarke           298    1
THURSDAY, JULY 23, 2009
INSTRUCTIONS CONFERENCE                       306    1
INSTRUCTIONS READ (Omitted)                   315    1

1                           <u>EXHIBITS</u>

2    <u>NUMBER</u>                                          <u>PAGE</u>  <u>VOL</u>
     1                                              38   1
3    18                                             42   1
     3                                              48   1
4    2                                              70   1
     4-5                                           100   1
5    13                                            118   1
     12                                            119   1
6    15                                            155   1
     16                                            158   1
7    17                                            169   1
     6                                             172   1
8    14                                            173   1
     7                                             175   1
9    8                                             176   1
     9                                             180   1
10   10                                            182   1
     11                                            184   1
11   20                                            225   1
     21                                            230   1
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      <u>MONDAY, JULY 20, 2009</u>

2              THE COURT:  We are here this afternoon in

3      Case No. 09-20059, United States of America versus

4      Casey Frakes.  Would the parties state their

5      appearances, beginning with counsel for the United

6      States.

7              MS. MARTIN:  Your Honor, the United States

8      appears by Kim Martin.

9              MR. CLARKE:  Your Honor, Mr. Frakes appears

10     in person with counsel Michael Clarke.

11             THE COURT:  Thank you.  We're here this

12     afternoon because this case is scheduled for a jury

13     trial to begin tomorrow morning, and it is my custom

14     in all jury trial cases to conduct what I call a

15     limine conference at some point before the trial

16     begins, frequently the day before.  The purpose of a

17     limine conference really is several fold.  In the

18     event that there are legal matters which should be

19     determined before trial, of course, it gives a

20     vehicle for that, but even where there have not been

21     motions filed or other issues that need to be

22     resolved pretrial, I think it's a good idea to go

23     through with counsel sort of how I do things, what

24     the sort of logistics and rules of the road and so

25     forth are so that you will have an idea of those

1    things.

2    When I practiced law, it was always

3    disconcerting for me to have to guess what the judge

4    liked to do about all sorts of things, and so I feel

5    like it's a better practice to make sure counsel has

6    the opportunity to ask questions and be informed.

7    I'll begin by going through with you the

8    procedures that I follow in these cases.  Now, we

9    have this case set to begin at 9:00 o'clock tomorrow

10    morning, and I normally start my trial days at 9:00

11    o'clock, and I normally go until 5:00 with the

12    understanding that there could be exceptions.  Under

13    appropriate circumstances, should there be some

14    reason to go past 5:00 o'clock to finish up a witness

15    and the like, if the jury gives their consent, I'm

16    inclined to do that, but otherwise the nine-to-five

17    hours are the typical hours for the case.  I do not

18    meet on Mondays so that if this case is still going

19    from the perspective of presentation of evidence to

20    the jury and/or closing argument and we have gotten

21    through Friday and we're not done we would recess

22    until next Tuesday.  If the case is, in fact,

23    submitted to the jury before the end of the week or

24    by the end of the week and it's simply a matter of

25    deliberation, the jury would be able to deliberate on

Monday.  Of course, the reason I don't meet on Monday is simply because I have other matters that I take care of.  I have criminal matters, which both counsel are aware of, that I maintain and other related issues.  Keep that in mind.  If the evidence is finished and the case is to the jury by the end of the week, they would be permitted to deliberate on Monday.  If not, we would hold over until Tuesday.  Typically on days other than the day the jury is being selected, I take a 15-minute recess in the morning and a 15-minute recess in the afternoon generally about midway through.  On the day that we select the jury, on the other hand, I try to get that done, if at all possible, in one sitting not to exceed a total of maybe three hours so that we don't have any either waste of time for those jurors, prospective jurors, who will ultimately be excused -- we get them on their way sooner -- and/or any confusion that sometimes is created when you take a break in the middle of jury selection.  There are all sorts of things that can happen that are not as good as you would like them to be, but I'll apply a rule of reason to that.  If people need a break, we will take a break, but ordinarily I hold our feet to the fire a little more during the jury selection process.

1          The way the jury selection process works is

2     this:  We will, of course, have ultimately 12 jurors,

3     and we will also have two alternate jurors because

4     the peremptory challenges total 16 for the regular

5     jurors plus two more for the alternates.  That means

6     that we will need, the way I do things, to qualify 32

7     people for cause.  The courtroom when you come back

8     tomorrow will have chairs lined up in front of the

9     jury box and in the well of the courtroom, and the

10     computer-predesignated order by which prospective

11     jurors will be called forward to the box will be used

12     by Ms. Scheurer to call the names.  The first 28 of

13     whom she calls will be seated in the box and will

14     function as the -- and in the chairs surrounding the

15     box to function as the prospective jurors.  The next

16     four or last four names she calls and any

17     replacements for those four people are peremptory

18     alternates for the case.  Now I will conduct the

19     initial or beginning portion of the voir dire.  I

20     will acquaint the jury with what the case is about,

21     and I will talk to them about the constitutional

22     rights which a person who is accused of a crime has

23     and various other sort of standard matters that I

24     think would be brought up in any voir dire

25     examination.

1      During the course of that I will call on

2   counsel's help at least twice and perhaps a third

3   time.  The first time is after I've gotten done

4   explaining what the case is about and the nature of

5   some of the special constitutional rules that apply

6   in criminal cases.  I will ask counsel to introduce

7   yourself and to give the jury some idea about where

8   you practice law and just who you are just in order

9   for them to determine whether they may have any

10  acquaintance with you by any -- in any respect, so I

11  would want you to give enough biographical

12  information that would allow somebody to know who you

13  were.  Don't introduce a case agent or the defendant

14  at that time.  Just talk about the lawyers.  If you

15  have either cocounsel or a legal assistant at the

16  table with you, then introduce those individuals as

17  well.  After that I will have you introduce the case

18  agent and the defendant.  Again, give enough

19  biographical information that the jury would be able

20  to have some idea of whether or not they have any

21  acquaintance with these participants in the case.

22      The final place in which I would ask the lawyers

23  to participate, if you care to, is with regard to

24  witnesses.  Now, in a criminal case where the

25  defendant certainly is not obligated to put on

1    witnesses, sometimes the preference of defense

2    counsel is that I simply ask the government to read a

3    comprehensive list of witnesses which will include

4    any witnesses which the defendant might call, and I

5    would explain to the jury that I'm asking the

6    government to do that simply as an accommodation to

7    save time and that it's because of the fact that the

8    defendant has no obligation to put on any evidence in

9    the case.  Certainly don't draw any inferences if

10   that should occur, and understand that at the outset

11   of the case nobody knows exactly how many or which

12   witnesses for certain need to be called because those

13   are things which may sometimes depend upon what

14   occurs in the trial, and they shouldn't draw any

15   inferences if they hear more names than they actually

16   see as witness in the case.  On the other hand, if

17   defense counsel prefers to read a list of defendant's

18   witnesses, I'm perfectly happy to accede to that as

19   well.

20        In this case, Mr. Clarke, is it your preference

21   to have government counsel read a list of witnesses?

22             MR. CLARKE:  That would be preferable, your

23   Honor, yes.  And we have not provided any notice of

24   new witnesses that the defense intends to call in

25   this case.

1          THE COURT:  I had not seen any, and

2     obviously you're entitled to call anyone on the

3     government's list of witnesses, should you so desire.

4          Ms. Martin, I will have you do that, and I will

5     make that statement to the jury that I indicated I

6     would.

7          MS. MARTIN:  Your Honor, I'm assuming that

8     the defendant's name should not be included on that

9     list.

10          THE COURT:  Correct.  They will meet the

11     defendant as the defendant, and if the defendant --

12     of course, the defendant has the right to testify --

13     we will talk about that -- or not testify, but that's

14     a separate matter, and whatever decision Mr. Frakes

15     decides to make with regard to testifying, I will

16     want to make an inquiry of him on the record outside

17     the prospective jury to make sure he understands he

18     that he has a constitutional right both not to

19     testify, which is, of course, how we typically think

20     about it, but also a constitutional right to testify

21     if he wants to.  So if he chooses not to testify, he

22     understands that that's a decision he's made; and if

23     he decides not to testify, that's fine; if he chooses

24     to testify, he understands that he's giving up his

25     right to remain silent.  I'll go through all that

when the time comes.  I won't press you on an

ultimate decision on that, Mr. Clarke, until

absolutely necessary, but when the time comes, I will

need to do that.  Once what I call the boilerplate

aspect of voir dire, or the standard questions as

tailored to a case of this nature are asked, I will

come back and ask counsel for each side to conduct

any follow-up voir dire they might like to conduct

with a limit of 30 minutes per side.  At that point

in time you're not to argue your case.  I don't want

you to go back and repeat things or be redundant, but

that gives you some opportunity to explore areas that

I might not have touched on or which I might not have

gone into in the detail that you think is important

or follow up on something I may have not followed up

on.  There's no question that in any case the lawyers

know the case a lot better than the judge does, and

you say may see aspects about it that weren't obvious

or apparent to me, so you've got that time to ask

those sort of follow-up questions.

Now, at any time during the examination, whether

it be my portion of the examination or counsel's

portion of the examination, if I sense that there is

some reason why a juror should come up to the bench

to talk to us, I won't hesitate to ask them to do

1    that, and I'll specifically invite them to consider

2    approaching the bench when I ask questions about any

3    experience they may have with the criminal justice

4    system, but at some point during the jury selection

5    process if counsel sees something that you think

6    there's a juror who might be about to say something

7    or do something that would affect the entire array,

8    don't hesitate to ask leave to approach and let me

9    know, Judge, I think you ought to have that juror

10    come up and talk to us at the bench.  Don't hesitate

11    to do that.

12        Similarly, with regard to challenges for cause,

13    I will certainly rule without seeking your input,

14    probably, on requests that relate to scheduling

15    matters, people who believe they should be excused

16    for scheduling matters, and, of course, if I hear

17    something which to me is clear that a person should

18    be excused for cause, I will excuse somebody for

19    cause without seeking help.  If somebody says, I know

20    this lawyer or that participant or whatever and I

21    couldn't possibly be fair in a case they are involved

22    in, obviously, I'm going to excuse that person.  But

23    for other cause challenges, if you feel that there is

24    a cause challenge to be made, there are two ways in

25    which you can do that:  First is at any time if you

1    want to seek leave to approach and come up to the

2    bench, you can explain what the cause challenge is.

3    I don't want you saying in open court that you're

4    making a cause challenge, that you have a cause

5    challenge, because I think that puts counsel in an

6    awkward position of having let the world know that

7    you have a problem with one of these jurors.  Either

8    it works out or it doesn't, but it may cast some

9    inferences that you would just as soon not have as

10    part of the picture.  So just ask leave to approach,

11    explain to me at the bench what the situation is.

12    I'll rule on your challenge, and you'll like it or

13    you won't, but at least you won't have had to go

14    through the jury knowing what we were doing.  The

15    alternative is at the end of all of the questioning

16    by myself and by counsel I will ask whether the

17    parties pass the jury for cause.  That is the point

18    at which you need to make an objection or it is

19    waived.  If we get past that and start into the

20    peremptory challenges, you have waived your cause

21    challenges.  I will ask you at the conclusion of the

22    peremptory challenges, after the courtroom deputy

23    clerk comes back and shows them to me and we're ready

24    to go with her calling the names of the people who

25    will be excused, I will ask you, are there any Batson

1      challenges?  That would be the time then at which, if

2      there are any Batson challenges, that you would make

3      them.  Again, the procedure for that would be for you

4      to simply ask leave to approach, and we will take it

5      up at the bench.  Counsel can state the prima facie

6      case.  I'll hear from the other side with regard to a

7      legitimate, nondiscriminatory reason for a challenge,

8      and I'll hear argument about pretext if there's one

9      to be made, and I'll make that ruling at that time.

10         Now, are there any questions then about the jury

11     selection process?

12             MS. MARTIN:  No, your Honor.

13             THE COURT:  Mr. Clarke?

14             MR. CLARKE:  Your Honor, I suppose the

15     question would be that if we find that our individual

16     questioning is taking longer than the 30 minutes that

17     is allotted, would the court be open to a request at

18     that point to -- for leave to continue on?

19             THE COURT:  The true answer is, if you gave

20     me good cause, I could envision extending the time.

21     The rest of the answer is, I have yet to find good

22     cause and extend anybody's time beyond 30 minutes

23     that I can recall, so I think you should not waste

24     your time.  I don't mean you shouldn't waste your

25     time making a request.  I mean you shouldn't waste

1    your time during the 30 minutes.  But I want to make

2    it clear I will make a reasoned judgment if you ask

3    for more time.  If my assessment is you've squandered

4    your time, I'm not going to give you more.  If I

5    think there's something that merits more, I'm not

6    going to turn it down arbitrarily based upon a time

7    limit.  But my experience in the voir dire process in

8    the cases that I've tried -- and it's been a few --

9    is that, generally speaking, the lawyers find that 30

10   minutes is more than adequate in light of the voir

11   dire that I conduct myself.

12              MR. CLARKE:  Thank you.

13              THE COURT:  Sure.  After the jury is

14   selected and with whatever breaks are taken and so on

15   and so forth, the next step is that I will read some

16   preliminary instructions to the jury.  Those are,

17   again, largely procedural to explain to the jury what

18   their role is, a bit of the cautionary instruction

19   information which is repeated in that instruction as

20   well as separately as well as just sort of a heads up

21   about what is evidence and what isn't evidence, and,

22   finally, sort of how the trial will unfold, what the

23   steps are going to be.  I don't go into any

24   substantive legal matters in those preliminary

25   instructions.  I won't tell them what the elements of

1    the alleged offense are or any of those kinds of

2    things.  I will tell them that I will do that at the

3    conclusion of the case.

4        Once the preliminary instructions are

5    completed -- they don't take more than ten or 15

6    minutes -- we will proceed to opening statement, and

7    I will -- as I do for the voir dire, I will have a

8    timer available for you to follow so you will know

9    how much time you have, and I will have that timer

10   available for opening as well.  And, again, I will

11   hold you to that time unless you can convince me that

12   there's good cause to extend the time, which perhaps

13   you might guess is an uphill battle, but I don't want

14   to leave the wrong impression.  Obviously, things can

15   occur that change the analysis, and I'm more than

16   happy to revisit these things, but I think we should

17   try to figure it out in advance.

18       Ms. Martin, how long do you think the government

19   needs for opening in this case?

20          MS. MARTIN:  Approximately 20 minutes, your

21   Honor.

22          THE COURT:  Is that adequate for the

23   defendant as well?

24          MR. CLARKE:  It is, your Honor.

25          THE COURT:  All right.  Then I will assign

1    20 minutes per side for opening in this case.  I know

2    I don't need to repeat or emphasize this, but opening

3    is not a time to argue the case, that is, an attempt

4    to get the jury persuaded as to your perspective or

5    tell them how you think they ought to analyze things.

6    Rather, it's a time to share with them your notions

7    of what the evidence is likely to be in the case.

8         The next thing I want to cover are what I would

9    consider a very few ground rules or rules of the

10   road, whatever you want to call them.  First of

11   all -- and this is in my opinion -- the most

12   important of these things, if you're going to object

13   to a question that's being asked by opposing counsel,

14   please stand to do so, and think about standing as

15   soon as you possibly see that it's coming because it

16   helps me quite a bit to help you if I know you're

17   going to object and, therefore, I can caution a

18   witness not to answer until I've ruled on the

19   objection, as opposed to your kind of coming in with

20   an objection after the witness has already blurted

21   something out.  Yes, I can give an instruction to

22   ignore that, and the circuit will say that's plenty

23   adequate, but we all know it would be better if that

24   didn't happen at all.  That's why I ask you to stand

25   up, so I can help you if you do have a valid

1    objection.

2        In addition, it really helps the court reporter

3    because in the course of trying to figure out what's

4    going on here I have learned that court reporters pay

5    attention with their eyes as well as with their ears.

6    So seeing what is going on helps them a lot.  So if

7    you'll indulge Ms. Ryder, I think she will be

8    appreciative, and it's always good to keep the court

9    reporter happy, I've discovered over many years as

10   lawyer and judge.

11       Second -- this is just a matter of personal

12   privilege, so to speak -- don't greet the witnesses.

13   If you need to tell a witness who you've never met --

14   and you can tell they don't know how this is all

15   coming to pass -- that you're the lawyer for the

16   government or the lawyer for Mr. Frakes, that's fine.

17   But what I mean by that is, don't go into, good

18   morning, Mr. Jones, or, good afternoon, Ms. Smith.

19   Nice to see you again, or whatever.  Don't do that.

20   I used to not like it when lawyers did it when I was

21   a lawyer.  I thought it was phony about half the

22   time, and since I'm the judge, I get to say don't do

23   it.  So don't do it.

24       On a more be important vein, probably, I want to

25   give you a heads up that if you need to approach a

1    witness to show that witness a document or something

2    like that or have them point at something in a

3    photograph and you don't want to fool around with

4    using all the electronic stuff to focus their

5    attention, please feel free to do that, and you need

6    not ask leave to approach.  If that's your practice,

7    to ask leave to approach, that's fine, but I think

8    that's not necessary.  As long as you're intending to

9    approach the witness for an proper purpose such as

10   that, I think it's fine.  If I think that counsel is

11   for any reason desirous of standing by the witness

12   box because they think their presence might affect

13   the answer, I would invite you to go back to the

14   lectern.  If it's simply to be helpful, to show where

15   they need to look or what it is you're talking about,

16   please don't hesitate.

17        Finally in this regard, you are not restricted

18   to the lecturn.  If it's your style to conduct voir

19   dire or make opening statement or examine witnesses

20   or give a closing argument by walking around and

21   moving around the courtroom, feel free to do so.

22        Two things:  One, keep an arm's length from the

23   jury.  Don't encroach on their space.  Keep an arm's

24   length from the jury box.  And second, do remember

25   that the microphone is built into the lecturn, so if

1    that's an issue at all for you, just remember that

2    that's where that might be.

3        Any questions about any of those, or any other,

4    logistical issues that you might want me to expound

5    upon?

6              MS. MARTIN:  No, your Honor.

7              THE COURT:  Mr. Clarke?

8              MR. CLARKE:  No, your Honor.

9              THE COURT:  All right.  Next I want to call

10    to your attention the privacy policy of the judiciary

11    and how that interrelates with public access to court

12    records.  As you both know, court records are

13    available to anyone who has a PACER account.  That

14    enables them to come on line through our CM/ECF

15    system and court records.  People can look at the

16    indictment in this case or motions that have been

17    filed, assuming they are not sealed, and the like

18    simply by having that authorization.  They pay a fee

19    and so forth.

20        Well, if some day in this case a transcript is

21    made of any of these proceedings, for example, if

22    there's a trial and if for whatever reason an appeal

23    is necessary and a transcript of the trial is made

24    for appeal purposes, it will ultimately be placed

25    into the official record of our case electronically,

therefore, accessible to the public.  That means that

the judiciary's privacy policy applies to transcripts

as well as other documents, meaning that there are

certain things that can be omitted or if they are

already in the record can be redacted upon proper

procedures.

        With regard to transcripts, that proper

procedure is that you will be given notice that the

transcript is about to go up and a certain period of

time is set out in that notice, and you have the

right to request to make redactions consistent with

the judiciary's privacy policy.  Obviously, my reason

for bringing this up is not only to make you aware of

it or make sure you're aware of it but also to have

you consider when you're asking certain kinds of

questions whether -- to keep in mind, do I really

need this information?  The privacy policy, for

example, says you don't have to give actual addresses

unless that actually is relevant to some issue.  So,

for example, if a witness comes and testifies and

you're simply laying some background just to kind of

warm the witness up or let the jury know a little bit

about this person, it may be pertinent to show that

that witness lives in Overland Park or in Atchison or

wherever it might happen to be.  But it may not be

1    all that relevant that they live at 412 Oak Street

2    or, you know, on 5415 Schwartz Road or whatever it

3    might happen to be.  So think about that.  If you ask

4    somebody, where do you live? make sure you don't say,

5    what is your address because they will inevitably

6    tell you the full address.  So have those thoughts in

7    mind.  Let me turn to the rule excluding witnesses,

8    Federal Rule of Evidence.  615 does either party wish

9    to invoke that rule?

10    MR. CLARKE:  No, your Honor.

11    MS. MARTIN:  No, your Honor.

12    THE COURT:  Very well.  Next let me talk

13    about the final instructions in the case.  I will

14    instruct before closing argument, and the way I will

15    do that is that once all the evidence has been

16    submitted from both sides I will hand out to you my

17    proposed instructions, and I will give you a

18    reasonable time to review those proposed

19    instructions, and then we will have an instruction

20    conference here in the courtroom.  We will do it all

21    on the record in open court.  I don't do a sort of an

22    informal instruction conference in chambers and then

23    put things on the record, or whatever.  I do it all

24    on the record in open court.  I don't give out the

25    proposed instructions until all the evidence is in

1   because you feel somebody conceivably could go to a

2   tactical advantage if they see what the court's

3   instructions are going to be in the event if there's

4   some contested issue in the case, and so I think it's

5   important to save all of that until the evidence is

6   concluded.  Now, I know the government has filed some

7   proposed instructions.

8          Mr. Clarke, have you, or do you intend to file

9   some proposed instructions?

10              MR. CLARKE:  We do not, your Honor.

11              THE COURT:  All right.  That doesn't mean

12  you waive your right to object to what the government

13  has proposed, of course, but at least I won't be

14  looking for some sort of affirmative input on your

15  part.

16              MS. MARTIN:  Your Honor, this might be an

17  appropriate time.  I noticed on the proposed

18  instructions that I filed there was a typographical

19  error on page 14.  It should read "data" in the

20  second-to-the-last sentence.  If you like, I could

21  just submit a cleaned-up version without filing --

22              THE COURT:  I think we just tidy that up by

23  interlineation.  You say that was page 14?

24              MS. MARTIN:  Yes.  It should say, "data

25  stored on a computer" rather than "date stored on a

1          computer."

2                    THE COURT:  I see.  It's fine to correct it

3          that way.  That runs through my checklist of things.

4          I wanted to cover with you all to make sure you knew

5          where we were going.  I see no motions in limine

6          having been filed by either side; is that correct?

7                    MS. MARTIN:  Yes, your Honor.

8                    MR. CLARKE:  Yes, your Honor.

9                    THE COURT:  Is there anything else you

10         think we should do today?

11                   MS. MARTIN:  I have a couple things, your

12         Honor.  The parties have reached three definite

13         stipulations regarding the employment witnesses of

14         the defendant.  Would you like those to be marked as

15         exhibits?  If so, we can file an amended exhibit

16         list.  Frankly, I'm going to need to do that anyway

17         because I notice that Government's Exhibit 3 and

18         Government's Exhibit 15 are the exact same exhibit.

19                   THE COURT:  It depends on what the

20         stipulations are.  Tell me what they are.

21                   MS. MARTIN:  Two of these are employment

22         witnesses.  They are witnesses who would come in and

23         testify that on a date that the police officer

24         downloaded the images the defendant was not working.

25                   THE COURT:  All right.  Typically speaking,

1    I would not submit those stipulations to the jury, my

2    reasoning being that those are in lieu of testimony

3    and that they, therefore, should be read to the jury,

4    and much like other testimony where the jury doesn't

5    get a transcript or something like that, they are

6    simply left to make notes on the reading of the

7    stipulation; therefore, I think simply at the

8    appropriate point in the case you should ask leave to

9    read to the jury the stipulations.  I will confirm in

10   front of the jury that they are stipulations that

11   have been entered into by the defendant, and I will

12   instruct the jury as to what the consequences are,

13   that they are to treat this as if it was evidence

14   presented in the case.

15           MS. MARTIN:  The third stipulation is the

16   custodian of record, who will testify that the IP

17   address was assigned to the defendant's computer at

18   the date and time.

19           THE COURT:  Again, that's something that

20   would be appropriate for you to apprize the jury of

21   by reading the stipulation into the record.  Anything

22   further from the government?

23           MS. MARTIN:  I think that's all, your

24   Honor.

25           THE COURT:  Anything further from

1          Mr. Frakes?

2                    MR. CLARKE:  No, your Honor.

3                    THE COURT:  I will look forward to seeing

4     you all tomorrow morning at 9:00 o'clock, and until

5     that time we are in recess.

6                    (Court was adjourned.)

7                    *  *  *  *  *

8                    <u>TUESDAY, JULY 21, 2009</u>

9                    (Voir Dire was conducted, and a jury

10    consisting of 12 jurors and two alternates was sworn

11    to try the case.)

12                   THE COURT:  Now I am going to give you some

13    admonitions, and as the trial goes on, at certain

14    breaks I may refer to the admonition and not repeat

15    this entire instruction to you, but it's important

16    that you keep these things in mind until the trial is

17    completed.  You are not to discuss this case with

18    anyone, whether members of your family, people

19    involved in the trial, or anyone else.  That includes

20    your fellow jurors.  If anyone approaches you and

21    tries to discuss the trial with you, please let me

22    know about it immediately.  You can do so by

23    contacting one of the court officials that you have

24    seen here in the courtroom.  Also, you must not read

25    or listen to any news reports about the trial, if any

1     there may be.  And you also shouldn't do, and must

2     not do, in fact, any research or investigation on

3     your own about the matters involved in this trial.

4          As I alluded to earlier, that includes such

5     things as getting on the internet and trying to find

6     out more about any of the subjects here.

7          We talked about file sharing programs.  We

8     talked about how computers worked.  We talked about

9     child pornography.  We have talked about all sorts of

10    things here.  It would be very tempting for a person

11    to say, I think I would be a better juror if I went

12    out and Googled some of these things and tried to get

13    some information about them.  That would be a very

14    logical inclination for a person to have in this day

15    and age.  Don't do it.  That would violate your oath

16    that you just took as a juror.  You are to decide

17    this case solely on the evidence presented in the

18    courtroom and the law which I will give you and on

19    nothing else whatsoever.

20         Finally, once again, remember not to talk to any

21    of the participants in the case or have any contact

22    with them so that we can make sure that there's no

23    question about the impartiality of all involved.

24         We will resume at ten after three.  That will

25    give us enough time to rearrange the courtroom and

1    get set up for the next stage of these proceedings.

2    Ms. Scheurer, please take charge of the jury.

3         Counsel, remain here for just a moment.  As to

4    the jury we are in recess.

5              (The following proceedings were had outside

6    the presence of the jury:)

7              THE COURT:  Is there anything else we

8    should do before we break?

9              MR. CLARKE:  Your Honor, the only thing I

10   would bring up is Mr. Perry, who has made our jury,

11   indicated he was scheduled for some sort of

12   procedure.  We may need to work around his schedule.

13   I was hoping the court could inquire and let us know

14   what our schedule will be for the week.

15             THE COURT:  I'm going to have Ms. Scheurer

16   work with him to get it rescheduled as opposed to

17   working our schedule around that if at all possible.

18   Otherwise, we will let you know if we need to adjust

19   it.  Thank you for raising that issue.  Anything

20   further on behalf of Mr. Frakes at this point?

21             MR. CLARKE:  No, your Honor.

22             THE COURT:  Thank you all very much.  We

23   will reconvene at ten after three.

24             (A recess was taken.)

25             THE COURT:  If we're ready to proceed, we

1  will invite the jury in.  Ms. Scheurer, we're ready

2  when you are.

3            (The following proceedings were had in the

4  presence of the jury:),

5            THE COURT:  Members of the jury, now that

6  you have been sworn, I will give you some preliminary

7  instructions to help guide you through the trial.  It

8  will be your duty to find from the evidence what the

9  facts are.  You, and you alone, are the judges of the

10  facts.  You will have to apply to the facts the law

11  as the court will give it to you.  You must follow

12  the law whether you agree with it or not.

13        Nothing the court may say or do during the

14  course of the trial is intended to indicate or should

15  be taken by you as indicating what the court thinks

16  the verdict should be in this case.

17        The evidence from which you will find the facts

18  will consist of the testimony of witnesses,

19  documents, and other things received into the record,

20  such as exhibits and any facts the lawyers agree or

21  stipulate to or that the court may instruct you to

22  find.

23        Certain things are not evidence and must not be

24  considered by you.  I will list them for you now.

25            No. 1.  Statements, arguments, and questions by

1    lawyers are not evidence.

2         No. 2.  Objections to questions are not

3    evidence.  Lawyers have an obligation to their

4    clients to make an objection when they believe

5    evidence being offered is improper under the rules of

6    evidence.  You should not be influenced by the

7    objection or by the court's ruling on it.  If the

8    objection is sustained, then please ignore the

9    question.  If it is overruled, then just treat the

10   answer like any other.  If you are instructed that

11   some item of evidence is received for a limited

12   purpose only, then you must follow that instruction.

13        No. 3.  Testimony that the court has excluded or

14   told you to disregard is not evidence and must not be

15   considered.

16        No. 4.  Anything you may have seen or heard

17   outside the courtroom is not evidence and must be

18   disregarded.  You are to decide the case solely on

19   the evidence presented here in the courtroom.

20        There are two kinds of evidence: direct and

21   circumstantial.  Direct evidence is direct proof of a

22   fact, such as testimony by a person who says they saw

23   or heard or otherwise perceived something.

24   Circumstantial evidence is proof of facts from which

25   you may infer or conclude that other facts exist.  I

1 will give you further instructions on these as well

2 as other matters at the end of the case, but I do

3 want you to have in mind that you may consider both

4 kinds of evidence, direct evidence and circumstantial

5 evidence.

6   It will be up to you to decide which witnesses

7 to believe, which witnesses not to believe, and how

8 much of any witness's testimony to accept or reject.

9 I will give you some guidelines for determining the

10 credibility of witnesses at the end of the trial.

11   As we have discussed at some length up until

12 now, this is a criminal case, and there are three

13 basic rules about a criminal case that you must keep

14 in mind.  First, the defendant is presumed innocent

15 until proven guilty.  The indictment against him

16 brought by the government is only an accusation and

17 nothing more.  It is not proof of guilt or anything

18 else.  The defendant, therefore, begins the trial

19 with a clean slate.

20   Second, the burden of proof is on the government

21 until the very end of the case.  The defendant has no

22 burden to prove his innocence or to present any

23 evidence or to testify.  Since the defendant has the

24 right to remain silent, the law prohibits you in

25 arriving at your verdict from considering that the

1　defendant may not have testified if such should be

2　the case.

3　　Third, the government must prove the defendant's

4　guilt beyond a reasonable doubt.  I will give you

5　further instructions on this point later, but please

6　bear in mind that in this case a criminal case is

7　different from a civil case.  I will give you

8　detailed instructions on the law at the end of the

9　case, and those instructions will control your

10　deliberations and decision.

11　　Now a few words about your conduct as jurors.

12　First, I instruct you that during the trial you are

13　not to discuss this case with anyone or to permit

14　anyone to discuss it with you.  Until you retire to

15　the jury room at the end of the trial to deliberate

16　on your verdict, you simply are not to talk about

17　this case.

18　　Second, do not read or listen to anything

19　touching on this case in any way.  If anyone should

20　try to talk to you about it, please bring it to the

21　court's attention promptly.

22　　Third, do not try to do any research or make any

23　investigation about this case on your own.

24　　Finally, do not form any opinion until all the

25　evidence is in.  Keep an open mind until you start

 1          your deliberations at the end of the trial.

 2              If you wish, you may take notes, but if you do,

 3          please leave them in the jury room when you go from

 4          here at night and remember that they are for your

 5          personal use.  They are not to be given or read to

 6          anyone else except to the extent that you may use

 7          them to refresh your recollection during the jury

 8          deliberation process.

 9              The court reporter is making an official record

10          of the trial, but this is to assist any appeals.  A

11          typewritten copy of the testimony will not be

12          available for your use during deliberations.

13              The trial will now begin.  First, the government

14          will make an opening statement, which is simply an

15          outline to help you understand the evidence as it

16          comes in.  Next, defendant's counsel may, but does

17          not have to, make an opening statement.  Openings

18          statements are neither evidence nor argument.  The

19          government will then present its witnesses, and

20          counsel for the defendant may cross examine them.

21          Following the government's case, the defendant may,

22          if he wishes, present witnesses, whom the government

23          may cross examine.  After all the evidence is in, the

24          court will instruct you on the law, and then the

25          attorneys will present their closing arguments to

1    summarize and interpret the evidence for you.  After

2    that you will retire to deliberate on your verdict.

3         With that I will recognize counsel for the

4    government, Ms. Martin, for the purpose of making

5    opening statement.

6              (Opening statements were made by the

7    parties, after which the following proceedings were

8    had:)

9              JOHN HOWE,

10   having been duly sworn, was examined and testified as

11   follows:

12   <u>DIRECT EXAMINATION</u>

13   BY MS. MARTIN:

14   Q.   Detective, can you tell us what you do for a living.

15   A.   I am a police detective with the Independence

16   Missouri Police Department.

17   Q.   How long have you been a detective with the

18   Independence Missouri Police Department?

19   A.   Since 2001.

20   Q.   Before becoming a detective, were you a police

21   officer?

22   A.   Yes.

23   Q.   Can you tell us if you received any special training

24   to become a police officer.

25   A.   We attend a basic 855-hour police academy.

```
 1   Q.   What positions have you held within the police

 2        department during the time you've been a police

 3        officer?

 4   A.   From 1998 to 2001 I was in patrol, responsible for

 5        handling calls for service.  From 2001 to current I

 6        have been a detective.

 7   Q.   You've also worked on the drug task force, and you

 8        were also involved in intelligence unit; is that

 9        correct?

10   A.   That's correct.

11   Q.   What are your current duties?

12   A.   I'm assigned to the special victims unit

13        investigating child exploitation crimes.

14   Q.   How long have you done that?

15   A.   Since March of 2007.

16   Q.   Did you receive any special training to become a

17        detective who investigated crimes involving child

18        pornography?

19   A.   Yes, I have.  I have attended the Internet Crimes

20        Against Children Investigative Techniques class, the

21        undercover class, and then also an Operation Fair

22        Play Peer-to-Peer Instructor course.

23   Q.   Okay.  And can you tell us, what are -- you said

24        peer-to-peer instructor course, and what are

25        peer-to-peer cases?
```

1    A.    Basically, what we learned to do was to investigate

2          individuals who were trafficking in child sexual

3          abuse images by using Limewire, Kazaa, other file

4          sharing programs that operate off of the Gnutella

5          Network.

6    Q.    And peer to peer means one computer can talk to a

7          peer computer and download images from it; is that

8          safe to say?

9    A.    That's correct.

10   Q.    And that's where the name comes from?

11   A.    That's correct.

12   Q.    How did you become involved in the investigation of

13         this defendant?

14   A.    On March 12, 2008, I checked a list of recently seen

15         IP addresses, internet protocol addresses, that had

16         been seen in possession and offering for distribution

17         known or suspected child pornography images, and at

18         the time that IP address was 70.128-254-252.

19   Q.    Can you explain to us, what is an IP address?

20   A.    An IP address is like your street address of your

21         house.  Every computer is assigned an IP address.

22   Q.    So this address that you're talking about, it gets

23         assigned at a specific date and time to a specific

24         computer; is that correct?

25   A.    That's correct.

1  Q.  So you were investigating cases involving the sharing

2      of child pornography, and you located the IP address

3      that you just read to the jury?

4  A.  That's correct.

5  Q.  And what was significant about that IP address?

6  A.  Specifically, it had been seen sharing known or

7      suspected child pornography images.  So from that

8      point I opened a tool that is called Phex -- it's

9      also a peer-to-peer software -- and entered that IP

10     address and conducted a browse host of that IP.

11 Q.  Okay.  While you were doing this, did you do anything

12     to save what you were doing so you could show the

13     prosecutor or the jury the steps you took in

14     investigating this case?

15 A.  That's correct, I did.

16 Q.  What was that?

17 A.  During a portion of the download that I later got, we

18     used Camtasia, which is screen capture software,

19     where it basically takes a video of the screen, of

20     what's going on on the computer monitor at that time.

21     We also used during the connection between the two

22     computers what's called Netstat, which documents the

23     direct connection between my undercover computer and

24     the computer located at that IP address.

25 Q.  Okay.  I'm going to hand you what's been marked as

1      Government's Exhibit No. 1.  Can you tell us what

2      that is.

3  A.  Yes.  This is the Camtasia capture that I just spoke

4      of.

5  Q.  Okay.  Have you reviewed Government's Exhibit No. 1?

6  A.  Yes, I have.

7  Q.  And is that a true and accurate recordings of the

8      steps that you took to capture what you were doing on

9      that day?

10 A.  That's correct.

11             MS. MARTIN:  Your Honor, I would offer

12     Government's Exhibit No. 1.

13             THE COURT:  Any objection?

14             MR. CLARKE:  Your Honor, we have seen it.

15     I have no objection.

16             THE COURT:  Exhibit No. 1 is admitted.

17             (Exhibit 1 was admitted into evidence.)

18 Q.  (By Ms. Martin) Would it be beneficial to explaining

19     the steps that you took to locate these images of

20     child pornography to play this screen capture?

21 A.  Yes, it could be.

22 Q.  Okay.

23             MS. MARTIN:  Your Honor, with your

24     permission I would like to have him begin playing,

25     and I'll ask him questions as he goes through it.

1          THE COURT:  Without objection you may

2     proceed.

3  Q.  Can you tell us what we see now.

4  A.  Yes.  Just a second.  This shows a Phex window.  Phex

5     is essentially like Limewire and Kazaa and all of the

6     other platforms that operate Gnutella Network.  We

7     use Phex.  It's a publicly available software.  And

8     here you can see that I was using Phex version

9     3.0.2.100.  And what this screen right now is showing

10    is the different files that I'm attempting to

11    download.

12  Q.  All right.  And when you talk about Phex, just for my

13    clarification, Phex would allow you to look at

14    Limewire, Kazaa, all of the other softwares; whereas,

15    if you used Limewire, you could only look into

16    Limewire?

17  A.  Correct.  That is my understanding, yes.

18  Q.  Okay.  All right.  So then prior to this screen

19    coming up you indicated you did a browse host?

20  A.  Yes.

21  Q.  And is that shown -- is that depicted on this film as

22    well?

23  A.  No, that is not.  I actually started that later.  The

24    browse host was conducted, and this video was started

25    once I started receiving downloads.

```
1   Q.   Can you tell us, what is a browse host?

2   A.   Yes.  A browse host is basically where I'm making the

3        request to view what files another person is sharing

4        with the public.  Messages sent in this case, the

5        subject was using Limewire, and a request is sent to

6        Limewire asking for its file listing.  At that time

7        you know that you have a direct connection with the

8        other computer because it's not possible unless that

9        person, in this case Limewire, was up and running.

10       It then receives a list of the files that were

11       available at that time.

12  Q.   Okay.  So in other words, it allowed you to see all

13       the files in the share folder on that computer?

14  A.   Correct.

15  Q.   I'm going to show you what has been marked as

16       Government's Exhibit No. 18.  Before we talk about

17       it, let me ask you a couple questions.  You said you

18       conducted this browse host.  You didn't capture it on

19       your video, but did you do something to retain the

20       file listings you saw?

21  A.   Yes.

22  Q.   What is that?

23  A.   Once we obtain the file listings, we use cut and

24       paste operations to paste that information into a

25       software that we use called Grid Sleuth, and from
```

1    there we're able to compare the SHA1 values of the

2    file itself to known or suspected child pornography.

3    That information is also later saved and included in

4    the case file.

5  Q.  So once you did the browse host, you cut and pasted

6    the full shared folder that you found on that

7    computer and you cut and pasted it into your

8    computer, essentially?

9  A.  Correct.

10  Q.  All right.  Now, tell me about Government's Exhibit

11    No. 18.

12  A.  This is the file listing that was obtained on

13    March 12, 2008.

14  Q.  And that's the full listing of the share folder that

15    you were looking at on that day that you just

16    discussed?

17  A.  That's correct.

18          MS. MARTIN:  Your Honor, I would offer

19    Government's Exhibit No. 18.

20          THE COURT:  Any objection?

21          MR. CLARKE:  Perhaps I would like to look

22    at the exhibit briefly.

23          THE COURT:  You may.

24          MR. CLARKE:  No objection.

25          THE COURT:  Very well.  Exhibit 18 is

1      admitted.

2              (Exhibit 18 was admitted into evidence.)

3   Q.   (By Ms. Martin) All right.  You used some terms that

4        I'm not all that familiar with when you were

5        discussing what you did after you did the browse

6        host.  Once you did the browse host, you were able to

7        see a list of all of the files in the shared folder?

8   A.   That's correct.

9   Q.   So you were able to see the titles?

10  A.   Correct.

11  Q.   And did you believe that some of the titles were

12       indicative of images or movies that contained child

13       pornography?

14  A.   That's correct.

15  Q.   So what did you do to try to further investigate

16       whether any of those movies or videos did contain

17       child pornography?

18  A.   From there we compare the file listing to a file that

19       is located on our computer that basically compares

20       the SHA1 value, the SHA1 Base 32, to the file listing

21       to see what is known and what is suspected child

22       pornography.  That way you're not having to go

23       through thousands of files to find certain things.

24  Q.   Okay.  And there were quite a few files in this share

25       folder?

```
 1   A.   That's correct.
 2   Q.   Now, back to this -- the steps that you were taking.
 3        You said on this screen that we're looking at now it
 4        has a list of movies that you're trying to download.
 5        From where are you trying to download them from?
 6   A.   I'm attempting to download these from the IP address,
 7        70.128.254.252.
 8   Q.   Okay.  And those files are also listed in
 9        Government's Exhibit No. 18; correct?
10   A.   That's correct.
11   Q.   All right.  So then what did you do?
12   A.   Once you locate the file that you would like to
13        download, you double click on the file, and it begins
14        attempting to download that file.
15   Q.   Okay.  So what happens then?
16   A.   As you can see on the screen there, the first video
17        has already started downloading.  It shows a
18        percentage of how much has been downloaded thus far,
19        the amount, the rate, the estimated time that it's
20        going to take to finish downloading it, and the
21        status shows if it's downloading, if it's in cue, and
22        what exactly is going on with it.
23   Q.   So that first video, can you tell us what video you
24        downloaded?
25   A.   The first video was PtHC lolly fuck kimmy 14 yo
```

1           new.mpg.

2      Q.   Can you tell us what PtHC stands for.

3      A.   It's preteen hard core.

4      Q.   Is that a term that's common amongst people who

5           traffic in child pornography?

6      A.   Very common, yes.

7      Q.   What is it usually supposed to be?

8      A.   Preteen hard core usually depicts preteen children

9           engaged in sexual activity, sexual intercourse, and

10          usually harder material than -- there's other terms,

11          preteen soft core, which is usually what some

12          consider to be a mild pornography.

13     Q.   Okay.  So what did you do then?  While this was

14          downloading, what did you do?

15     A.   I continued to hit Netstat so I could document the

16          direct connection between the two computers and

17          basically waited for it to download.

18     Q.   You said that you found this IP address, and it was

19          hooked to a specific computer, and that computer was

20          running what file sharing program?

21     A.   Limewire.

22     Q.   Can you tell us, what is Limewire?

23     A.   Limewire is a file share program that also runs off

24          of the Gnutella network.  The Gnutella network is

25          basically the backbone for many different platforms,

```
 1           and the main difference between them is the
 2           appearances of them.
 3     Q.    Can you tell us, how does Limewire work?
 4     A.    Once it's downloaded and installed on your local
 5           machine, you can enter search terms, anything that
 6           you can remember, and it will return a list of files
 7           that match that search term.
 8     Q.    All right.  So if I were to use Limewire and I wanted
 9           to download some music, I could type in a term --
10           let's say I wanted to download Elton John's Yellow
11           Brick Road and I typed in that search term.  What
12           would happen?
13     A.    It's going to go out and -- with the file sharing
14           programs you're connected to what is called the ultra
15           peers.  Ultra peers are different computers across
16           the world that are also on the file sharing software,
17           and at times they can be indexing servers, and
18           there's no rhyme or reason to how that happens, but
19           you send a request out, and it's going to be
20           connected to a lot of other different computers, and
21           it's going to find who has that specific file that
22           you're looking for because every time Limewire opens
23           up, and all the other softwares, it automatically
24           caches all the files that you have in your shared
25           file and reports that to the ultra peers that you're
```

1          connecting to.

2    Q.    What does that look like to me if I have typed in a

3          search term that's Elton John Yellow Brick Road?

4          What does it look like on my computer screen?

5    A.    Basically, once you enter the search term and hit

6          enter, there's a section that shows the different

7          file listings.  Those are going to start populating,

8          depending on the popularity of the search term,

9          sometimes rather quickly, and there's usually a

10         progress bar that goes from zero to 100 percent.

11         Once it's done, you can review the different files

12         and select what you want to download.

13   Q.    So it gives me a list?

14   A.    Correct.

15   Q.    All right.  And so once I have that list, does that

16         song automatically get put into my shared folder?

17   A.    No.  To be able to get that file, you actually have

18         to double click on the file and then allow that to

19         download.

20   Q.    So if I double click on the Yellow Brick Road song,

21         then it downloads into -- where does it go?

22   A.    It's going to go into the predetermined location that

23         was set up during installation of Limewire.

24   Q.    And that's usually -- what's it called, I guess is

25         what my question is.

1    A.    Your shared folder.

2    Q.    So that song then would be in My Shared Folder?

3    A.    Correct.

4    Q.    Is there any way -- is it possible for someone --

5          let's say both of us are using the Limewire software.

6          Is it possible for me to put things into your shared

7          folder remotely?

8    A.    Not that I'm aware of, no.

9    Q.    So in order for it to be inside the shared folder,

10         you would have to go out and search for it and double

11         click on it and put it in your shared folder?

12   A.    Correct.  Or it can be manually downloaded or removed

13         from a different location on your computer.

14   Q.    Now, can you delete things?  Once you get something

15         into your shared folder, is it there forever?

16   A.    No.  You have the ability to delete it.

17   Q.    Can you tell us how Limewire is installed?

18   A.    Yes, I can.

19   Q.    Okay.  Before we get there, let me hand you what's

20         been marked as Government's Exhibit No. 3.  Can you

21         tell me what that is.

22   A.    Yes.  This is a disk that contains a video of the

23         Limewire installation and also PowerPoint that

24         contains screen captures of the installation as well

25         as PowerPoint presentation on SHA1 values.

1  Q.  Would that PowerPoint presentation, would that be

2      helpful to you to explain to the jury how Limewire

3      was installed?

4  A.  Yes, it would.

5          MS. MARTIN:  Your Honor, I would offer

6      Government's Exhibit No. 3.

7          THE COURT:  Is there any objection?

8          MR. CLARKE:  No, your Honor.

9          THE COURT:  Exhibit 3 is admitted.

10         (Exhibit 3 was admitted into evidence.)

11 Q.  Let's start with the PowerPoint presentation with

12     Limewire.  Can you pull that up for me.

13 A.  Yes.

14         MR. CLARKE:  Your Honor, if I may, I don't

15     know if the jurors might be confused about this, but

16     it occurs to me that Ms. Martin's introducing these

17     exhibits, he's taking them, and she's not explaining

18     that he's already put them on the computer.  So what

19     they are seeing is the same thing, but he's not using

20     those disks, but it is what -- what is on those disks

21     is what they are seeing.

22         MS. MARTIN:  I would say for purposes of

23     the record we made a disk but for purposes of ease of

24     playing we downloaded them onto the computer.

25         THE COURT:  I assume there's no objection

1        to Ms. Martin doing it that way.

2                    MR. CLARKE:  That's correct, your Honor.

3                    THE COURT:  Very well.  You may proceed.

4                    MS. MARTIN:  Okay.

5    Q.   (By Ms. Martin) So tell me what I'm seeing here.

6    A.   This is actually a PowerPoint I created that contains

7         screen captures of the different steps to install

8         Limewire.

9    Q.   Okay.  And this version of Limewire that you're --

10        you've created the PowerPoint for, is that the same

11        version of Limewire that was found on the defendant's

12        computer?

13   A.   That's correct.

14   Q.   Go ahead.  So when somebody wants to install Limewire

15        onto their computer, is this the first screen that

16        they see?

17   A.   Yes.  Actually, in order to install Limewire, the

18        basic version of it is free.  You can Google

19        Limewire, and it's going to return a list of a lot of

20        different places where you can download it from.

21        Once it's downloaded onto your computer, it comes in

22        an executable package, basically, where you can

23        double click it and begin the installation process of

24        that.  This first screen is the first screen you see

25        after you double click that, and it's asking you to

1          select language.

2    Q.    I assume the default language is English?

3    A.    Correct.

4    Q.    So then what happens?

5    A.    After you hit okay for English, this is the next

6          screen, the setup screen.  That basically thanks you

7          for choosing Limewire, tells you it's free, and you

8          have to click "next" to continue with the

9          installation.

10   Q.    So you have to do all of these steps before it will

11         be installed onto your computer?

12   A.    That's correct.  After you hit next, it asks you for

13         a destination folder.  By default it goes to the C

14         drive, program files, and then Limewire.  To the

15         right is a browse button where you can change that if

16         you would like, and it tells you the space that's

17         required and how much available space you have on

18         your computer.

19   Q.    So if you don't tell it any differently, it will be

20         found under the programs directly?

21   A.    That's correct.

22   Q.    Then what does a person have to do?

23   A.    The next screen just shows -- if you were to hit

24         browse, it brings up this dialogue box that allows

25         you to select where you would like to install it.  As

```
 1            soon as you hit next, it begins unbundling,

 2            unpackaging the file itself and installing.

 3     Q.    Once you've got it downloaded, what happens then?

 4     A.    It gives you a message that it's been installed

 5            successfully, asks you if you want to run it.  When

 6            you click finish, Limewire sets up; a dialogue box

 7            appears and tells you that the setup wizard is going

 8            to help you configure Limewire for optimum

 9            performance.

10     Q.    What does that mean exactly?

11     A.    The different steps are going to allow you to select

12            whether you have dial-up or cable modem or T1,

13            different connection speeds, on your internet.

14     Q.    Okay.  And so once you click next?

15     A.    Next is, it's asking you -- actually, it's telling

16            you that this is right now where by default your

17            saved files are going to be, and this is also the

18            folder that's going to be shared with other Gnutella

19            users by default.

20     Q.    Now, in this particular example it shows that the

21            shared folder is under documents and settings slash

22            administrator slash shared?

23     A.    Correct.

24     Q.    Why is that?

25     A.    Because that's how on my undercover machine -- my
```

1    user account is administrator, so if my user account

2    would have been John Doe, it would be say C,

3    documents and settings, John Doe, and then shared.

4  Q.  So if I were doing it -- and I have more than one

5    profile on my computer, but I log in under my

6    profile, and I download Limewire, it will say Kim

7    Martin?

8  A.  Correct.  Whatever your user name is named, that's

9    where it's going to install.

10 Q.  Then what happens?  I'm sorry.  Before we go there,

11   this is the default setting, and it says the folder

12   will be shared with others by default?

13 A.  Correct.

14 Q.  Does that mean he doesn't have to share?  In other

15   words, does it mean that he can turn off the sharing

16   function?

17 A.  Yes.  There's an option in his Limewire so that you

18   can turn off the sharing function, but by default

19   Limewire packages it so that you are sharing because

20   it optimizing the performance of the network.  With

21   more people sharing more files, you can get different

22   pieces.

23 Q.  Okay.

24 A.  Once you hit next, if I can back out, by default it

25   goes to this.  If you were to hit the browse, it

 1        brings up this dialogue box and gives you the option

 2        to place wherever you would like.

 3   Q.   So it doesn't have to be under my profile name?  I

 4        can put it somewhere else?

 5   A.   Correct.  You can put it wherever you would like.

 6        Once you've hit next, this is where you configure

 7        your connection speed.  If you don't know, you try to

 8        make your best guess.

 9   Q.   All right.

10   A.   Once you hit next, this is asking you if you want

11        Limewire to start automatically every time you turn

12        on your computer by default.  It's checked so that it

13        will start automatically.  You have the ability to

14        uncheck the box and not have it start.

15   Q.   Okay.  So if you don't want it to start, you want to

16        decide when you're making things available to share,

17        you can uncheck that box, and then you would have to

18        start it manually?

19   A.   That's correct.  Once you hit "next," it's going to

20        ask you about enabling content filtering so that

21        basically Limewire can filter files that copyrighted

22        owners don't want to be shared, and by default that's

23        turned off.

24   Q.   So there won't be any filtering unless you choose to

25        filter?

1    A.   Correct.

2    Q.   Okay.

3    A.   Once you hit next, it tells you that you've finished

4        installation of this and you need to hit the finish

5        button.  Once you hit the finish button, it's already

6        open in the background, but these dialogue boxes go

7        away, and you can start typing in whatever search

8        terms you would like.

9    Q.   Where would you type in a search term?

10   A.   On the left-hand side of the screen in bold there's

11       all types.  Under file name you're going to type in a

12       search term of your choosing and then hit search, and

13       it's going to return a lot of files.

14   Q.   Okay.  And so that's where I would type in Yellow

15       Brick Road or Elton John's Yellow Brick Road?

16   A.   That's correct.

17   Q.   I think we already discussed whether or not somebody

18       can disable the sharing function.  If I want Limewire

19       and I want to use it to be able to go out and

20       download music or movies but I don't want people to

21       be able to get anything off my computer, I can turn

22       that off?

23   A.   That's correct.

24   Q.   And is there also -- is there another way, if I

25       download something into my share folder, but I don't

1   want to share it with everybody, is there another way

2   besides disabling the share function where I can

3   remove something?

4   A.   Yes.  You can actually either just go into your

5   shared folder and remove it and put it somewhere

6   else, or there's features in Limewire where you can

7   exclude certain files.

8   Q.   So I can select a file -- if I downloaded a movie and

9   I don't want other people to see it, I can select

10   that movie and move it to another place on my

11   computer?

12   A.   That's correct.

13   Q.   So the images of child pornography that you saw in

14   the shared folder, those could have been removed out

15   of the shared folder if he didn't want to share them

16   with other people?

17   A.   That's correct.

18   Q.   So what did you do after you discovered that this IP

19   address was up and running?  You said that you ran

20   SHA values.  Can you tell me what those are.

21   A.   SHA1 Base 32 hash value is basically a digital

22   fingerprint or serial number of a file.  It allows

23   you to know because of that digital fingerprint what

24   you're downloading before you download it.

25   Q.   Okay.  And did you also create a PowerPoint that

1          would explain what a SHA value is?

2     A.   Yes.

3     Q.   Is that also located on Government's Exhibit No. 3?

4     A.   That's correct.

5               MS. MARTIN:  Your Honor, at this time I

6          would ask that the witness be allowed to play that

7          PowerPoint as we ask questions about the SHA values.

8               MR. CLARKE:  No objection.

9               THE COURT:  All right.  You may proceed.

10    Q.   (By Ms. Martin) So this is the PowerPoint that you

11         made to explain the SHA1 Base 32 values.  Where do

12         you start?

13    A.   Next slide.  The secure hash algorism is basically a

14         mathematical computation of a given file, and it was

15         developed by the National Institute of Standards and

16         Technology along with National Security Agency for

17         use in the digital signature standard, and basically

18         what all that means is that a lot of government

19         agencies came together and wanted a secure way to be

20         able to tell if a file has been altered or if it's

21         been changed and to be able to confirm that this is

22         the same file.

23    Q.   Okay.  So basically that's how it got started?

24         That's how it was created?

25    A.   Correct.  And there's been other algorithms that have

1    been used, and they keep changing.  So this is -- the

2    SHA1, the reason that we're using that is across the

3    Gnutella Network that's how it identifies files, by

4    the SHA1 Base 32.

5  Q.   So basically these agencies both got together and

6    developed a mathematical algorithm?

7  A.   Correct.

8  Q.   And can you explain that further.

9  A.   Yes.  It's a file encryption method that can be used

10    to produce a unique digital signature so that it's

11    computationally infeasible for different files to

12    have the same SHA1 value, and it's 160-bit encryption

13    algorithm.

14  Q.   So basically it's a mathematical equation that each

15    image is assigned?

16  A.   That's correct.  The complexity is two to the

17    sixty-third as of August 17, 2005, and it gives you

18    that long number, comparable to DNA.  Basically, the

19    easiest way to say this is with this next slide, that

20    the SHA1 Base 32 values are 99.9 percent that you're

21    never going to have a collision of two different

22    images having the same digital fingerprint.

23  Q.   Okay.  Did you create an example of how images can be

24    changed?

25  A.   Yes, I did.

1 Q. Can you show that to us.

2 A. Real quick, if I can, the base 16 is a 40-character

3 algorithm, and the Base 32 is 32 characters.

4 Q. Is that similar to points of a fingerprint?

5 A. Correct.

6 Q. So you're saying Base 32, they require 32 points of

7 matching before it will be matched as an image?

8 A. That's correct. For example, I downloaded an image

9 of this flower pot. It was off the internet. With

10 the tools that we have available, I hashed it and

11 obtained the SHA1 Base 32 value of what is shown on

12 the screen. Do I need to read that?

13 Q. For the record it's

14 SQEYLUP44RF7D7G3I3HI2KSNZ3J7QQAO; is that accurate?

15 A. Correct. So with this you've got the baseline SHA1

16 Base 32 value, and I next added one brush stroke,

17 which ended up changing four pixels on the picture.

18 As you can see right in the center, there's a white

19 square where my curser is pointing with that change

20 being made. I rehashed it. It was saved as the same

21 file name, and it comes up with a completely

22 different SHA1 Base 32, that is,

23 FF5G7PIMH63CDC76P4PZQ18E24X2IPPCGL, and the arrow

24 there shows the difference between.

25 Q. That's where the change was made?

1    A.    That's correct.

2    Q.    Do you have a side-by-side comparison?

3    A.    Yes.  With the original picture on the top it shows

4          the SHA1 value, and with the change being made it

5          shows that SHA1 value.  So one change as simple as

6          one brush stroke will dramatically change it.  By

7          changing the file name itself, by renaming the file,

8          it doesn't -- there's no change that's actually made

9          to the file, so that doesn't cause the SHA1 to

10         change, but making a change like I did will change

11         it.

12   Q.    What is the importance of that in your work as an

13         investigator in a child pornography case?

14   A.    Well, by using the SHA1 base, if we come across new

15         images of child pornography, we can flag that so that

16         other investigators can basically be on the lookout

17         for those images that are being trafficked.  When I

18         get a file list and I run that file list through the

19         local SHA file that's on my computer, I know

20         immediately how many files are known or suspected

21         child pornography, and it basically makes your job a

22         lot faster, and it keeps you from downloading viruses

23         and other things.  This way we know exactly what

24         we're downloading.

25   Q.    And did you do that in this case?

1    A.    Yes.

2    Q.    And explain to me again how you ran the SHA1 values

3          in relation to the share folder listing that you saw

4          on the computer.

5    A.    Yes.  Once we -- once I sent the request for this IP

6          address of 70.128-254-252, it gives me the file list.

7          I copy and paste that into software called Grid

8          Sleuth.  That's a law enforcement tool that was

9          written by the Wyoming Internet Crimes Against

10         Children Task Force.  I paste that in there, and I

11         click a button that is within that tool that says

12         check SHA, and then that returns a list of SHA values

13         that are known or suspected child pornography.

14   Q.    And once you got a list of the movies that were known

15         or suspected child pornography, you targeted two of

16         them for downloading?

17   A.    That's correct.

18   Q.    I'm going to show you what has been marked as

19         Government's Exhibit No. 2.  Can you tell me what

20         that is.

21   A.    Yes.  This is a CD that contains the two files that I

22         downloaded from that IP address on March 12, 2008.

23   Q.    Have you reviewed it prior to today?

24   A.    Yes, I have.

25   Q.    Does that Government's Exhibit No. 2 contain an

1      accurate depiction of the movies that you downloaded

2      from that computer on that day?

3  A.   That's correct.

4           MS. MARTIN:  Your Honor, I would offer

5      Government's Exhibit No. 2.

6           THE COURT:  Any objection?

7           MR. CLARKE:  Your Honor, for purposes of

8      demonstrating what Detective Howe downloaded that

9      day, no, no objection, to the extent that that's what

10     it shows; correct.

11          MS. MARTIN:  Your Honor, maybe we should

12     approach.

13          THE COURT:  Yeah.  I probably need some

14     clarification.

15          (Counsel approached the bench and the

16     following proceedings were had:)

17          MS. MARTIN:  These are the actual movies

18     that he downloaded on that day.

19          MR. CLARKE:  Right.

20          MS. MARTIN:  I'm going to admit them as the

21     movies he downloaded and then play them.

22          THE COURT:  What was the purpose of your

23     sort of caveat on your statement?

24          MR. CLARKE:  That's what I was wondering,

25     whether they were going to play them at this point.

1    I'm not sure they become relevant at this point

2    beyond establishing that's what he downloaded from

3    the computer.  I suppose at this point the

4    prejudicial value may outweigh the probative value.

5          THE COURT:  There are a couple questions.

6    The first would be the admissibility of the exhibit;

7    the second would be what might be done with it once

8    it's admitted.  If it were admitted for some purpose

9    less than the full purpose for which the government

10   seeks to offer it, I understood your opening

11   statement -- and correct me if I'm wrong -- that it's

12   part of the government's theory of the case that by

13   having the computer configured the way it was,

14   thereby permitting Mr. Howe to access these files,

15   that that constituted distribution of child

16   pornography by whoever it is who is responsible for

17   those files having been there.

18         MS. MARTIN:  That's correct.

19         THE COURT:  You are offering this to prove

20   that child pornography was distributed by whoever it

21   was that was responsible; correct?

22         MS. MARTIN:  Correct.  And I was going to

23   say with regard to the relevance issue I think we

24   have a stipulation that I'm prepared to read after

25   this witness that will identify that IP address as

1    having been assigned to the Frakes computer at the

2    date and time, so that makes it relevant.

3         MR. CLARKE:  Sure.  I don't disagree with

4    that.  I guess the issue is, has there been enough

5    shown that my client was responsible for those images

6    being on the computer?  Because it's obviously very

7    inflammatory to show these videos at this point.

8         THE COURT:  I'm going to overrule your

9    objection.  The reason is this:  If the government

10   never submits enough evidence to tie your client to

11   it, your remedy is a Rule 29 motion.  If they haven't

12   produced that evidence, the case is over, and the

13   jury may think badly of something for something seen

14   in the videos, but that's not really something that

15   is pertinent at this juncture, I think.  So the

16   government has proffered the relevance of it.  I

17   assume you are proffering as well that you would be

18   tying this up with evidence linking it to at least

19   the government's theory of the case of how this is

20   attributable to Mr. Frakes; is that correct?

21        MS. MARTIN:  And I think, as I said in my

22   opening statement, those two videos that were

23   downloaded by Detective Howe were found on the

24   defendant's computer.  As I said, in the stipulation

25   that IP address was assigned to the computer at the

1    defendant's house on that date and time.

2              MR. CLARKE:  We're not challenging that.

3              THE COURT:  I understand, but I don't see

4    any basis to object under all these circumstances

5    unless there's a stipulation that these videos do

6    constitute child pornography as defined by the law,

7    and maybe not even then, but if there were such a

8    stipulation that these videos constituted child

9    pornography as defined by law, that would take away

10   at least one of the bases on which these would be

11   relevant, that is, to prove that they are indeed

12   child pornography.  There may be other bases for

13   playing them, but absent such a stipulation, it's

14   incumbent upon the government to prove that they are

15   child pornography as defined by law; therefore, it is

16   not a matter where the prejudicial effect outweighs

17   the probative value because, indeed, the government

18   has to prove they are child pornography, so I don't

19   see any basis yet for sustaining any objection, and

20   so therefore I will overrule it.

21             MR. CLARKE:  I would note that Mr. Frakes

22   has offered to stipulate that the videos are --

23   contain child pornography as we have generally

24   discussed it.

25             THE COURT:  Okay.  Let's come back to talk

1      about that.  Are there other independent reasons why

2      showing the video -- if there were a stipulation that

3      the videos constitute child pornography, is there any

4      independent basis to show the videos to the jury?

5                MS. MARTIN:  I think there is an

6      independent basis.  First of all, the stipulation

7      was -- as he was walking out the door, he said, we

8      would be willing to stipulate, as an offhand comment.

9      I didn't take it as a serious offer.

10               THE COURT:  Sure.  But there's an

11     opportunity still to deal with that at this juncture,

12     but my question is, is there some basis apart from

13     the trier of fact determining that the videos

14     constitute child pornography that playing the videos

15     becomes relevant?

16               MS. MARTIN:  A couple of things.  First, I

17     believe that it is the jury's decision to determine

18     whether or not they are, in fact, images of child

19     pornography, so I think that takes away the trier of

20     fact's ability to look at the images and evaluate for

21     themselves whether they are or not child pornography.

22     The defendant has said there were very few movies

23     that contained child pornography.  I think he said

24     1.5 percent; however, I think the evidence will show

25     that there was a long, long list of names, titles

1    that would be indicative of child pornography.  In

2    other words, the defendant was out searching for

3    child pornography.  What he got turned out not to be

4    child pornography.  So I think it's important to show

5    that he did knowingly possess the child pornography

6    because he actually had to type in search terms that

7    would create that list from which these titles could

8    be shown, and I do believe that even one of these two

9    videos -- the first one, there's no question that it

10   is child pornography.  The second one has a title

11   indicative of child pornography, but it's a question

12   whether or not there is -- whether or not those girls

13   are 15 and 14, as the title would suggest.  So I

14   think that it is relevant for the trier of fact in

15   order to determine the defendant's knowledge of the

16   child pornography and his intent to possess it.

17            THE COURT:  Mr. Clarke, I'll give you one

18   last shot.

19            MR. CLARKE:  Thank you.  I suppose two

20   things in response.  One, the title of the movies is

21   a different issue.  In fact, I think the government's

22   already introduced evidence of what the titles of the

23   movies are, and we understand the reason why they

24   want to introduce the titles.  We don't object

25   because we understand that it would be relevant.  The

1    title's already in.  You don't need to see the movies

2    to understand what the titles show, although I would

3    submit that I don't think the evidence will

4    necessarily show that because those are the titles

5    those were necessarily the search terms.  But the

6    other issue is she said if we go to the stipulation

7    that's removing it from the jury.  That makes no

8    sense.  I mean, you know, you're admitting something,

9    but you would rather take a chance if they have a

10   choice.

11             THE COURT:  As I recall, you all correct me

12   if I'm wrong, but as I recall, the cases that were

13   cited after Old Chief, what the court basically said

14   was that where you're talking about something which

15   is an element in the government's case-in-chief, they

16   are not compelled to accept a stipulation.  There may

17   be other times when it is somehow collateral, still

18   relevant, still material, but collateral, in which

19   the government might be compelled to, in essence,

20   accept a stipulation, but where it is an element in

21   their case in chief to prove, then the government is

22   entitled to put their evidence on, because in

23   federal court -- I assume in state court as well, but

24   in federal court the stipulation is not binding on

25   the jury in a criminal case.  In a civil case it's

1   binding.  But in a criminal case my instruction to

2   the jury would be, you are to consider this as

3   evidence in the case.  It's not binding though, and

4   that's why the courts, I believe, have taken the

5   position that the government then is entitled to

6   prove, even if it has some prejudicial elements to

7   it, those things which are part of the basic elements

8   of the case.  And here this is a basic element of the

9   case.  That's why I probably spoke a little bit

10  prematurely in even throwing out the stipulation, but

11  certainly the government might have chosen to

12  approach it differently, but in light of the

13  government's position, I think the objection should

14  be overruled and the government should be permitted

15  to proceed.

16      Now, there is another issue that may or may not

17  have to be dealt with.  That is the cumulative nature

18  at some point of the showing of materials.  For

19  example, with regard to any particular video,

20  offhandedly at least, I don't see any reason why that

21  video should be played more than one time.  The

22  government has no disagreement with that?

23      MS. MARTIN:  No.

24      THE COURT:  Nor do I think there should be

25  a sort of parading of videos that simply cast the

1    defendant in an unnecessarily bad light that go

2    beyond the government's establishing the elements it

3    has to establish.  I don't know where that line is,

4    but to make a bad comment, you know it when you see

5    it.  So if we get to that point, I would be looking

6    for an objection that I would probably sustain.

7         MS. MARTIN:  Your Honor, I might say in

8    order to try to alleviate some of this, I haven't

9    intended to play all of the videos.  One of the

10   issues, we requested a stipulation as to the

11   interstate nexus for the possession, and so we have

12   to play a couple of the videos.  One, the one which

13   is the longest -- and I think it might be almost 20

14   minutes long.  I went back and checked.  Two agents

15   are coming in to testify that they are familiar with

16   the case and these images were produced outside of

17   Kansas.  Those are the victims for which they -- so I

18   wanted the court to be aware of that.

19        THE COURT:  But that is an issue on which,

20   the interstate nexus, a stipulation might be somewhat

21   different.  If the defendant did stipulate to the

22   interstate nexus, I might feel differently because

23   the viewing of the videos themselves wouldn't

24   necessarily have an evidentiary value.

25        MS. MARTIN:  Correct.  We did seek a

1      stipulation.

2              THE COURT:  I leave that to the defendant

3      to decide.  But if there is no stipulation on

4      interstate nexus and if the way the government has to

5      prove the interstate nexus is the way you've

6      described it, well, so be it, but that might be

7      alleviated by a stipulation, and I'll let counsel

8      figure out how you want to proceed in that regard.

9              MS. MARTIN:  Thank you, Judge.

10             (The proceedings returned to open court.)

11  Q.  (By Ms. Martin) I think I asked you if you had

12      reviewed Government's Exhibit No. 2.

13             THE COURT:  First of all, I have now

14      admitted into evidence Exhibit No. 2.

15             (Exhibit 2 was admitted into evidence.)

16             MS. MARTIN:  Thank you, Judge.  I forgot

17      where I had left off.

18             THE COURT:  That's all right.

19  Q.  (By Ms. Martin) Can you tell us what is contained on

20      Government's Exhibit No. 2.

21  A.  The two videos that I downloaded from this IP address

22      that I was investigating.

23  Q.  And can you play the one video that you downloaded

24      that was entitled PtHC Kimmy 14.

25  A.  Yes.  I apologize.  It's gotten moved.  I had a

1      shortcut that was on here.

2   Q.   Do you want to just use the disk?

3   A.   Yes.  That would be easier.  Can I go ahead and play?

4   Q.   Yep.

5              (A portion of Exhibit 2 was played in open

6         court.)

7   Q.   (By Ms. Martin) Now, the other movie that you

8         downloaded, can you tell us what the title of that

9         movie was.

10  A.   Yes, it's 15-yo girl fingers 14-yo friend.mpg.

11  Q.   Have you reviewed that movie as well?

12  A.   I have.

13  Q.   Can you play it for the jury, please.

14             (A portion of Exhibit 2 was played in open

15        court.)

16  Q.   (By Ms. Martin) After you reviewed these movies, what

17        did you do?

18  A.   Based on the downloads, it was collected as evidence

19        and that same day I sent a Jackson County Missouri

20        Circuit Court subpoena to SBC Global Internet

21        Services, which is AT&T.

22  Q.   What information were you asking them to provide?

23  A.   I asked them specifically to identify the subscriber

24        for the IP address 70.128.254.252 on March 12, 2008,

25        at 11:51:45 a.m.

1   Q.   Did they respond to your subpoena?

2   A.   They did.

3   Q.   What did they say?

4   A.   On March 25, 2008, I received a response that

5        identified the subscriber for that IP address at that

6        date and time to be Pam S. Frakes, that the service

7        address for that was 1115 Summit, Atchison, Kansas

8        66002.

9   Q.   So once you discovered that the IP address was

10       assigned to a computer located in Atchison, Kansas,

11       what did that do to your investigation?

12  A.   Because it was located in Kansas, on the Kansas side,

13       I went ahead and referred the investigation to

14       another agency.

15  Q.   Okay.

16            MS. MARTIN:  Your Honor, I have no further

17       questions at this time.

18            THE COURT:  Mr. Clarke, you may cross

19       examine.

20                  CROSS EXAMINATION

21  BY MR. CLARKE:

22  Q.   Detective Howe, you used, I think, the term "offering

23       for distribution."  Do you remember that?

24  A.   Okay.

25  Q.   And you were referring to -- it sounds like you were

1       referring to the Frakes computer; correct?

2   A.  Correct.

3   Q.  Now, when you say offering for distribution, does

4       that mean there was some advertisement out there on

5       the internet that said, come look at this computer,

6       it's got pornography on it?

7   A.  Technically there is.  With the way that the file

8       names -- the way that they are named indicates

9       different search terms that can be used.  So, for

10      instance, PtHC, somebody searching PtHC is going to

11      get a list of files that have PtHC in it.

12  Q.  Well, what you're talking about though is what the

13      computer, the browser, whatever, what the program

14      recognizes as a for sale sign versus what I'm talking

15      about as what you and I see as a for sale sign.

16      There was nothing out on the internet, you know, that

17      said, Frakes computer, here it is, it's got

18      pornography on there; right?

19  A.  I guess it's a difference in wording because with my

20      training it's very indicative of, like I said, the

21      way the file name -- and as I said, every time

22      Limewire starts, it reports the file name, and it

23      reports the SHA1 to ultra peers that it's connected

24      to, saying, these are the files I have available.

25  Q.  And that's the way the whole peer-to-peer networking

1       thing works; right?

2  A.   Correct, yes, sir.

3  Q.   I mean, in a sense that's very different from --

4       well, you're computer savvy; right?

5  A.   Somewhat.

6  Q.   You understand what search engine optimization is?

7  A.   I have never used that, no.

8  Q.   Are you familiar with the term?

9  A.   Vaguely.

10 Q.   All right.  So you have some sense that basically if

11      you set up a website you can pay for your search

12      engines to direct traffic to your website; right?

13 A.   Correct.

14 Q.   All right.  And the way you do that is, depending on

15      which service you use, you bid for search terms. If I

16      have a website and I want to find people who need a

17      really, really, really good defense attorney in

18      Lawrence, Kansas, I can bid on those search terms so

19      that if somebody types in on Google, I need a really,

20      really good defense attorney in Lawrence, Kansas,

21      they will be directed to my website; right?

22 A.   I'm not familiar with that process, sir.  I can't say

23      yes or no.

24 Q.   All right.  When you say offering, is there anyone

25      doing -- any person doing anything active?

1  A.   Whoever is actually -- it's the computer itself at

2       that time that is offering these files for share, but

3       behind that the files don't get there by themselves.

4  Q.   I understand.  But the user, whoever is on Limewire,

5       they are not doing anything actively to offer that.

6       All they have done is installed it on their computer,

7       and they have used it.  The program itself -- when

8       you say offering, it's just what the program does;

9       right?

10           MS. MARTIN:  Your Honor, I'm going to

11      object and ask to approach, please.

12           THE COURT:  You may.

13           MS. MARTIN:  Your Honor, my objection is

14      that the defendant's seeking to include an element or

15      even a defense that's not legally required.  There's

16      no requirement of an act of distribution, and I

17      believe the Schaeffer case from the Tenth Circuit is

18      clear on that point, and so he's leading the jury to

19      believe that something is required that is not

20      required, so I would object.

21           THE COURT:  Mr. Clarke?

22           MR. CLARKE:  Judge, I understand that, but

23      the agent used that terminology "offering for

24      distribution," and it made it sound like somebody was

25      doing something active.  This is simply the operation

1   of the software itself.  That's what I'm trying to

2   get at, because there is a -- there's a knowledge and

3   intent element to this, and if they are under the

4   impression that he was doing something actively, they

5   are more likely to find knowledge and intent versus

6   if it's simply the software doing it.  That cuts

7   another way.

8           MS. MARTIN:  That was also mentioned in the

9   opening statement.  I didn't object at that time

10  because I wanted to see what sort of testimony would

11  come out.

12          THE COURT:  The concern is that the witness

13  used the term "offering for distribution."  I think,

14  Mr. Clarke, that you have clarified what he meant by

15  that and that that is the way in which the computer

16  works.  I think that whether that was relevant or not

17  or whether you could have even objected to and had an

18  objection sustained to his use of the term "offering

19  for distribution," much of that is water over the dam

20  at this juncture.  I think your next question about

21  the person actually out there doing it is largely

22  irrelevant, especially in light of the fact that he

23  described what he meant was that automatically by

24  turning on the program it sends out the message, so

25  to speak, that these files are available.  So I'm

1      going to sustain the objection because I agree with

2      counsel that that does suggest to the jury that it is

3      necessary for distribution purposes for the defendant

4      to have taken a step more affirmative than simply

5      agreeing to set up the Limewire program, getting

6      files into the sharing folder, and making them

7      available to the world.  And I believe the law is

8      roughly what I just described constitutes

9      distribution, so he doesn't need to be having a real

10     world for sale sign.  The virtual for sale sign which

11     was described by the agent is sufficient.

12         Now, if you disagree with Ms. Martin's reading

13     of the law, or mine, help me out, but otherwise I

14     agree with Ms. Martin that it's misleading to the

15     jury to sort of belabor this point further about the

16     necessity of additional affirmative action on his

17     part.

18             MS. MARTIN:  Your Honor, I might say for

19     the record I think that term "offering for

20     distribution" was in the Schaeffer case and they --

21     so that might be --

22             THE COURT:  But that does -- I understand,

23     but it does seem somewhat different, and I think it

24     bears explanation, but that's been done.

25             MS. MARTIN:  Okay.

1          THE COURT:  And that's why I say I think

2     we're at the point where any further is where it

3     becomes misleading unless Mr. Clarke can show me that

4     my understanding of the legal standard is incorrect.

5          MR. CLARKE:  Judge, I don't disagree with

6     the court in terms of what the government has to

7     show.  Again, it goes more towards the issue of the

8     knowledge and intent elements and what the

9     government, I think, is trying to show in their case

10    in chief.  For example, they went through and said,

11    you've made these purposeful elections or you didn't

12    change -- you didn't change the default settings.

13    Well, you know, that counterbalances the arguments

14    they have made.  Well, it doesn't require you to do

15    anything affirmative; then don't make a big deal

16    about you didn't change the default settings.

17          THE COURT:  Except not changing the default

18    settings is the affirmative step that was taken

19    allegedly by whoever did it when the Limewire program

20    was installed by not changing the default setting.

21    That is an affirmative step to say, I'm willing to

22    share the contents of these folders.  So I think

23    that's extremely relevant and extremely pertinent to

24    the distribution issue, that you are faced with a

25    conscious decision whether or not to share and you

1    decide, I am going to stay with the default, which is

2    sharing.  So I see nothing inappropriate about that.

3    So I'm going to overruled the objection.

4            MS. MARTIN:  Sustain?  You said overrule.

5            THE COURT:  Excuse me.  I'm going to

6    sustain the objection.  Let's wrap it up here then

7    for the day.

8            MS. MARTIN:  And bring him back tomorrow?

9            THE COURT:  Yeah.

10          MS. MARTIN:  I assume you're not done?

11          MR. CLARKE:  No.

12          THE COURT:  Are you at a breaking spot?

13          MR. CLARKE:  Yes, Judge.

14          (The proceedings returned to open court.)

15          THE COURT:  Members of the jury, I sustain

16    the objection, and we are now going to take our

17    recess for the day.  We will resume at 9:00 o'clock

18    tomorrow morning, 9:00 o'clock tomorrow morning.  Let

19    me underscore that.  Let me remind you all of the

20    admonitions which I have given about not discussing

21    the case with anyone or having any contact with the

22    participants in the case.  Don't discuss the case

23    among yourselves when you go home tonight, or

24    wherever you go tonight.  I know people want to know

25    what you've been doing, and, of course, you're

1  entitled to tell them that you're involved in a trial

2  in federal court, but please don't tell them what the

3  nature of the trial is.  Don't tell them even that

4  it's a criminal case, let alone the subject matter.

5       The reason I say that is people, out of all good

6  intentions, are likely to give you their views of the

7  world about things of this kind, and that is not

8  evidence, that is not part of what your

9  decision-making process will involve, and there's

10  simply no reason to get into that, further discussion

11  about things.  You'll have plenty of time to talk

12  among yourselves when we get to the deliberation

13  process, and you and you alone will be the people who

14  will have seen the evidence and heard the law which

15  is controlling with regard to the ultimate decision

16  here.  As I said, don't make any investigation or

17  make any attempt to do research or educate yourself

18  more about these things.  Again, we have heard more

19  and more terms about computer language of various

20  kinds, and it would be so tempting to want to -- what

21  was that that he meant by a hash value, or what was a

22  SHA value?  Don't try to find those things out.  All

23  the evidence that you will need to decide the case is

24  presented here on the witness stand, and that's what

25  you have to decide the case based on.

1          Have a good evening.  Ms. Scheurer, please take

2     charge of the jury.  Counsel, please remain here, if

3     you would.  Ms. Silverman, as we go forward, is there

4     a better place for you to sit than that seat?

5          JUROR SILVERMAN:  I'm fine.  I just can't

6     seem to get it together to get up.

7          THE COURT:  Okay.

8          JUROR SILVERMAN:  Thank you, sir.

9          THE COURT:  Sure.

10          (The following proceedings were had outside

11     the presence of the jury:)

12          THE COURT:  I wanted to talk about

13     scheduling here.  First of all, tomorrow I am

14     obligated to break between essentially 11:30 and 1:00

15     o'clock for an administrative matter.  I know that

16     that's not something I put you on notice of

17     yesterday, but it's sort of developed that way.  That

18     means about a half hour extra out of the day

19     tomorrow.  How do you see things going at this

20     juncture, Ms. Martin, in terms of now that we have

21     actually begun the presentation of evidence?

22          MS. MARTIN:  Your Honor, it's a little

23     slower than I thought.  I thought we would get

24     further along with Detective Howe.  I thought we

25     might even finish him today.  I think the jury

1    selection took a little longer than I anticipated.  I

2    think with the stipulations we have we might be able

3    to catch up tomorrow.  I plan to put as much of it on

4    tomorrow as possible and hopefully maybe even finish

5    the evidence first thing on -- that would be

6    Thursday?  Is that Thursday?

7              THE COURT:  Yes, sometime early on

8    Thursday.

9              MS. MARTIN:  And maybe even tomorrow late.

10   I'm not certain.

11             THE COURT:  Mr. Clarke, you indicated in

12   your opening statement that it was likely that

13   Mr. Frakes was going to testify in this case, and,

14   again, I don't want to put you on the spot.  No

15   commitments, any of those things, but as you sit here

16   now, what do you estimate in terms of the

17   presentation of the case from the defense in terms of

18   duration?  I'm always planning in terms of when do I

19   have to have my instructions ready.  That's why I'm

20   inquiring.

21             MR. CLARKE:  Your Honor, I anticipate,

22   assuming Mr. Frakes does testify, that would be the

23   extent of the defense's presentation.

24             THE COURT:  All right.  Thank you.  Is

25   there anything further we should do before we break

1    today?

2                MS. MARTIN:  No, your Honor.

3                MR. CLARKE:  No, your Honor.

4                THE COURT:  Very well.  We are in recess

5    until tomorrow morning at nine.

6                (Court was adjourned.)

7                      * * * * *

8                WEDNESDAY, JULY 22, 2009

9                THE COURT:  If we are ready to proceed, we

10   will have the jury brought in.  It takes a moment to

11   finally get them lined up and so forth, but we're in

12   the process.

13               (The following proceedings were had in the

14   presence of the jury:)

15               THE COURT:  Welcome back, members of the

16   jury.  Mr. Howe, you may resume the witness stand.  I

17   will remind you that you remain under oath.

18               THE WITNESS:  Yes, sir.

19               THE COURT:  And, Mr. Clarke, you may resume

20   your cross examination.

21               MR. CLARKE:  Thank you, your Honor.

22               CROSS EXAMINATION

23   BY MR. CLARKE:

24   Q.   Detective Howe, I want to go back a little bit

25        concerning the software that you were using or the

| | | |
|---|---|---|
| 1 | | programs that you were using on, was it March 12 of |
| 2 | | last year? Because if I recall, you used several |
| 3 | | programs on that day; is that correct? |
| 4 | A. | That's correct. |
| 5 | Q. | And the first one you started off with was Phex, |
| 6 | | P-H-E-X? |
| 7 | A. | That's correct. |
| 8 | Q. | And it works similarly to the Limewire program; |
| 9 | | correct? |
| 10 | A. | Correct. |
| 11 | Q. | And it has a search function that, regardless of the |
| 12 | | underlying workings of how it actually works, it |
| 13 | | works similar to Google or Yahoo, correct, in that |
| 14 | | you can put in a term and it's going to give you |
| 15 | | results based upon the term you typed in to search? |
| 16 | A. | With the exception that the search results are |
| 17 | | actually only that of -- on the Gnutella network of |
| 18 | | other peer-to-peer networks. |
| 19 | Q. | Again, you're typing in search terms, and it's using |
| 20 | | those terms to find what you're looking for? |
| 21 | A. | Correct. Whatever search term you use, it hits on |
| 22 | | key words that are in files. |
| 23 | Q. | And on the morning in question what search terms were |
| 24 | | you using? |
| 25 | A. | I didn't use a search term. |

1  Q.  So you didn't do it the same way the average person

2      using the program would use?

3  A.  No.

4  Q.  How did you then start your search?

5  A.  By entering the defendant's IP address and conducting

6      a browse host that returns the file listing.

7  Q.  Is that something a person using LimeWire could do?

8  A.  Yes.

9  Q.  But so you were not doing a search, term search, if

10     you're just out there looking for -- I think an

11     example was given of looking for Yellow Brick Road;

12     instead, you typed in someone's address, and it took

13     you directly to that computer?

14 A.  Correct.  But it's a little more complicated than

15     that because with the software Grid Sleuth that I

16     talked about yesterday -- that's the law enforcement

17     tool that we use -- I was able to see IP addresses

18     that had been recently seen trafficking in child

19     sexual abuse images, which is how I obtained the

20     defendant's IP address.

21 Q.  All right.  Now, you've used the term trafficking.

22     What do you mean by that?

23 A.  Basically distributing or offering for distribution

24     child sexual abuse images.

25 Q.  When you say offering for distribution, is it the

1           same meaning that you had yesterday, basically that

2           it was in a shared folder and that shared folder was

3           accessible to anyone on the network?

4    A.    Correct, anybody in the world.

5    Q.    Who was on the network?

6    A.    People all over the world.

7    Q.    On the network?

8    A.    Correct.

9    Q.    Okay.  Instead of doing a search, you went

10          specifically to this computer, and then you looked at

11          all the files that were in that shared directory; is

12          that true?

13   A.    Correct.

14   Q.    Did you access any other folders on that computer

15          other than the folder entitled shared?

16   A.    No.  You're not able to.

17   Q.    And when you did that, you found 1325 files on there?

18   A.    I would have to look at the file listing, but that

19          sounds about right.

20   Q.    And those files were comprised of video files, as we

21          have discussed?

22   A.    Correct.

23   Q.    Not all of them were pornographic; correct?

24   A.    Correct.

25   Q.    And it included music files; true?

| | | |
|---|---|---|
| 1 | A. | I believe so.  I would have to look at the exhibit |
| 2 | | with the file list to be sure. |
| 3 | Q. | So as you've described offering for distribution, |
| 4 | | those nonpornographic files were being offered for |
| 5 | | distribution just as the pornographic files; true? |
| 6 | A. | Correct. |
| 7 | Q. | The SHA values that you described yesterday, are |
| 8 | | those searchable on LimeWire?  For example, if I type |
| 9 | | in one of the SHA values of one of the videos that |
| 10 | | you described yesterday, is it going to return any |
| 11 | | results? |
| 12 | A. | At this time, no. |
| 13 | Q. | But you used the SHA values to search that shared |
| 14 | | file directory or not? |
| 15 | A. | Incorrect.  No.  Once I hit the browse host function, |
| 16 | | it returned the list of file names.  That file |
| 17 | | listing is then put into Grid Sleuth and compared to |
| 18 | | other known SHA values.  That's another reason we use |
| 19 | | Phex, because we have the option of being able to |
| 20 | | turn off and on, whether we can see the SHA1 value. |
| 21 | Q. | You described yesterday something about copying or |
| 22 | | copying and pasting the names, it sounded like, of |
| 23 | | all the files on the shared directory. |
| 24 | A. | Yes.  Once that file listing is returned, you click |
| 25 | | inside that file, click control A to select it all, |

1    control C copies it all, and that's when you paste it

2    into Grid Sleuth so you can compare it to the other

3    known SHA values.

4  Q.   In doing that, you didn't actually copy all those

5    files; you just copied the file name and then meta

6    data and similar information about the files; is that

7    true?

8  A.   All you're actually receiving when you do the browse

9    host function is just the file listing, and at that

10    point you haven't physically downloaded any of the

11    files.  It's almost like a menu at a restaurant.

12    It's showing you what's available.

13  Q.   Just like any other user of LimeWire or one of these

14    other fire-sharing programs, you actually did not

15    view with your eyes the visual depictions until they

16    were downloaded on your computer; is that true?

17  A.   That is correct.

18  Q.   You had a PowerPoint slide that Ms. Martin took you

19    through yesterday of what looked to be a clay pot?

20  A.   Yes.

21  Q.   You changed some brush strokes on it to show how just

22    changing a few brush strokes changed the SHA value.

23    Do you remember that?

24  A.   Correct.

25  Q.   Another way to change that SHA value would be simply

```
 1           to, if you shortened a video clip by one second, just
 2           simply cut it off one second earlier.  Wouldn't that
 3           also change that SHA value?
 4    A.     That's correct.
 5    Q.     And if you lengthened it even one second, it would
 6           change the SHA value?
 7    A.     Yes.  Virtually any change that is made to that file
 8           is going to cause the SHA value to change.
 9    Q.     Based upon what you saw using these programs that you
10           have described on March 12, what other information
11           did you know about, for example, how these files came
12           to be on the Frakes computer?  Did you know anything
13           at that point?
14    A.     No.
15    Q.     Did you know -- can you tell who had used the
16           LimeWire program on the Frakes computer?
17    A.     No.
18    Q.     Can you tell what, if any, search terms had been used
19           to locate any of those files that may have downloaded
20           onto the Frakes computer?
21    A.     No.  I mean, you can assume based on what the file
22           name is, but you can't say for sure.  The only things
23           that we knew -- that I knew on March 12, 2008, was
24           that I had a direct connection with that IP address
25           and that I obtained the two files from that IP
```

 1         address.  Outside of that, we had no knowledge until

 2         you actually go in and are able to start seizing

 3         things.

 4  Q.   When you downloaded the files from -- let me back up.

 5         When you use LimeWire to search for video files to

 6         download, you have the option of checking a file to

 7         tell the program, I'm going to download this file,

 8         but don't start downloading it right away; wait until

 9         I finish checking which files I want to download

10         before it downloads, or as soon as you check that

11         file for download, does it start to download?

12  A.   My knowledge of the software is, once you double

13         click to begin downloading it, depending on how many

14         candidates are available and other issues, it will

15         start downloading immediately.

16  Q.   And you may have covered this yesterday.  When you

17         use the term candidates, what that means is, for

18         example, using the Yellow Brick Road song by Elton

19         John example, if you do a search for that, you may

20         have 200 computers that offer that song for download,

21         and those are the candidates; correct?

22  A.   Correct.  That's what I'm referring to as the

23         candidates.

24  Q.   Does the time that it takes for the files to download

25         vary?

1    A.    I'm not understanding what you're asking.

2    Q.    Does it take longer to download a larger file?

3    A.    Yes, it does.

4    Q.    Does the time that it takes a file to download depend

5          upon the nature of the connection that you have to

6          the internet?

7    A.    Yes.  That comes into play as well as the connection

8          speed of whoever is offering that file for

9          distribution.

10   Q.    So both ends?

11   A.    Correct.

12   Q.    And, in fact, I think during the video capture that

13         we saw yesterday where you recorded downloading files

14         it look a little while for those files to download;

15         is that correct?

16   A.    Yes, it did.

17              MR. CLARKE:  No further questions, your

18         Honor.

19              THE COURT:  All right.  Any redirect?

20              MS. MARTIN:  Yes, your Honor.

21              THE COURT:  Very well.  You may proceed.

22                  REDIRECT EXAMINATION

23   BY MS. MARTIN:

24   Q.    Detective Howe, Mr. Clarke just asked you whether you

25         know how the files came to be on the Frakes computer

1      in that shared folder, and you indicated that you did

2      not.

3  A.  That's correct.

4  Q.  But that's not exactly correct, is it?  You know how

5      it's done.

6  A.  I know the process of how to get files like that,

7      yes, but specifically how he got his on that date,

8      no.

9  Q.  But really the issue is, you don't know who did it,

10     but you know how it was done?

11 A.  Correct.

12 Q.  And in order to put files into your shared folder,

13     walk us through that.  How is it done?

14 A.  It can be done one of several ways.  One is going

15     out, and, in the defendant's example, with him having

16     LimeWire, actually using search terms to find child

17     pornography and to download that into their shared

18     folder.

19 Q.  Let me interrupt for you a second.  When you say

20     download, he types in search terms and he gets a

21     list.  Then what does he have to do to get it to

22     download?

23 A.  You have to actually double click on that file to

24     allow it to download.

25 Q.  You have to actually pick out of the list what names

1      or what movies that you want to put into your shared

2      folder?

3  A.   Correct.  And that's why key words are so important,

4      and the way that the files are titled, because the

5      more key words that are in that, the more searchable

6      that file is.

7  Q.   So once he gets a list of items based on his search

8      terms, a list of movies, for instance, in this case

9      he selects one or two or however many he wants to add

10     to his collection?

11 A.   Correct.

12 Q.   Okay.  And then what does he have to do?

13 A.   Basically, you have to double click that file to

14     begin downloading it and then allow it to continue to

15     download until it's complete.

16 Q.   Is there any way that those items can be placed in

17     your shared folder without an active participation by

18     somebody?

19 A.   No.  I mean, you have to either physically double

20     click the file to download it and it's downloaded

21     into the shared folder or move it from another

22     location on the computer into the shared folder, but

23     it takes somebody doing that.

24 Q.   When you go out and you actually search for an item

25     that you don't already have, it takes you looking

1      through the list and deciding which of these items on

2      the list you want to put into your shared folder?

3  A.   That's correct.

4           MS. MARTIN:  I have no further questions,

5      your Honor.

6           THE COURT:  Mr. Clarke?

7           MR. CLARKE:  Thank you, your Honor.

8                    RECROSS EXAMINATION

9  BY MR. CLARKE:

10 Q.   You just went down the path of saying this is how

11      these files got on that computer, but, in fact,

12      you don't specifically know; true?

13 A.   That's correct.

14 Q.   And, in fact, I think after your initial answer you

15      then came back and said, well, there are other ways

16      for files to get into that shared file folder besides

17      just being downloaded from -- by the LimeWire

18      program; true?

19 A.   Downloaded by the user, whoever is in control of that

20      LimeWire program.  The only other way is to actually

21      physically copy those items into the shared folder

22      from another location on your computer, a hard drive

23      somewhere.

24 Q.   All right.  And, again, you don't know what, if any,

25      search terms were used to download any programs using

1      the LimeWire software that was on the Frakes

2      computer; true?

3  A.  That's correct.

4  Q.  And you've used the LimeWire program personally;

5      true?

6  A.  Yes.

7  Q.  Have you ever done a search that did not include any

8      pornographic terms that came up with results that

9      included files that at least had pornographic terms

10     in the file names?

11 A.  I can honestly say every time I've used Phex or

12     LimeWire, due to the nature of my job, it's always

13     been a pornographic term, so I've not used a

14     nonpornographic term.

15 Q.  Have you used a pornographic term when doing a search

16     that did not itself suggest you were looking for

17     child pornography but nevertheless a file name that

18     suggested that it could have a minor engaged in

19     sexual activity in the file?

20 A.  Can you repeat the question.  I don't quite

21     understand what you're asking.

22 Q.  I'll try to give you a different example then.  Have

23     you searched for pornography using LimeWire or Phex,

24     used search terms that in and of themselves don't

25     contain any words like teen or whatever, the acronym,

1          the PtHC, and the search results nevertheless

2          included files that had that acronym in it or

3          included the word teen or something of that nature?

4     A.   That's actually a couple questions.  I'll answer the

5          first forward.  All the search terms I have ever used

6          on Phex or LimeWire have been so we can find

7          candidates that are offering child pornography.

8          There's instances when, say, I used PtHC and I search

9          for PtHC.  Other key words in that file name are

10         going to come up, so you're not just seeing a file

11         called PtHC.  The file names can be quite long, and

12         not always is it a video or an -- you know what I'm

13         saying?  Sometimes it could be a music file.

14    Q.   The computer that you used to play some of these

15         files, is that yours, or is that one from the U.S.

16         Attorney's Office?

17    A.   That's the U.S. Attorney's Office.

18    Q.   Do you know whether or not that computer has LimeWire

19         on it, the program itself?

20    A.   I'm not sure.

21              MR. CLARKE:  No further questions, your

22         Honor.

23              THE COURT:  Ms. Martin?

24              MS. MARTIN:  No, your Honor.

25              THE COURT:  All right.  Mr. Howe, you may

1          step down.  Without objection you are excused.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  Ms. Martin, the government may

4          call its next witness.

5                    MS. MARTIN:  Thank you.  Before we call our

6          next witness, your Honor, I would ask to read one of

7          our stipulations and admit two exhibits.

8                    THE COURT:  You may do so.  And let me just

9          tell the jury first, Ms. Martin made reference to a

10         stipulation, and I made some passing reference to

11         stipulations as well in my instructions to you,

12         indicating that they were a form of evidence that you

13         could conceivably receive in this case.  In essence,

14         a stipulation means that the parties have agreed that

15         certain matters should be entered into evidence in

16         the case for your consideration, as I have in the

17         case along with all of the other evidence that's

18         admitted in the case, testimony, exhibits, and so

19         forth.  And what Ms. Martin reads to you, assuming,

20         as I believe he will, Mr. Clarke confirms that

21         there's a stipulation along these lines, it is

22         something that you can consider as part of the

23         evidence as you continue your participation in the

24         trial.

25                    MS. MARTIN:  Your Honor, the stipulation

reads, United States of America by and through

Assistant United States Attorney Kim I. Martin and

the defendant Casey Frakes by and through his counsel

Michael R. Clarke hereby agree and stipulate as

follows:

If Kent Willnauer were called and sworn to

testify, he would testify to the following facts:

(a) that Mr. Willnauer is employed by AT&T,

formerly SBC Internet Services; that Mr. Willnauer

has been employed by this company for approximately

ten years;

(b) Mr. Willnauer is familiar with and

knowledgeable of records maintained by AT&T, formerly

SBC Internet Services;

(c) that Government's Exhibits 4 and 5 were made

at or near at the time of the act, event, or

condition reflected in the exhibit; that they were

made as a result of the regular business practice of

AT&T, formerly SBC Internet Services, and they were

kept in the course of the regularly conducted

business activity of AT&T, formerly SBC Internet

Services.

Government's Exhibit No. 4 reflects internet

service provided to 1115 Summit in Atchison, Kansas,

beginning January 21, 2005, with the subscriber

1     listed as Pam S. Frakes.  Government's Exhibit 4 also

2     reflects the following member IDs associated with Pam

3     Frakes' internet account, Frakesfam, J_byrd_05,

4     Jonjon2005, Jonjon _ 2005, and Kacey96.

5         Government's Exhibit 5 is the radius log record

6     for IP address 70.128.254.252, which belongs to AT&T,

7     formerly SBC Internet Services.  Government's

8     Exhibit 5 reflects that between March 11 of 2008 at

9     10:21 p.m. and March 12, 2008, at 10:41 p.m the IP

10    address of 70.128.254.252 was assigned to the Frakes

11    computer located at 1115 Summit, Atchison, Kansas.

12        When an IP address is assigned to a particular

13    computer, the records automatically assign the

14    address to the master member ID for that account,

15    which in this case was Frakes Fam.  Government

16    Exhibits 4 and 5 are admissible in the trial of this

17    case without requiring a records custodian to testify

18    to the facts above.  The parties signify their

19    agreement by their signatures below.

20            THE COURT:  Mr. Clarke, is it correct that

21    Mr. Frakes does so stipulate?

22            MR. CLARKE:  That's correct, your Honor.

23            THE COURT:  Very well.  The stipulation is

24    accepted into the record, and the jury is instructed

25    that you may consider that as evidence in the case.

1       MS. MARTIN:  Your Honor, we would offer

2    Government's Exhibits 4 and 5.

3             THE COURT:  Without objection then?

4             MR. CLARKE:  Yes, your Honor.

5             THE COURT:  Exhibits 4 and 5 are admitted.

6             (Exhibits 4 through 5 were admitted into

7    evidence.)

8             MS. MARTIN:  Your Honor, our next witness

9    is Detective Terry Kelley.

10            TERRY WAYNE KELLEY,

11   having been duly sworn, was examined and testified as

12   follows:

13                    DIRECT EXAMINATION

14   BY MS. MARTIN:

15   Q.   Detective Kelley, can you tell us what you do for a

16        living.

17   A.   I'm a detective with the Atchison Kansas Police

18        Department.

19   Q.   How long have you been a detective?

20   A.   I have been a detective for two and a half years.

21   Q.   Before becoming a detective were you a police officer

22        in Atchison?

23   A.   Yes.  I have been a police officer since 1989.

24   Q.   In order to become a police officer, did you receive

25        any special training?

1    A.    Yes, I have.

2    Q.    What was that?

3    A.    Numerous hours of training in the Kansas academy, law

4          enforcement academy.  I have been to several

5          investigative classes.

6    Q.    As part of that training you were trained to, for

7          instance, recover evidence, conduct interviews, that

8          sort of thing?

9    A.    Correct.

10   Q.    And so you've been doing that for quite some time?

11   A.    Yes.

12   Q.    Can you tell us what your duties are as a detective

13         with the Atchison Police Department.

14   A.    Investigate crimes, anything from criminal damage to

15         homicide.  I take care of evidence.  We do

16         interviews, just about anything there is to be done

17         we do.

18   Q.    And Atchison Police Department is not a very big

19         department?

20   A.    No, ma'am.

21   Q.    So you pretty much have to do it all?

22   A.    That's correct.

23   Q.    Can you tell us how you became involved in the

24         investigation of this case.

25   A.    I was given a disk from an FBI agent out of the

1        Topeka office, and once I reviewed the disk, it was

2        obvious it was an investigation of child pornography,

3        and I contacted special agent -- Senior Special Agent

4        Jim Kanatzar.

5    Q.  Why didn't you just investigate the case yourself?

6    A.  We do not have the means or the ability to analyze

7        computers.

8    Q.  So you had known Agent Kanatzar from a prior case?

9    A.  That's correct.

10   Q.  So you gave him a call and asked him to assist you

11       with this investigation?

12   A.  I did.

13   Q.  What happened then?

14   A.  He come down to my office.  I showed him what I had,

15       and he took that -- that was about the -- I want to

16       say the week of the 20th of May, somewhere in there.

17   Q.  Okay.

18   A.  On June 10 we conducted a search warrant on the

19       residence.

20   Q.  Okay.  Did you have to do any other investigation

21       before you were able to get the search warrant?

22   A.  We went out by the residence.  I showed him where the

23       house was at, the surroundings of it.

24   Q.  All right.  So then you guys got a search warrant,

25       and on the 10th of June you went to the house to

1    execute it.  Was anybody else there?

2  A.  No.

3  Q.  So what did you do?

4  A.  The front door was unlocked.  Entry was made.  After

5      the house was secured to make sure nobody was inside,

6      me and Agent Kanatzar went next door and spoke to the

7      neighbors.

8  Q.  Okay.  What was the purpose of that conversation?

9  A.  To locate where anyone that would have been at the

10     house, where they may work.

11 Q.  So you -- I'm sorry.  Go ahead.

12 A.  We eventually located the mother, and I had an

13     officer bring her -- go down and explain what was

14     going on, and she showed up at the house.

15 Q.  So you found out where she worked and sent an officer

16     down to tell her that you were at her house to do a

17     search warrant?

18 A.  That's correct.

19 Q.  And she came home -- you didn't pick her up and

20     physically bring her back?

21 A.  No.  I believe Sergeant Stone hand delivered a copy

22     of a search warrant for her at Design Laboratories in

23     Atchison.

24 Q.  She came home on her own?

25 A.  That's correct, with her sister, I believe.

1   Q.   At that time did she agree to talk with you?

2   A.   Yes, she did.

3   Q.   And she provided you with some information?

4   A.   Yes.

5   Q.   That information she provided you also lead you to

6        interview the son, Jason; is that correct?

7   A.   That's correct.

8   Q.   Did both you and Agent Kanatzar participate in all of

9        these interviews?

10  A.   Yes, we did.

11  Q.   And ultimately you decided that you needed to

12       interview the defendant; is that right?

13  A.   That's correct.

14  Q.   Can you tell us about that.

15  A.   We went to Aspen Lawn Care in Olathe, Kansas.  He was

16       not there.  He was out on a job site.  We spoke to

17       the owner of the company.  He gave us an address

18       in -- I don't remember what town; it was 118th

19       Street, a suburb of Kansas City, and told us that

20       Casey would be there between 1:30 and 5:30 on the job

21       site.

22  Q.   And so you went there?

23  A.   We did.

24  Q.   Okay.  And what happened when you got there?

25  A.   When we got there, we introduced ourselves to Casey

| | | |
|---|---|---|
| 1 | | Frakes, told him that we would like to speak with |
| 2 | | him.  When we got done speaking to him, he was going |
| 3 | | to return to his job.  We was not going to remove him |
| 4 | | from the job site.  We just had some questions for |
| 5 | | him. |
| 6 | Q. | Okay.  And did you read him his rights? |
| 7 | A. | No, we did not, had no intentions of taking him into |
| 8 | | custody at that point. |
| 9 | Q. | And he wasn't in custody when you were talking to |
| 10 | | him? |
| 11 | A. | No, he was not. |
| 12 | Q. | So you just -- this was just a voluntary interview |
| 13 | | with him? |
| 14 | A. | That's correct. |
| 15 | Q. | And he could have said no, I'm not going to talk to |
| 16 | | you? |
| 17 | A. | Yes, he could have. |
| 18 | Q. | But he didn't? |
| 19 | A. | No. |
| 20 | Q. | Can you tell us what happened then. |
| 21 | A. | We were standing in a driveway.  We had asked |
| 22 | | Casey -- we told him our purpose of being there was |
| 23 | | because we was investigating child pornography on the |
| 24 | | computer.  He first denied knowing any child |
| 25 | | pornography being on the computer.  Then he admitted |

| | | |
|---|---|---|
| 1 | | that he did watch about a 20-second clip of a girl |
| 2 | | that was probably younger than 14 that was dancing |
| 3 | | and during the dance she removed her clothing. |
| 4 | Q. | I'm assuming that both you and Agent Kanatzar were |
| 5 | | asking questions at different times? |
| 6 | A. | That's correct. |
| 7 | Q. | And you were focused on the defendant's collection |
| 8 | | and what he had on his computer? |
| 9 | A. | That's correct. |
| 10 | Q. | Is it fair to say that Agent Kanatzar was focused |
| 11 | | more on the workings of how the images got on the |
| 12 | | computer? |
| 13 | A. | That's correct.  Casey did admit that he does use |
| 14 | | Limewire.  Eventually he told me that there was |
| 15 | | probably over a hundred movies on his computer.  I |
| 16 | | asked him what percentage of those movies did he |
| 17 | | believe to be child pornography.  Casey told me |
| 18 | | probably 10 to 15 percent.  Casey's definition of |
| 19 | | child pornography was any child under 16 that was |
| 20 | | nude. |
| 21 | Q. | Okay.  And was he asked about the age of the child |
| 22 | | pornography on his computer? |
| 23 | A. | Between 12 and 14.  The age of 12 and 14 was his |
| 24 | | estimate. |
| 25 | Q. | So he admitted he had movies involving children |

1    between the ages of 12 to 15?

2  A.   Correct.

3  Q.   Did you ask him if he had any images of children,

4       say, five to nine years old?

5  A.   He said he did not have any small children.

6  Q.   Okay.  Just the 12 to 15 range?

7  A.   Correct.

8  Q.   Okay.  Did the defendant say anything else to you?

9  A.   As we were ending the interview, he told me that if

10      there was any child pornography on the computer it

11      was his and to leave his brother Jason and his mother

12      out of it.

13           MS. MARTIN:  Your Honor, I have no further

14      questions.

15           THE COURT:  Mr. Clarke, you may cross

16      examine.

17                    CROSS EXAMINATION

18  BY MR. CLARKE:

19  Q.   Detective Kelley, I think you said that you got the

20      disk from the FBI somewhere in May of 2008?

21  A.   Correct.

22  Q.   And you executed the search warrant in June of 2008?

23  A.   Correct.

24  Q.   And you did some preparation in anticipation that the

25      search warrant would be issued; true?

| | | |
|---|---|---|
| 1 | A. | The preparation was getting ahold of Jim Kanatzar. |
| 2 | Q. | You guys went by the house? |
| 3 | A. | Correct. |
| 4 | Q. | Somebody checked driver's license numbers, stuff like |
| 5 | | that? |
| 6 | A. | I believe I checked our computer, in-house computer, |
| 7 | | and showed who was listed at that address. |
| 8 | Q. | And you had multiple people working on it, at least |
| 9 | | you and the agent here; right? |
| 10 | A. | Correct. |
| 11 | Q. | Did you take any recording devices with you? |
| 12 | A. | To? |
| 13 | Q. | When you went and interviewed people. |
| 14 | A. | No. |
| 15 | Q. | Didn't have time to get the recording device? |
| 16 | A. | I'm not sure that I had one available. |
| 17 | Q. | How about the homeland security?  You think they got |
| 18 | | any recording device? |
| 19 | A. | I'm not sure what they have.  I can only make an |
| 20 | | assumption. |
| 21 | Q. | But the bottom line is you went and you interviewed, |
| 22 | | for example, Mrs. Frakes.  You didn't record that |
| 23 | | interview; true? |
| 24 | A. | That's true. |
| 25 | Q. | You went and interviewed Jason Frakes, and you didn't |

1       record that interview; true?

2  A.   True.

3  Q.   And then you went and you interviewed Casey Frakes

4       and you didn't record that interview; true?

5  A.   Correct.

6  Q.   Did you have a list of questions prepared in advance

7       that you could show us now that tells us exactly what

8       questions you asked?

9  A.   No, I did not.

10  Q.   Did you give Mr. Frakes a call ahead of time and tell

11       him you were coming?

12  A.   No, I did not.

13  Q.   And you guys went to the house to execute the search

14       warrant really fairly early in the morning; true?

15  A.   That's correct.

16  Q.   And that was intentional, to do it in the morning

17       versus wait until the afternoon; right?

18  A.   That's what time it was executed.

19  Q.   Isn't it kind of standard law enforcement technique

20       that it's always better to execute search warrants

21       early in the morning?

22  A.   I have executed search warrants probably just about

23       every hour of the day there is.

24  Q.   Now, your examination by Ms. Martin in terms of

25       covering what was said by Mr. Frakes, for example,

1      didn't last very long.  How long did you interview

2      Mr. Frakes?

3   A.  Probably less than 15 minutes.  It wasn't very long.

4   Q.  When you questioned him, did you ever challenge what

5      he told you?

6   A.  As in accuse him of lying?

7   Q.  Accuse him of lying or just not telling you

8      everything he knew or not giving you the answer that

9      you were looking for.

10  A.  I don't know that you would say we challenged.  I

11     asked him what percentage of the movies were

12     pornographic when he initially said that there was no

13     pornographic movies, and we talked for a little bit,

14     and he remembered one, and we talked for a little

15     bit, and he admitted 10 to 15 percent.

16  Q.  Well, how did you get from somebody telling you they

17     don't have any pornographic videos on their computer

18     to then later on them allegedly saying, well, I had

19     this computer -- how did you transition?  If he told

20     you he didn't have it, then why did that conversation

21     keep going?

22  A.  We had a discussion about LimeWire, his use of it,

23     who used the computers at his house, because we had

24     spoke to Jason's -- I'm not sure if it's older or

25     younger brother at this point, who said that he

1    wasn't familiar with LimeWire, and he had Casey

2    download music to his MP3 player for him, and we just

3    had those type of discussions with him and asked him,

4    why are there images downloading from an investigator

5    in Independence if they are not on your computer?

6  Q.  So you went from him telling you that he didn't think

7    he had any child pornography on the computer to you

8    telling him that's not accurate?

9  A.  That's correct.

10 Q.  Then you went, it sounds like, to some sort of

11    discussion to where you guys are telling him that's

12    not accurate and telling us how it got there.

13 A.  I never told him how it got there, no.

14 Q.  No.  You said you were challenging --

15 A.  I told him how we got the evidence, that there was

16    some there, yes.

17 Q.  So you started to challenge him and say, how did it

18    get on the computer?

19 A.  Jim may have asked him if he downloaded anything,

20    yes, Mr. Kanatzar.  Sorry.

21 Q.  You said on direct examination you weren't going to

22    remove him from the job site.  In effect, you were

23    telling him you weren't going to place him under

24    arrest?

25 A.  That's correct.

1  Q.  That day.  That's what you meant, that day?

2  A.  That's correct.

3  Q.  And you tell him that to put him at ease; right?

4  A.  Because we had no intentions of arresting him that

5      day.

6  Q.  At some point one of you told him that you were after

7      bigger fish, or words to that effect?

8  A.  I don't remember that.

9  Q.  Nothing along the lines of that you're really trying

10     to get people who are more responsible for the child

11     pornography?  You never led him down that road?

12 A.  I don't remember doing that, no.

13 Q.  Are you saying you guys didn't do that or you just

14     don't remember doing it?

15 A.  I don't believe that come out of my mouth.

16 Q.  Did you have a different demeanor than Agent Kanatzar

17     when questioning?

18 A.  I don't believe so.  We were both polite and

19     courteous to him.

20 Q.  So how did you leave it?  How did you end your

21     questioning of Mr. Frakes?

22 A.  I was standing at the back of Agent Kanatzar's car,

23     and we was getting ready to leave, and he said, if

24     there's any child pornography on that computer, leave

25     my brother and my mother out of it, and we said okay

1    and pretty much left.

2 Q.  Before that, because obviously that's his alleged

3    closing statement to you, what had you guys said to

4    him right before that?

5 Q.  Just prior to that was when I asked him what the

6    percentage of child pornography movies was on his

7    computer after he stated there was a hundred -- he

8    had probably downloaded a hundred movies, and I asked

9    him what percentage of those -- of that hundred was

10   child pornography.  He said probably 10 to

11   15 percent, and that was pretty much the end of our

12   conversation.  Just right after that he had stated

13   the last statement.

14 Q.  Well, did you tell him, well, you'll be hearing from

15   us; I don't know what's going to happen with this

16   investigation?

17 A.  Jim may have said that because technically this was

18   the federal investigation, and I was just assisting

19   on it.  I don't know -- at that time I did not know

20   their whole procedure of how they handled things.

21 Q.  Is there any reason you didn't invite him to come

22   down to the police department for your interview?

23 A.  Probably because he was working in Kansas City.

24 Q.  All right.  Was there any reason you guys didn't

25   invite him to go to the homeland security office

1          there in Kansas City?

2    A.   It would have took longer to take the drive than it

3          did the interview.  I mean, it was, like I said, less

4          than 15 minutes, probably.

5    Q.   At your office there where he lives; right?  He lives

6          in Atchison where your police department is?

7    A.   That's correct.

8    Q.   So you could have invited him up to your office there

9          after he got off work for the interview; true?

10   A.   I believe he gets home in the evening, according to

11         his mom.

12   Q.   Well, you guys don't close.  I assume you're a 7/24

13         police department?

14   A.   Correct.  I work normally eight to five though.

15   Q.   And at your police department you would have had the

16         ability to not only record audibly what was said, but

17         you had the ability to videotape the questioning

18         itself; true?

19   A.   No.  We do not have that at our department.

20   Q.   All you can do is audio record it?

21   A.   We're 10,000 people, 22 officers.  We don't have that

22         equipment yet.

23               MR. CLARKE:  No further questions, your

24         Honor.

25               THE COURT:  Ms. Martin, any redirect?

<u>REDIRECT EXAMINATION</u>

BY MS. MARTIN:

Q. Detective Kelley, you told the defendant that you weren't going to arrest him because it was the truth?

A. That's correct.

Q. It wasn't just some ploy, was it?

A. No.

Q. Now, you didn't record these interviews, but you did make a record of it; correct?

A. That's correct.

Q. You wrote a report?

A. I did.

Q. And you wrote it -- when did you write your report in connection with the interviews?

A. I believe it was that evening or that morning.

Q. And you wrote an accurate report, and you accurately recorded in your report what was said during the interviews; is that fair?

A. That's correct.

MS. MARTIN:  I have no further questions, your Honor.

THE COURT:  Mr. Clarke?

MR. CLARKE:  No additional questions, your Honor.

THE COURT:  All right.  Then you may step

1     down, Mr. Kelley, and without objection you are

2     excused.  Ms. Martin, the government may call its

3     next witness.

4          MS. MARTIN:  Your Honor, we have two more

5     stipulations to read at this time.

6          THE COURT:  You may do so.

7          MS. MARTIN:  The first stipulation reads,

8     United States of America by and through Assistant

9     United States Attorney Kim I. Martin and the

10    defendant Casey Frakes by and through his counsel

11    Michael R. Clarke hereby agree and stipulate as

12    follows:

13         (1) if Matt Grenier were called and sworn to

14    testify, he would testify to the following facts:

15         (a) Mr. Grenier is employed by Snow Creek and

16    has been working for that family-owned business his

17    entire life.  In March of 2008 Mr. Grenier was the

18    human resource director;

19         (b) Mr. Grenier is familiar with and

20    knowledgeable of the business records maintained by

21    Snow Creek;

22         (c) Government's Exhibit 13 was made at or near

23    the time of the act, event, or condition reflected in

24    the exhibit.

25         (d) Government's Exhibit 13 was made as a result

1    of the regular business practices of Snow Creek.

2    (e) Government's Exhibit 13 was kept in the

3    course of the regularly conducted business of Snow

4    Creek.

5    (f) Government's Exhibit 13 is the time sheet

6    for the hours worked by the defendant Casey Frakes

7    between March 9, 2008, and March 20 of 2008.

8    (g) Government's Exhibit 13 reflects that the

9    defendant, Casey Frakes, was not working on March 12

10   of 2008.

11   (2) Government's Exhibit 13 is admissible in the

12   trial of this case without requiring a records

13   custodian to testify to the facts above.  And the

14   parties signify their agreement by their signature.

15        THE COURT:  Mr. Clarke, is it correct that

16   Mr. Frakes so stipulates?

17        MR. CLARKE:  Yes, your Honor.

18        THE COURT:  Then the jury is instructed to

19   consider that stipulation as part of the evidence in

20   the case.

21        MS. MARTIN:  We would move to admit

22   Government's Exhibit 13.

23        THE COURT:  Without objection?

24        MR. CLARKE:  Correct, your Honor.

25        THE COURT:  Exhibit 13 is admitted.

1    (Exhibit 13 was admitted into evidence.)

2         MS. MARTIN:  The next stipulation, your

3    Honor, reads, United States of America by and through

4    assistant United States Attorney Kim I. Martin and

5    the defendant Casey Frakes by and through his counsel

6    Michael R. Clarke hereby agree and stipulate as

7    follows:

8         If Cheryl Petesch were called and sworn to

9    testify, she would testify to the following facts:

10   Ms. Petesch is employed by the Long John Silver's in

11   Atchison, Kansas, and has been the manager at that

12   location for 19 years.  Ms. Petesch is familiar with

13   and knowledgeable of the business records for that

14   Long John Silver's location.

15        Government's Exhibit 12 was made at or near the

16   time of the act, event, or condition reflected in the

17   exhibit.  Government's Exhibit 12 was made as a

18   result of the regular business practice of Long John

19   Silvers, and Government's Exhibit 12 was kept in the

20   course of the regularly conducted business of Long

21   John Silvers.  Government's Exhibit 12 is the time

22   schedule and the time sheets for March 12 of 2008.

23   Government's Exhibit 12 indicates that the defendant

24   Casey Frakes was not scheduled to work and did not

25   work on March 12 of 2008, and Government's Exhibit 12

1       is admissible in the trial of this case without

2       requiring a records custodian to testify to the facts

3       above.  The parties have signed below.

4                  THE COURT:  Again, Mr. Clarke, is that

5       correct?  Mr. Frakes so stipulates?

6                  MR. CLARKE:  Yes, your Honor.

7                  MS. MARTIN:  We would offer Government's

8       12.

9                  THE COURT:  Exhibit 12 is admitted, and the

10      jury is instructed to consider the stipulation as

11      part of the evidence in the case.

12                 (Exhibit 12 was admitted into evidence.)

13                 MS. MARTIN:  Your Honor, the government's

14      next witness is Ms. Pamela Frakes.

15                      PAMELA S. FRAKES,

16  having been duly sworn, was examined and testified as

17  follows:

18                    DIRECT EXAMINATION

19  BY MS. MARTIN:

20  Q.   Mrs. Frakes, do you know the defendant in this case?

21  A.   Yes, I do.

22  Q.   How do you know him?

23  A.   He's my son.

24  Q.   Can you tell us where you live.

25  A.   1115 Summit in Atchison, Kansas.

1   Q.   And who lives there with you?

2   A.   My oldest son Jason and then Casey.

3   Q.   How long have you lived there?

4   A.   I think it was in '79, February of '79.

5   Q.   So you have lived there quite a while?

6   A.   Uh-huh.

7   Q.   Were you living there in March of 2008?

8   A.   Yes.

9   Q.   And are all of the utilities in your name?

10  A.   I believe, except for the -- I think it's the gas

11       bill, I think, or electric bill, one of them.

12  Q.   The cable bill and the internet service, that was all

13       in your name?

14  A.   Yes.

15  Q.   And were Jason and Casey both working -- or living

16       with you in March of 2008?

17  A.   Yes.

18  Q.   And can you describe your house for us.  How many

19       bedrooms do you have?

20  A.   There is three brooms.

21  Q.   And did you have a computer in March of 2008?

22  A.   Yes.

23  Q.   Can you tell us how you obtained that computer.

24  A.   My work had bought some computers.  They got a double

25       order of computers, so my employer offered them to

```
 1        the employees.  We purchased one.  Jason and I

 2        discussed it, and we purchased one on a payroll

 3        deduction plan, and Jason paid for it, reimbursed me

 4        for it.

 5   Q.   So they took the money for the computer out of your

 6        payroll, and then he paid you the money?

 7   A.   Yes.

 8   Q.   Where was the computer located in March of 2008?

 9   A.   In Casey's bedroom.

10   Q.   Did you use the computer?

11   A.   I did use it.  Very seldom, but I did.

12   Q.   Okay.  And what did you use it for?

13   A.   Mainly for my online banking and to pay a few bills,

14        look at some recipes that I had seen.

15   Q.   Did you ever download anything from the computer or

16        download anything from the internet onto the

17        computer?

18   A.   No, I did not, nothing that I recall ever doing.

19   Q.   And do you know what LimeWire is?

20   A.   I have never heard of it before, no.

21   Q.   So you didn't know it was on your computer?

22   A.   No.

23   Q.   And had you ever used it?

24   A.   No.

25   Q.   Did you ever download music or movies or anything
```

1          like that?

2     A.   No.

3     Q.   Who used the computer the most?

4     A.   I would say Casey did.

5     Q.   Okay.  And now you had your own profile on the

6          computer?

7     A.   Yeah, if you're talking about the little icon.

8     Q.   Yeah.  The little box when you sit down at the

9          computer, there was a box for you, and was there one

10         for Jason?

11    A.   Yes.

12    Q.   And then one for Casey?

13    A.   Yes.

14    Q.   And that's all that was on this?

15    A.   That I recall, yes.

16    Q.   And when you sit, do you know if those boxes were

17         showing -- did you log in under yourself most of the

18         time?

19    A.   Well, most of the time the computer was already on,

20         so I would just go on.

21    Q.   So if Casey had been on the computer and he walked

22         away from it, you would just get on it and use it and

23         not exit out?

24    A.   Yes, right.

25    Q.   But when you would get on, if his profile was already

1    running, you would still just use it for your

2    banking?

3  A.   Yes.

4  Q.   Did you ever notice anything on the computer?  In

5    other words, when you would sit down at Casey's

6    computer, did you ever notice anything that caused

7    you any concern?

8  A.   No.

9  Q.   So if he did walk away from the computer, he didn't

10    leave anything running that would cause you to be

11    concerned?

12  A.   No.

13         MS. MARTIN:  Could I have just a moment,

14    your Honor?

15         THE COURT:  Certainly.

16  Q.   (By Ms. Martin) Whenever you would come into the

17    bedroom and you would see that the computer was

18    already running, did you ever use LimeWire under

19    Casey's profile?

20  A.   I didn't know it was on there.  I never -- I never

21    used it.  I never -- I didn't even know what it was,

22    so no.

23  Q.   How would you describe your computer abilities?

24  A.   Basics.  I know how to get on there and do a few

25    things, enough that I -- what I need to know, and

1           that's basically --

2    Q.    Checking e-mails?

3    A.    Checking e-mails and getting on checking, my banking

4           and that, doing some searching.

5    Q.    On the internet?

6    A.    Yes, on the internet, yes.

7    Q.    But nothing as far as being able to configure your

8           computer?  Would you be able to get on and change

9           profiles or do anything like that?

10   A.    No.

11                 MS. MARTIN:  I have no further questions,

12          your Honor.

13                 THE COURT:  All right.  Mr. Clarke?

14                 MR. CLARKE:  Thank you, your Honor.

15                     CROSS EXAMINATION

16   BY MR. CLARKE:

17   Q.    Ms. Frakes, when the computer was purchased, it was

18          just you and Jason in the home; is that correct?

19   A.    Yes.

20   Q.    And approximately how old is Jason?

21   A.    Thirty-seven.

22   Q.    And he has always lived in the home with you; is that

23          true?

24   A.    Yes.

25   Q.    He's never moved out?

1  A.  Right.

2  Q.  You have then obviously Casey.  He's younger than

3      Jason?

4  A.  Yes.

5  Q.  He's moved out?

6  A.  Yes.

7  Q.  He relatively recently moved back in with you?

8  A.  Yes.

9  Q.  And then you have another son who is older, Jon?

10 A.  Yes.

11 Q.  Jon --

12 A.  My middle son, yes.

13 Q.  And he also lives in Atchison; is that true?

14 A.  Yes.

15 Q.  Now the computer was purchased through your work, and

16     Jason paid for it?

17 A.  Yes.

18 Q.  And it was placed in a room, a spare room, is that

19     true, at the time?

20 A.  Well, it was -- it's always been a bedroom, yes,

21     uh-huh.

22 Q.  But at the time that the computer was purchased, no

23     one was living in that room; is that true?

24 A.  Yes.

25 Q.  So basically you have -- you had your own bedroom;

1          Jason had his bedroom; and the computer was set up in

2          a spare bedroom?

3    A.   Yes.

4    Q.   And then later on Casey moved back.  That was the

5          room that became his bedroom; is that true?

6    A.   Yes.

7    Q.   And prior to Casey moving back, both you and Jason

8          used that computer; is that true?

9    A.   Yes.

10   Q.   Did you ever use the computer with Jason?

11   A.   He may have called me in there to look at something

12         that he was looking at, or we may have gone in to

13         look something up.  I don't remember any specific

14         things.

15   Q.   Now, you were asked about your own computer use, and

16         you use a computer at work, don't you?

17   A.   Yes, uh-huh.

18   Q.   When I say a computer, it's a PC?

19   A.   Yes.

20   Q.   Your son Jason knows how to use a computer at least

21         basically; true?

22   A.   Yes.

23   Q.   He's had some technical training post high school,

24         drafting?

25   A.   Yes, uh-huh.

1    Q.   You remember June 10 pretty clearly, don't you?

2    A.   Yeah.

3    Q.   What about March 12?  Do you remember that day?

4    A.   No.  I couldn't even tell you what day that was.

5    Q.   What about December 9 of 2007?

6    A.   Nothing specifically, no.

7    Q.   So the reason you remember June 10 is because that's

8         the date law enforcement came to your house and

9         searched it; right?

10   A.   Yes.

11   Q.   In terms of the dynamics in the home, is everyone

12        free to go wherever they want in the house?

13   A.   Oh, yeah.

14   Q.   Does everyone talk to each other on a daily basis?

15   A.   Yes.

16   Q.   Do the boys -- you were asked about the utilities.

17        Are some of the utilities in Jason or Casey's name?

18   A.   No.

19   Q.   Do they contribute to that stuff?

20   A.   Yes.

21   Q.   What kind of -- during 2007 and 2008 to the best of

22        your recollection what kind of hours did the boys

23        keep?

24   A.   Jason works -- he goes in at five, and usually,

25        unless he has to work overtime, gets off at 1:30 in

1    the afternoon.  Casey, depending on what job he

2    worked, depending on what -- when he was home what

3    hours he worked, if he was working at Long John's, he

4    might go in at 8:00, 830 in the morning and, I don't

5    know, sometimes 3:00, 4:00 o'clock.  Maybe later. I

6    don't remember for sure what shifts he worked.

7    Sometimes he worked mornings; sometimes he would work

8    later in the afternoon until the evening.  They both

9    did seasonal work.

10   Q.   So, for example, they both worked at Snow Creek?

11   A.   Yes.

12   Q.   For those who might not know, Snow Creek is a ski

13        facility?

14   A.   Ski resort, uh-huh.

15   Q.   You were asked about the profiles that were on the

16        computer, and do you remember when those profiles

17        were set up?

18   A.   I don't remember exactly the day, but I would assume

19        shortly after we had gotten the computer.

20   Q.   Do you remember how close in time it was from when

21        the computer was purchased and placed in the home to

22        when Casey moved back home?

23   A.   I can't tell you an exact time.  I would say a few

24        months maybe.  I'm not sure.

25   Q.   Jon would come over to the house; true?

1  A.   Yes.

2  Q.   Weekly basis?

3  A.   Yes.

4  Q.   Sometimes more, sometimes less?

5  A.   Yes.

6  Q.   And he would use the computer sometimes when he came

7       over to your house; is that true?

8  A.   Yes.

9  Q.   And when your boys were using the computer, were you

10      paying attention to what any of them were doing

11      particularly?

12 A.   No.  I usually was in the front of the house, front

13      part of the house.

14 Q.   To your recollection were any of the profiles on the

15      computer ever protected, meaning that you had to

16      enter a password in order to use that profile?

17 A.   No.

18           MR. CLARKE:  No further questions, your

19      Honor.

20           THE COURT:  Ms. Martin?

21           REDIRECT EXAMINATION

22 BY MS. MARTIN:

23 Q.   You mentioned your son Jon.  How often did he

24      actually come over and use the computer?

25 A.   For a while it might have been once or twice a week,

1          maybe, that I'm aware of.

2     Q.   Within the last year, let's say.

3     A.   Within the last year?

4     Q.   Yeah, within the last year.

5     A.   The same, I would say.

6     Q.   Maybe once a week, twice a week?

7     A.   Uh-huh.

8     Q.   And if I told you that you purchased your computer in

9          November of 2006, would you disagree with that?

10    A.   I can't remember exactly when it was purchased, no.

11    Q.   Okay.

12    A.   I'm sorry.

13    Q.   2004, would that seem about the right time frame?

14    A.   That would seem more -- I was going to say four or

15         five years.

16    Q.   And if the computer records show that Casey's profile

17         was added in January of 2005, would that seem about

18         right?

19    A.   I don't know for sure.  I can't give an exact date.

20         I don't remember for sure.

21    Q.   Okay.  Did you have a computer in the house before

22         this particular one?

23    A.   Yes.

24    Q.   Where was it?

25    A.   In the same room.

1   Q.  So that's basically the room that the computer's

2      always been in?

3   A.  Yes.

4   Q.  Whether Casey was there or not?

5   A.  Exactly.

6          MS. MARTIN:  I have no further questions,

7      your Honor.

8          THE COURT:  Mr. Clarke?

9          MR. CLARKE:  Yes, your Honor.

10         RECROSS EXAMINATION

11  BY MR. CLARKE:

12  Q.  Ms. Frakes, if I understood one of the questions you

13      were just asked, it was how often Jon came over and

14      used this computer in the last year?  Do you remember

15      that?

16  A.  Uh-huh.

17  Q.  This computer hasn't been in your home for the last

18      year, has it, approximately?

19  A.  Not for the last year, no.

20  Q.  Thank you.

21         THE COURT:  Ms. Martin, anything further?

22        REDIRECT EXAMINATION

23  BY MS. MARTIN:

24  Q.  Let me clarify that.  How about the year before it

25      was seized by the government?

1    A.    Yes, the year before, yes.

2    Q.    Your answer would still be the same?

3    A.    Yes.

4    Q.    Maybe once, maybe twice a week?

5    A.    Yes.

6                    MS. MARTIN:  Thank you.

7                    THE COURT:  Anything further, Mr. Clarke?

8                    MR. CLARKE:  No, your Honor.

9                    THE COURT:  Ms. Frakes, you may step down.

10         Without objection you are excused.  The government

11         may call its next witness.

12                   MS. MARTIN:  Your Honor, we would call

13         Jason Frakes.

14                   THE COURT:  Let me do this instead.

15         Actually, members of the jury, I'm going to have to

16         have a little bit of an unusual schedule today

17         because I have an administrative matter I have to

18         attend to, so I'm going to break at 11:30 for our

19         lunch recess, and we won't pick up again until about

20         ten minutes after one.  That's a lot longer than I

21         normally would do, and I apologize to the extent that

22         that inconveniences folks, but I'm going to take our

23         morning recess as a result right now.  That will give

24         us a little break, and we will come back and go until

25         11:30.  Let's see if we can make it on ten minutes,

1    and we will be back at 20 after.  I'll remind the

2    jury of the admonitions, and Ms. Ludwig will take

3    charge of the jury.  We are in recess.

4              (A recess was taken.)

5              THE COURT:  If we're ready to proceed, I

6    will have Ms. Scheurer bring in the jury.

7              (The following proceedings were had in the

8    presence of the jury:).

9              THE COURT:  Ms. Martin, the government may

10   call its next witness.

11             MS. MARTIN:  Your Honor, we would call

12   Jason Frakes.

13                  JASON P. FRAKES,

14   having been duly sworn, was examined and testified as

15   follows:

16                DIRECT EXAMINATION

17   BY MS. MARTIN:

18   Q.   Mr. Frakes, do you know the defendant?

19   A.   Yes, ma'am.

20   Q.   How do you know him?

21   A.   He's my brother.

22   Q.   Can you tell us where you live.

23   A.   1115 Summit with my mother and my brother.

24   Q.   And that's in Atchison, Kansas?

25   A.   Yes, ma'am.

1   Q.   Does anybody else live there with you?

2   A.   No.

3   Q.   Did anybody else live there with you in March of

4       2008?

5   A.   No.

6   Q.   Can you tell us if you have a computer.

7   A.   Not currently, I don't have a computer, but I did

8       have.

9   Q.   In March of 2008?

10   A.   Yeah.

11   Q.   Can you tell us how you guys got that computer.

12   A.   Like my mom stated, she got a computer offered to her

13       through her work, and it was payroll deducted, and

14       then I gave her money to pay her back for it.

15   Q.   Okay.  And when you got the computer, was Casey

16       living in the house?

17   A.   I don't believe so, not at that time.

18   Q.   So when the computer was brought home, you turned it

19       on and set it up?

20   A.   Yeah.  Basically at the time that I got it I believe

21       one of my ex-girlfriends was living there.  She

22       helped me set it up.

23   Q.   So between the two of you, you were able to put the

24       profiles on?

25   A.   I believe she did most of that stuff.

1    Q.    So how would you describe your abilities with

2          computers?

3    A.    Well, if my mom said she was basic, then I'm probably

4          a little bit below her.

5    Q.    Okay.  And when you got the computer, where did you

6          put it in the house?

7    A.    We put it back in the back room, which was Casey's

8          room.

9    Q.    Is that where your computers always were?

10    A.    Yeah.  That's where we would always put our computer.

11    Q.    There were times when Casey lived in that bedroom and

12          you had a computer in there, and after he moved out

13          the computer stayed in there?

14    A.    Yes.

15    Q.    When you got the new computer, it went in there?

16    A.    Yes.

17    Q.    When Casey moved back in, he just went back into his

18          room?

19    A.    Yeah.

20    Q.    So did you use the computer?

21    A.    Yeah.

22    Q.    About how often did you use it?

23    A.    Well, I would probably use it every day if I could.

24    Q.    Okay.  What did you use it for?

25    A.    If it was available.

1   Q.   I'm sorry?

2   A.   If it was available, if Casey wasn't on it, or

3       somebody else.

4   Q.   And who used the computer the most?

5   A.   Well, since it was back there, I would say Casey

6       slightly more than me.

7   Q.   What did you use the computer for?

8   A.   I just -- I consider it normal stuff, just like my

9       mom said, probably internet banking and pay bills and

10      check bills and, you know, just read material, some

11      e-mails maybe, and, like, just articles on the web.

12   Q.   Okay.  And you also played some computer games?

13   A.   Yeah.  I had a few.

14   Q.   A treasure hunt game, something like that?

15   A.   No.  I didn't actually --

16   Q.   I can't remember the name.

17   A.   I didn't actually play any games on the internet

18      itself, just ones that we purchased and put on the

19      computer.

20   Q.   Okay.  So you didn't play online games; you didn't

21      have online gaming?

22   A.   No.

23   Q.   They were just games on your computer?

24   A.   [Nodded head.]

25   Q.   Do you know what LimeWire is?

| | | |
|---|---|---|
| 1 | A. | I do now. |
| 2 | Q. | Okay.  At the time, in March of 2008, did you? |
| 3 | A. | Yeah, I believe so.  I was -- I knew of LimeWire. |
| 4 | Q. | Did you install LimeWire on your computer? |
| 5 | A. | No, I did not. |
| 6 | Q. | And did you ever use LimeWire on your computer? |
| 7 | A. | Not really.  I don't believe so. |
| 8 | Q. | Not really or you did or you didn't? |
| 9 | A. | As in -- no, not really, I didn't.  I mean I knew it |
| 10 | | was on there, but I didn't go in and download |
| 11 | | anything on it, if that's what -- |
| 12 | Q. | Okay.  That's what I'm asking.  Did you use LimeWire |
| 13 | | to download any music or movies or anything like |
| 14 | | that? |
| 15 | A. | No. |
| 16 | Q. | Okay.  And did you get an MP3 player?  Do you |
| 17 | | remember telling me about getting an MP3 player? |
| 18 | A. | Yeah. |
| 19 | Q. | Go ahead. |
| 20 | A. | My mom purchased one for me for Christmas. |
| 21 | Q. | What did you do with it? |
| 22 | A. | We put some music on it. |
| 23 | Q. | Who did? |
| 24 | A. | Casey did. |
| 25 | Q. | Okay.  And why was that? |

1   A.   Basically he just grabbed it and did it.

2   Q.   Did you know how?

3   A.   Well, I didn't ever do it, so technically, no, I

4       guess not.  I mean, I am sure I could figure it out.

5   Q.   At the time you hadn't ever done it and you weren't

6       sure how to do it?

7   A.   No.

8   Q.   Okay.  Now, you had a profile on the computer, and

9       your mom had a profile, and Casey had a profile.  Are

10      those the only people who had profiles?

11  A.   No.  My ex's was on there still, and my brother Jon.

12  Q.   And how often -- when did your ex-girlfriend -- did

13      she live there?

14  A.   Yeah, she lived there.

15  Q.   When did she live there?

16  A.   I'm not really for sure.  It's been a few years.

17  Q.   So it's been a while?

18  A.   Yeah.

19  Q.   So you just didn't remove the profile?

20  A.   Right, right.

21  Q.   So she would not have been using the computer in

22      March of 2008?

23  A.   No.

24  Q.   And your brother Jon, you said he did not live at the

25      house in 2008?

| | | |
|---|---|---|
| 1 | A. | That's correct.  He did not. |
| 2 | Q. | And so how often did he come over and use the |
| 3 | | computer? |
| 4 | A. | As I told you.  I think sometimes maybe once a week, |
| 5 | | sometimes not at all.  Just sporadically. |
| 6 | Q. | Not -- very rarely? |
| 7 | A. | Yeah. |
| 8 | Q. | Now, when you would sit down and get on the computer, |
| 9 | | did you usually log in under your profile? |
| 10 | A. | Yeah.  If I had to go in and turn the computer on, |
| 11 | | yeah, I logged in under my profile. |
| 12 | Q. | But was that your experience?  In other words, most |
| 13 | | of the time you went in there, was the computer |
| 14 | | already running? |
| 15 | A. | A lot of times, yeah, the computer was already on. |
| 16 | Q. | And do you know whose profile had been running? |
| 17 | A. | I can't say for sure who it was all the time, but I |
| 18 | | imagine most of the time it was Casey's. |
| 19 | Q. | If it was already up and running, you would go ahead |
| 20 | | and sit down and use it? |
| 21 | A. | Right. |
| 22 | Q. | But you didn't ever use it to download anything? |
| 23 | A. | No, not -- |
| 24 | Q. | And when you were -- when you would come in and |
| 25 | | Casey's profile would be running, did you ever see |

         anything -- did you ever see any pornographic movies?

2   A.   I did see a couple things listed on there.

3   Q.   Okay.  And did you ever talk to your brother about

4        that?

5   A.   I believe I had made comments to him before.

6   Q.   Okay.  What did he say?

7   A.   He just would basically, you know, he apologized,

8        said he wouldn't do it any more.

9   Q.   And what would you say -- how often or how frequently

10       would you say that your brother was on the computer

11       downloading videos or music?

12  A.   I don't know for sure.

13  Q.   Was it a lot or a little?

14  A.   I don't know if that's what he was doing.  He would

15       do that.

16  Q.   I'm sorry?

17  A.   I don't know how often he would do it, but I did know

18       he did download music.

19  Q.   How long would he spend at the computer at any given

20       time?

21  A.   When I was there, he was on there quite a bit when he

22       would come home from work.

23  Q.   Are you talking about hours at a time?

24  A.   Hours, yeah.

25  Q.   I'm sorry?

```
 1   A.    Hours.
 2               MS. MARTIN:  I have no further questions,
 3         your Honor.
 4               THE COURT:  Mr. Clarke?
 5                    CROSS EXAMINATION
 6   BY MR. CLARKE:
 7   Q.    Mr. Frakes, when you used the computer, did you keep
 8         the door open or closed?
 9   A.    Open.
10   Q.    When your brother Casey was using the computer, was
11         the door open or closed?
12   A.    It was mostly closed.
13   Q.    How do you know he was using the computer if the door
14         was closed?
15   A.    Because sometimes I would go back there and check on
16         him for supper or tell him he had a phone call or
17         something and he would be on the computer.
18   Q.    Would you agree with me while the door is closed you
19         don't know what's going on back there until you
20         actually go and see what he's doing?
21   A.    Correct.
22   Q.    Because, unlike your room, his room was both a
23         community area and his bedroom; right?
24   A.    Correct.  I would say so, yes.
25   Q.    You work at Bizmiz?
```

1   A.   Bushmize.

2   Q.   All right.  What is that business?

3   A.   It's a wholesale hardware distributor.

4   Q.   And you've worked there for a fair bit of time;

5        right?

6   A.   Yes, sir.

7   Q.   What do you do there?

8   A.   Like, the team lead on the receiving dock.

9   Q.   And in the course of your business you do use a

10       computer and software?

11  A.   We use a computer, but it's a company.  They made up

12       their own program.

13  Q.   And you received training on how to use that program?

14  A.   Well, yeah.

15  Q.   Or did you mostly figure it out?

16  A.   No.  They showed us.  They trained us how to use it.

17  Q.   Now, sounds like you've got an email account.

18  A.   Yes, sir.

19  Q.   Is it Yahoo mail, Gmail, what kind of account?

20  A.   It's AOL account, and I had a Hotmail account.

21  Q.   Who set up the AOL account?

22  A.   I did.

23  Q.   Who set up the Hotmail account?

24  A.   Me and Angela.

25  Q.   And is Angela the girl that set up the profiles?

    1    A.    Yes, sir.

    2    Q.    You've got a high school certificate or diploma; is

    3          that right?

    4    A.    Yes, sir.

    5    Q.    And you've had some technical training beyond high

    6          school; is that true?

    7    A.    That's true.  I went to drafting school for a year.

    8    Q.    You didn't necessarily complete the program, but you

    9          went for about a year; is that right?

   10    A.    Yes, sir.

   11    Q.    And as part of that schooling you had some computer

   12          training; is that true?

   13    A.    We had a little bit, but it was mostly just bookwork,

   14          basic courses in math and codes and stuff for

   15          drafting and building codes and things like that.

   16    Q.    Did you use a software program called Autocad?

   17    A.    Yes, we did use it a little bit.

   18    Q.    You said you used the computer, if I understood you

   19          correctly, for browsing the net and reading articles?

   20    A.    Yeah.  Like on Yahoo or AOL, the home page type

   21          things, the main page, click on these articles and

   22          such.

   23    Q.    Would you use the computer for looking up hunting

   24          stuff?

   25    A.    Yeah.

1    Q.   What kind of stuff would you look up on the computer

2          in relation to hunting?

3    A.   We would just -- well, I would go to, like, different

4          hunting sites and look at stuff on there.

5    Q.   So would you have used the computer on occasion for

6          an hour or more at a time looking at hunting stuff?

7    A.   Yes, sir.

8    Q.   You said you used the computer for online banking; is

9          that right?

10   A.   Yes, sir.

11   Q.   And you also use a software program to manage your

12         finances, Microsoft Money; is that right?

13   A.   Yeah, I had.

14   Q.   Was your Microsoft Money program set up so that it

15         interfaced with the internet and your bank account?

16   A.   No, sir.

17   Q.   On the online banking, did you set that up?

18   A.   Online banking?

19   Q.   Yes.

20   A.   Yeah.  I just go in, set up a password and stuff, and

21         put your account number in, yeah.

22   Q.   So when you set up the online banking, it basically

23         took you through a series of steps that asked you to

24         click yes or no or input account number, things of

25         that nature; is that right?

1    A.    Yes.

2    Q.    You were able to do that without assistance?

3    A.    Yes, sir.

4    Q.    Did you have any formal training in using Microsoft

5          Money?

6    A.    No sir.

7    Q.    Did you basically kind of figure it out on your own?

8    A.    Well, Angela and myself did, my former girlfriend.

9    Q.    Do you still have an MP3 player?

10   A.    Yes, sir.

11   Q.    Is it the same one that your mom gave you for

12         Christmas?

13   A.    Yes, sir.

14   Q.    Are there music files on that MP3 player that were

15         downloaded using the LimeWire program?

16   A.    I don't know that.

17   Q.    Are there music files that came off the computer on

18         your MP3 player?

19   A.    I'm assuming so, sir, yes.

20                   MR. CLARKE:   No further questions.

21                   THE COURT:   Ms. Martin, any redirect?

22                   MS. MARTIN:   Nothing further, your Honor.

23                   THE COURT:   Mr. Frakes, you may step down.

24         Without objection you are excused.   The government

25         may call its next witness.

1          MS. MARTIN:  Your Honor, the next witness

2      that the government would call would be Agent Jim

3      Kanatzar.

4                   JAMES DEAN KANATZAR,

5  having been duly sworn, was examined and testified as

6  follows:

7                   DIRECT EXAMINATION

8  BY MS. MARTIN:

9  Q.   Agent Kanatzar, can you tell us what you do for a

10     living.

11 A.   I'm a senior special agent with Immigration and

12     Custom Enforcement.

13 Q.   How long have you done that?

14 A.   Over 20 years.

15 Q.   Can you tell us what sort of training you had to

16     become an agent with the Bureau of Immigration and

17     Customs Enforcement?

18 A.   Yes.  When I was hired, I went through the Federal

19     Law Enforcement Training in Glenco, Georgia, went

20     through their training.

21 Q.   I'm going to stop you there.  Can you slow down a

22     little bit.

23 A.   Okay.

24 Q.   Thank you.  You went through?

25 A.   Federal law enforcement training.

1    Q.   And where was that?

2    A.   In Glenco, Georgia.

3    Q.   How long was that training?

4    A.   Over four months.

5    Q.   And do you have follow-up training for law

6         enforcement like we do for lawyers?

7    A.   Yes.

8    Q.   Like a continuing training?

9    A.   Yes.

10   Q.   And so over the course of the last 20 years how many

11        other training courses have you attended?

12   A.   Numerous.

13   Q.   Now, at some point in your career you became involved

14        in investigating child pornography and working with

15        computer forensics.  Can you tell us when that was.

16   A.   Yes.  In 1998, in January of 1998.

17   Q.   And so what are your duties today with Immigration

18        and Customs Enforcement?

19   A.   Like I said, I'm the senior special agent with them.

20        I'm assigned to the national security unit.  Most of

21        my cases have been child pornography cases, and I

22        also do computer forensics for the Kansas City

23        office.

24   Q.   All right.  Just so I don't keep butchering this, is

25        it okay with you if I call it ICE instead of

1    Immigrations and Custom Enforcement?

2    A.    Yes.

3    Q.    When you became involved with computer forensics,

4          were you required to go to some specialized training?

5    A.    Yes.

6    Q.    And what was that?

7    A.    We called it SCERS, but it was Seize Computer

8          Evidence Recovery Training.  It was down also in

9          Georgia.  It was over a six-week period of training

10         which taught us how to seize and mirror computer hard

11         drives using software to analyze the mirror image of

12         the computer.  He was given equipment to do that

13         with, and software.

14   Q.    All right.  And why is it important to use a mirror

15         image of a computer?  First of all, what is a mirror

16         image of a computer?

17   A.    We use various software to take an image of the

18         computer, and basically it takes a byte-by-byte image

19         from that computer, and it's an exact copy of what's

20         contained on that computer.

21   Q.    So if the computer hard drive was a piece of paper,

22         it would be like a photocopy?

23   A.    Similar, yes.

24   Q.    Okay.  So why do you do that?

25   A.    Well, then I use that mirror image to do my analysis

1        so I preserve the original evidence.

2   Q.   And is there a reason for doing that?  Can things

3        happen during your analysis that would change the

4        evidence, for instance?

5   A.   Well, when you mirror a computer, I use a write

6        blocking device so I don't write or add anything to

7        the hard drive, but if you work off the original

8        media, if you didn't have the blocking device, you

9        could ultimately change the access dates or file

10       creation dates on a file.  So I make a mirror image

11       and analyze that mirror image.

12  Q.   And have you as part of your duties then also

13       participated in search warrants relating to child

14       pornography?

15  A.   Yes.

16  Q.   About how many?

17  A.   I have connected well over a hundred child porn

18       investigations and executed over 70 -- 60 to 70

19       federal search warrants related to child pornography.

20  Q.   Approximately how many computers have you analyzed?

21  A.   Well over 300 computers.

22  Q.   In the process of analyzing and examining these

23       computers, approximately how many images of child

24       pornography or movies of child pornography have you

25       reviewed?

1   A.   Well over -- approximately 1 million images.

2   Q.   Okay.  And in the process of reviewing those images,

3       do you become aware of images?  In other words, you

4       see the same images sometimes in every case?

5   A.   Yes.  Over and over again, yes.

6   Q.   Okay.  And some of those images are what we call

7       known images; is that correct?

8   A.   Yes.

9   Q.   And can you tell us what that means.

10   A.   Well, known images is the victims of the images are

11       known to law enforcement or have been identified as

12       an actual person in that image.

13   Q.   All right.  So movies that you've seen, somebody has

14       been able to identify the person or child in that

15       scene as a real victim?

16   A.   Yes.

17   Q.   All right.  Now, did you investigate this defendant?

18   A.   Yes.

19   Q.   Can you tell us how you became involved with this

20       investigation?

21   A.   Yes.  I received a telephone call from Detective

22       Terry Kelley with Atchison Police Department, and he

23       told me that he had a child porn investigation and

24       requested my assistance.

25   Q.   Okay.  And so did you go and meet with Detective

1     Kelley?

2  A.   Yes, I did.

3  Q.   And what happened then?

4  A.   Like I said, I went to his office.  He had a CD that

5     he was given.  Reviewed that CD.  It had the movies,

6     the two movies that were downloaded by Detective John

7     Howe.  We reviewed the movies.  We also -- he also

8     had on the CD the AT&T information related to the IP

9     address that was captured during the download of

10    those movies.

11  Q.   So at this time you were focused on a particular

12    address and a particular account, internet account?

13  A.   Yes.

14  Q.   Your investigation was?

15  A.   Yes.

16  Q.   All right.  Is it uncommon that when you are at this

17    stage of the investigation that you don't know

18    exactly who at that house is using the computer for

19    the child pornography?

20  A.   Yes, correct.

21  Q.   That's pretty common?

22  A.   Right.

23  Q.   All right.  So you reviewed those two movies

24    yourself?

25  A.   Yes.

1   Q.   And what -- did you determine that they were child

2        pornography?

3   A.   The one I did.

4   Q.   The very first one?

5   A.   Fourteen Kimmy.

6   Q.   So you believed that met the definition of child

7        pornography?

8   A.   Yes, I do.

9   Q.   So had you seen that movie before?

10  A.   Yes.

11  Q.   But it's not a known victim?

12  A.   No.

13  Q.   All right.  So then what did you guys do after you

14       reviewed the movies and determined --

15  A.   We did some background checks on the residence.  I

16       had Detective Kelley check his system, see if he's

17       encountered the family before.  I think I did some

18       credit records checks, and we also did a drive by the

19       address.

20  Q.   What did you do with that information?

21  A.   I applied for a federal search warrant.

22  Q.   And did you get a search warrant?

23  A.   Yes, I did.

24  Q.   And did you then go and serve that search warrant?

25  A.   Yes.

1  Q.  When was that?

2  A.  June 10 of 2008.

3  Q.  And what evidence did you recover from that search

4     warrant?

5  A.  At the time we went in, there were two computers at

6     the residence.  I think we seized a couple CD Rom

7     disks and some basic paperwork.

8  Q.  Okay.  Tell us about the computer that's not at issue

9     in this case.

10 A.  It was a laptop computer that belonged to the aunt,

11    Debra Sass.  It was located in, I believe, Pam's

12    bedroom, and she told me during the interview that

13    the computer was not hooked to the internet and it

14    was basically used for the granddaughter to play

15    games and stuff on.

16 Q.  Okay.  But you did take it as part of your

17    investigation?

18 A.  Yes, I did.

19 Q.  And did you analyze that lap top?

20 A.  Yes.

21 Q.  And did you find anything on it?

22 A.  No.

23 Q.  What did you do with it then?

24 A.  I returned that lap top.

25 Q.  So what other evidence did you seize?

| | | |
|---|---|---|
| 1 | A. | A Dell computer. |
| 2 | Q. | And where did you seize it from? |
| 3 | A. | It was identified -- it's in the bedroom of the |
| 4 | | residence in which was told to us belonged to Casey |
| 5 | | Frakes' bedroom. |
| 6 | Q. | So the defendant's bedroom contained the computer? |
| 7 | A. | Yes. |
| 8 | Q. | And you seized that as evidence? |
| 9 | A. | Yes. |
| 10 | Q. | I'm going to hand you what's been marked as |
| 11 | | Government's Exhibit 15.  Can you tell me what that |
| 12 | | is. |
| 13 | A. | Yes.  This is the hard drive from the Dell computer. |
| 14 | | I've removed the hard drive from the computer and put |
| 15 | | it in this evidence bag. |
| 16 | Q. | Okay.  And has that been in your custody since you |
| 17 | | seized it? |
| 18 | A. | Yes. |
| 19 | Q. | And as you said, you took it, you mirrored it, and |
| 20 | | then you put the original into evidence; is that |
| 21 | | correct? |
| 22 | A. | Right. |
| 23 | | MS. MARTIN:  Your Honor, I would offer |
| 24 | | Government's Exhibit 15. |
| 25 | | THE COURT:  Is it 15 or 16 on the exhibit |

1        list?  The hard drive is shown as 16.

2                     MS. MARTIN:  It is 15.  I think we did an

3        amended list because we had a duplicate, 15.

4                     THE COURT:  Gotcha.

5                     MS. MARTIN:  I apologize.

6                     THE COURT:  No problem.  I just want to

7        keep it straight.  I thought you said 15, but when I

8        looked at the exhibit list, it looked like it might

9        be 16.  Is there any objection?

10                     MR. CLARKE:  No, your Honor.

11                     THE COURT:  All right.  Exhibit 15 is

12       admitted.

13                     (Exhibit 15 was admitted into evidence.)

14   Q.   (By Ms. Martin) So tell us about examining this

15        computer hard drive that's Government's Exhibit 15.

16   A.   Like I said, once I got the Dell back to the office,

17        I took the drive from the computer and then put a

18        write blocking device on the computer so I didn't

19        make any writes to the drive, and I made a

20        byte-by-byte copy of the contents of the drive.

21   Q.   Okay.  And then once you have the copy to work from,

22        what do you do then?

23   A.   Then I use -- in this case I would use EnCase

24        forensic software to analyze the drive.

25   Q.   And what does EnCase do for you?

```
1    A.   It allows me to see the contents.  It puts the
2         mirrored image into a working tree, where I can
3         analyze the contents.
4    Q.   Okay.  So it makes it easier for you to search the
5         computer?
6    A.   Yes.  It has fewer programs and stuff associated with
7         it.
8    Q.   So do you have to load that onto the computer, onto
9         the computer hard drive?  Do you have to load the
10        EnCase software onto that?
11   A.   On my forensics computer.
12   Q.   So it's on your computer, and then you put the
13        computer hard drive in your computer?
14   A.   Well, when I make a mirror image, I mirror the
15        contents to another hard drive onto a forensic hard
16        drive, and that's connected to my forensic computer,
17        which I can pull up EnCase and pull that image up.
18   Q.   Okay.  I'm going to hand you what's been marked as
19        Government's Exhibit 16.  Can you tell me what that
20        is.
21   A.   Yes, it's a screen print PowerPoint presentation.
22   Q.   Is that something you prepared for court?
23   A.   Yes.
24   Q.   Okay.  And is that something that would help us go
25        through the file structure of the defendant's
```

```
 1        computer so we could see what you saw at the time?
 2   A.   Yes.
 3   Q.   And is that a true and accurate depiction of the file
 4        structure of the defendant's computer at the time?
 5   A.   I have to play it, but --
 6   Q.   Well, you created it?
 7   A.   Oh, yes.  What I put on here, yes.
 8   Q.   Okay.
 9                 MS. MARTIN:  Your Honor, I offer
10        Government's Exhibit 16.
11                 THE COURT:  Any objection?
12                 MR. CLARKE:  Your Honor, I would object at
13        this point until we have had an opportunity to
14        actually see the exhibit itself, what it depicts.
15                 THE COURT:  Well, if we see the exhibit, it
16        will be displayed to the jury, so what do you mean by
17        that?  Are you meaning that you need to see it
18        outside the presence of the jury to determine whether
19        or not it is what it purports to be?
20                 MR. CLARKE:  No, your Honor.  It would be
21        my understanding that they possibly could be shown to
22        the jury without admitting them, but then it may not
23        go back to deliberations with them.
24                 THE COURT:  No, no, it would not be shown
25        to the jury without being admitted into evidence, so
```

1    the question is, has this witness laid a proper

2    foundation for this being what he says it is?

3              MR. CLARKE:  Yes, Judge, he has.

4              THE COURT:  Very well.  The exhibit is

5    admitted.

6              (Exhibit 16 was admitted into evidence.)

7              (Exhibit No. 16 was played in open court.)

8              THE COURT:  I assume what we're doing is,

9    while Exhibit 16 is a free-standing exhibit, you have

10   preloaded the contents of that exhibit on a lap top

11   for purposes of connecting to the viewing system and

12   expediting presentation; is that correct?

13             MS. MARTIN:  Yes, your Honor, and it is on

14   a disk for the record of the case.

15   Q.  (By Ms. Martin) So this is just the beginning page

16       that you created to start the presentation; is that

17       accurate?

18   A.  Yes.

19   Q.  Okay.  Can you tell us what this is.

20   A.  Okay.  This is a screen print of my forensic

21       computer.  I've got EnCase up and running.  I've got

22       the mirrored image of this hard drive up and

23       displayed on the screen here, and what I've got

24       highlighted is the document and settings folder on

25       that computer, and it shows the profiles that's

1  loaded on this computer.

2  Q.  Okay.  Before we get too far, I want to double check

3     and make sure these screen prints that we're looking

4     at were from your analysis of the computer hard

5     drive, which is Exhibit 15, the mirror image of

6     Exhibit 15.

7  A.  Yes.

8  Q.  So you have the documents and settings, and it has

9     all the users listed?

10 A.  Yes.

11 Q.  Can you tell us what users are listed under the

12    documents and settings.

13 A.  Okay.  You got all users; you have Angela; you have

14    Casey; you have default user; you have Jaybird; you

15    have Jon; you have local services, local services NT

16    authority; and you have mom; and the last one is

17    network services.

18 Q.  And I forgot to ask, but Jaybird, whose profile is

19    that?

20 A.  I believe it's Jason.

21 Q.  Okay.  Can you tell us what we're seeing now?  Can

22    you back up just one --

23 A.  I can try.  On the right-hand side it will show the

24    file creation.  You see the column with the red

25    arrow?  That tells me when the -- those profiles were

1           installed on the computer.

2    Q.    Okay.  So it will tell you when each person's profile

3           was added?

4    A.    Yes.

5    Q.    Can you tell us when Casey's profile was added?

6    A.    January 4, 2005.

7    Q.    And everybody else, it appears to me that everybody

8           else's profile was added on -- at or about the same

9           time, in November of '04?

10   A.    Yes.  The all users, the default user, local

11          services, the two local services, and the network

12          services, that's part of the software that loads up

13          under the windows that's already loaded on the

14          computer.

15   Q.    When you buy the computer, they already have that?

16   A.    If you make any changes, it may change the one

17          folder.  I think the one folder is added later on the

18          network.

19   Q.    And it looks like mom's profile was added in December

20          of '04?

21   A.    Yes.

22   Q.    Okay.  What are we seeing here?

23   A.    Again, under the all users -- under document settings

24          I've got open the all users profile, and I've opened

25          up the application data, and these are programs that

1          are installed under that profile.

2     Q.   Okay.  Under the all users profile?

3     A.   Yes.  And I'm looking for LimeWire, and you see it's

4          listed in alphabetical order.  LimeWire is not

5          installed under the all users profile.

6     Q.   And when you say all users profile, that doesn't show

7          us all the applications on the entire computer under

8          all users profiles?

9     A.   No.  It's just -- all users is another name for

10         administrator.  Usually you don't see it called all

11         users.  Usually it's administrator.

12    Q.   But as you said, you do not see LimeWire loaded under

13         this?

14    A.   Under that profile.

15    Q.   What is this?

16    A.   The start menu under the all users profile.  These

17         are the programs that can be loaded up on the start.

18    Q.   Okay.  Is LimeWire listed to start -- to load upon

19         starting under the all users profile?

20    A.   No.

21    Q.   Okay.

22    A.   Next we have Angela's profile, and I have open the

23         application data.  I'm looking again to see what

24         programs are installed under her profile, and

25         LimeWire is not installed under her profile.

1    Q.    Are there any -- does it appear that she has any

2          other software sharing programs under her profile?

3    A.    No.  And then under her profile on the startup menu

4          are programs that will start up on her boot up.

5    Q.    When you say that, if she sits down and the computer

6          is turned off and she turns it on and logs on under

7          her profile, these are the programs that will begin

8          running?

9    A.    Yes.

10   Q.    What is this?

11   A.    This is Casey's profile.  I've got open the

12         application data profile, and you'll see LimeWire is

13         installed under his profile.

14   Q.    Does it show when LimeWire was installed?

15   A.    Yes.  Over on the -- I've got it highlighted.  The

16         blue mark across shows August 10 of 2006.

17   Q.    What is this?

18   A.    I highlighted the folder and some of the files that

19         are under the LimeWire directory.

20   Q.    And can you explain that better.

21   A.    LimeWire doesn't keep log files.  You know, I'm

22         looking, you know, like, for all files pulled down on

23         a certain date.  Some programs will keep that

24         information, and LimeWire is not one of them.

25   Q.    Okay.  Along those same lines, does LimeWire keep

1    your search terms?  Not to where -- no.  I mean, it

2    doesn't create a folder that types your search terms,

3    no.

4  Q.  There are other programs that do; is that correct?

5  A.  Again, yes.

6  Q.  So when you're doing your investigations, sometimes

7    it's easy because you can find out what terms the

8    person is using to pull up what they are searching

9    for?

10  A.  That's correct.

11  Q.  But to your knowledge LimeWire doesn't do that?

12  A.  Yes.

13  Q.  All right.  So are there any files or folders on this

14    screen that you want to make note of?

15  A.  I just had highlighted the LimeWire props directory,

16    and that kind of shows when it was installed and some

17    of the settings, but I just --

18  Q.  Under Casey's profile?

19  A.  Yes.

20  Q.  What's this?

21  A.  This is Casey's startup menu, and you'll see LimeWire

22    under start menu, so it starts up when he's on his

23    profile, and I've got highlighted the top row, the

24    Limewire Pro.  It's a link file.  And at the bottom

25    of the screen you'll see in blue the path where the

 1          executable file is located, so it's C, program files,

 2          LimeWire, and then you see limewire.exe.  That's the

 3          executable file that will start the program.

 4     Q.   So every time somebody comes in and sits down at the

 5          computer and turns it on and logs on using Casey's

 6          profile, LimeWire will start?

 7     A.   Yes.

 8     Q.   What is the consequence of that?

 9     A.   When you're on LimeWire, you're sharing whatever you

10          have got in your shared folder.

11     Q.   So if you turn your computer on and you walk away

12          from it -- let's assume Casey sat down, logged on,

13          maybe downloaded some music, and then walked away

14          from his computer and just left it running.

15     A.   He would be sharing.

16     Q.   Can you tell us what this is.

17     A.   Yeah.  This is the default user, and then I've got

18          the application data opened, and LimeWire is not part

19          of that default user setting, and this is the start

20          menu under default user, and LimeWire does not load

21          up under default user.  This is Jaybird.  His

22          application data folder is open, and LimeWire is not

23          part of his application data.

24     Q.   Okay.

25     A.   This is the start up for Jaybird, the programs that

1       start up, and LimeWire is not a program that will

2       start up under his profile.

3    Q.   In fact, there aren't very many, are there?

4    A.   What's that?

5    Q.   There aren't very many programs that start up under

6       this profile?

7    A.   That's correct.  This is Jon's user profile.  Under

8       application data these are the programs installed

9       under his profile, and LimeWire is not one of them.

10      This is Jon's startup, and it's the programs that

11      starts up under his profile, and LimeWire is not one

12      of them.  Local services.  This is the applications

13      that loads up under local services, and LimeWire is

14      not loaded up.  Local services doesn't have a

15      startup, so that's why you don't see the second

16      screen shot of local services, because there's no

17      startup on that.

18          Same thing applies to this local services NT

19      authority.  This is the application folder, and

20      LimeWire is not installed, and there's no startup on

21      that.  So this is the mom's profile under application

22      data.  These are the programs installed under her

23      profile, and LimeWire is not one of them.  This is

24      mom's startup menu, programs that start up under her

25      profile, and LimeWire does not start up, and this is

1  network services.  This is what's loaded under

2  network services, and LimeWire is not part of it.

3  Q.  Okay.  Now, what does that really mean, that LimeWire

4  wasn't in any of these other user profiles?

5  A.  It's telling me that the only time LimeWire is going

6  to start and load is under Casey's profile.

7  Q.  Does it show you who installed LimeWire under Casey's

8  profile?

9  A.  It's just the user profile Casey's.

10  Q.  Okay.  Was LimeWire available to the other users of

11  the computer?

12  A.  Not under their profile.

13  Q.  But if they logged on using Casey's profile, they

14  could use it?

15  A.  Yes.

16  Q.  Or if they came upon the computer already running

17  under Casey's profile, they could use it?

18  A.  Yes.

19  Q.  And that's, of course, assuming they knew how to do

20  that?

21  A.  That's correct.

22  Q.  All right.  After you checked the file structure of

23  the computer, what did you do next?

24  A.  I searched the computer for images of -- and movies

25  of child pornography.

1    Q.    And what did -- did you find any?

2    A.    Yes.

3    Q.    And where did you find them?

4    A.    I found seven child pornography movies under the

5          shared directory under Casey's profile.

6    Q.    That would be in the LimeWire program in the shared

7          directory under Casey's profile?

8    A.    Yes.

9    Q.    You said you found seven movies.  Were there other

10         movies in that shared folder that you believed might

11         be child pornography?

12   A.    Yes.

13   Q.    In other words, there was a whole list of movies?

14   A.    Yes.  I think there was 400 and -- I don't have my

15         list, but I think there was over 493 files, I think,

16         movie files.

17   Q.    Of those 493 movie files, how many of those had

18         titles that would lead you to believe that they might

19         be child pornography?

20   A.    Over 91.

21   Q.    And so did you then have to go and view each one of

22         those 91 movies to see if they were, in fact, child

23         pornography?

24   A.    Yes.

25   Q.    The titles that you find in the shared folder, are

1  those the titles that are out there on the LimeWire

2  system?

3  A.  Anything in the shared folder would be shared out on

4  the system, yes.

5  Q.  But, in other words, before they got into the shared

6  folder, there was some searching?  Somebody typed in

7  a search term and got a list of files?

8  A.  Files were put in there by -- you know, they would be

9  in there by whoever controlled the computer.

10  Q.  I guess what I'm getting at is, somebody had to look

11  at the title of the movie and select that movie to be

12  deployed, downloaded into the shared folder; is that

13  accurate?

14  A.  Yes.

15  Q.  So of the 490, you said there were over 90?

16  A.  Yes.

17  Q.  Then you had to look at them to see if they were

18  actually child pornography?

19  A.  Yes.

20  Q.  Let me hand you what's been marked as Government's

21  Exhibit 17.  Can you tell me what that is.

22  A.  Yes.  This is the screen print of the shared folder

23  under the Casey profile.

24  Q.  Okay.  And is that something that you made a copy of

25  that was part of your report of your investigation?

1  A.   Yes.

2  Q.   And can you tell me, did you review Government's

3       Exhibit No. 17?

4  A.   Yes.

5  Q.   And is it an accurate depiction of your report?

6  A.   Yes.

7            MS. MARTIN:  Your Honor, I would offer

8       Government's 17.

9            THE COURT:  Is there any objection?

10           MR. CLARKE:  No, your Honor.

11           THE COURT:  Exhibit 17 is admitted.

12           (Exhibit 17 was admitted into evidence.)

13 Q.   (By Ms. Martin) Can you tell me what we're looking at

14      here in Government's Exhibit 17.

15 A.   Okay.  This is through EnCase.  Again, I've got

16      the -- Casey's profile is opened, and you see down

17      toward the middle a shared directory where the blue

18      check mark is.  I have it grayed out.  I have it

19      highlighted.  And to the right are some of the files

20      that's located in that shared directory.  What I have

21      bookmarked with the blue checks are the child

22      pornography that I've found in the shared directory

23      there, and then the additional -- the eighth file is

24      the other movie that was downloaded by Detective John

25      Howe.

1    Q.   The 14-year-old Kimmy?

2    A.   Yes.

3    Q.   Now, you looked at all 90 movies, and were there some

4         movies that were -- that in your mind were

5         questionable whether they were or were not child

6         pornography?

7    A.   Yes.

8    Q.   And so when you were looking at them, did you throw

9         in everything that was possibly child pornography, or

10        did you only choose those movies that were absolutely

11        in your mind 100 percent child pornography?

12   A.   I chose only ones that absolutely were child

13        pornography to me.

14   Q.   Okay.  And you didn't ask a doctor to come and look

15        at these movies and give an age evaluation?

16   A.   No.

17   Q.   So is it possible that more movies would be child

18        pornography?

19   A.   It's possible.

20   Q.   Okay.  All right.  So on the right-hand side we have

21        the seven or eight movies that you have checked that

22        you yourself determined that in your mind was child

23        pornography?

24   A.   Yes.  A lot of these movies I have seen in other

25        investigations that I have done.

1  Q.  Is this the whole list of all of the movies that were

2      located in the shared directory?

3  A.  No.  What you're seeing is just a partial list.

4  Q.  With regard to the Kimmy, 14-year-old, you reviewed

5      that movie?

6  A.  Yes.

7  Q.  And you reviewed it from the defendant's computer?

8  A.  Yes.

9  Q.  And did you compare that to the movie that we saw

10     yesterday?

11 A.  A visual comparison, yes.

12 Q.  Let me hand you what's been marked as Government's

13     Exhibit No. 6.  Can you tell me what that is.

14 A.  It's the copy of the Kimmy movie from the shared

15     directory of Casey Frakes' computer.

16 Q.  And you reviewed that movie?

17 A.  Yes.

18 Q.  And it was accurately copied from the defendant's

19     computer onto the disk?

20 A.  Yes.

21            MS. MARTIN:  Your Honor, I would move

22     Government's Exhibit 6 be admitted.

23            THE COURT:  Any objection?

24            MR. CLARKE:  No, your Honor.

25            THE COURT:  Exhibit 6 is admitted.

1           (Exhibit 6 was admitted into evidence.)

2   Q.   (By Ms. Martin) Let me hand you what's been marked as

3        Government's Exhibit No. 14.  Can you tell me what

4        that is.

5   A.   Yes.  This is a -- using EnCase, I created a

6        bookmark, all the movies that were located in this

7        shared directory under the Casey profile.

8   Q.   Okay.  And that would be in the shared folder?

9   A.   In the shared directory, yes.

10  Q.   And those are all the lists, the movies that were

11       listed?

12  A.   Yes.

13  Q.   And did you compare that image -- that's obviously a

14       printed-off copy.  Did you compare the printed off

15       copy with the digital copy that you had on the mirror

16       image of the computer?

17  A.   Yes.

18  Q.   And is it an accurate copy?

19  A.   Yes.

20            MS. MARTIN:  Your Honor, I would move for

21       Government's Exhibit 14.

22            THE COURT:  Any objection?

23            MR. CLARKE:  No objection, your Honor.

24            THE COURT:  No. 14 is admitted.

25

1           (Exhibit 14 was admitted into evidence.)

2  Q.  (By Ms. Martin) Now, in addition to movies, there

3       were also music; is that correct?

4  A.  Yes.

5  Q.  And were you able to look at the -- do you remember

6       Detective Howe testified that he had also printed off

7       a copy of the lists of all the files?

8  A.  Yes.

9  Q.  And that was what was on the computer on March 12 of

10      2008?

11 A.  Yes.

12 Q.  And then you also had a list of files, all of the

13      files, the music and the movies and everything, as it

14      was on June 12 of 2008?

15 A.  June 10.

16 Q.  I'm sorry, June 10?

17 A.  Yes.

18 Q.  And were you able to do some comparison between the

19      two?

20 A.  Yes.

21 Q.  And were they the same?

22 A.  There's some files that I was not finding, you know,

23      on the current computer that John Howe had captured

24      on March 12.

25 Q.  Okay.  And the files that you weren't finding in June

1          were present in March?

2    A.    On his list, yes.

3    Q.    And what types of files were you finding that were

4          not there?

5    A.    Music files.

6    Q.    So what do you think happened?

7    A.    The files were either deleted or removed from the

8          shared directory.

9    Q.    So somebody was knowledgeable enough to delete files

10         they didn't want any more?

11   A.    Yes.

12   Q.    Or to move them to other places within the computer

13         that the shared folder or the shared directory didn't

14         have access to?

15   A.    That's correct.

16              MS. MARTIN:  Your Honor, could we approach?

17              THE COURT:  Yes, you may.

18              (Counsel approached the bench and the

19         following proceedings were had:)

20              MS. MARTIN:  Your Honor, I'm at a stage

21         where I'm going to start going through the individual

22         movie files and playing movies.  I don't know if you

23         want to stop at this point or just launch into it

24         before lunch.

25              THE COURT:  Obviously, I would want to stop

1          in approximately ten or 12 minutes.

2                    MS. MARTIN:  I think we might have a couple

3          short ones we can proceed with.

4                    THE COURT:  All right.

5                    (The proceedings returned to open court.)

6     Q.   (By Ms. Martin) I'm going to hand you what's been

7          marked as Government's Exhibit No. 7.  Can you tell

8          me what that is.

9     A.   Yes.  This is a copy of the movie that came from the

10         shared folder under the Casey profile.  It's titled

11         Nine-year-old Vicky Stripping.

12    Q.   Is that a true and accurate copy of the video that

13         was located in the defendant's shared folder?

14    A.   Yes.

15                   MS. MARTIN:  Your Honor, I offer

16         Government's Exhibit No. 7.

17                   THE COURT:  Any objection?

18                   MR. CLARKE:  No, your Honor.

19                   THE COURT:  Exhibit 7 is admitted.

20                   (Exhibit 7 was admitted into evidence.)

21                   MS. MARTIN:  Your Honor, we would ask to be

22         able to play that for the jury.

23                   THE COURT:  You may do so.

24                   (Exhibit 7 was played in open court.)

25    Q.   (By Ms. Martin) All right.  Are you familiar with

1           that video?

2    A.    Yes.

3    Q.    And is that what we have talked about as a known

4          victim?

5    A.    Yes.

6    Q.    She has been identified?

7    A.    Yes.

8    Q.    And she was a minor at the time?

9    A.    Yes.

10   Q.    Okay.  Let me ask you to look for me at Government's

11         Exhibit No. 8.

12   A.    Yes.  This is a copy of another movie that was

13         located in the shared directory under the Casey

14         profile.

15   Q.    Okay.  Is that an accurate copy of the movie that you

16         found on his computer in the shared folder?

17   A.    Yes.

18              MS. MARTIN:  Your Honor, I would offer

19         Government's Exhibit No. 8.

20              THE COURT:  Is there any objection?

21              MR. CLARKE:  No, your Honor.

22              THE COURT:  Exhibit 8 is admitted.

23              (Exhibit 8 was admitted into evidence.)

24              MS. MARTIN:  Your Honor, we would ask to

25         play this movie.

1        THE COURT:  You may proceed.

2             (Exhibit No. 8 was played in open court.)

3    Q.  (By Ms. Martin) Now, that particular video, did you

4        find it anywhere else on the computer besides the

5        shared folder?

6    A.  No.

7    Q.  Did you find it -- was it listed anywhere, for

8        instance, in the recent directory?

9    A.  Yes, it was.

10   Q.  Okay.  And what does that mean?

11   A.  The recent directory are documents that were recently

12       opened by an individual by -- I want to say by

13       software.  Like, a recent directory shows, like, a

14       document was opened or movies played.  It would

15       sometimes be located in a recent directory.

16   Q.  All right.  So, in other words, somebody looked at

17       it?

18   A.  Yes.

19   Q.  Now, did the defendant have any -- what video players

20       did the defendant have on his computer?

21   A.  He had another video playing program called DIVX.

22       That's a program I use to play movies as well.  It

23       will play the majority of the movies that are located

24       out there on the internet.

25   Q.  All right.  And what is peculiar with DIVX?

| | | |
|---|---|---|
| 1 | A. | Again, DIVX is a software that does not keep log |
| 2 | | files showing what movies played through the program. |
| 3 | Q. | Is that different from other video players? |
| 4 | A. | Yes. |
| 5 | Q. | And how so? |
| 6 | A. | Well, Real Player, it keeps a history of movies |
| 7 | | played through Real Player, and there's other video |
| 8 | | programs out there. Some will keep log files; some |
| 9 | | will not. |
| 10 | Q. | And so if he used a Windows-based video player, would |
| 11 | | that keep a log file? |
| 12 | A. | Windows Media? It would probably show up under the |
| 13 | | recent directory because it's associated to Windows. |
| 14 | | You know, that's part of what the recent directory |
| 15 | | is. Some of the programs that's associated to |
| 16 | | Windows will show up under the recent directory. |
| 17 | Q. | So if there were -- if there weren't very many files |
| 18 | | in the recent directory, does that mean nobody's |
| 19 | | looking at them? |
| 20 | A. | No, not necessarily, no. |
| 21 | Q. | Okay. I think what you're saying -- and correct me |
| 22 | | if I'm wrong -- is he can look at -- he could have |
| 23 | | looked at videos under -- using DIVX, the DIVX |
| 24 | | viewer, and there wouldn't be any record on the |
| 25 | | computer of what he was looking at or when? |

1  A.    Yes.

2              THE COURT:  All right.  This would be a

3       time for a break if you're finished with this line of

4       questioning.

5              MS. MARTIN:  Yes.

6              THE COURT:  Members of the jury, we will

7       take our recess.  Again, my apologies for the

8       extended nature of the recess, but we will resume at

9       1:10.  Please remember the admonitions not to discuss

10      the case among yourselves or with anybody else.

11      Please have no contact with the participants in the

12      case or do anything which touches on the case

13      whatsoever.

14          Ms. Ludwig, please take charge of the jury.  Mr.

15      Kanatzar, you may step down.  We are in recess.

16              (A recess was taken.)

17              THE COURT:  If we're ready to proceed, I'll

18      have Ms. Scheurer bring in the jury.

19              (The following proceedings were had in the

20      presence of the jury:)

21              THE COURT:  Mr. Kanatzar, you may resume

22      the witness stand.  Of course, I will remind you that

23      you remain under oath.  Ms. Martin, you may resume

24      your examination.

25              MS. MARTIN:  Thank you, your Honor.

1    Q.    (By Ms. Martin) Agent Kanatzar, I'm now going to hand

2          you what has been marked as Government's Exhibit No.

3          9.  Can you tell me what that is.

4    A.    Yes.  This is a video from the shared directory under

5          the Casey profile that I copied to this disk.

6    Q.    And did you review that video?

7    A.    Yes.

8    Q.    And is it one of the videos that you marked as

9          containing child pornography?

10   A.    Yes.

11   Q.    Can you tell me if that movie that's on Government's

12         Exhibit No. 9 is a true and accurate copy of the

13         movie that you found in the shared directory of the

14         defendant's computer.

15   A.    Yes.

16              MS. MARTIN:  Your Honor, I would offer

17         Government's Exhibit No. 9.

18              THE COURT:  Any objection?

19              MR. CLARKE:  No, your Honor.

20              THE COURT:  Exhibit 9 is admitted.

21              (Exhibit 9 was admitted into evidence.)

22   Q.    (By Ms. Martin) Okay.  And can you tell us what is

23         contained on Government's Exhibit No. 9.

24   A.    Yes.  The movie depicts a young girl.  It's the same

25         girl that was seen in an earlier movie dancing around

1   taking her clothes off known as Vicky.  She's

2   depicted on a bed totally nude with her on all fours

3   with her butt up in the air.  The movie depicts her

4   spreading her butt cheeks open wider than -- you can

5   see, like, the vagina area and her anal area.  Then

6   you see later in the clip an adult male insert his

7   penis -- attempt to insert his penis in the girl's

8   vagina, and it ends with the male still inserting his

9   penis in the girl's vagina.

10  Q.   And let me now hand you what's been marked as

11       Government's Exhibit No. 10.  Can you tell me what

12       this is.

13  A.   Yes.  This is a movie that was in the shared

14       directory under the Casey profile.  It's entitled

15       Many Girls From 12 to 14 Years Old.

16  Q.   Is that disk an accurate copy of the movie that was

17       found in the shared folder of the defendant's

18       computer?

19  A.   Yes.

20            MS. MARTIN:  Your Honor, I would offer

21       Government's Exhibit No. 10.

22            THE COURT:  Any objection?

23            MR. CLARKE:  No, your Honor.

24            THE COURT:  No. 10 is admitted.

25

```
 1                    (Exhibit 10 was admitted into evidence.)
 2   Q.   (By Ms. Martin) Can you describe for the jury what
 3        the video shows in Government's Exhibit No. 10.
 4   A.   You have a compilation of numerous -- I would say
 5        seven to eight different girls depicted in the video.
 6        It starts off with two girls fully clothed standing
 7        who then sit on a couch and disrobe, totally get
 8        nude --
 9   Q.   I'm sorry to interrupt.  About how old are those two
10        girls?
11   A.   I would say between 10 to 14 years old.
12   Q.   Okay.
13   A.   And then the girls are totally nude.  Then they
14        spread their vagina area to the camera.  The camera
15        zooms in and out of the private area of the girl, and
16        then it cuts to some more girls -- another girl
17        depicted having a sex toy, inserting it in her
18        vagina, and then --
19   Q.   I'm sorry.  That girl was approximately how old?
20   A.   Twelve to 14 years of age.
21   Q.   Okay.
22   A.   And then it shows -- I believe it shows a male
23        inserting his finger into the girl's vagina area and
24        then cuts back to her putting a sex toy in her
25        vagina, and then there's another couple more scenes
```

1    where it appears to be, like, a bathroom area where

2    girls -- numerous girls are getting undressed and --

3  Q.  Is that like a hidden camera video?

4  A.  It appears to be, yes.  And then it kind of ends with

5    two girls nude on a bed, you know, kissing each

6    other, rubbing each other's vagina area, and I think

7    that was about the end of the movie.  Maybe a little

8    bit more to that.

9  Q.  Were all the girls that you saw in this entire video,

10    did they appear to be under the age of 18?

11  A.  Yes.

12  Q.  Let me show you what's been marked as Government's

13    Exhibit No. 11.  Can you tell me what that is.

14  A.  Yes.  This is a movie that was located in the shared

15    directory under the Casey profile.  It's called Pedo

16    Vicky Compilation, and I copied it to this disk here.

17  Q.  Is that an accurate depiction on that disk of what

18    you found in the shared directory of the defendant's

19    computer?

20  A.  Yes.

21         MS. MARTIN:  Your Honor, I would offer

22    Defendant's Exhibit 11.

23         THE COURT:  Any objection?

24         MR. CLARKE:  No, your Honor.

25         THE COURT:  Exhibit 11 is admitted.

```
 1                      (Exhibit 11 was admitted into evidence.)

 2    Q.   (By Ms. Martin) Agent Kanatzar, on this particular

 3         video -- I am going to want to play it, but I want

 4         you to briefly describe what we're going to see.

 5    A.   Okay.  We have the Vicky child in this video.  Again,

 6         she's shown taking her clothes off.  Shows her

 7         performing oral sex on a male.  She's also seen in a

 8         bondage scene where she's got, like, a mask on and

 9         her hands are tied behind her back.  Then it cuts to

10         scenes -- numerous scenes of her laying on a bed

11         providing oral sex to an adult male.  Then it goes

12         into another -- picks a different child.

13    Q.   So there are more than just Vicky on that particular

14         movie?

15    A.   Yes.

16    Q.   Okay.

17                   MS. MARTIN:  Your Honor, I would ask to

18         play Government's Exhibit No. 11.

19                   THE COURT:  You may proceed.

20                   (Exhibit No. 11 was played in open court.)

21    Q.   (By Ms. Martin) Okay.  Agent Kanatzar, in your

22         analysis of the computer that was seized from the

23         defendant's bedroom, were you able to locate -- was

24         there any evidence on the computer that would lead

25         you to believe that anyone other than the defendant
```

1          was downloading these movies?

2    A.   No.

3    Q.   Did you participate in an interview with Detective

4         Kelley of the defendant?

5    A.   Yes.

6    Q.   Can you tell us about that.

7    A.   Yes.  On June 10 we went to his place of employment

8         in Olathe, Kansas, and we talked to the manager

9         there, and he told us where Casey's work site was in

10        Overland Park, Kansas.  Detective Kelley and I then

11        went over and went to the address and spoke with

12        Casey Frakes.

13   Q.   Okay.  What was the conversation like?

14   A.   We drove up and parked.  I walked up to him, asked

15        him if he was Casey Frakes.  He identified himself; I

16        identified myself.  I showed him my credentials.  I

17        told him that we had just executed a federal search

18        warrant on his residence for child pornography and

19        that we had seized a computer from the residence, and

20        I told him I wanted to talk to him about that and

21        also advised him that he was not under arrest, that

22        he didn't have to talk to us if he didn't want to,

23        and if he wanted to go back to work, he could.

24   Q.   And what was the tone of the conversation like after

25        that?

| | | |
|---|---|---|
| 1 | A. | He was agreeable.  We did the interview in the |
| 2 | | driveway of the residence. |
| 3 | Q. | Okay.  And he was there, and his job was landscaping, |
| 4 | | so he was at a residence doing some landscaping or |
| 5 | | some lawn care? |
| 6 | A. | Yes, putting in a retaining wall. |
| 7 | Q. | So who did most of the questioning? |
| 8 | A. | I did. |
| 9 | Q. | And can you tell us about that.  What did you |
| 10 | | initially ask Mr. Frakes about? |
| 11 | A. | Well, initially asked him his name and his date of |
| 12 | | birth and social security number, asked him if he had |
| 13 | | access to a computer or owned a computer.  He said he |
| 14 | | had a computer at his residence in his bedroom.  He |
| 15 | | had a profile on that computer under his name, Casey. |
| 16 | | He said it was not password protected.  I asked him |
| 17 | | if LimeWire was installed on the computer.  He said, |
| 18 | | yes, it was.  He said that he used LimeWire to |
| 19 | | download movies and music files, and then I asked him |
| 20 | | was he aware that LimeWire -- anything in a shared |
| 21 | | directory or downloaded direct of LimeWire will share |
| 22 | | files with other users who are using LimeWire, and he |
| 23 | | said yes, he knew that. |
| 24 | Q. | Now, when he said he was downloading movies, did he |
| 25 | | say what kind of movies? |

```
1    A.   Adult porn.

2    Q.   Did you ask him about his brother's use of LimeWire?

3    A.   Yes.

4    Q.   And what did he say?

5    A.   He didn't believe his brother used LimeWire.

6    Q.   And did you ask him whether or not his brother would

7         download pornography?

8    A.   Yes.

9    Q.   What did he say?

10   A.   He didn't believe his brother downloaded any

11        pornography.

12   Q.   Okay.  And so then he at this point is saying he was

13        only downloading adult pornography?

14   A.   That's correct.

15   Q.   And at this time you were aware of at least one video

16        that had been downloaded from his computer which

17        indicated child pornography?

18   A.   Yes.

19   Q.   And that's the 14-year-old Kimmy?

20   A.   Yes.

21   Q.   So did you ask him about that?

22   A.   Yes, because eventually, after he said he knew his

23        shared directory would be sharing with others, I

24        asked him if he downloaded any child pornography, and

25        he denied downloading any child pornography.  He
```

```
 1          stated that you don't know what you're getting until

 2          you download it and see it on your computer.

 3   Q.     Okay.

 4   A.     And my response back to him was, well, correct me if

 5          I'm wrong.  In LimeWire you type in a search term and

 6          then get a list of the search terms that you typed

 7          in, and then you double click on that file and play

 8          the movie, and he agreed with that statement.

 9   Q.     Okay.  So then what did you ask him?

10   A.     Well, then that's when I informed him that a

11          detective in Independence, Missouri, had downloaded a

12          child porn video from his computer, and I described

13          it and told him it was a 14-year-old girl shown

14          depicted performing oral sex on an adult male.  His

15          statement was he wasn't aware of that movie.

16   Q.     Okay.  So when you asked him about the list, were you

17          aware at this time of some of the titles that were on

18          his computer?

19   A.     No.

20   Q.     Okay.  But you asked him a question about what is it

21          he thought he was getting?

22   A.     Right.  I just basically asked him if he knew what

23          LimeWire did, you know.  I said LimeWire is a

24          program.  You can type in a search term.  I think my

25          example was, like, preteen or porn movies, and you
```

1     get a list of the top 100 hits from that search, and

2     then you have to go through that list and double

3     click a movie from that list to your computer, and he

4     agreed with that statement.

5  Q.  All right.  Even though he was saying, I don't know

6     what I'm getting until I download it and look at it?

7  A.  Right.

8  Q.  All right.  Did you sort of -- did you ask him about

9     what he expected to get if he clicked on a certain

10    title?

11  A.  Yes, because he kept saying he didn't know what he

12    got to the computer until he looked at the movie, and

13    my response was, well, if you download a movie

14    12-Year-Old Girl Sucks Ten-Year-Old Dick, what do you

15    expect to find in that movie?

16  Q.  And did he respond?

17  A.  No.

18  Q.  So did you ask him any more about his collection?

19  A.  Yes.

20  Q.  And what did you ask him?

21  A.  Again, when we told him about the detective

22    downloading the movie, he admitted that he has seen

23    child porn on his computer.  He remembered one video

24    he described to be a 14-year-old girl who dances

25    around and gets nude, and it was a short 20-second

1      clip.

2  Q.  After he admitted that he had at least this one clip

3      of possible child pornography, did you follow up with

4      any question?

5  A.  That's when Detective Kelley asked him how many

6      movies he had in his collection, and he stated he had

7      approximately 100 movies, and Detective Kelley asked

8      him how many of those out of the hundred did he have

9      that were depicting child pornography, and he stated

10     he believed there would be 10 to 15 percent.

11 Q.  Now, did you ask him about the ages of the child

12     pornography that he had in his collection?

13 A.  Yes, I did.

14 Q.  What did you ask?

15 A.  I asked him if there would be any images of five- to

16     six-year-old girls in his collection, and he stated

17     no, he didn't think he had anything like that in his

18     computer.  He did state that he had images or movies

19     of girls 12 to 14 years of age.

20 Q.  And did he indicate those movies of girls 12 to 14

21     were images or movies of child pornography?

22 A.  Yes.

23 Q.  Did you ask him how he defined child pornography?

24 A.  Yes, I did.

25 Q.  What did he say?

1    A.    I asked him if he knew what child pornography was,

2          and initially he said no, and I said, what's your

3          definition of child pornography?  And he answered

4          that it would be a nude image of a 16-year-old and

5          the image did not have to depict any sexual activity

6          to be child pornography.

7    Q.    All right.  And the defendant said he thought he had

8          about a hundred movies in his collection; is that

9          what you said?

10   A.    Yes.

11   Q.    And of the movies that you looked at in the shared

12         directory, how many did you say had names that would

13         indicate they were child pornography?

14   A.    About 91.

15               MS. MARTIN:  I have no further questions,

16         your Honor.

17               THE COURT:  All right.  Mr. Clarke, you may

18         cross examine.

19               MR. CLARKE:  Thank you.

20                    CROSS EXAMINATION

21   BY MR. CLARKE:

22   Q.    Agent Kanatzar, we watched a fairly long video clip.

23         The last one that we just watched, do you have any

24         physical evidence that that video clip was ever

25         played on the Frakes computer?

1    A.    Any physical evidence, no.  Again, he had a viewer

2          program, DIVX, that wouldn't actually keep a log of

3          that, so that movie could have been played, but any

4          log files showing, no.

5    Q.    Well, the fact that he had those players doesn't make

6          it any more likely or less likely that that

7          particular video was ever viewed on that computer;

8          true?

9    A.    Again, DIVX is a fairly universal player that will

10         play most movies, so that's the purpose of having

11         that program.

12   Q.    Right.  You can use it to watch music videos; true?

13   A.    Yes.

14   Q.    Do you have any physical evidence that the first

15         movie that was shown to the jurors was ever viewed on

16         the Frakes computer?

17   A.    Same thing, no.  I didn't see any.  Again, it could

18         be played through DIVX, but I didn't see any logs.

19   Q.    You keep throwing the DIVX out there like it's a

20         possibility.  It's a possibility, but you don't have

21         any evidence that any of these were ever played on

22         DIVX, do you?

23   A.    No.

24   Q.    You attributed a statement to Mr. Frakes that you

25         don't know what you get until you download it, or

1      words to that effect?

2   A.   Yes.

3   Q.   That's true, isn't it?

4   A.   Yes.

5   Q.   One of the things that was done repeatedly on direct

6        examination was that and you Ms. Martin kept

7        referring to it as Casey Frakes' computer.  Are you

8        aware of him having some property interest in this

9        computer?

10  A.   Well, it was in his room, but the mother and -- it

11       was Jason's computer.  He's the one that paid for it.

12  Q.   Did Casey Frakes ever do anything to prevent anyone

13       else from using the computer as far as you know?

14  A.   No.

15  Q.   And I think we have established that none of the

16       profiles on this computer were password protected;

17       true?

18  A.   True.

19  Q.   Now, on direct examination I believe I just heard you

20       say that before going out to interview Mr. Casey

21       Frakes you didn't know the names of the files on the

22       computer in response to Ms. Martin's question.

23  A.   After I answered that, I remembered I did see the

24       list -- I took her question as, did I examine the

25       computer already? which I didn't.  What I seen was

| | | |
|---|---|---|
| 1 | | the list of some files that Detective John Howe had |
| 2 | | downloaded, so I did see that list. |
| 3 | Q. | Right.  In fact, you prepared an application for a |
| 4 | | search warrant to be issued from this court; true? |
| 5 | A. | Yes. |
| 6 | Q. | And in your application for the search warrant you |
| 7 | | very specifically listed the names of 20 files on |
| 8 | | that computer; is that true? |
| 9 | A. | That's correct. |
| 10 | Q. | And you did this days before you went out to visit |
| 11 | | Mr. Frakes; true? |
| 12 | A. | True. |
| 13 | Q. | And I think you've testified that you were familiar |
| 14 | | with some of the files that were named in the search |
| 15 | | warrant; true? |
| 16 | A. | True. |
| 17 | Q. | So you knew quite a bit about some of these files |
| 18 | | before you went and talked to Mr. Frakes about it; |
| 19 | | true? |
| 20 | A. | True. |
| 21 | Q. | Now, your office is in Kansas City, Missouri, true? |
| 22 | A. | True. |
| 23 | Q. | And on the outside of that building where you work it |
| 24 | | says homeland security; right? |
| 25 | A. | I don't think there's a sign out there, no, but . . . |

1    Q.   Well, you work for ICE, which is a component of

2         Homeland Security; true?

3    A.   Sure.

4    Q.   And you were in the courtroom when I was asking

5         Detective Kelley about the whole line of questioning

6         about whether or not you tape recorded any of the

7         interviews.  Do you remember that?

8    A.   Yes.

9    Q.   And Detective Kelley said, well, the Atchison Police

10       Department doesn't have the resources to have video

11       equipment to record interviews; right?

12    A.   Yes.

13    Q.   Your agency isn't in that same boat, is it?  You've

14       got the money to get the equipment to record

15       interviews, don't you?

16    A.   In the office I work at they do not have that

17       capability.

18    Q.   Your office is the office of a -- your physical

19       office space is, you walk in and it says geek, right,

20       computer geek, because there's a gazillion computers

21       over there; right?

22    A.   Yes.

23    Q.   You've got lots of hardware, video capabilities, all

24       sorts of equipment in there; true?

25    A.   True.

1    Q.   I mean, you're not suggesting that you couldn't have

2         figured out a way to videotape an interview with

3         somebody, are you?

4    A.   I have never did that other than at a local police

5         department.  That's what I'm saying.

6    Q.   You were asked questions about search terms, and the

7         question actually seemed to assume that search terms

8         were used to locate files using LimeWire and download

9         them into the Frakes computer.  Did you take it that

10        way when you answered the questions?

11   A.   That search terms are used, yes.

12   Q.   What search terms were used?

13   A.   I do not know.

14   Q.   For any of the movies, any of the pornographic --

15        child pornography or otherwise, do you know what the

16        search terms were?

17   A.   No, but I know you have to do some kind of search.

18        You don't just type in Elton John and get 12-year-old

19        sucks dick, you know.  You've got to -- it's going to

20        go out and locate what you search for, so if you have

21        files that have child porn-sounding names, you would

22        have to use some kind of child porn search term to

23        get those files.

24   Q.   Detective Howe, I think, testified, and you were in

25        here for that, that he had never used LimeWire to

1           search for anything other than child porn, so he

2           couldn't really say whether or not if he just did a

3           regular search for adult pornography, whether or not

4           child pornography terms or files would come up.  Do

5           you remember that?

6     A.    Yes.

7     Q.    Have you used LimeWire to search for regular porn,

8           for lack of a better term, versus child porn?

9     A.    I have not used LimeWire to search for porn, no.

10    Q.    So you don't know whether or not if you searched for

11          adult porn child porn comes up because you've never

12          done it?

13    A.    That's correct.

14    Q.    You've asked the 439 file names of the movies that --

15          or clips that were on the computer; true?

16    A.    True.

17    Q.    Not all of them were pornographic; true?

18    A.    True.

19    Q.    I mean, there were some videos from just regular

20          movies that we might go see at the movie theater; is

21          that right?

22    A.    That's correct.

23    Q.    And in evaluating the names and some of the file

24          creation dates, file access dates, did you notice any

25          patterns?

```
 1    A.    I noticed the seven child porn movies were downloaded

 2          on his computer one year prior to them being

 3          downloaded by Detective Howe.

 4    Q.    Did you notice any patterns along the lines of how

 5          many files were downloaded at once or in one setting?

 6    A.    No.

 7    Q.    But you have that information --

 8                    MR. CLARKE:  May I approach, your Honor?

 9                    THE COURT:  You may.

10    Q.    (By Mr. Clarke) I've handed you Government's

11          Exhibit 14.  Am I correct that that's the exhibit

12          that shows the file names and it lists access date

13          and created date and directory that it came from and

14          all that stuff; is that right?

15    A.    Yes.

16    Q.    There were -- now those file creation dates, am I

17          correct that that means that's the date that the

18          computer is telling you that that file was written to

19          that spot on the computer?

20    A.    Yes.  When a file gets copied to the computer, it

21          usually uses the computer settings -- the time

22          settings that the computer has, yes.

23    Q.    Computers have internal clocks; right?

24    A.    Yes.

25    Q.    And they have internal batteries that run those
```

1      clocks when they are not connected to a power source;

2      is that true?

3  A.  True.

4  Q.  And so the file creation date generally does not

5      refer to when that video, for example, was originally

6      filmed; it just has to do with that video file on

7      that computer; right?

8  A.  That's correct.

9  Q.  Now, there were a bunch of files downloaded on -- it

10     appears, if we assume that all these files were

11     downloaded from LimeWire, that they were downloaded

12     on October 4, 2006; is that true?

13 A.  Well, I will have to find it but -- October 4?  Do

14     you have a page by chance that you're referring to?

15 Q.  Well, truth be told, I've got it in a different

16     format.

17 A.  Yeah.  Here is some other, October 4, yes.

18 Q.  And there's a couple files that -- well, let me ask

19     you if you see a file that has the name

20     "amateurcreampies-madison (nextdooramateur)."  Do you

21     see that file?

22 A.  "(Nextdooramateur) creampie creampies"?

23 Q.  Right.

24 A.  Yes.

25 Q.  Am I correct that that file shows a date created of

1    10/4/06 at 12:40:21 a.m.?

2  A.  Yes.

3  Q.  And there's another file, "female ejaculation_Tabetha

4      Stephens squirt (1)."  Do you see that?

5  A.  Yes.

6  Q.  And it was -- it has a date created of 10/4/06 and a

7      time file created 12:40:29 a.m.; is that correct?

8  A.  Yes.

9  Q.  All right.  So these two files, at least according to

10     that record from Exhibit 14, Government's Exhibit 14,

11     shows that these two files were downloaded eight

12     seconds apart?

13 A.  Yes.

14 Q.  Just looking at those two files, what's the common

15     term that was used to search for those?

16 A.  You really don't know.

17 Q.  And the reason you don't know is because they don't

18     have anything -- no terms in those names are common

19     to each other; true?

20 A.  True.

21 Q.  So there's more to the search than just the file

22     names, isn't there?  How about this?  Meta data.

23     Tell us what that is.

24 A.  Well, meta data would be embedded in the file itself

25     in search terms that you could hit off of.  That's

```
 1        part of the file.
 2    Q.  Am I correct that you can have a file that has a very
 3        simple, short name like "female ejaculation_Tabetha
 4        Stephens squirts" and it would come up potentially if
 5        you searched for hot brunette porno if those hot
 6        brunette porno terms were embedded in that file to be
 7        used when things were searched for?
 8    A.  Yes.
 9    Q.  So the fact of the matter is that the names in these
10        files don't necessarily tell you at all what the
11        search terms were when they were found on line; true?
12    A.  Well, true, but, you know, another avenue just came
13        to my mind, you know.  Again, you could copy these
14        from somewhere else or copy them from another folder.
15        That's another option too.
16    Q.  It's an option, but is that just pure speculation on
17        your part?
18    A.  Well, again, it's in -- all I can say is it's in the
19        shared folder.
20    Q.  On March 12, 2007, there were 60 files downloaded,
21        pornographic files?
22    A.  Did you say March 6?
23    Q.  March 12.
24    A.  Can you refer me to the page?
25    Q.  I'm sorry, I cannot, but it's the date that we have
```

1      been talking about.

2   A.  Well, 2008, March 12, 2008.  You said 2006.

3   Q.  I'm sorry.  I meant 2007, March 12, 2007.

4   A.  I am just seeing one so far, but these are not

5       recorded in alphabetical order, so . . .

6   Q.  Let me ask you this, if it refreshes your

7       recollection.  Does it sound about right that on

8       March 12 files started to be downloaded at

9       approximately 1:35 a.m.?  I'm sorry.  I should be

10      saying created that file at 1:35 a.m. and they were

11      completed by 1:45 a.m.

12  A.  What was the question again?

13  Q.  When on March 12 did files start to be written?

14      According to the file creation time, at 1:35 a.m.?

15  A.  Yes.

16  Q.  And does it appear that files were finished being

17      downloaded at 1:45 a.m.?

18              MS. MARTIN:  Your Honor, I could just ask

19      for a clarification.  I don't recall whether that was

20      March 12, 2007, or March 12, 2008.  I think there

21      were two different answers there, and I was just

22      seeking a clarification.

23              THE COURT:  What then is the proper date

24      that you're looking for, Mr. Clarke?

25              MR. CLARKE:  Your Honor, the date in

1    question is March 12, 2007.

2                THE COURT:  Very well.

3    A.   Yes.  March 12, 2007.  Uh-huh.

4    Q.   (By Mr. Clarke) And does it appear that the last of

5         the files was downloaded 1:45 a.m.?

6    A.   Yes.

7    Q.   And does it appear that it's approximately 60 files?

8    A.   I didn't count the files, but there's quite a few

9         pages, yes.

10   Q.   Now, those same files have access dates listed; true?

11   A.   True.

12   Q.   Now, the access date simply means that that file was

13        referred to by the computer in some way, shape, or

14        form; true?

15   A.   True.

16   Q.   So it could mean that somebody clicks on that file

17        and views it, whether or not it be a video image or

18        a -- or it could be, if it was a music file, listened

19        to.  That's one explanation for that file access

20        date; correct?

21   A.   That the computer does it, yes.

22   Q.   Another possible explanation is virus software could

23        be scanning that particular file; is that true?

24   A.   True.

25   Q.   So the file access date doesn't necessarily mean that

1   a person is sitting at the computer using it at that

2   particular time; is that true?

3   A.   True.

4   Q.   And, in fact, if you look at the access times, for

5        example, a lot of these files that were -- have a

6        file created date of March 12, 2007, at least

7        according to that exhibit, have an access date of

8        April 4, 2008.  For example, "Five Star Porn Jesse

9        Jane Best Score Yet, Rough Sex."

10  A.   What was the second file you said?

11  Q.   I just gave you one file name.

12  A.   Five Star Jesse Jane?

13  Q.   Yes.

14  A.   Yes.

15  Q.   And that's got an access time of 1:35:44, and then

16       there's another file with the same access date with

17       the exact same access time, the Three Lesbians.  Do

18       you see a title starting Three Lesbians?

19  A.   Some of those files are showing 4/7/08 also.

20  Q.   Right.  But do you see the Three Lesbians?

21  A.   Three Lesbians, One Using Strap On.

22  Q.   Right.  And it has a file access date also of

23       April 4, 2008; true?

24  A.   Yes.

25  Q.   And it has a file access time of 11:35:44?

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | So it's showing that that file was accessed the exact |
| 3 | | same second as the Five Star Porn file? |
| 4 | A. | That's true. |
| 5 | Q. | Can you explain, based upon your training and |
| 6 | | experience, what that means, put that in perspective. |
| 7 | | It could have been a virus definition ran at that |
| 8 | | time and it touches every file? |
| 9 | A. | It could have.  Could have opened up a player and had |
| 10 | | these two movies associated to DIVX or -- and could |
| 11 | | have played those movies, loaded up DIVX and played |
| 12 | | the movies in concession. |
| 13 | Q. | Since this was a shared folder, does that mean -- |
| 14 | | obviously, it means, apparently, that other people on |
| 15 | | the internet could go in and see the contents of this |
| 16 | | file and access it; right?  We have heard that. |
| 17 | A. | Uh-huh. |
| 18 | Q. | Does it also mean that other users of the computer, |
| 19 | | even if they are logged in under their own profile, |
| 20 | | could see this folder and its contents? |
| 21 | A. | Other people? |
| 22 | Q. | Sure.  If I'm Pam Frakes and I click on Pam Frakes' |
| 23 | | profile, am I going to have access to the shared |
| 24 | | folders on the computer? |
| 25 | A. | If she is set up as administrator and she knew where |

 1           to search, she could.

 2    Q.    Now, what if -- now, we probably ought to for the

 3           benefit of the jury -- the administrator is the

 4           person who has ultimate privileges on the computer;

 5           true?

 6    A.    True.

 7    Q.    That means that you have the ability to set up

 8           profiles that don't have the same privileges that you

 9           do and you can restrict what files they have access

10           to; right?

11    A.    That's true.

12    Q.    But you can give everybody the same privileges that

13           you have as the administrator; true?

14    A.    True.

15    Q.    So do you know what the privileges were on the five

16           profiles?  Did they all have administrative

17           privileges, or were they restricted?

18    A.    I tried to look into that, and I could not determine.

19           I assume that they would all have demonstrative

20           rights.

21    Q.    In response to a question by Ms. Martin on direct

22           examination, you made a statement -- this isn't an

23           exact quote necessarily, but along the lines of, when

24           you're on LimeWire, you're sharing whatever is in

25           your shared folder.  Do you remember that?

1   A.   Yes.

2   Q.   Couldn't that statement be changed and still be just

3        as true to say that whenever the computer is on and

4        somebody is using the computer under Casey's profile

5        that the shared folder is available to everybody?

6   A.   Casey's profile has to be the active profile for that

7        to happen.

8   Q.   But it didn't require them to be using LimeWire at

9        that time actively, meaning he didn't have to be

10       looking at music files or porn files or doing

11       anything actively with LimeWire; is that true?

12  A.   That's true.

13  Q.   Because the way it was set up, as soon as that

14       profile came up, as shown in the PowerPoint or the

15       slide show, LimeWire was on and active?

16  A.   That's true.

17  Q.   And in the slides that you showed no one else had

18       that set up in their startup.  Is that what it was?

19       It was the startup?

20  A.   Yeah, showing where the LimeWire loaded up, yes.

21  Q.   Now, it's put there every time somebody downloads

22       LimeWire unless they make the decision and tell the

23       installation program not to do that; right?  That's

24       the default setting for LimeWire to start up?

25  A.   True.

1  Q.  Was there virus software on the computer?  I mean

2      software to detect and prevent viruses from infecting

3      the computer?

4  A.  Well, that screen print, if you notice, under Casey's

5      profile, he had McAfee and McAfee Firewall.

6  Q.  Is there any way to tell how many times a file was

7      accessed on a computer?

8  A.  How many times the file was accessed?  Again, if

9      there's any log files that you can find, because each

10     time you touch the file it's going to change the last

11     access, it's going to show the last access to that

12     file.  I'm not aware of any log files that would show

13     how many times a particular file is touched.

14 Q.  You heard Jason Frakes testify; right?

15 A.  Yes.

16 Q.  And he had an MP3 player that got hooked up to the

17     computer; right?

18 A.  Yes.

19 Q.  Did you check the computer to find out where the

20     music files were that went back and forth to that MP3

21     player?

22 A.  I don't have the MP3 player, so I have no idea what

23     files are loaded on that MP3 player.

24 Q.  Well, when you looked at the computer and you

25     analyzed it, did you find any other folders?  Because

1    you looked at all the folders on the computer; right?

2  A.  I went through them, yes.

3  Q.  Did you find music files in other areas other than

4    the shared LimeWire folder?

5  A.  Well, I wasn't really looking for music files.  I was

6    looking for child pornography.  I was looking for

7    MPG, ABIs, so I wasn't looking to see where music was

8    stored elsewhere on the computer, so I really don't

9    know.

10  Q.  So the answer is no, but you weren't necessarily

11    looking for it?

12  A.  I wasn't looking for it.

13  Q.  What were the specifications of the computer from the

14    Frakes home?  What processor did it have?

15  A.  I didn't go to the bios.  I only went into the bios

16    to check to see if the time and date stamp was set

17    correctly.

18  Q.  You checked that and it appeared that it was correct?

19  A.  Yes.

20  Q.  Do you know how much ram was installed on this

21    computer?

22  A.  No.

23  Q.  So you don't -- is it a fair statement to say you

24    don't know whether or not this computer was sluggish

25    or really super fast if you used it to look at a

1  video file?

2  A.  That's true.

3  Q.  Does watching videos -- it sucks a lot of juice out

4      of the computer, doesn't it, compared to other

5      things?

6  A.  Yes, memory, yes.

7  Q.  And if you -- if you're a gamer or you want to look

8      at a lot of movie files on a computer, it's better to

9      have a faster processor?

10 A.  And a lot of memory, yes.

11 Q.  When you went into the Frakes home to execute the

12     search warrant, did you go -- once you made contact

13     with Mr. Frakes, did you go straight to the bedroom

14     with the computer, take the computer, and leave, or

15     did you search around the house for other things?

16 A.  We searched around the house.

17 Q.  And you searched around the house for things that you

18     had listed in the search warrant application; is that

19     true?

20 A.  Yes.

21 Q.  What sort of things were you looking for?

22 A.  Looking for CD Roms, DVDs, any type of external

23     storage media that could store files.

24 Q.  You found some CD Roms?

25 A.  Yes.

1   Q.   You took the CD Roms?

2   A.   Yes.

3   Q.   You analyzed the CD Roms?

4   A.   Yes.

5   Q.   And you didn't find any child pornography on those CD

6       Roms; is that true?

7   A.   That's true.

8   Q.   In the course of that search did you also look for

9       magazines or other things?

10   A.   Yes.

11   Q.   And the magazines that you would have been looking

12       for would be magazines that had depictions of child

13       pornography; true?

14   A.   That's true.

15   Q.   You didn't find any magazines that had depictions of

16       child pornography; is that true?

17   A.   That's true.

18   Q.   Did you do any investigation into email accounts?

19   A.   I did not.

20   Q.   Did you find any evidence that there had been chats

21       using this computer?  By chat I mean internet-based

22       chat.  You understand what I mean by that?

23   A.   Uh-huh.

24   Q.   Did you find any evidence that there had been any

25       chat using this computer that in any way, shape, or

1      form dealt with child pornography?

2  A.    I did not find any.

3            MR. CLARKE:  No further questions, your

4      Honor.

5            THE COURT:  All right.  Ms. Martin, you may

6      cross examine.

7            MS. MARTIN:  Thank you.

8                    REDIRECT EXAMINATION

9  BY MS. MARTIN:

10 Q.    Agent Kanatzar, in your experience in doing all these

11     cases, is it your experience that people download

12     movies and then don't watch them?

13 A.    No.

14 Q.    And you said that at least one of the videos,

15     Exhibit No. 8, which is entitled 12-Year-Old Boy

16     Fucks 12-year-Old Girl, was viewed?

17 A.    From the recent directory, yes.

18 Q.    So we know at least that one movie was viewed?

19 A.    Yes.

20 Q.    And you indicated that you don't know what search

21     terms were used.  Why is that?

22 A.    Because LimeWire doesn't keep the search terms.

23 Q.    Okay.  Now, let's assume that you're searching for

24     adult pornography and you come up with a video that's

25     entitled Nine-Year-Old Vicky Stripping and Sucking.

1    You still have to do something -- you still have to

2    select that from the list, do you not, to have it

3    downloaded onto your shared folder?

4  A.  If you're using LimeWire, you do, yes.

5  Q.  So if you have all of these titles that are

6    indicative of adult porn but you have one that says

7    nine-year-old and you double click on it, it's going

8    to go into your shared folder?

9  A.  Yes.

10  Q.  All right.  Once you get it into your shared folder,

11    let's assume you look at it and it really is a

12    nine-year-old and you absolutely do not want that

13    child pornography.  Is there a way to get rid of it?

14  A.  Yes.

15  Q.  How do you do that?

16  A.  Simply delete the file.

17  Q.  All right.  And do we know whether or not Casey or

18    anyone else using that computer was aware of the

19    ability to delete files?

20  A.  Well, from the two -- the files currently on the

21    computer and what Detective John Howe had did, the

22    list browse, there's been files that's no longer on

23    the computer.

24  Q.  Okay.  Now, the videos that the defense attorney was

25    asking you about on March 12 of 2007, those videos

1      were downloaded a year prior to Detective Howe's

2      investigation?

3   A.  That's correct.

4   Q.  And they remained on the computer until you analyzed

5      it; correct?

6   A.  That's correct.

7   Q.  And, again, if Casey, or whoever was in charge of

8      this shared folder, did not want those files any

9      longer, he could delete them?

10  A.  Yes.

11  Q.  And if he didn't want to share them, he could move

12      them from the shared folder to somewhere else on the

13      computer?

14  A.  That's true.

15  Q.  Okay.  I want to make one correction.  You indicated

16      that other people on the internet could look into his

17      shared folder.  Is it everybody on the internet, or

18      is it just other people who have LimeWire?

19  A.  Other people who have LimeWire.

20  Q.  I want to go back to March 12 of 2007.  The times of

21      the downloading that he asked you about was from 1:35

22      in the morning to 1:45 in the morning?

23  A.  I wish I had marked that page.

24  Q.  Me too.

25  A.  You said 1:41 a.m.?

1  Q.  1:35 a.m. to 1:45 a.m.

2  A.  Yeah, a.m., yes.

3  Q.  Okay.  Where was this computer located again?

4  A.  In Casey's bedroom.

5  Q.  I have?

6            MS. MARTIN:  No further questions, your

7      Honor.

8            THE COURT:  All right.  Mr. Clarke?

9            MR. CLARKE:  Thank you, your Honor.

10                  RECROSS EXAMINATION

11  BY MR. CLARKE:

12  Q.  You were just taken through a sequence of questions

13      about deleting files.  Do you remember that?

14  A.  Yes.

15  Q.  And you were first asked whether they knew how to

16      delete files, or a question along those lines; right?

17  A.  Yes.

18  Q.  And you agreed with the idea that since the files

19      that were on the computer when Detective Howe looked

20      at the computer and then when you looked at it, since

21      the files in that shared file folder weren't the

22      same, that that meant they knew how to delete; right?

23  A.  Delete or move the file.

24  Q.  And you said you didn't look anywhere else on that

25      computer to see whether or not there were music files

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1        somewhere else; right?

2    A.   That's correct.

3    Q.   Now, maybe that fact isn't all that important, but

4         would you agree that you were making an assumption

5         there when you said that they knew how to delete?

6    A.   It's either deleted or moved.  There's two options

7         right there, yes.

8    Q.   You said on redirect that -- she asked you a question

9         along the lines of, not everybody on the internet has

10        access to it; it's only the people that have

11        LimeWire.  That was the question you were asked?

12   A.   Yes.

13   Q.   And you agreed with that?

14   A.   Yes.

15   Q.   We know that Detective Howe was using Phex; right?

16   A.   Yes.

17   Q.   So it's not just people using LimeWire; right?

18   A.   The law enforcement -- the average individual would

19        have to be using LimeWire because all -- I don't

20        think it speaks across, even though it's on the same

21        network with Limewire.

22   Q.   We have heard reference to some Bear Share program.

23   A.   Not to my knowledge.  What I know about it, you have

24        to have LimeWire; other users have to the LimeWire.

25   Q.   And then you were asked a question about the recent

1      file folder, that that meant that that file had been

2      viewed?

3  A.  Had been accessed, yes.

4  Q.  Had been accessed; right.  That's what that means?

5  A.  If it was a movie, Windows Media Player, something

6      played that movie, opened it up.  It was touched.

7  Q.  Well, the recent file folder is simply a -- it is a

8      shortcut, isn't it, is what it amounts to on XP?

9  A.  Not all files are put in the recent directory, but it

10     can serve as a shortcut.

11 Q.  I mean, the idea in XP to have that recent file

12     folder is to make it so that you can access something

13     quickly if you had recently been working on it, for

14     example; right?

15 A.  Yes.  Go to my documents and click on that file.  If

16     it hasn't been moved, it will start up.

17 Q.  So it's very possible somebody could have clicked --

18     you could click on a music file by accident when

19     you're trying to access a Word document, you

20     immediately see what you're doing, you make the

21     mistake, so you close out of, let's say, I-Tunes

22     or -- I'm sorry, whatever player you're using, you

23     click out of that so that you never really listened

24     to that song or viewed that file, but it's still

25     going to show up in that recent file folder, won't

1      it?

2  A.  You gotta go to -- for that file to be touched, the

3      person had to go to My Shared Directory to touch that

4      file, to open that up from there.

5  Q.  I understand.  Have you ever gone into your My

6      Documents folder and clicked on a file, realized that

7      you didn't mean to click on that one, closed that out

8      real quick, and jumped to another one?

9  A.  I usually don't use My Documents directory to do

10     that, but it can be done, yeah.

11 Q.  So you don't have any physical proof that a person

12     actually viewed that file that you have reserved that

13     was in the recent file folder?

14 A.  Physical proof, no.

15 Q.  And if someone had opened it up and viewed it, you

16     don't know how much of it they viewed; true?

17 A.  That's true.

18 Q.  And you don't have to watch any of these videos the

19     whole way through; you can stop it at any point;

20     right?

21 A.  True.

22 Q.  And close that player all together?

23 A.  True.

24         MR. CLARKE:  No additional questions, your

25     Honor.

1          THE COURT:  Ms. Martin?

2          MS. MARTIN:  Nothing further, your Honor.

3          THE COURT:  All right.  Mr. Kanatzar, you

4    may step down.  The government may call its next

5    witness.

6          MS. MARTIN:  Your Honor, at this time the

7    defendant would call Todd Beard.  Could we approach

8    briefly?

9          THE COURT:  Yes, you may.

10          MS. MARTIN:  I have already talked to

11    Mr. Clarke about this, but rather than play these

12    movies for these witnesses, I had just one screen

13    capture done, and I have marked those as exhibits.  I

14    will lay the foundation that they came from the movie

15    exhibit itself so we don't have to go through all

16    that again.  Because they weren't on your exhibit

17    list, I wanted you to know that we had done that.

18          THE COURT:  Any objection to proceeding in

19    that fashion?

20          MR. CLARKE:  On that particular issue, no,

21    your Honor.

22          THE COURT:  Is this the interstate nexus

23    evidence?

24          MS. MARTIN:  Yes.

25          MR. CLARKE:  I guess we might as well cover

1    this in advance.  I guess the question I have going

2    forward with these witnesses -- a couple, but one is,

3    how are they going to testify to this without relying

4    upon or using hearsay?

5          MS. MARTIN:  Mr. Beard and Mr. Latham both

6    were at the scenes depicted in these videos.  They

7    can testify that the scenes, well, in Mr. Beard's

8    case, were in Richland, Washington.  He recognizes

9    this girl.  He has seen her.  He saw her at the time

10    and since that time, so he was aware of her age.  But

11    he went to the actual location where these videos

12    were shot and can testify that it is -- that he is

13    confident that the videos were made at that location.

14    And as far as Mr. Latham, he actually discovered this

15    video during the search warrant.  He can testify that

16    he actually seized this bed cover, and then he went

17    door to door to try to identify the victim in this

18    video, and that this occurred in Michigan.

19          THE COURT:  Mr. Clarke?

20          MR. CLARKE:  That helps explain.  I

21    probably would like a moment to discuss what's going

22    on with my client.

23          MS. MARTIN:  Since they are here, I'm going

24    to go ahead and have them testify.

25          (The proceedings returned to open court.)

```
 1              MS. MARTIN:  Are we ready?

 2              THE COURT:  Yes.

 3                  TODD JAMES BEARD,

 4   having been duly sworn, was examined and testified as

 5   follows:

 6                 DIRECT EXAMINATION

 7   BY MS. MARTIN:

 8   Q.   Mr. Beard, can you tell us what you do for a living.

 9   A.   I'm a criminal investigator with Immigration and

10        Customs Enforcement.

11   Q.   How long have you been a federal agent?

12   A.   I have been in federal law enforcement since 1995.

13   Q.   And did you have special training to become a federal

14        law enforcement officer?

15   A.   Yes, I did.

16   Q.   Can you briefly describe that for us.

17   A.   Sure.  There was a four-month training course down in

18        Georgia that I attended in late 2002, 2003.

19   Q.   About how long is that course?

20   A.   About four months.

21   Q.   What sort of things do you learn during that?

22   A.   Well, there's the tactical part of being a federal

23        law enforcement officer.  In addition to that,

24        there's interviewing techniques and court procedures.

25   Q.   Where are you currently stationed?
```

1   A.   I'm in the Spokane, Washington, office.

2   Q.   And as part of your duties as an investigator located

3       in Spokane, Washington, did you participate in an

4       investigation which uncovered the Vicky child

5       pornography series?

6   A.   Yes, I did.

7   Q.   Can you tell us how you became involved.

8   A.   Yes.  I became involved in 2006 primarily for two

9       reasons.  The victimization of the girl in the Vicky

10      series began with a child coming forward and telling

11      her mom that she had been victimized by her father,

12      so the reason that Immigration and Custom Enforcement

13      became involved in 2006 was two-fold.  The subject,

14      the father of victim, had fled.  It was a state

15      prosecution.  It was a state case for rape of a

16      child.  When this individual fled, Richland Police

17      Department turned to a federal entity to help them

18      locate the person they believed had fugitated.  And

19      the second -- well, the second reason for our

20      involvement, my personal involvement, was because a

21      lap top computer given to the child, the victim child

22      in this case, had been determined to have production

23      videos on it with the father and the child on it, and

24      they seeked a federal charge and wanted the federal

25      government to come after Mr. Freeman for production

1      of child pornography.

2  Q.   All right.  Have you been to the house where the

3      videos were taken?

4  A.   Yes.  After my first interview with the victim in the

5      Vicky series, myself and another agent went to the

6      location where the alleged videos had been produced.

7  Q.   Where is that location?

8  A.   That is located in Richland, Washington, on Cannon

9      Road.

10 Q.   And have you reviewed Government's Exhibits 7, 9, and

11     11 in this case?

12 A.   Yes, I have, all three.

13 Q.   Can you tell us if you recognize the girl in that

14     movie.

15 A.   Yes.  The child victim in all three of those videos

16     is the same child in the Vicky series.

17 Q.   Okay.  And I'm going to show you what I have marked

18     as Government's Exhibit No. 19.  Do you recognize the

19     girl in Exhibit 19?

20 A.   Yes, I do.

21 Q.   That is a still frame from a movie which was marked

22     as Government's Exhibit No. 11; is that correct?

23 A.   Yes, that's correct.

24           MS. MARTIN:  Your Honor, I would offer

25     Government's Exhibit No. 19.

1          THE COURT:  Any objection?

2          MR. CLARKE:  No, your Honor.

3          THE COURT:  Exhibit 19 is admitted.

4    Q.  (By Ms. Martin) All right.  So you have actually been

5        to the house where this still photograph shows?

6    A.  Yes, correct.

7    Q.  And you recognize the scene?

8    A.  Yes, I do.

9    Q.  And have you seen this girl in person?

10   A.  I have.  I met her on six occasions.

11   Q.  And did you see her at this time at this age?

12   A.  No.  I met her for the first time in 2006.  She would

13       have been about 17.

14   Q.  Okay.  And how old is she in this video?

15   A.  She is around ten, 11 years old.

16   Q.  Let me show you what's been marked as Government's

17       Exhibit No. 20.  This is another still photograph

18       from Government's Exhibit No. 11.  Do you recognize

19       this still photograph?

20   A.  Yes, I do.

21   Q.  Is that a still image from Government's Exhibit

22       No. 11?

23   A.  Yes.

24          MS. MARTIN:  Your Honor, I would offer

25       Government's Exhibit No. 20.

```
 1                    THE COURT:  Any objection?

 2                    MR. CLARKE:  No, your Honor.

 3                    THE COURT:  Exhibit 20 is admitted.

 4                    (Exhibit 20 was admitted into evidence.)

 5   Q.   Does this appear to be the same location as

 6        Government's Exhibit No. 19?

 7   A.   From what I can tell, it's -- the room could be

 8        similar to other rooms, but it's an exact duplicate

 9        if it's not the actual room.

10   Q.   And, again, this house where these videos were taken

11        is in Richland, Washington?

12   A.   Correct.

13                    MS. MARTIN:  Your Honor, I have no further

14        questions.

15                    THE COURT:  All right.  Mr. Clarke?

16                    MR. CLARKE:  Yes, your Honor.

17                    CROSS EXAMINATION

18   BY MR. CLARKE:

19   Q.   Sir, could you elaborate on one of your last

20        statements about it could have been an exact

21        duplicate.  Does that mean you're not sure that it

22        was necessarily that exact location?

23   A.   Well, the reason I brought that up is Mr. Freeman had

24        sold the house in the time frame between when the

25        production of these videos had taken place and when
```

1  myself and another agent had visited the location, so

2  the room had changed color.  They were painted, and

3  we had to get permission from the new owners to come

4  in and look.  If you watch all the videos, all the

5  videos taken together, you can't get a hundred

6  percent clear picture of the entire room, so I'm just

7  being careful when I say that it's an exact duplicate

8  if it's not the house, but I'm very confident that

9  it's the same house.  The reason I say that is

10 because there are additional videos in addition to

11 the three that were watched today.  There are

12 probably at least eight videos, and in those videos

13 there's also bathroom scenes, and based on the

14 bathroom, it is really clear that that's most

15 definitely probably, you know, the house.  There was

16 no bathroom in the video that was shown today because

17 those weren't found on the defendant's computer.

18        MR. CLARKE:  No further questions, your

19 Honor.

20        MS. MARTIN:  Nothing further.

21        THE COURT:  All right.  Mr. Beard, you may

22 step down, and without objection you are excused.

23 You may call your next witness.

24        MS. MARTIN:  Your Honor, at this time we

25 would call Peter Latham.

1    PETER LATHAM,

2  having been duly sworn, was examined and testified as

3  follows:

4                    DIRECT EXAMINATION

5  BY MS. MARTIN:

6  Q.   Mr. Latham, what do you do for a living?

7  A.   I'm currently a senior special agent for Immigration

8       Customs Enforcement in Grand Rapids, Michigan.

9  Q.   How long have you been a federal law enforcement

10      officer?

11 A.   Since 1990.

12 Q.   And did you have similar training to Agent Beard?

13 A.   Yes.  It would have been nearly identical.

14 Q.   And where are you currently stationed?

15 A.   In Grand Rapids, Michigan.

16 Q.   Sorry.  You said that.  Do you investigate child

17      pornography cases as a result of the Meg series?

18 A.   Yes, I do.

19 Q.   Can you tell us how you became involved in that

20      investigation.

21 A.   Yes.  In 1998 we received a lead, what we call a

22      collateral request, from our attaché office in Great

23      Britain.  They had seized a file server over there

24      which captured a number of internet addresses and

25      credit card addresses in the United States where

```
 1          people had accessed a website over there and

 2          downloaded pornography or child pornography.

 3     Q.   And so basically what you had was a name and a credit

 4          card number?

 5     A.   Yes.

 6     Q.   And what did you do to further investigate that case?

 7     A.   We built it up to the level where we could get a

 8          search warrant for the subject's house in Grand

 9          Haven, Michigan.

10     Q.   And so you did get a search warrant?

11     A.   Yes, we did.

12     Q.   And tell us what happened then.

13     A.   The subject's name in this case was a guy by the name

14          of Dan Brown.  He was a part of a group called

15          Wonderland.  As part of that group, you had to

16          produce original material to be a member.  Basically,

17          during the course of the search we recovered -- there

18          were several hundred VHS tapes.

19     Q.   I'm sorry.  You yourself actually recovered some VHS

20          tapes from the bathroom?

21     A.   Yes, we did.

22     Q.   And where were they located in the bathroom?

23     A.   In a clothes hamper.

24     Q.   And at the time was Mr. Brown being forthcoming about

25          his involvement in child pornography?
```

1    A.    Initially, no, he was not.  He denied it up to the

2          point where we confronted him with the VHS tapes that

3          we found.

4    Q.    So you actually put a VHS tape into the VCR and

5          played it at his residence?

6    A.    Two of the ones that we found in the bathroom we did

7          because we knew if he had hid them in that area that

8          they were likely not a movie or, you know, a reunion

9          tape or whatever the case might be.  So yes.

10   Q.    All right.  Have you -- did you review Government's

11         Exhibit No. 11 prior to coming to testify

12         this morning?

13   A.    Yes, I did.

14   Q.    And were there images on Government's Exhibit No. 11

15         that correspond with your investigation?

16   A.    Yes.

17   Q.    All right.  I'm going to show you what's been marked

18         Exhibit 21.  Can you tell me if you locate that.

19   A.    Yes, I do.  That was one of -- or the primary victim

20         of Dan Brown.

21   Q.    Okay.  And that's a still image from Government's

22         Exhibit No. 11, is it not?

23   A.    That's a still of a fairly long video, yes.

24   Q.    Okay.

25                    MS. MARTIN:  And, your Honor, I would offer

1       Government's Exhibit 21.

2            THE COURT: We got the cart before the

3       horse in terms of not displaying it before it was

4       admitted.

5            MS. MARTIN: And I'm sorry. Yes.

6            THE COURT: Any objection?

7            MR. CLARKE: No, your Honor.

8            THE COURT: Exhibit 21 is admitted.

9            (Exhibit 21 was admitted into evidence.)

10 Q. (By Ms. Martin) Can you tell me about this video.

11     When you first put it in, did you know what you were

12     going to see?

13 A. No.

14 Q. And when you first put it in the VCR and it started

15     to play, was there something that caught your eye?

16 A. Well, both of those VCR tapes had several different

17     segments which basically ran back to back to back and

18     were anything from, like, hot tub scenes to, you

19     know, a lot of other videos that involved the primary

20     victim and other girls that lived in that

21     neighborhood.

22 Q. All right. But this particular still that we're

23     looking at, when you first looked at it, did you

24     recognize anything about it?

25 A. Yes. The comforter on the bed and the vibrator that

1    the girl is holding.

2    Q.   Why did you recognize it?

3    A.   Because we recovered them both from his house, Mr.

4         Brown's house, the night that we searched him.

5    Q.   That was the bedspread that was on his bed at the

6         time you were doing the search warrant?

7    A.   Yes, it was.  If you saw the other portion of the

8         video, the whole display of the bedroom, it's -- it

9         was evident it was in his bedroom.

10   Q.   So at that point you knew you had a case of

11        production of child pornography and not just receipt

12        or distribution?

13   A.   Yes, that was the case.

14   Q.   Did you recognize the girl in the video?

15   A.   I'm not sure what point you mean.

16   Q.   Well, at the time you first played it, did you know

17        who she was?

18   A.   No.

19   Q.   And how did you identify her?

20   A.   Mr. Brown wouldn't identify her, so we went back --

21        myself and a detective from the state police went

22        back the next day in the neighborhood and basically

23        went door to door with a cropped image of her face.

24   Q.   And were you able to locate her in the neighborhood?

25   A.   Yeah.  Very -- I think it was the second house we

1     knocked on the people knew her as a girl from across

2     the road.

3  Q.  Okay.  And so you actually saw this girl then not

4     long after you did the search warrant?

5  A.  The following day.

6  Q.  How old was she?

7  A.  She was at that time about 14 years old.

8  Q.  Okay.  And, again, where was this located?

9  A.  In Grand Haven, Minnesota.

10          MS. MARTIN:  I have no further questions,

11     your Honor.

12          THE COURT:  All right.  Mr. Clarke, you may

13     cross examine.

14          MR. CLARKE:  No questions, your Honor.

15          THE COURT:  Very well.  You may step down,

16     and without objection, Mr. Latham, you are excused.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  Ms. Martin?

19          MS. MARTIN:  Your Honor, at this time the

20     government would rest.

21          THE COURT:  All right.  We will take a

22     recess now, members of the jury.  By recessing, what

23     that means is that the government has completed the

24     presentation of its evidence in this case.  Let me

25     caution you, as I do at each of the breaks when I

1    give you the cautionary instruction about not sort of

2    talking about the case, let me go one step further

3    and say, just because you've heard the government's

4    evidence, now is not the time that you should say, I

5    think I'll get a head start on figuring out how this

6    all comes out.  You haven't heard the instructions

7    from the court about what the law is that's

8    applicable and so forth.  You haven't heard argument

9    by counsel, etc., so not everything has been

10   presented to you yet.  Simply take a break, and we

11   will have some matters that we need to talk about a

12   little bit here, and then we will be back with you.

13        I'm going to put you on break until 3:15, and I

14   think Ms. Scheurer should be someplace.  I think

15   she's probably coming in the back door.  I will

16   remind you of all the admonitions that I have given

17   you in this respect.  Ms. Scheurer will take you out

18   as soon as she's here.  We are in recess.  Counsel,

19   please remain.

20        (The following proceedings were had outside

21   the presence of the jury:)

22        THE COURT:  You may be seated, Mr. Clarke.

23   Let me first ask you, what is your pleasure at this

24   juncture?

25        MR. CLARKE:  Your Honor, I would make a

1    Rule 29 motion.  We believe that the government has

2    not presented sufficient evidence to sustain a

3    conviction that Mr. Frakes possessed nor distributed

4    child pornography.

5         THE COURT:  Thank you.  I'm going to deny

6    the motion.  I think the government has presented

7    sufficient evidence for a reasonable jury to draw a

8    conclusion beyond a reasonable doubt that Mr. Frakes

9    is guilty of both of those charges.  That doesn't

10   mean they will, but there is adequate evidence for

11   them to do so.  All right.

12        Now let me talk to you about where we go from

13   here.  You had indicated yesterday Mr. Frakes was

14   likely to testify here.  Is that still his pleasure?

15        MR. CLARKE:  I believe it is, your Honor,

16   although, obviously, I haven't spoken to him since

17   the close of the government's case.

18        THE COURT:  Right.  What I would suggest is

19   that we take a break then.  I will come back and make

20   inquiry of Mr. Frakes regardless of what his decision

21   is to make clear for the record that he understands

22   his rights and whatever decision he makes is his

23   decision and not something counsel is foisting on him

24   or something like that, not that I think counsel is

25   going to be foisting decisions on him, but I want to

1    make it clear for the record.

2         Is there any other evidence that you intend to

3    present other than Mr. Frakes' testimony should he

4    desire to testify?

5              MR. CLARKE:  No, your Honor.

6              THE COURT:  All right.  Let's be in recess

7    until -- do you think five minutes after 3:00?

8    That's about 15 minutes.  Is that enough time for you

9    to visit with Mr. Frakes, or do you want more time?

10             MR. CLARKE:  Your Honor, could we have ten

11   after?

12             THE COURT:  I'll give you ten after.

13             MR. CLARKE:  Thank you.

14             THE COURT:  We will be in recess until ten

15   after 3:00.

16             (A recess was taken.)

17             THE COURT:  All right.  Mr. Clarke, have

18   you and Mr. Frakes had the opportunity to confer

19   concerning what his decision might be with regard to

20   testifying?

21             MR. CLARKE:  We have, your Honor.

22             THE COURT:  What is his decision?

23             MR. CLARKE:  He is going to testify.

24             THE COURT:  Mr. Frakes, would you stand up

25   for just a moment, please.  I simply want to

1       ascertain for the record the fact that you are aware

2       that under the Constitution of the United States you

3       have the right not to testify and that if you do not

4       testify then the jury will be instructed that they

5       cannot draw any inferences or even consider or

6       mention or discuss the notion that you haven't

7       testified.  Do you understand that?

8               THE DEFENDANT:  Yes, I do.

9               THE COURT:  If you do testify, your

10      testimony will be subjected to cross examination, and

11      the jury will be instructed that they can weigh your

12      testimony just the same as any other witness in the

13      case.  Are you aware of that?

14              THE DEFENDANT:  Yes, I am.

15              THE COURT:  And that, of course, with

16      testifying comes the risk then that you may have

17      aspects of your testimony which the jury draws

18      negative inferences about you or concludes that it

19      isn't helpful to you.  I'm putting it in sort of an

20      easy-to-listen-to way, but I think you probably get

21      my drift here that there's some risk to testifying as

22      well as some potential benefit.  Do you understand

23      that?

24              THE DEFENDANT:  Yes, I do.

25              THE COURT:  And have you discussed with

1          Mr. Clarke other potential ramifications of your

2     testifying versus remaining silent here?

3               THE DEFENDANT:  Yes, I have.

4               THE COURT:  All right.  Now, is it correct

5     then that your decision is you want to testify?

6               THE DEFENDANT:  Yes, it is.

7               THE COURT:  And is that your decision and

8     not Mr. Clarke's decision?

9               THE DEFENDANT:  Yes, it is.

10               THE COURT:  Very well.  I will accept your

11     decision as a knowing and voluntary waiver of your

12     right to remain silent.  When we bring the jury back

13     in, I'll recognize Mr. Clarke for the purpose of

14     calling witnesses, and we will proceed accordingly.

15               (The following proceedings were had in the

16     presence of the jury:)

17               THE COURT:  Mr. Clarke, the defendant may

18     call his first witness.

19               MR. CLARKE:  Thank you, your Honor.  The

20     defense calls Casey Frakes.

21

22

23

24

25

1          CASEY FRAKES,

2     having been duly sworn, was examined and testified as

3     follows:

4                    DIRECT EXAMINATION

5     BY MR. CLARKE:

6              THE COURT:  You are the Casey Frakes who is

7          the defendant in this matter; is that correct?

8              THE DEFENDANT:  Yes, I am.

9              THE COURT:  Very well.  You may proceed,

10         Mr. Clarke.

11             MR. CLARKE:  Thank you.

12    Q.   (By Mr. Clarke) Mr. Frakes, you're 31 years old?

13    A.   That's correct.

14    Q.   Where are you currently employed?

15    A.   For Pinnacle Lawn Care, Overland Park, Kansas.

16    Q.   And what's the nature of the work that you do for

17         Pinnacle?

18    A.   I'm an accounts manager, oversee the maintenance

19         aspect of lawn care, mowing, that sort of thing.

20    Q.   How long have you worked at Pinnacle?

21    A.   I have worked there for approximately 2½ months.

22    Q.   Prior to working at Pinnacle, where were you

23         employed?

24    A.   I was unemployed, had been laid off from Botorff

25         Construction.

| | | |
|---|---|---|
| 1 | Q. | And how long were you unemployed? |
| 2 | A. | Since the first of the year. |
| 3 | Q. | Kind of jumping farther back, you graduated from |
| 4 | | Atchison High School in 1996; is that correct? |
| 5 | A. | Atchison, yes. |
| 6 | Q. | After graduation what did you do? |
| 7 | A. | I went to college two years at Highland Community |
| 8 | | College, graduated there, and then on to Kansas State |
| 9 | | University, where I did not finish, took a full time |
| 10 | | job in landscaping at the time. |
| 11 | Q. | So you received an associate's degree from Highland? |
| 12 | A. | That's correct. |
| 13 | Q. | And what was your degree in? |
| 14 | A. | Associate of arts and sciences. |
| 15 | Q. | And what were you studying at K-State? |
| 16 | A. | I was studying international business and marketing |
| 17 | | and human resource management. |
| 18 | Q. | And how far did you get at K-State? |
| 19 | A. | Approximately two years, four semesters. |
| 20 | Q. | So how many more did you have to go to complete your |
| 21 | | degree? |
| 22 | A. | I believe I have approximately one full year of |
| 23 | | credits left to graduate. |
| 24 | Q. | While you were going to school at Highland and |
| 25 | | K-State, did you own a computer? |

```
 1   A.   I didn't own one, no.

 2   Q.   Did you borrow one from your aunt?

 3   A.   At that time, no.

 4   Q.   Did you use a computer at any point for your studies?

 5   A.   When I was going to Highland, just used the computers

 6        in, like, the business center or the library.

 7        K-State, basically the same thing but had roommates,

 8        and we had one -- basically one computer for the

 9        house.

10   Q.   And what would you use the computer for at that time?

11   A.   At that time it would have been for school studies,

12        that sort of thing.  When I was going to K-State, I

13        actually did some, I guess, online banking through

14        the computer, but other than that, that's primarily

15        what it was for.

16   Q.   So at least at that time you were using the internet;

17        is that true?

18   A.   Yes.

19   Q.   Were you using the computer for word processing?

20   A.   Yeah, for reports.

21   Q.   What did you do after you attended K-State?

22   A.   I worked for a landscape company.  I was a project

23        foreman for them.  And then I moved back home and was

24        working in Kansas City.  Approximately 2001 I worked

25        for a company called Longevity and was their air
```

|   |   |   |
|---|---|---|
| 1 |    | conditioning services manager, and then after two |
| 2 |    | years there I moved to Colorado and was an accounts |
| 3 |    | manager for American Civil Constructors in Colorado |
| 4 |    | Springs, and then -- two years there.  Moved to |
| 5 |    | Scottsbluff, Nebraska, and was a general |
| 6 |    | manager/salesperson for a landscape company up there. |
| 7 | Q. | During that employment history that you just reviewed |
| 8 |    | for us, did you use a computer in the course of your |
| 9 |    | work? |
| 10 | A. | Yeah.  I wouldn't say on a daily basis, but yeah. |
| 11 | Q. | Frequently? |
| 12 | A. | Frequently, yes. |
| 13 | Q. | And what would you use the computer for? |
| 14 | A. | Mainly e-mails.  That was pretty much it. |
| 15 | Q. | After Nebraska then you moved back home; is that |
| 16 |    | correct? |
| 17 | A. | That's correct. |
| 18 | Q. | What did you do once you moved back home? |
| 19 | A. | Once I moved back home, I started working at Long |
| 20 |    | John Silvers in Atchison as an assistant manager and |
| 21 |    | also worked at Snow Creek as a manager there as well. |
| 22 | Q. | What sort of hours did you work when you were working |
| 23 |    | at Long John Silvers and Snow Creek? |
| 24 | A. | When I was working -- both of them -- when Snow Creek |
| 25 |    | was in season, I was working approximately -- some |

1    days I would work close to 12, 15 hours a day.

2  Q.  Do you remember approximately when you moved back to

3       the home from Nebraska?

4  A.  Middle to late -- end of August, I believe, of '06.

5  Q.  And when you moved back home, what part of the home

6       did you move into?

7  A.  You mean inside the house?

8  Q.  Yes.

9  A.  Back into my old bedroom.

10  Q.  And is that the same room that we have heard

11       described during the course of this trial?

12  A.  Yes, it is.

13  Q.  Have you ever lived in another room in that house?

14  A.  No, never.  I mean, no.

15  Q.  From the time that you moved back into the home from

16       Nebraska until June 10 when they came and seized the

17       computer, was that computer in your bedroom?

18  A.  Yes, it was.

19  Q.  You've heard testimony the last couple days about the

20       profiles set up on the computer.  What do you

21       remember?

22  A.  I remember the five profiles: my mother's, myself,

23       Jason's, Jon's, and Angela's.

24  Q.  Do you remember whether or not you set up any of

25       those profiles?

```
 1   A.   I don't recall setting any of them up.  I'm sure I

 2        probably set my own up, but I don't recall the rest

 3        of them.

 4   Q.   Do you recall -- you heard testimony from Agent

 5        Kanatzar about administrator privileges on the

 6        computer.  Do you remember that?

 7   A.   I remember his testimony, yes.

 8   Q.   Do you recall who had those privileges on the

 9        computer?

10   A.   No.  I have no idea.

11   Q.   What did you use that computer for?

12   A.   I used it for various things: email, surfing the web,

13        downloading music, and downloading porn.  But that

14        was -- and news articles, I guess, like Yahoo News.

15   Q.   You heard your mother testify; is that right?

16   A.   Yes.

17   Q.   Do you remember her testifying about how she used the

18        computer for online banking?

19   A.   Yes.

20   Q.   Is that consistent with your recollection of how your

21        mother used the computer?

22   A.   Pretty much, yes.

23   Q.   You heard some testimony about your brother Jon

24        coming over to use the computer.  Do you remember

25        that?
```

1    A.   Yes, I do.

2    Q.   How did that testimony jibe with what you remember

3         about your brother using the computer?  When I say

4         brother, brother Jon.

5    A.   Well, it was pretty accurate.  I mean, from what I

6         remember, you know, he would oftentimes come over

7         when nobody was home or everybody was at work.  I was

8         never usually there a lot of times when he was using

9         it.

10   Q.   How would you know if you weren't there that he had

11        been using the computer?

12   A.   Usually Mike, my brother, or Jason would say that he

13        had stopped by to use the computer.  Communication, I

14        guess, between us.

15   Q.   Do you know why he would have been coming over to

16        your house to use the computer?

17   A.   The only reason I know of that he would be using a

18        computer is that he would come over to do his online

19        banking and look at stuff, his email, that sort of

20        thing.

21   Q.   Do you know why -- did he have his own computer?

22   A.   I don't know if at the time he had his own computer

23        or if he just didn't have the internet at the time.

24        I don't remember.

25   Q.   What about your brother Jason?  What do you remember

1      about his usage of that computer?

2   A.  Again, online banking; you know, he would search, you

3       know, news articles about all sorts of stuff, I mean,

4       anywhere from, like, gym equipment to hunting stuff.

5       I mean, I wasn't really in there when he was looking

6       for things, so I don't really know exactly.

7   Q.  How was the computer set up in the room?  Was it on a

8       desk, on a table?

9   A.  It was on a desk.

10  Q.  Was there a permanent chair in there?  What I mean by

11      permanent is, was the chair always there to be used

12      at the computer, or did you have to bring in a chair

13      to use it?

14  A.  It was always in the room.

15  Q.  Was there more than one?

16  A.  I don't recall there being more than one.

17  Q.  Did you ever have occasion to use the computer with

18      another person, for example, your mother or Jason?

19  A.  On occasion, yeah, just showing them things, or they

20      would show us things, that sort of stuff.

21  Q.  Can you give a specific example of you and Jason

22      using the computer together?

23  A.  One example was, like, he was showing me some

24      elliptical machine on there at one time, how much it

25      cost, or showing me a game that he might be playing

1    or might have played, or had me come listen to some

2    song that he was listening to at the time.

3    Q.   Did you ever help Jason with music files on the

4         computer?

5    A.   As far as downloading music files or --

6    Q.   Or putting them on an MP3 player, anything like that?

7    A.   I know I did help him with his MP3 player that he

8         got, but other than that I don't recall specifically

9         helping him with music files.

10   Q.   When you say you helped him with the MP3 player, was

11        that just helping him with the actual player itself,

12        or did it have something to do with having the MP3

13        player hooked up to the computer?

14   A.   I think it was -- you know, we installed the software

15        to put music on the MP3 player together.  I don't

16        know if -- for whatever reason, but I was in there

17        with him, so . . .

18   Q.   Do you have a specific recollection of what the steps

19        were to get music from the computer to the MP3

20        player?

21   A.   Specifically, no.

22   Q.   Were you ever personally involved in that?

23   A.   That day, yes.

24   Q.   Other than that day were you involved with it?

25   A.   I don't believe so.

1   Q.   You've heard a lot of testimony about LimeWire; true?

2   A.   Yes.

3   Q.   Did you install the LimeWire software on this

4        computer?

5   A.   Yes, I did.

6   Q.   To the best of your recollection, when did you do

7        that?

8   A.   I don't know for sure.  Shortly after I moved back or

9        when I moved back.

10  Q.   And were you familiar with LimeWire before installing

11       it on this computer?

12  A.   Yeah.  I had used it when I lived in Nebraska.

13  Q.   And what computer were you using when you were using

14       it in Nebraska?

15  A.   I believe I used the lap top and I had a computer

16       there, a desk top, for a short time, but it shot

17       kaput.

18  Q.   So you think that you installed the LimeWire software

19       shortly after you moved back home; is that right?

20  A.   That's correct.

21  Q.   Did you ever have to, to your recollection, reinstall

22       that software?

23  A.   I don't know that we had to reinstall it, but I think

24       sometimes we had to, like -- I don't know if it was

25       called reinstalling it or not, but it was almost like

1      an update or something for that, I guess.

2   Q.   What do you remember about the installation process

3      of LimeWire to the best of your recollection?

4   A.   What I remember is not much, honestly.  Asked me if I

5      wanted to install it.  Yes, I wanted to install it.

6      I vaguely remember the destination directory, but

7      other than that, I don't remember much.

8   Q.   Do you remember where you -- did you go to the

9      internet to get the software, or did you install it

10      from a CD or DVD?

11   A.   I believe it was off the internet.

12   Q.   If it was off the internet, do you remember the

13      specific website that you went to to download the

14      software?  Was it a website for and owned by the

15      company LimeWire, or was it from some third party?

16   A.   I don't remember.  I would assume it was the LimeWire

17      website, but I'm not sure.

18   Q.   Do you remember making any changes during the

19      installation process, again, to the best of your

20      recollection, of any of the default settings?

21   A.   No.

22   Q.   Do you remember at any point thereafter making any

23      changes to any of the programs, software settings?

24   A.   For LimeWire?

25   Q.   Yes.

1   A.   No.

2   Q.   Now, you've heard the testimony of Detective Howe,

3        Agent Kanatzar, and they both at some point talked

4        about it being a file-sharing service.  Did you

5        understand that's what it was?

6   A.   Yes, I did.

7   Q.   You heard them describe how it works.  For example,

8        the terminology peer to peer, I think, was probably

9        used.  Do you remember that?

10  A.   Yes, I do.

11  Q.   Did you understand at least in a general sense that's

12       how the software worked?

13  A.   I'm not sure I understand what you mean.

14  Q.   When you were -- if you used that software to

15       download files, did you understand that it was

16       coming -- those files were probably coming from some

17       other user's computer?

18  A.   I assumed, yes.

19  Q.   If you can think back, can you estimate how

20       frequently you used LimeWire?

21  A.   How frequently?  I don't know.  Once a week.  Maybe

22       more.  Just depends.  Sometimes I would use it, you

23       know, maybe every day; sometimes I wouldn't use it at

24       all for months at a time.

25  Q.   We have already said that you used LimeWire to access

1      pornography; right?

2  A.   Yes.

3  Q.   Did you use it to access other nonpornographic files?

4  A.   Music and other movies, videos, yes.

5  Q.   When you say other movies and videos, can you give an

6      example?

7  A.   Like, the DaVinci Code, I know, was one.  I think

8      Superman Returns was on there.  There might have been

9      some other just, like, miscellaneous, like, clips or

10     something, but I don't remember all the exact file

11     names, no.

12  Q.  So you were familiar with using the service before

13     you downloaded it on this computer.  Once it was

14     installed, to your recollection, how did it work?

15     How did you do a search?

16  A.  You would type in a search term, and you could

17     choose, like, file types, videos, music, images, that

18     sort of stuff.  And then I would just hit enter, and

19     the results would start to show up on the window.

20  Q.  When the results would come up on the screen, would

21     it say 300 files, you know, have come back based upon

22     your search, or was it continuously updating the

23     number of files that were available even after you

24     had hit enter?

25  A.  Most of the time it was continuously updating.

1   Q.   And if you were searching for music, let's say, to

2       the best of your recollection, if you typed in a

3       search like Yellow Brick Road -- I don't know if you

4       looked for that or not, but if you did, what would

5       the display look like?

6   A.   It would have, like, folder icons, and then it would

7       just have, like, file names, or whatever.  It would

8       say, you know, Yellow Brick Road or who sung the song

9       or who wrote it or what album it might be on, that

10      sort of thing.

11  Q.   Have you ever used I-Tunes?

12  A.   Not to my knowledge, no.  I don't remember ever using

13      it, no.

14  Q.   When you did a search for, let's say, Yellow Brick

15      Road, would a picture of the album cover come up, or

16      would it just be a file name?

17  A.   It would just be a file name.

18  Q.   Would it only be music files that would come up, or

19      could it be video files and other types of files?

20  A.   I honestly don't remember if -- I would say most of

21      the time it was -- if you were searching for music,

22      it was just music, but I don't believe it was always

23      that way, but I don't remember for sure.

24  Q.   Do you recall whether or not you have the option of

25      telling it to only search for music files?

```
 1    A.    Initially when you would open it up it would show --
 2          on the left side of the screen it would show, like,
 3          three or four different options or all types, and
 4          usually I would pick music, or whatever, whatever I
 5          was going to download at that time.
 6    Q.    When you used it for video clips or movies, how, if
 7          at all, would searching for those differ from
 8          searching for music?
 9    A.    Usually if you were searching for, like, a video clip
10          it would just have, like, I believe just the title or
11          key word; and then you could choose, like, movies.  I
12          know, like, adult porn was one CE, DVD.  I mean,
13          there were various other things that you could do to
14          kind of, I guess, narrow the search.
15    Q.    So your ability to narrow the search -- for example,
16          based upon your experience, if you had typed in
17          Yellow Brick Road and then subsequently typed in the
18          search for Yellow Brick Road, Elton Jon, would one
19          search produce more specific results than the other?
20    A.    Sometimes yes; sometimes no; sometimes not at all.
21          Sometimes it wouldn't allow you to put in that much
22          of a specific search term or search words.
23    Q.    How did you go about, if you did, selecting which
24          files you wanted to download?
25    A.    As far as?
```

| | | |
|---|---|---|
| 1 | Q. | Music files, video files, any of them. |
| 2 | A. | Usually if it was a music file, I was typically |
| 3 | | looking for more specific, like, artists.  Sometimes |
| 4 | | I would just type in, you know, a single word |
| 5 | | regarding music or videos. |
| 6 | Q. | And so once you typed in that search term, let's say |
| 7 | | REO Speed Wagon, Golden Country, and up comes music |
| 8 | | files and you see that title, what do you do to get |
| 9 | | it on your computer? |
| 10 | A. | You would have to click on it. |
| 11 | Q. | Did you have the ability to preview it? |
| 12 | A. | No. |
| 13 | Q. | And so once you click on it, was it the display box |
| 14 | | that you clicked, or what did you click? |
| 15 | A. | I don't remember if there was a box or not.  Usually |
| 16 | | I would just double click right over the top of the |
| 17 | | file. |
| 18 | Q. | Did anything indicate to you whether or not your |
| 19 | | double click was effective in getting the file to |
| 20 | | your computer? |
| 21 | A. | Well, usually there's like a very small box at the |
| 22 | | bottom that would show, I guess, file status, or |
| 23 | | whatever. |
| 24 | Q. | And so what would the file -- would the file status |
| 25 | | go from downloading to download complete, or what |

1      would it do?

2   A.   Typically, yeah.  Downloading to download complete.

3        I mean, that's what I recall.

4   Q.   Now, let's say with music files, if you wanted to

5        download a bunch of Bruce Hornsby songs, you could

6        just type in an artist rather than a song title;

7        right?

8   A.   That's correct.

9   Q.   So if you wanted to get a bunch of Bruce Hornsby

10       songs, did you have to click one, wait for it to

11       download, and then click the other and wait for that

12       one to finish, and then click another, or how did it

13       work?

14  A.   No.  You can click on -- from my experience, you

15       could click on as many as you wanted.

16  Q.   And would they just start downloading as soon as you

17       clicked them?

18  A.   More or less.  That's basically how it worked.

19  Q.   Now, when it said that it was downloading, is that

20       because it gave you some sort of indication like a

21       symbol showing that the computer was, quote-unquote,

22       thinking or doing something, downloading?

23  A.   No.  It would have, I guess, like a percentage bar or

24       something, that would show that it was downloading, I

25       guess.

1    Q.    So the percentage bar was showing you what percentage

2         of the file had been downloaded?

3    A.    That's correct.

4    Q.    So with movie files did it work the same way as the

5         music files that we just discussed?

6    A.    Yes, it did.

7    Q.    So let's get to pornography.  You searched for

8         pornography?

9    A.    Yes, I did.

10    Q.    Using LimeWire?

11    A.    That's correct.

12    Q.    And can you give us an example of search terms that

13         you used?

14    A.    I would use, like, nude, sex.  I would use the word

15         fuck, anal.  I even used cum shots.

16    Q.    And could you combine those terms?  Could you have

17         brunette, anal, cum shot, whatever, all in one

18         search?

19    A.    I don't know.  I never tried, so I can't tell you if

20         you can.

21    Q.    So once you typed in those search terms, what would

22         you see on your computer?

23    A.    A bunch of files would just start to pop up on the

24         right side.

25    Q.    And what would it tell you about those files?

1    A.    As far as --

2    Q.    What did you see when the screen popped up?

3    A.    A lot of times just words, random words, not

4          necessarily, like, a specific file name.

5    Q.    So random words, meaning, like, the list of words

6          that I just described, might those come up?

7    A.    Uh-huh.

8    Q.    Was it more typically than, let's say, my hot wife in

9          bed?

10   A.    More typically, yeah.  The way I remember, that's the

11         way it would show up.

12   Q.    The latter?  It would just be kind of a bunch of

13         terms grouped together?

14   A.    Yes.

15   Q.    Sometimes did it have a more readable sequence of

16         terms?

17   A.    Sometimes, yes.

18   Q.    So you're sitting at the computer.  Would you do this

19         in the middle of the day, late at night, or all times

20         of the day?

21   A.    Just whenever I was in the mood to download music or

22         porn.  I mean, it wasn't like I had a set time or a

23         preference when I would do it.

24   Q.    Would you normally have the door to the bedroom

25         closed if you were looking at porn?

1   A.   Just depends.  I mean, I would close it if I was

2       looking at the computer, period, sometimes.  I mean,

3       it wasn't -- I wouldn't necessarily close it because

4       I was looking or downloading porn, no.

5   Q.   When you did a search that included a pornographic

6       term, do you recall how many -- I'll use the term

7       hits.  How many hits would you have?

8   A.   Probably thousands or -- more than just like a

9       hundred, but probably thousands.

10   Q.   And how would you know that you had, let's say,

11       hundreds of hits?

12   A.   At the top it shows you, I guess, how many available

13       files, I guess is what it is.

14   Q.   Do you see all those available files on the screen,

15       or do you just see a portion of them?

16   A.   You would just see a portion of them.

17   Q.   Could you, to your knowledge, change how the screen

18       displayed things?  For example, would there be a

19       classic view and a new view that would just change

20       how things looked on your screen?

21   A.   I don't recall, no.

22   Q.   To your knowledge, do you remember ever changing how

23       the screen looked?

24   A.   Other than maybe like shrinking the window itself,

25       no.

1  Q.  So let's say you had 500 hits based upon a search for

2      some pornographic term.  How would you go about

3      selecting which files to download?

4  A.  Normally I would just start it at the top and just

5      start clicking on stuff from the top down.

6  Q.  Why would you do it that way versus going through and

7      selectively clicking certain files?

8  A.  Because I wasn't after anything in particular.  I

9      mean, I was just searching for, I guess, porn in

10     general.  I mean, it wasn't anything specific.

11 Q.  When you say you weren't after anything specific,

12     obviously, you would type in some search term; is

13     that true?

14 A.  Yeah.

15 Q.  So you were at least looking for some files that

16     would match those search terms; is that right?

17 A.  Yeah.

18 Q.  Now, you heard Agent Kantazar --

19          THE COURT:  It's Kanatzar.

20          MR. CLARKE:  And I've heard it a million

21     times, Judge, in this trial, and I still get it

22     wrong, and I apologize.

23          THE COURT:  That's all right.

24 Q.  (By Mr. Clarke) You heard the discussion about how

25     the search term may not correlate with the names of

| | | |
|---|---|---|
| 1 | | the files that came up.  Do you remember that |
| 2 | | discussion that I had with him? |
| 3 | A. | Yes, I do. |
| 4 | Q. | Is that consistent or not consistent with your |
| 5 | | recollection of how things worked? |
| 6 | A. | I would say it's consistent with, I mean, how it |
| 7 | | worked.  I don't know if I actually understand the |
| 8 | | question. |
| 9 | Q. | When you typed in a search term and you got results |
| 10 | | back -- |
| 11 | A. | Uh-huh. |
| 12 | Q. | -- did the search term always appear in the name of |
| 13 | | the file that came up? |
| 14 | A. | To my -- to the way I remember it, yes. |
| 15 | Q. | In terms of the file names themselves, did you |
| 16 | | find -- well, let me -- before I get to that, let me |
| 17 | | jump -- once you downloaded files, did you ever look |
| 18 | | at any of the files? |
| 19 | A. | After they were downloaded? |
| 20 | Q. | Yes. |
| 21 | A. | A few, yes. |
| 22 | Q. | And do you remember what player you would have used |
| 23 | | to look at the files? |
| 24 | A. | I used DIVX players; I used Windows Media Player; I |
| 25 | | think if I remember right LimeWire either has a |

 1      default player or uses Windows Media Player.

 2  Q.  Do you ever remember making any changes to the

 3      LimeWire software to change which media player it

 4      would use?

 5  A.  No.

 6  Q.  The names of the files -- I think we covered that

 7      oftentimes it would just be a bunch of words grouped

 8      together that didn't necessarily make a sentence, for

 9      example.  Did you find that the name always matched

10      what was on the file in terms of what it depicted?

11  A.  Did I find that the name always matched?  No.

12  Q.  And so can you elaborate on that?  What do you mean

13      by that?

14  A.  I just recall one specific one that said -- I believe

15      it had two white girls doing -- like, it said horse

16      cock, but it wasn't actually a horse cock.  I mean,

17      it was a black man.

18  Q.  Did you ever arrange the files that were downloaded

19      either into separate folders or just arrange them

20      within the folder that they were downloaded into?

21  A.  No.

22  Q.  You heard testimony that some music files at some

23      point were in that directory, I think on March 12,

24      2007, and then when the hard drive was examined later

25      those music files weren't on -- in that directory.

1   Do you remember that testimony?

2   A.   Yes, I do.

3   Q.   Do you have any idea where those music files went to?

4   A.   I have no idea where they would have gone.  Maybe in

5        an MP3 player.  I honestly don't know.

6   Q.   Did you ever to your recollection add music files to

7        the computer?  For example, did you ever take a

8        George Strait CD, pop it in the computer, and copy

9        all those songs into a folder?

10  A.   I don't recall doing that, no.

11  Q.   How about with just still image files, just pictures?

12       Did you ever do that with pictures?

13  A.   As far as putting them into the LimeWire shared file?

14  Q.   No.  Just in any --

15  A.   Well, yeah.  I put pictures on the computer, various

16       things.

17  Q.   Did you ever put any of those picture files into the

18       shared file folder on LimeWire?

19  A.   No, I didn't.

20  Q.   Now, what about video files?  Did you ever add any

21       video files to the computer from any source beyond

22       the net?

23  A.   No.  I never uploaded, I guess, videos.

24  Q.   To your recollection, any files on the computer that

25       you moved, they were already on the computer, let's

1      say, versus adding them, as we just discussed.  So

2      files that were on the computer from whatever source,

3      did you ever move any files into the shared file

4      folder?

5  A.   No, I never moved any files into the LimeWire shared

6      folder.

7  Q.   Do you remember ever moving any files out of the

8      shared file folder?

9  A.   No, I don't recall ever doing that, no.

10  Q.   Now, on June 10 who were you working for again?

11  A.   Aspen Lawn Care in Olathe.

12  Q.   And for Aspen what did you do?

13  A.   I was a production manager for the landscape

14      department.

15  Q.   And in general terms what does that mean?  What did

16      you do?

17  A.   Oversaw the landscape crews, would help them with

18      projects if they had questions or problems, would

19      maybe get them started on a project.  Basically, I

20      just oversaw the production, made sure that they were

21      doing what they were supposed to be, and, like I

22      said, if they had any questions, I would help answer

23      them.

24  Q.   At some point Officer Kelley and Agent Kanatzar

25      showed up on the job site; is that right?

1  A.  That's correct.

2  Q.  What do you remember when they first got there?

3  A.  I remember it was pretty out that day, in the middle

4      of the afternoon.  I was helping build a retaining

5      wall with two other individuals.  I believe it was

6      the ICE agent came up behind me, introduced himself,

7      asked who I was, asked me if they could ask me some

8      questions, and I said yes.  So we proceeded over to

9      his car where the -- sorry.

10 Q.  That's fine.  Let me ask, were you were expecting

11     them?

12 A.  No, I was not.

13 Q.  Had anyone called you and told you that a search

14     warrant had been executed at your house?

15 A.  No.

16 Q.  Had you spoken to your mother and been advised that

17     she had been interviewed by law enforcement?

18 A.  No.  I hadn't spoken to anyone.

19 Q.  Your brother Jason?

20 A.  No.

21 Q.  So they take you down the driveway?

22 A.  From what I remember, it was actually on the street,

23     it wasn't in the driveway.

24 Q.  All right.  So they are taking you down to the

25     street.  What happens next?

1   A.   From what I remember, the agent asked me if I used a

2        computer, used it to download porn, and I answered

3        yes.  Then he --

4   Q.   Let me stop you there for a second.  Did they do

5        anything prior to questioning you?

6   A.   He asked me if he could take my picture.

7   Q.   What did you say?

8   A.   I asked him why, and he informed me that it was just

9        for, like, I guess, a case file.  I don't remember if

10       that's the word he used or not, but --

11  Q.   And so did -- were they prepared?  Did they have a

12       camera there to take your picture?

13  A.   Yes, they had a camera.

14  Q.   Did they, in fact, take your picture at that point?

15  A.   Yes, they did.

16  Q.   After he introduced himself to you, he told you he

17       was an ICE agent?

18  A.   Yes.  He said he was with Immigration Customs

19       Enforcement.

20  Q.   What was going through your mind at that point?

21  A.   Initially I thought he was there to question me about

22       the two Hispanic workers with me.

23  Q.   But once you got to the street, is that when they

24       took your picture, or did they take your picture

25       before you got to the street?

1   A.   No, they took it once we got out to the street by his

2       car.

3   Q.   Did they take your picture before or after he told --

4       started talking about pornography?

5   A.   I believe it was before.

6   Q.   All right.  So they take your picture, and then he

7       tells you -- or asks you a question.  What was it?

8   A.   I believe he asked me if I had ever used a computer

9       at home to download porn.

10   Q.   And what was your response?

11   A.   I said yes.

12   Q.   And so then what happened?

13   A.   I remember him asking me who all had access to the

14       computer, profiles, if it was password protected, if

15       any of the profiles were password protected.

16   Q.   At that point did he tell you why he was asking about

17       pornography?

18   A.   I don't remember him telling me at that point

19       specifically why he was asking me about pornography,

20       no.

21   Q.   Did it appear to you either through what they were

22       asking you or what they were telling you that they

23       knew about the computer at your house?

24   A.   At that point I don't remember them specifying any

25       computer at the house, no.

1    Q.    All right. So they are asking you about profiles,

2        and what do you remember telling them?

3    A.    That my mom, myself, Jason, Jon, and Angela all had

4        profiles, that there were five on there.

5    Q.    And so then what happened next?

6    A.    Then I believe the agent, the ICE agent, stopped and

7        then proceeded to tell me they had just executed a

8        warrant at the house and that my mom was there, and

9        then he started to tell me that -- the reason why was

10       because of a detective, an undercover detective, had

11       downloaded a suspected child porn video from that

12       computer.

13    Q.    Now, at that point the ICE agent and Detective Kelley

14       were both there; is that right?

15    A.    That's correct.

16    Q.    Was Detective Kelley saying much at this point?

17    A.    At that point I don't recall him saying anything at

18       all.

19    Q.    So once he tells you that they have executed a search

20       warrant at the house, what happens next?

21    A.    I believe next he asked me if I had used LimeWire to

22       download child porn, and then I told him no.

23    Q.    So what happened next?

24    A.    Then he asked me if I had some sort of -- I believe

25       he referred to it as, like, an eraser program, which

```
1        I didn't understand what it was, really, but he
2        explained it to me.  It was basically to wipe files
3        off the computer so they couldn't be detected.  And I
4        told him no, there was nothing like that on the
5        computer besides, like, an antivirus or virus
6        protection.  And then he questioned me again about
7        downloading -- whether or not I had downloaded child
8        porn, and I said no, and then he went on to tell me
9        that, well, we're after -- or, don't worry.  We're
10       after bigger fish or some sort of larger ring of
11       people that are downloading child porn.
12   Q.  Let me ask you, are those his exact words, or are you
13       paraphrasing when you say that?
14   A.  Which part of it?
15   Q.  That we're looking for bigger fish.
16   A.  Those are the words that I remember.
17   Q.  And so during this questioning are you still
18       standing, or are you sitting in somebody's car,
19       sitting on the back of a pickup tailgate?  Where are
20       you at?
21   A.  I was standing next to the agent's car.
22   Q.  Now, you heard testified that they told you at some
23       point that you weren't going to be arrested.  Do you
24       remember that?
25   A.  Yes.
```

| | | |
|---|---|---|
| 1 | Q. | I guess I should ask, do you remember him saying that |
| 2 | | on June 10? |
| 3 | A. | Yes, I remember him saying that. |
| 4 | Q. | To the point that you described the conversation, did |
| 5 | | he say that before or after the point we have gotten |
| 6 | | to? |
| 7 | A. | It was before. |
| 8 | Q. | Before or after he took your picture? |
| 9 | A. | I don't remember. |
| 10 | Q. | Do you remember whether or not it was before or after |
| 11 | | he told you that -- started asking you questions |
| 12 | | about pornography? |
| 13 | A. | I don't really remember.  I think it was before, but |
| 14 | | I don't remember. |
| 15 | Q. | At the point that he told you that, did you have any |
| 16 | | idea why arrest would even be an issue? |
| 17 | A. | No. |
| 18 | Q. | All right.  So at this point has Detective Kelley |
| 19 | | said anything much? |
| 20 | A. | I don't recall him saying much of anything at that |
| 21 | | point, no. |
| 22 | Q. | All right.  So he says something, words to the effect |
| 23 | | that they are looking for bigger fish; is that right? |
| 24 | A. | That's the way I remember it, yes. |
| 25 | Q. | And did you respond to that in any way? |

1   A.   No, not that I remember.  Not verbally, no.

2   Q.   And did you get a sense of why he was telling you

3        that at that point?

4   A.   About the bigger fish.

5   Q.   Yeah.

6   A.   No.  I just -- it seemed that he was just trying to,

7        I guess, get me to say something.  I don't know.

8   Q.   So what happened next?

9   A.   Next he proceeded to tell me about -- that they

10       weren't talking about, like, teenaged girls, they

11       were talking about, like, five- or six-year-old

12       girls, and I think he was referring to -- I thought

13       he was referring to the file that the detective, the

14       undercover detective, had initially downloaded, and I

15       just said okay.  I didn't -- he had asked if I had

16       downloaded any child porn of that nature, and I said

17       no, and I told him that I had recalled at that point

18       a video that may have been a minor, but I wasn't

19       sure.  And so he asked me again if I had ever

20       downloaded child porn, and I said, no, I don't

21       believe so.  Then that's when Detective Kelley

22       finally spoke up.

23   Q.   So what did Detective Kelley say when he spoke up?

24   A.   Detective Kelley said, well, is it "no," or is it "I

25        don't believe so"?  Those are two different answers

1          to basically the same question.

2     Q.   How did you respond?

3     A.   I just basically said, well, I'm not sure.  I don't

4          know.  I don't believe so, was the way I remember.

5     Q.   Had the tone of the questioning changed at that point

6          in your perception?  Had it gone from more casual to

7          confrontational, or was it still relatively casual?

8     A.   I would say at that point it was more confrontational

9          or hostile.       .

10    Q.   Did you feel the hostility was equal parts from both

11         people questioning you, or did it come more from one

12         than the other?

13    A.   I would say it was coming from more one than the

14         other, but not completely, no.

15    Q.   Who in your recollection was being more hostile?

16    A.   Detective Kelley.

17    Q.   All right.  So what happened after that?

18    A.   They continued to question me.  Detective -- not

19         detective, but the ICE agent had asked me if I was

20         aware of any other files that may be child porn, and

21         I told him no.  Then he was telling me that if it was

22         on there they would find it, asked me if I deleted

23         anything, and if I had, they would know.  I believe

24         they asked me what kind of search terms I had used,

25         and I told them basically the same thing I said here

1    today, one-word terms, and he again told me, well, if

2    it's on -- if you used, like, kiddy porn, is the term

3    that he actually used, then we will know.  We will

4    find it.  And I just told him okay.  I told him I had

5    nothing to hide and that, you know, once again,

6    nothing was password protected.  So, you know, I told

7    him, if it's on there, I guess you'll find it.

8  Q.  And is the ICE agent still doing the bulk of the

9    questioning at that point?

10 A.  At that point, yes.

11 Q.  What, if anything, is Detective Kelley saying?

12 A.  I don't recall him other than just, is it no or I

13    don't believe so?  And that was pretty much it until

14    he asked me another question down the line.

15 Q.  So what happened next?

16 A.  Then Detective Kelley asked me how many pornographic

17    movies I had downloaded, and I told him I wasn't

18    sure, I didn't really have any idea.  I was guessing

19    maybe a hundred.  I didn't know.  And then he asked

20    me about if I thought any of them could be child porn

21    and, if so, how many might be.

22 Q.  Did you -- it sounds like there were three questions

23    there.  Did you answer all three separately, or did

24    you combine your answer into one?

25 A.  I don't remember separating it out.  I just recall

1    saying that I wasn't sure, that I suppose some of

2    them could be, and if there were, maybe, I guess,

3    10 percent, maybe 15 percent.  I have no idea.

4    Q.  Why did you say that if you didn't have any idea?

5    A.  Well, because I was unsure.  They had told me about

6    the one that they had found, and so I was starting to

7    doubt myself about what actually had been downloaded.

8    I didn't know.

9    Q.  Have you -- you've heard that there may have been as

10    many as 439 pornographic movies on the computer?

11    A.  Yes, I have.

12    Q.  Would that be inconsistent with your recollection, or

13    is it wholly consistent and possible that that many

14    files had been downloaded?

15    A.  I would say it's possible.  I don't recall that many

16    necessarily, but I wasn't counting.

17    Q.  Would you have used -- to your recollection would you

18    have used this service over a period of months

19    stretching out over years?  Is it possible that, you

20    know, Government's Exhibit 14 is going to show movies

21    being downloaded in 2006 and 2007 and even 2008?

22    A.  Is it possible that there would be movies that were

23    downloaded as far as -- you mean -- we're talking

24    porn?

25    Q.  Yes.

```
 1   A.   I guess it's possible.
 2   Q.   Do you think you used the service during that period
 3        of time?
 4   A.   To download, yes, I was.
 5   Q.   So what happened after you tell them maybe, whatever
 6        words you used, 10 to 15 percent, what happened next?
 7   A.   There wasn't much said other than -- I just remember
 8        them basically thanking me for my time, and then they
 9        left.
10   Q.   Now do you remember some discussion about you saying
11        words to the effect of, if child pornography is found
12        on the computer, my mom and my brother didn't have
13        anything to do with it?
14   A.   I remember the testimony, yes.
15   Q.   Do you remember saying something along those lines?
16   A.   Similar.  But the way I recall it was when we were
17        standing there talking I just -- I had told them both
18        that if they had found anything that I had probably
19        downloaded it by accident.
20   Q.   Well, do you think that you specifically referenced
21        your brother and said it was unlikely that he had
22        downloaded pornography?
23   A.   Not at that time.
24   Q.   Did you tell them that at some point?
25   A.   When they were asking me about the child porn and who
```

| | | |
|---|---|---|
| 1 | | would have -- they were asking me about porn and who |
| 2 | | would download porn. |
| 3 | Q. | And what do you remember telling them about your |
| 4 | | brother? |
| 5 | A. | Just that I didn't -- I didn't believe that he had |
| 6 | | downloaded porn, but I didn't know for sure because I |
| 7 | | wasn't in there when he was on the computer most of |
| 8 | | the times. |
| 9 | Q. | And we're talking about Jason now; right? |
| 10 | A. | That's correct. |
| 11 | Q. | And what about now?  Do you think that Jason has used |
| 12 | | the computer to download pornography? |
| 13 | A. | I have no real reason to believe that, but I don't |
| 14 | | know. |
| 15 | Q. | How would you describe his personality? |
| 16 | A. | He's pretty quiet, reserved, kind of keeps to |
| 17 | | himself. |
| 18 | Q. | What about brother Jon? |
| 19 | A. | He's more like me, outgoing, you know, will talk to |
| 20 | | anybody. |
| 21 | Q. | Do you suspect that Jon used the computer to download |
| 22 | | pornography? |
| 23 | A. | I don't know that he downloaded pornography.  I know |
| 24 | | that he had -- he has shown me, I guess, images of |
| 25 | | naked women that he had on, I believe -- I want to |

```
 1         say it was in his email account, but I'm not sure.

 2    Q.   So it sounds like it's much more likely for you to

 3         have some discussion about naked women or something

 4         like that with your brother Jon than it is with

 5         brother Jason; is that true?

 6    A.   Yes and no.  Jason and I have -- you know, we have

 7         made comments like that back and forth, but more

 8         likely, yeah, Jon and I would have a discussion of

 9         that nature.

10    Q.   Unfortunately, during the course of this trial we

11         have seen several video clips that obviously, the

12         government's position, has shown child pornography,

13         and you've been here for that; right?

14    A.   That's correct.

15    Q.   When have you -- before this trial when have you seen

16         those videos?

17    A.   Never.

18    Q.   When you were questioned at the job site, did they

19         bring a lap top and show you any video files or

20         anything like that?

21    A.   No, they didn't.

22    Q.   Did they invite you to come down to their office to

23         view video files to see if you were talking about the

24         same ones that they were talking about?

25    A.   At that time, no.
```

```
 1    Q.   What do you remember about either one of those guys

 2         questioning you about what their knowledge was about

 3         videos, meaning were they questioning you about

 4         specific scenes in videos, or was their questioning

 5         more broad and general?

 6    A.   Well, they were questioning me specifically, or more

 7         specifically.  The ICE agent kept referring to the

 8         Vicky series, and I had never heard of it until he

 9         mentioned it that day.

10    Q.   Now do you remember when you were being interviewed

11         there was some discussion about seeing a girl dancing

12         in a video that I think you said may have been a

13         minor?

14    A.   Yes.

15    Q.   Is that right?

16    A.   That's correct.

17    Q.   Was that one of the videos that we have seen during

18         the course of this trial?

19    A.   No, it wasn't.

20    Q.   When you have used the LimeWire program, did you ever

21         use any search terms like kiddy, as you described?

22    A.   No.

23    Q.   Did you ever use any search terms like preteen?

24    A.   No.

25    Q.   How about Lolita?
```

1  A.  No.

2  Q.  The acronym PT, whatever it was, that was described

3      earlier, did you ever use that?

4  A.  No, I had no idea what that even meant until

5      yesterday.

6  Q.  To your knowledge, do you ever specifically remember

7      clicking on a video file with the expectation that

8      you were going to download pornography -- I'm sorry,

9      child porn?

10 A.  With the expectation I was downloading child

11     pornography?

12 Q.  Yes.

13 A.  No.

14 Q.  You've seen the list of files that were found on the

15     computer; am I correct?

16 A.  Yes, I have seen them.

17 Q.  Some of those terms that I just referenced were --

18     are in some of the file names; correct?

19 A.  I believe so.

20 Q.  Can you explain to the jury how you, if you did,

21     download files that have those names in them but not

22     be thinking, I'm downloading child pornography?

23 A.  I'm not sure I understand what -- the question.

24 Q.  Well, we have got these file names, and some of them

25     include those terms like preteen, Lolita, ages,

1          things of that nature.  If you downloaded those

2          files, how could you download those files and not

3          expect that those had child pornography?

4     A.   I wasn't paying attention to the file names per se.

5          I just assumed they were all porn, adult porn, so I

6          just was just clicking, I guess, in a quick manner,

7          just double clicking as fast as I could just to

8          download as many as I could at one time or click --

9          you know, to get as many as I could at one time.

10    Q.   And so I believe the evidence is that there were

11         some, you know, 439 video files that contained

12         pornography.  Did you look at them?  Have you looked

13         at all those files to your knowledge?

14    A.   No, I have not looked at all of them.

15    Q.   Why not?  Why didn't you?

16    A.   Really, I had no desire to look at all of them.  If I

17         was looking -- when I would choose a file to look at,

18         unless I specifically recognized the name of what it

19         was, it was more or less the file size, typically,

20         that I would refer to.

21    Q.   Okay.  So can you explain that.  Why were you paying

22         attention to the file size versus the names?

23    A.   Because typically from my understanding, in my

24         experience, the file size just meant that it was a

25         longer video.

1    Q.   And is that consistent -- for example, I think we saw

2           videos back-to-back today at some point.  One was

3           fairly long and one seemed short.  Is that what

4           you're referring to?

5    A.   No.  Usually the videos that I was watching were 15,

6           20 minutes, if not longer.  Some of them were an

7           hour.

8    Q.   Did you ever participate -- let me back up.  Did

9           LimeWire have a chat function?

10   A.   I believe it did.

11   Q.   Did you ever use it?

12   A.   No, I never used it.

13   Q.   Did you ever use IM or some other form to communicate

14          with the other members of LimeWire about the files

15          that were on your computer or their computer?

16   A.   No, I never did.

17   Q.   So at any point did you knowingly download child

18          pornography?

19   A.   No, I never knowingly downloaded child pornography.

20   Q.   Did you keep any child pornography on that computer

21          so that other people could have access to those

22          files?

23   A.   No, I did not.

24              MR. CLARKE:  No further questions, your

25          Honor.

1          THE COURT:  Ms. Martin, you may cross

2     examine.

3                    CROSS EXAMINATION

4   BY MS. MARTIN:

5   Q.   Mr. Frakes, when did you say you returned to your

6        mother's home?

7   A.   I believe it was in August, I would say, of '06.

8   Q.   All right.  And you said that you added your profile

9        to the computer?

10  A.   I can only assume I did.  I don't know that I -- I

11       don't recall ever doing it, but I would just assume

12       that I did.

13  Q.   Did you add that profile before or after you returned

14       to the home?

15  A.   I would say it was before.

16  Q.   Okay.  And why would you put a profile on a computer

17       at a home you don't live on, in?

18  A.   I visited.  I was probably there once a month, if not

19       more.

20  Q.   The records show that that profile was added in

21       January of 2005.  Is that consistent with what you

22       recall?

23  A.   I don't recall when it was actually added.

24  Q.   Okay.  And it appears that LimeWire was installed in

25       August of 2006?

| | | |
|---|---|---|
| 1 | A. | I would say that's accurate. |
| 2 | Q. | And you admit that you're the one who installed |
| 3 | | LimeWire on the computer? |
| 4 | A. | Yes, I do. |
| 5 | Q. | And so you were familiar with the PowerPoint that was |
| 6 | | used that showed how the installation process worked? |
| 7 | A. | Vaguely, yes. |
| 8 | Q. | You went through that yourself? |
| 9 | A. | I can only assume it was the same one, yes. |
| 10 | Q. | Well, Detective Howe testified that he used the same |
| 11 | | version that you have when he made up this |
| 12 | | PowerPoint, so would it have been the same then? |
| 13 | A. | Like I said, I can only assume it's the same, but I |
| 14 | | don't recall.  It was several years ago. |
| 15 | | MS. MARTIN:  Your Honor, could we switch |
| 16 | | over to the -- |
| 17 | Q. | (By Ms. Martin) Do you recall having to select a |
| 18 | | language? |
| 19 | A. | Yes.  I recall vaguely, yes. |
| 20 | Q. | Okay.  Do you recall this? |
| 21 | | THE COURT:  For the record, you're looking |
| 22 | | at -- |
| 23 | | MS. MARTIN:  I'm sorry your Honor.  For the |
| 24 | | record, this would be Exhibit No. 3. |
| 25 | | THE COURT:  Thank you. |

1 A. Honestly, it was several years ago.  I can't remember

2   necessarily exactly what it was, but it looks

3   familiar.

4 Q. (By Ms. Martin) Okay.  And LimeWire asks you to

5   select a folder where you want it installed.  Do you

6   recall that?

7 A. Yes, I recall that.

8 Q. And did you select a folder to put it in?

9 A. I didn't select anything other than what was already

10   on there.

11 Q. Does this look familiar?  This is what it looked like

12   when it was downloading onto your computer; correct?

13 A. I guess so.

14 Q. This slide says, "Choose a folder where you would

15   like your files to be downloaded.  The folder will

16   also be used with other Gnutella users by default."

17    Do you recall this?

18 A. I don't recall this saying at the top, but I recall

19   the rest of it, yes.

20 Q. You were aware when you set this up that you were

21   going to have a shared folder?

22 A. Yes, I was aware that LimeWire was a share program.

23 Q. But you were going to be able to put things in the

24   shared folder?

25 A. I would assume so.  I mean, I never --

```
 1    Q.   You do or you don't?  You either know that you're

 2         going to, is that fair, or you don't?

 3    A.   But I -- I know it was set up to share, but you asked

 4         me if I --

 5    Q.   That's all I'm asking.  You know that when you put

 6         things in your shared folder that they are going to

 7         be available to be shared?

 8    A.   When you download stuff, yes.

 9    Q.   All right.  So when you went out on the Gnutella,

10         when you used LimeWire, you went out and you searched

11         other people's computers; right?

12    A.   That's the way it works.  I was searching on my

13         computer but --

14    Q.   You were looking in other people's computers for

15         files that you wanted to download onto your computer?

16    A.   I would say yes.

17    Q.   All right.  And so you knew that those people were

18         giving you files off their computer; correct?

19    A.   Yes.

20    Q.   Now, before you moved back to your mom's house in

21         Atchison you said you used LimeWire before on a lap

22         top?

23    A.   I remember using LimeWire.  If I remember correctly,

24         it was on a lap top.

25    Q.   And was that your aunt's lap top that she let you
```

1    use?

2  A.   I believe so, yes.

3  Q.   All right.  And you actually downloaded or had some

4       images of pornography on that computer before you

5       brought it home, didn't you?

6  A.   There were a few photos, yes.

7  Q.   And she objected to them?

8  A.   Yes, she did.

9  Q.   And she told you she wanted them removed?

10 A.   That's correct.  I removed them.

11 Q.   So you were aware that you can delete files; correct?

12 A.   That's correct.

13 Q.   So you know that if you have files on your computer

14      that you don't want you can delete them?

15 A.   That's correct.

16 Q.   All right.  I have here Government's Exhibit No. 18,

17      which is the file list that Detective Howe got from

18      your computer when he accessed it.  When you'd go out

19      and search or put in search terms for pornography,

20      you would get a list of names of files; correct?

21 A.   Yes.

22 Q.   All right.  And the list looked something like this;

23      correct?  I mean, it would give you a list of names

24      like this?

25 A.   Not necessarily so specific, but yes, a list.

| | | |
|---|---|---|
| 1 | Q. | Well, these are the lists of titles from your |
| 2 | | computer. |
| 3 | A. | From the computer, okay.  I can only assume that |
| 4 | | that's what they are. |
| 5 | Q. | Well, let me -- let me back up and ask you this.  The |
| 6 | | pornography that was found in the shared folder, you |
| 7 | | downloaded it? |
| 8 | A. | I downloaded porn, yes. |
| 9 | Q. | You didn't -- your mom didn't download it into the |
| 10 | | shared folder? |
| 11 | A. | I have no reason to believe that, no. |
| 12 | Q. | And your brother Jason didn't? |
| 13 | A. | I don't know. |
| 14 | Q. | Okay.  And your brother Jon did not? |
| 15 | A. | I don't know. |
| 16 | Q. | You were the primary user of that computer; correct? |
| 17 | A. | I would say Jason and I shared it equally. |
| 18 | Q. | Okay.  And Jon didn't even live there, did he? |
| 19 | A. | No, he didn't. |
| 20 | Q. | Okay.  So you would get a list of names like this |
| 21 | | from which to choose; correct?  You would decide -- |
| 22 | | let's assume this is just a search term, this first |
| 23 | | page, even though we know these are a list of names |
| 24 | | of files on your computer, in your shared folder. |
| 25 | A. | Okay. |

1   Q.   All right.  But let's assume that you typed in some

2        search terms.  You got back a list of names like

3        this; correct?

4   A.   Similar, yes.

5   Q.   All right.  Now, you didn't download all of those

6        names onto your computer; right?

7   A.   I would download several, many at one time.

8   Q.   Okay.  But you got a list to choose from, and you had

9        to pick which ones you wanted to put in your shared

10       folder?

11  A.   Yes, you have to pick.

12  Q.   They don't automatically download into your computer?

13  A.   No, they do not.

14  Q.   Let's go through some of the names that you actually

15       did pick to download, Pedophilia, 14-Year-Old,

16       Virgin, Sex, Anal.  That was one of the names you

17       picked; correct?

18  A.   There were so many on there, I don't recall.

19  Q.   All right.  Would the term pedophilia in the title of

20       a video seem to indicate to you that it was child

21       pornography?

22  A.   If I had seen it, yes.

23  Q.   Okay.  So you're just saying you just went out and

24       downloaded everything?

25  A.   I was downloading a lot of stuff, yes.

1    Q.    But there were only 400 movies on your computer.

2    A.    It's more than what I remembered, but yeah.

3    Q.    Let's look at another one.  Actually, there's one

4          right here on the screen, My 13-year-old Sister

5          Satisfying Herself on My 27-year-old Massive Cock,

6          Real Kiddy Movie, Lolita.  That's one that you

7          clicked on and picked to download, isn't it?

8    A.    Like I said, I don't recall downloading that, no.

9    Q.    Okay.  What about Web Camera, 14-Year-Old Babysitter,

10         Drugged, Masturbation, Hidden Camera in My Sister's

11         Closet?

12   A.    I do not recall that, no.

13   Q.    My 15-Year-Old Teeny Daughter Getting Fucked on My

14         Couch?

15   A.    Same.  I don't recall that.

16   Q.    Do you think your mom downloaded that?

17   A.    Do I think my mom downloaded it?  Probably not.

18   Q.    Okay.  And you're indicating to me that if there's

19         porn on the computer you downloaded it?

20   A.    If there was porn on there, then I probably had

21         downloaded it.

22   Q.    Okay.  Now, you said to the agents that you didn't

23         have any young girls, five or six, but you did have

24         some teenagers?

25   A.    That's not the way I remember it, no.

| | | |
|---|---|---|
| 1 | Q. | Well, that's what you just testified to on direct. |
| 2 | A. | I understand I said possibly could have been a minor, |
| 3 | | but -- |
| 4 | Q. | Okay.  When you see video files that have the ages, |
| 5 | | do you expect that you're going to get, let's say, a |
| 6 | | 15 year-old girl? |
| 7 | A. | I would assume that, you know, if that's what the |
| 8 | | file said then you probably are, yes. |
| 9 | Q. | So when you have 13, little girl, kiddy, child, |
| 10 | | Lolita, illegal, preteen, underage, Lolita, kiddy, |
| 11 | | child, incest, porno, gay fuck, do you anticipate |
| 12 | | that you're going to get a 13-year-old girl? |
| 13 | A. | If that's what the file says, then I would assume |
| 14 | | that that's what this file was. |
| 15 | Q. | Now, these are names of files that were in your |
| 16 | | shared folder.  So did you anticipate that when you |
| 17 | | downloaded that that that's what you would get? |
| 18 | A. | Like I said, I don't recall all the file names, and I |
| 19 | | don't recall downloading that specific file. |
| 20 | Q. | So you said that you didn't watch all these movies? |
| 21 | A. | No, I did not. |
| 22 | Q. | Why download them if you're not going to watch them? |
| 23 | | What's the point? |
| 24 | A. | To have a selection, I guess, to choose from.  It |
| 25 | | wasn't to necessarily view them as I'm downloading |

```
1          them, so I would just download a bunch and go on

2          about my day.

3     Q.   And never come back and watch them?

4     A.   No.  I would watch some later.  Later I would select

5          some that had a specific file name that I recognized.

6     Q.   Okay.  So you want the jury to believe that there

7          were 91 titles indicative of child pornography in

8          your shared folder and that you downloaded them all

9          by accident?

10    A.   I want them to believe that I downloaded porn and did

11         not knowingly download child porn and did not watch

12         all the files.

13    Q.   Okay.  I know that's what you want them to believe,

14         but do you truly believe that it was an accident, it

15         was an accident that you got 91 videos with child

16         porn names?

17    A.   Was it an accident?

18    Q.   Right.  You said that you downloaded -- if there was

19         child porn, you downloaded it by accident.

20    A.   Well, I believe it was an accident if I downloaded

21         child porn.

22    Q.   Even --

23    A.   It wasn't intentional.

24    Q.   Even though the titles are very specific and very

25         specifically indicate that these movies will depict
```

1       underage girls or boys?

2   A.  Yes, it was an accident.

3   Q.  Okay.  Now, there was one video -- do you recall the

4       video of the little boy and the little girl having

5       intercourse that we saw in court?

6   A.  I believe so, yes.

7   Q.  Do you recall seeing that before today or before

8       yesterday?

9   A.  No, I do not.

10  Q.  Even though that file was listed in your recent file?

11  A.  Even though it was listed in that, no, I do not

12      recall viewing that file.

13  Q.  Let me look at the statement that you gave to the

14      agents.  You said that it became hostile?

15  A.  It felt that way, yes.

16  Q.  But they thanked you for your time?

17  A.  Yeah, they thanked me for my time, yes.

18  Q.  And you're not denying that you told them that you

19      had child porn on your computer; correct?

20  A.  I don't believe I said that, no.

21  Q.  But you admitted here today during your direct

22      testimony that you told them that 10 to 15 percent of

23      your collection would be child pornography.

24  A.  What I said was that 10 or 15 percent maybe could be.

25      I wasn't sure.

1   Q.   Okay.  And you said that you thought you had a

2        hundred movies?

3   A.   A hundred, total, movies, yes.  That's all I

4        believed -- I didn't know.  I had no idea.  I was

5        guessing.

6   Q.   And you thought you had a hundred movies, total?

7   A.   Yeah, that's what I thought I had, total.

8   Q.   As it turns out, you had almost 100 child pornography

9        movies; isn't that true?

10                  MR. CLARKE:  Objection, your Honor.  That's

11       not consistent with the evidence.

12                  THE COURT:  Sustained.

13  Q.   (By Ms. Martin) But you did have 91 movie titles that

14       were indicative of child pornography; isn't that

15       correct?

16  A.   If that's what's on there, then that's what is on the

17       computer.

18                  MS. MARTIN:  Your Honor, could I have just

19       a moment?

20                  THE COURT:  You may.

21                  MS. MARTIN:  I have nothing further, your

22       Honor.

23                  THE COURT:  Mr. Clarke?

24                  MR. CLARKE:  Thank you, your Honor.

25

REDIRECT EXAMINATION

BY MR. CLARKE:

Q.   Mr. Frakes, early on in cross examination you were
     asked a question about your using LimeWire to look at
     other people's computer, and you paused when
     answering that.  Why was that?

A.   Because I didn't -- I guess I didn't view it as
     looking or searching another person's computer.  I
     was equating that with, like, the Detective Howe, who
     testified -- and I believe Mr. Kanatzar testified
     about searching with an IP address onto someone
     else's computer.

Q.   You knew that it was a peer-to-peer network that you
     were using; is that true?

A.   I knew it was a file share -- I guess I'm -- I didn't
     know or understand it was a peer to peer.  I just
     knew it was a file share.

Q.   On cross examination one of the things that you said
     was that you would click on it if it was a file name
     you recognized.  Can you explain that.

A.   There were -- I know there were several files on
     there regarding, like, bang busts or MILF, and those
     were the ones that I typically was viewing.

Q.   For example, bang bust, was that the name of the
     file?

| | | |
|---|---|---|
| 1 | A. | I believe it was the name of the file, yes. |
| 2 | Q. | Was it -- I mean, so was there only one file with the |
| 3 | | name bang bust? |
| 4 | A. | No.  There were a couple, several.  I'm not sure how |
| 5 | | many. |
| 6 | Q. | If we look at Exhibit 14, are we going to see files |
| 7 | | that may have all those terms in them, again, hot |
| 8 | | brunette and then bang bust and then something else? |
| 9 | A. | No.  From what I have seen it's -- it was bang busts. |
| 10 | Q. | She asked you whether or not -- she was asking you |
| 11 | | about specific file names.  Do you remember that? |
| 12 | A. | Yes, I do. |
| 13 | Q. | Now they took the computer out of the house on |
| 14 | | June 10? |
| 15 | A. | I believe that's the day. |
| 16 | Q. | When did you guys get the computer back? |
| 17 | A. | We never got it back. |
| 18 | Q. | So have you seen that computer since June 10? |
| 19 | A. | No, I have not. |
| 20 | Q. | Since you were charged with this crime, have I given |
| 21 | | you a photocopy of, for example, Exhibit 14 to take |
| 22 | | home? |
| 23 | A. | No.  I don't have one. |
| 24 | Q. | Has anyone given you a copy of Exhibit 14 or any list |
| 25 | | of the -- of all the movie files that were found on |

| | | |
|---|---|---|
| 1 | | the computer and given it to you and said take this |
| 2 | | home and study it or do whatever you want with it? |
| 3 | A. | No. |
| 4 | Q. | In fact, can you describe to the jury what, if any, |
| 5 | | access that you've had to this list of files since |
| 6 | | they took the computer away from your home over a |
| 7 | | year ago. |
| 8 | A. | In your office, maybe 15, 20 minutes. |
| 9 | Q. | How many times? |
| 10 | A. | Once. |
| 11 | Q. | So when you were answering her questions about the |
| 12 | | specific file names, were you denying that the file |
| 13 | | was on the computer, or were you simply saying you |
| 14 | | don't remember specific file names? |
| 15 | A. | I don't remember specific file names. |
| 16 | Q. | Now, you remembered on direct examination a couple of |
| 17 | | movies.  One was the DaVinci Code.  You remembered |
| 18 | | that; is that true? |
| 19 | A. | Yes. |
| 20 | Q. | But in terms of the names of the pornographic files, |
| 21 | | did you have memory of those file names like you did |
| 22 | | the DaVinci Code? |
| 23 | A. | The only one I really recall are the bang busts and |
| 24 | | the MILF ones.  Those are the only ones I can |
| 25 | | actually remember. |

1  Q.  Before the agents came to speak with you on June 10,

2      did it occur to you that you had child pornography on

3      the computer?

4  A.  No, it had not.

5  Q.  Did your thought process on that change once the

6      agents came to question you?

7  A.  Did my thought process change?

8  Q.  Did you start to think maybe you had child

9      pornography on the computer at that point?

10  A.  I wasn't sure because I hadn't seen everything, so I

11      didn't know.

12  Q.  Did what they were telling you have an impact on your

13      thought about it?

14  A.  Well, certainly they told me that they had downloaded

15      what they believed to be child porn off the computer.

16  Q.  The very first -- I think one of the very first

17      things that she did on cross examination was take you

18      through the LimeWire installation slides, or video,

19      or whatever, that she had for you.  Do you remember

20      that?

21  A.  Yes, I do.

22  Q.  Were you saying that that -- those depictions were

23      inaccurate, or were you simply saying, I don't have a

24      specific recollection of it?

25  A.  Just I don't have a specific recollection.  I mean,

1      it was several years ago.

2             MR. CLARKE:  No additional questions, your

3      Honor.

4             THE COURT:  All right.  Ms. Martin?

5               RECROSS EXAMINATION

6  BY MS. MARTIN:

7  Q.   Mr. Frakes, you said that all you knew was that

8      LimeWire was a share program?

9  A.   Well, that's all I knew it was.  I mean, I didn't

10     know the exact definition of what that was,

11     necessarily.

12  Q.   What did you think it was when you downloaded it onto

13     your computer?

14  A.   To share files.

15  Q.   With who?

16  A.   Whoever.  I didn't have a specific person,

17     individual, company, or anything like that in mind.

18  Q.   But with other people.  You were going to share files

19     with other people; correct?

20  A.   That's the way it's set up, yes.

21  Q.   But that's what you -- you got the software; right?

22     You downloaded it onto your computer.  Why did you do

23     that?

24  A.   So I could download some music and other stuff.

25  Q.   So you could download pornography?

1    A.    So I could download music and porn and other movies,

2          yes.

3    Q.    So you knew that when you installed it you were going

4          to be getting those things from other users; correct?

5    A.    I didn't know what those users were.  I mean, I

6          can -- I assumed they were people, I guess.

7    Q.    Well, you didn't know exactly who they were, but you

8          knew that you were going to be getting them from

9          other people who were using LimeWire?

10   A.    Yes.

11   Q.    So you knew that from the day you installed it onto

12         your computer?

13   A.    Yes, from the day that I installed it, yes.

14   Q.    So you were going to go out and you were going to

15         download items from other people; you were going to

16         get items from other people on the LimeWire system?

17   A.    Yes.

18   Q.    All right.  And whenever you did that, it would go in

19         your shared folder, and then you would be giving

20         those things to anybody else on the LimeWire system?

21   A.    Yes.

22   Q.    Okay.  And I just want to make sure because I know

23         the agents testified about this before.  You can put

24         something in your shared folder.  You have to double

25         click on it; correct?

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | So when you get the list, you double click on it, |
| 3 | | selecting it to go into your shared folder? |
| 4 | A. | You double click it to download it. |
| 5 | Q. | Okay.  And you're telling the jury that you didn't |
| 6 | | see the file names that you double clicked on to |
| 7 | | download? |
| 8 | A. | I didn't pay attention to the file names, no. |
| 9 | Q. | Even though some of them started with ages like |
| 10 | | 13-year-old, 12-year-old, 11-year-old, nine-year-old? |
| 11 | A. | I don't recall them starting with ages, no. |
| 12 | Q. | But you do remember MILF and you do remember bang |
| 13 | | bust? |
| 14 | A. | Only after I downloaded them, yes. |
| 15 | | MS. MARTIN:  I have no further questions, |
| 16 | | your Honor. |
| 17 | | THE COURT:  Mr. Clarke? |
| 18 | | REDIRECT EXAMINATION |
| 19 | BY MR. CLARKE: | |
| 20 | Q. | You paused when she was asking you about you knew or |
| 21 | | words to this -- questions along this line of you |
| 22 | | knew that your shared folder was going to be shared |
| 23 | | with other people.  Remember that?  She just asked |
| 24 | | you? |
| 25 | A. | Yes. |

1   Q.   Why did you pause?

2   A.   Because I wasn't using LimeWire, I guess, to give

3        things to other people.  I just wanted to download

4        stuff from -- I wasn't -- I wasn't giving things to

5        people.

6   Q.   No new content; right?  I mean, that's the bottom

7        line?

8   A.   Yeah, yeah.

9   Q.   Do you know more about LimeWire now than you did when

10       you installed the program?

11  A.   Yes, much more.

12  Q.   Do you know more about LimeWire today than you did

13       two days ago?

14  A.   Yes.

15            MR. CLARKE:  No further questions, your

16       Honor.

17            THE COURT:  Ms. Martin?

18            MS. MARTIN:  Nothing further, your Honor.

19            THE COURT:  Mr. Frakes, you may step down.

20       All right.  Mr. Clarke, does the defendant have

21  any additional evidence to present?

22            MR. CLARKE:  No, your Honor.

23            THE COURT:  Does the government have any

24  rebuttal evidence?

25            MS. MARTIN:  No, your Honor.

1          THE COURT:  Very well.  Members of the

2     jury, that does conclude the presentation of the

3     evidence in the case.  We're obviously at the end of

4     the day, and I'm going to send you home for the day.

5     I'm going to ask you to come back at 10:00 o'clock

6     tomorrow morning.  The reason I'm asking you come

7     back at ten rather than at nine is because, as I

8     mentioned to you earlier, I have to instruct you on

9     the law.  The process in which the instructions are

10    prepared for me to give to you include me not only

11    assembling proposed instructions but also giving

12    those instructions to counsel for the parties so that

13    they can review them, make objections to me, argue

14    for changes and different instructions, and then I

15    finalize those at the conclusion of that particular

16    process.  It is my practice, and the practice of most

17    judges, I think, not to give to counsel until all the

18    evidence is in drafts of the proposed instructions

19    simply because one doesn't really know for sure until

20    the evidence is in which instructions ought to be

21    submitted and it might provide some advantage to one

22    side or the other if they knew how the court might be

23    resolving issues that could be in dispute with regard

24    to instructions.  That's to share with you that it's

25    not that we want to sleep in tomorrow; it's that the

1    lawyers and I have some work we need to do without

2    you all and there's no reason for you to be here any

3    earlier than necessary.  I hope that we will be able

4    to start in the 10:00 o'clock time frame, but it

5    might not necessarily be quite at 10:00.  We will do

6    our best to be able to go at or about 10:00 o'clock.

7    So be here, if you would, at 10:00, and we will get

8    going as soon as we can after.

9        Let me remind you and underscore the admonitions

10   not to discuss the case among yourselves or with

11   anybody else or to have any contact with the

12   participants or to do any research or investigation.

13   Certainly don't get on the internet and attempt to

14   educate yourselves or any of those kinds of things.

15   Moreover, I'll underscore once again, don't go home

16   and try to get a head start on deliberating.  You

17   haven't heard the law, and you haven't had the

18   benefit of the arguments the lawyers will give you

19   about why they think certain evidence that's been

20   presented in this case is significant in the context

21   of what the law is under which you must return your

22   verdict, so it would be still premature for you to

23   start processing what you have seen and heard thus

24   far.  You will have adequate opportunity to do that

25   once you've had the rest of the information presented

1    to you, that is, the instructions and the argument.

2    All right. Well, have a pleasant evening. Ms.

3    Scheurer, please take charge of the jury. Counsel,

4    remain here. As to the jury, we are in recess until

5    10:00 a.m. tomorrow morning.

6             (The following proceedings were had outside

7    the presence of the jury:)

8             THE COURT: It is my hope to have something

9    for you to look at by approximately 9:00. I don't

10   know that there's going to be any huge dispute about

11   what the instructions should consist of. Perhaps

12   there will, perhaps there won't. Hopefully, we will

13   be in a position to have a conference 15 or 20

14   minutes after you've had a chance to look at the

15   instructions and, hopefully, be in a position to

16   start at 10:00. If we are a little bit late, so be

17   it.

18      It is my practice to have copies of my

19   instructions available for the jurors to follow along

20   as I read them to them, and a copy of the verdict

21   form. The verdict form will be on a

22   contrasting-colored piece of paper so it doesn't get

23   mixed up with the official verdict form when they are

24   deliberating. I don't read the verdict form to the

25   jury. I leave that to counsel. If you want to

1  display the verdict form and suggest how you think it

2  ought to be answered, you're free to do so, but I

3  don't go through it.  I do go through the

4  instructions.

5       How long does the government believe it needs

6  for closing argument?

7            MS. MARTIN:  Your Honor, if we could have

8  30 minutes, I think I'm going to need maybe ten

9  minutes for rebuttal.  I think that would cover it.

10           THE COURT:  Thirty minutes a side?

11  Mr. Clarke, is that acceptable to you?

12           MR. CLARKE:  Yes, your Honor.

13           THE COURT:  Ms. Martin, you may reserve

14  certainly no more than half.  It is my practice these

15  days to put the timer up, and it's up to you to keep

16  track of where you are.

17           MS. MARTIN:  I can't see it very well.

18           THE COURT:  When you stop, if you have more

19  than 15 minutes remaining, you only get 15.  If you

20  have less, you get whatever you have left.

21       Is there anything further we need to do before

22  we break?

23           MS. MARTIN:  I have one question.  I cannot

24  recall.  Do you typically instruct before or after

25  closing?

1          THE COURT:  Before closing.  And I

2     encourage you strongly to make use of the

3     instructions in closing.  You all have tried many

4     Casey's.  I'm certain you know how you like to do

5     things.  But it has been my experience in this job

6     that our jurors here respond more to arguments based

7     on reason and logic and how the evidence correlates

8     to the instructions than they do to emotion or to

9     rhetoric, and so I think it is very useful to take

10    the instructions and try to explain how the evidence

11    fits in with the instructions.  But it's your job to

12    try the case; it's my job to sit up here.  I don't

13    mean to tell you what to do.

14         There are two instructions, in full complete

15    answer to your question, Ms. Martin, that I give

16    after the closing.  Those are the ones that have to

17    do with the first thing you do is select a foreperson

18    and the one that has to do with swearing the bailiff.

19    But those instructions will be given after closing.

20         MS. MARTIN:  Along those same lines, if it

21    were possible to get at least the elements

22    instructions ahead, I would be able to make better

23    use of those.  As I indicated, that's sort of what

24    I'm looking for.

25         THE COURT:  This is a good news/bad news

1    thing, of course, in that it is both good and bad

2    that the case came in faster than advertised because

3    we thought we had a little more time to get these

4    ready than it turned out we did, and I don't know

5    that we're going to have the elements instructions

6    available any sooner than the others just in terms of

7    the practicality of it.  If we can, we will have Ms.

8    Scheurer notify you and let you know.

9           MS. MARTIN:  You can send them by email

10   perhaps.

11          THE COURT:  By "you" I mean both counsel.

12   Obviously, I'm not going to let one side know and not

13   the other, but we'll let both sides know if something

14   is available before 9:00 o'clock.

15       Is there anything else we should do before we

16   break?

17          MS. MARTIN:  No, your Honor.

18          MR. CLARKE:  No, your Honor.

19          THE COURT:  Let me thank both of you for a

20   case that's been very well tried, and I'll look

21   forward to meeting with you tomorrow morning with

22   regard to the instructions.  Until that time we are

23   in recess.

24          (Court was adjourned.)

25                  * * * * *

1          <u>THURSDAY, JULY 23, 2009</u>

2          THE COURT:  We are gathered in open court

3    in the United States of America versus Casey Frakes

4    for the instruction conference in this case.  I have

5    given out proposed instructions to counsel, and I

6    understand you are ready now to proceed, so I will

7    turn to counsel for the United States for any

8    objections or requests for changes in the

9    instructions.

10          MS. MARTIN:  Your Honor, I'm not sure I

11    have an objection.  I have a question, frankly.

12    Instruction No. 20, that deals with out-of-court

13    statements of a defendant, is that one of the new

14    Tenth Circuit pattern instructions?  I don't recall

15    having seen it before.

16          THE COURT:  It's certainly an instruction

17    that I have given numerous times under these

18    circumstances, including in the couple cases I just

19    recently tried in the last couple months.  I think it

20    came from the pattern instructions, but I'm satisfied

21    that it is an appropriate instruction to give.

22          MS. MARTIN:  Okay.  I hadn't seen it

23    before, your Honor.  I don't think there was any

24    issue that there was an involuntary statement.  There

25    was no attempted --

1             THE COURT:  You know, there was certainly

2       an inference there that Mr. Frakes was surprised by

3       this, no notice, thought he was maybe going to talk

4       about the Hispanics working on the job, talked to him

5       about bigger fish.  I think there's things for the

6       jury to ponder as to whether or not any statements

7       which could be viewed as incriminating by Mr. Frakes

8       were truly voluntarily as opposed to the product of

9       what Mr. Frakes might argue as some involuntariness,

10       so I think it's an appropriate instruction.

11             MS. MARTIN:  That would be the only

12       question I have regarding the entirety of the

13       instructions.

14             THE COURT:  Thank you, Mr. Clarke.

15             MR. CLARKE:  Your Honor, we don't have any

16       objections.

17             THE COURT:  All right.  Any objections to

18       the verdict form, or changes?  That's pretty plain

19       vanilla.

20             MS. MARTIN:  No, your Honor.

21             MR. CLARKE:  No, your Honor.

22             THE COURT:  Then we will proceed to making

23       copies.  As I indicated to you, it is my practice to

24       have all of the jurors and alternates have a copy of

25       the instructions and the verdict form.  I will not

1  read them the verdict form.  I will read them the

2  first -- let's get the number here -- the first 27

3  instructions; then we will have closing argument;

4  then I will read them No. 28 and 29 once we have

5  completed the closings.  I think that pretty much

6  covers anything we need to talk about from my point

7  of view.  Is there anything else we should talk about

8  from the government's point of view?

9          MS. MARTIN:  No, your Honor.

10         THE COURT:  From Mr. Frakes?

11         MR. CLARKE:  No, your Honor.

12         THE COURT:  All right.  Then I will see you

13  all at 10:00 o'clock, and until that time we are in

14  recess.

15         (A recess was taken.)

16         THE COURT:  I've got a couple things we

17  need to discuss before we bring the jury in.  First,

18  I understand Ms. Scheurer has informed you that with

19  regard to the jury we will furnish them with a lap

20  top that's clean and isn't hooked up to the internet

21  but which will permit them to, if they so choose,

22  play the CDs of various exhibits that have been

23  presented into evidence.  Is there any objection to

24  proceeding along those lines?

25         MS. MARTIN:  No, your Honor.

1        MR. CLARKE:  No, your Honor.

2        THE COURT:  Second, something occurred just

3    before we came down here that I want Ms. Scheurer to

4    tell you about, and then I want to see from you all

5    where you would recommend we go from there.  Ms.

6    Scheurer?

7        THE COURTROOM DEPUTY:  I was checking on

8    the jury to see if everyone was here and was

9    approached by Pamela Schneider as she was just coming

10    in, and she told me that she needed to ask me a

11    question.

12        THE COURT:  Ms. Schneider is, of course,

13    one of our jurors who sits right in the middle of the

14    second row of the jury box.

15        THE COURTROOM DEPUTY:  And she -- I said,

16    go ahead and ask.  You can ask the question.  If I

17    can't answer it, I'll tell you so.  So she said that

18    she has knowledge about how shared networks work.

19    She disclosed that in voir dire, but she wanted to

20    know how much of that she could use in -- bring into

21    the jury room for deliberations, and she said that if

22    she heard something and she thinks it possibly works

23    another way -- she said, I can give you specifics.  I

24    said, don't give me specifics.  I'll go to the judge

25    and see what we need to do.

1          THE COURT:  All right.  That's what

2     occurred.  The instructions themselves, of course,

3     indicate that the jury must decide the case based on

4     the evidence and on the law, that they are entitled

5     to use their common knowledge.  We, I think, covered

6     in the early part the notion that they are not to

7     substitute their own knowledge for the evidence in

8     the case.  That's not something that is covered

9     generally in my final instructions.  Does anyone have

10    any thoughts or requests that you would make in

11    connection with what this particular juror has

12    disclosed to Ms. Scheurer?

13         MS. MARTIN:  I have some thoughts.  I'm not

14    sure I have any suggestions yet.  My thought is that

15    not all shared networks work exactly alike, so she

16    shouldn't assume that because she may know how one

17    shared program works that other shared programs work

18    exactly like that.

19         THE COURT:  Which is, in fact, a matter

20    that in argument both counsel now, having notice of

21    this, can make.  I'm not sure which way it cuts, of

22    course, her knowledge, whether it's helpful to one

23    side or the other.

24         MS. MARTIN:  The second thing that occurs

25    to me is that she may think it works a different way.

1  Depending upon what the evidence is, I think she's

2  committed to following what the evidence is, and I

3  think that instruction -- I don't know if there's

4  another instruction that needs to be given

5  necessarily, but I think it would be helpful -- I

6  don't think she should act as an expert in the jury.

7  That's the point, I guess, I'm making.

8            THE COURT:  And I clearly agree with that.

9  The real question is what happens next.  Mr. Clarke,

10  do you have any thoughts or suggestions?

11            MR. CLARKE:  Your Honor, I don't disagree

12  with anything that has been said so far other than it

13  seems to me that by bringing this forward what this

14  juror is saying is that she thinks that she's going

15  to have a problem doing what the court has already

16  instructed her to do, which is disregard her personal

17  knowledge and follow -- and rely upon the evidence

18  that's been presented at the trial, and she's saying

19  that's a problem for her, which obviously I

20  appreciate the fact that she's come forward with

21  that, and we put her then in a difficult situation if

22  we now know that she's got that issue and we're going

23  to tell her bottle it up because that may have the

24  effect of being overbearing in that she may then

25  refrain from engaging in that discussion at all,

1    which is not what we want.  Obviously, we want people

2    bringing their own personal life experiences because

3    that is very relevant to how they decide the case.

4    Obviously, we don't want her being an expert witness.

5    I think the solution is we object, and we have got

6    two alternate jurors, and we remove that from being

7    an issue and relieve her of that burden, and we don't

8    have the issue then.  We don't have any concerns

9    about it.

10              THE COURT:  Ms. Martin?

11              MS. MARTIN:  Your Honor, that might be a

12    solution, actually.

13              THE COURT:  Well, that certainly crossed my

14    mind, that since -- we did cover this in voir dire.

15    Certainly she was aware of it from the very

16    beginning, but the fact that she did bring it forward

17    now means, as you suggest, Mr. Clarke, that it is

18    something that's really weighing on her, and

19    without objection by the parties I would be perfectly

20    comfortable in excusing her and bringing in our first

21    alternate and simply proceeding that way.  So I think

22    what I'm going to do is, first of all, I don't want

23    to be unduly embarrassing to the juror.  I think that

24    what I might do is have Ms. Scheurer bring her to one

25    of the mini chambers rooms behind here.  I will thank

1    her for coming forward with her candor and indicate

2    that what we have decided to do is to excuse her, and

3    then I will have Ms. Scheurer inform our first

4    alternate, who is the gentleman on the back row,

5    Mr. Newton, that he is now to take her seat as a

6    regular member of the jury.  I'm about to tell the

7    alternates that they are alternates.  They may have

8    guessed that by now, but it's my practice not to tell

9    them until after closing argument.

10         Is there any objection to my proceeding along

11   those lines, Ms. Martin?

12              MS. MARTIN:  No, your Honor.

13              THE COURT:  Ms. McCracken?

14              MR. CLARKE:  No, your Honor.

15              THE COURT:  Very well.  Ms. Scheurer, if

16   you would get Ms. Schneider, I will step down, and I

17   will be back shortly.  Until then we are in recess.

18              (A recess was taken.)

19              THE COURT:  I visited with Ms. Schneider.

20   I informed her of what we had discussed and our

21   resolution, excused her with our thanks, told her we

22   were not telling her she had done something wrong, in

23   fact, it was much better that she had come forward

24   with this than left herself in deliberations having

25   to deal with the awkward situation or going ahead and

1  doing something that might be appropriate, so I

2  thanked her profusely, and there we are.

3      If we're ready to proceed, we will bring in the

4  jury.

5          (The following proceedings were had in the

6  presence of the jury:)

7          THE COURT:  As a first order of business,

8  just to note initially, Mr. Newton, you were

9  originally selected as the number one alternate in

10  this case.  We have had something occur through no

11  fault of anyone's that has led us to excuse

12  Ms. Schneider from the jury; therefore, we have moved

13  you into her position on the jury, and you therefore

14  will be participating in the deliberations as a full

15  member of the jury.

16      Mr. Sickel, you do remain an alternate, and at

17  the close of all the instructions and closing

18  argument I will have you separated from the rest of

19  the jury.  You will not participate in the

20  deliberations unless and until something arose that

21  necessitated us to substitute you for someone else.

22  I make it a practice not to tell the alternates until

23  the end of the case to take away any temptation there

24  might be, which I'm sure wouldn't have occurred here,

25  to pay less attention because they might think, I'm

1   not going to participate in the deliberations, and as

2   Mr. Newton has just learned, that's something that

3   can occur even at the 11th hour, and it could yet

4   occur, obviously.  So, Mr. Sickel, your participation

5   and attention was very much appreciated.

6        You will note, members of the jury, that there

7   are copies of the court's instructions as well as the

8   verdict form that are available to you on your chair

9   to follow along as I read them.  I will not read the

10  verdict form to you.  The verdict form that you have

11  is on the blue paper.  That's so that in the jury

12  deliberation room there won't be any confusion

13  between the original verdict form, which is on white

14  paper, and the verdict forms that you have that you

15  can do with whatever you want to during your

16  deliberations, but there won't be any confusion as to

17  which is the official form as to the instructions.

18  As I say, you're perfectly welcome to -- and, in

19  fact, encouraged -- to read along with them as I read

20  them to you, make notes on them as you wish, because

21  you will take those with you to the deliberation room

22  as well.

23           (The instructions were read to the jury;

24  closing arguments were made by the parties; the

25  bailiffs were sworn; the jury retired to deliberate

1     at 11:54 a.m., and they returned the verdict at 3:00

2     p.m.)

3                    (Court was adjourned.)

4                         * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATE

3   STATE OF KANSAS        |

4                          |   ss

5   COUNTY OF JOHNSON      |

6

7           I, Rebecca Ryder, RMR, CRR, a Certified

8   Shorthand Reporter and official reporter for the United

9   States District Court, District of Kansas, do hereby

10  certify that as such official reporter I was present at

11  and reported in machine shorthand the above and foregoing

12  proceedings.

13          I further certify that a transcript of my

14  shorthand notes was prepared and that the foregoing

15  transcript is a true and correct transcript of my notes in

16  said case to the best of my knowledge and ability.

17

18                          S/REBECCA S. RYDER
                            REBECCA S. RYDER, RMR, CRR
19

20

21

22

23

24

25