1       VOLUME 2
        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF KANSAS

3
    UNITED STATES OF AMERICA,
4
                    Plaintiff,
5   vs.                                 Case No. 09-20059

6   CASEY FRAKES,

7                   Defendant.

8
                TRANSCRIPT OF PROCEEDINGS
9                       before
            HONORABLE JOHN W. LUNGSTRUM
10
                VOIR DIRE, JULY 21, 2009
11          OPENING STATEMENTS, JULY 21, 2009
            CLOSING STATEMENTS, JULY 23, 2009
12

13                     APPEARANCES

14  For the Plaintiff:    Kim Martin
                          United States Attorney's Office
15                        500 State Avenue
                          Kansas City, Kansas 66101
16
    For the Defendant:    Michael R. Clarke
17                        Clarke  & Wilson, LLC
                          1040 New Hampshire St.
18                         Lawrence, KS 66044

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2                                          <u>PAGE</u>   <u>VOL</u>

3

4        TUESDAY, JULY 21, 2009
         VOIR DIRE EXAMINATION                  320     2
5        TUESDAY, JULY 21, 2009
         OPENING STATEMENTS                      497     2
6        THURSDAY, JULY 23, 2009
         CLOSING STATEMENTS                      517     2
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       <u>TUESDAY, JULY 21, 2009</u>

2              VOIR DIRE EXAMINATION

3              THE COURT:  The court calls for trial

4       United States of America versus Casey Frakes,

5       Case No. 09-20059.  Would the parties state their

6       appearances, beginning with counsel for the United

7       States.

8              MS. MARTIN:  Your Honor, the United States

9       appears by Kim Martin.

10             MR. CLARKE:  Your Honor, Mr. Frakes appears

11      in person with counsel Michael Clarke.

12             THE COURT:  Let me first inquire, counsel

13      for the United States, are you prepared to proceed to

14      trial?

15             MS. MARTIN:  Yes, your Honor.

16             THE COURT:  And, Mr. Clarke, is the

17      defendant prepared to proceed to trial?

18             MR. CLARKE:  He is, your Honor.

19             THE COURT:  Let me apologize for the

20      confusion on the starting time.  I thought that I had

21      communicated at some point in time with my staff that

22      we would start at nine today.  I somehow made a

23      mistake, obviously, and told you all yesterday that

24      it was going to be nine, but the plans had been set

25      in stone for 9:30, so to the extent that you have

1    been inconvenienced, I apologize.

2         If we're ready to go, Ms. Scheurer, let's please

3    bring in the jury.

4         If you are unable to find a seat, don't worry

5    because I'm shortly going to start calling people up

6    into the well of courtroom, and seats will develop,

7    so please just wait a moment.

8              (The panel was sworn for voir dire and

9    first 32 prospective jurors were called forward by

10   the courtroom deputy.)

11             THE COURT:  Thank you very much.  For those

12   of you who haven't previously found seats, take a

13   seat wherever you like, and for all of the rest of

14   you who remain in the back of the courtroom but have

15   not yet been called up as prospective jurors, please

16   be sure to pay close attention, to watch and listen

17   to what goes on here, because you may yet have the

18   opportunity to be called forward to participate in

19   the jury selection process.

20        I am going to turn my attention now to those of

21   you who have been called forward, and I would like to

22   introduce myself to you.  My name is Judge Lungstrum.

23   I'm one of the United States District Judges for the

24   District of Kansas.  I sit here in Kansas City.  Most

25   importantly, I am the judge who is assigned to

preside over the trial for which you all have been

brought in as prospective jurors.  We start all jury

trials, of course, by selecting the jury, and the

selection of the jury begins with what is known as

the voir dire process, and the voir dire process

involves questioning to enable the court to determine

whether or not any prospective juror should be

excused for cause and to enable counsel for the

parties to exercise their individual judgment with

respect to peremptory challenges, which are

challenges for which counsel need not give specific

explanations.  Voir dire is not meant to pry into

your private life or to embarrass you; it is merely a

standard part of the trial of any lawsuit and is

aimed at selecting a jury that is as impartial as

possible under all the circumstances.

Let me ask next for those of you who have been

called forward, do any of you have any issues

regarding sight or hearing or anything else which we

need to accommodate in order to have you be able to

serve effectively as a juror for us?  If you have any

issues along those lines, please let me know now by

raising your hand.  All right.  I see no hands.

Let me now give you some preliminary information

about this case.  It is a criminal case.  That means

1    the United States Government has charged the

2    defendant, whose name is Casey Frakes, with

3    committing one or more crimes.  These criminal

4    charges have been brought by an indictment returned

5    by a grand jury.  The indictment spells out the

6    charges and informs the defendant of the nature of

7    the offense or offenses with which he is charged.  He

8    has pled not guilty to these charges.

9         Under our Constitution a defendant is presumed

10   to be innocent at all times, and unless and until the

11   jury returns a verdict of guilty, this presumption of

12   innocence remains with the defendant.  The fact that

13   he has been charged with a crime does not mean that

14   he is guilty, and as he sits here right now, you must

15   presume that he is innocent of any crime.  The

16   government has the burden of proving the defendant

17   guilty beyond a reasonable doubt.  If the government

18   fails to do so, then you must find the defendant not

19   guilty.  The defendant need not testify or present

20   any evidence in this case because the burden of proof

21   is on the government to prove him guilty beyond a

22   reasonable doubt.  You are to draw absolutely no

23   inference or conclusion from the fact that the

24   defendant may decline to testify or present evidence

25   if, in fact, that should be what occurs.

1          The indictment under which the defendant is

2     charged in this case is not evidence of guilt

3     whatsoever.  The indictment is informational only,

4     and it does not carry any weight in satisfying the

5     government's burden of proof.  You, the jurors, the

6     jurors who are selected to try the case, will be the

7     sole judges of the credibility and the weight to be

8     given to the evidence in this case.

9          The evidence will possibly consistent of

10     testimony of witnesses, written documents,

11     stipulations, and applicable presumptions, all of

12     which I will instruct you about further at a later

13     point if you are called to serve upon this jury.

14          Now, all of us know, of course, that there's

15     probably not a soul who walked up here this morning

16     who thought, what I really want to do today is be on

17     a jury in federal court, and we recognize that your

18     being here today and the prospect of your serving on

19     this jury will pose an inconvenience in your life.

20     That is something of which we are all acutely aware

21     and something about which we are very sensitive.

22          We also recognize that you know that the role of

23     the jury in deciding disputes, especially disputes

24     between the government and its citizens where the

25     government has brought a criminal charge or charges

1    such as this, is something that is extremely

2    important in your life.  I suppose along with voting

3    it's the place at which normal citizens get the

4    chance to actually impact the way the government

5    functions.  That is, in fact, what the framers of our

6    Constitution had in mind.

7        Many places around the world where there are

8    disputes like this they simply submit them to a panel

9    of judges who are professionally trained, and they

10    don't have citizens who are brought in to decide what

11    the facts are the way we do in the Anglo-American

12    system of jurisprudence.

13        When our founders wrote the Constitution and its

14    Bill of Rights, they thought the right to a jury

15    trial was so important that they incorporated it in

16    the Bill of Rights.  And so sometimes we think of

17    jury service as a duty, which I think is appropriate,

18    but it's also, I think, appropriate to think of in

19    terms of the right to serve on a jury where a citizen

20    has for whatever period of time the opportunity to

21    step up and be a part of the structure of our country

22    that actually functions and governs and deals with

23    whether or not the rules have been broken.

24        Now, this case is not a very long case by

25    federal court standards.  I tried a case this spring

1     that took five weeks to try.  This case is scheduled

2     as best I can tell from what people have told me to

3     have the evidence presented by the end of this week,

4     so this is not a long time by any means.  It's very

5     short by federal court standards.  By the same token,

6     it is possible that for some of you there is some

7     special hardship that you would have if during this

8     week or possibly into the beginning of next week you

9     were asked to be on a jury in this court.

10          So my first question to you then is, for any of

11    you is it a special hardship for you if you were to

12    serve on this particular jury with the time

13    constraint that I have just described?  If so, please

14    raise your hand.  I will come back and follow up.

15    Beginning in the back row, Ms. James?

16              MS. JAMES:  I have a surgery Monday

17    morning, an oral surgery.

18              THE COURT:  Is that something that could be

19    postponed?

20              MS. JAMES:  I could try.

21              THE COURT:  Is it outpatient type surgery?

22              MS. JAMES:  Uh-huh.

23              THE COURT:  One of the reasons I put the

24    question about outpatient surgery is this.  If the

25    evidence has not been completed and the case is ready

1    to be submitted to the jury to actually make a

2    decision by the end of the day Friday, we will not

3    meet on Monday.  I use Mondays for other hearings and

4    things.  If, on the other hand, the jury is ready to

5    deliberate in the case and we have submitted

6    everything to it, typically I would let the jury

7    deliberate on Monday because I could attend to any

8    matters involving the jury on breaks during the other

9    things that I am doing.  If that were the

10   circumstance and you had the surgery on Monday, is

11   that the sort of surgery that you would be able to

12   resume your service on Tuesday?

13          MS. JAMES:  They tell me I should have a

14   couple days, 48 hours, so probably in the afternoon

15   maybe, or something.

16          THE COURT:  I don't want to pry too far

17   into all of this, but is this surgery that -- are you

18   in pain and is it something that you -- if you don't

19   have it now it's going to really be a difficult thing

20   for you, or is it something that if you were able to

21   reschedule it that's something you could work out?

22          MS. JAMES:  I could try to work that out.

23   I have an infection in my mouth, so I'm being treated

24   with antibiotics right now.

25          THE COURT:  Thank you.  I appreciate your

1      responses.  In the next row I saw some hands.

2      Mr. Myers?

3               MR. MYERS:  Yes.  I have an infant son, and

4      my wife also works.  She works up until the time that

5      he's supposed to be picked up.  If I'm late picking

6      him up, which is at 6:00 o'clock, 1800 hours, if I'm

7      late picking him up, it's a dollar a minute, and if

8      we get out of here at 5:00 o'clock, to get to

9      Leavenworth is approximately one hour.  Basically, I

10     would be looking at between $40 to a $100 a week

11     additional cost on me.

12               THE COURT:  All right.  Thank you for that

13     information.  Mr. Perry?

14               MR. PERRY:  I have a medical procedure

15     Friday.  I have to prep Thursday.

16               THE COURT:  Is that a procedure that you

17     would be able to reschedule?

18               MR. PERRY:  Possibly, yeah.  I probably

19     could.

20               THE COURT:  All right.  Thank you.  Did I

21     see any other hands in that row?  All right.  Did I

22     see any hands in the first row?  Ms. Lutz?

23               MS. LUTZ:  I have been excused for the

24     first part of next week.  My daughter works and is

25     going out of town, so I have to watch my

1    three-year-old grandson starting Friday evening

2    through Tuesday of next week.

3              THE COURT:  All right.  And you had

4    previously arranged for that with the --

5              MS. LUTZ:  Uh-huh.  I have the email.

6              THE COURT:  -- with the court clerks?

7              MS. LUTZ:  Yes.

8              THE COURT:  I will permit you to step down

9    and contact Ms. Saragusa on the way out for further

10   directions.  Ms. Scheurer, please call the next name.

11             (The next prospective juror was called

12   forward by the courtroom deputy.)

13             THE COURT:  Mr. Dallman, were you able to

14   see and hear what has transpired so far?

15             MR. DALLMAN:  Yes.

16             THE COURT:  And would you have responded to

17   this question concerning extraordinary hardship?

18             MR. DALLMAN:  No.

19             THE COURT:  All right.  Were there other

20   hands in the first row?  In the chairs to my right?

21   Mr. Zinnecker?

22             MR. ZINNECKER:  My wife travels for

23   business, and she leaves tomorrow, and she will be

24   out of town for probably half a day, and then she

25   leaves again next week, and I have a nine-year-old

1  son we kind of rely on neighborhood babysitters to

2  kind of watch part of the day.

3  THE COURT:  All right.  What I understand

4  you are saying is that she will be gone for half a

5  day tomorrow?

6  MR. ZINNECKER:  Yes.

7  THE COURT:  All right.

8  MR. ZINNECKER:  I believe it depends on how

9  long the meeting goes.

10  THE COURT:  Would child care be available

11  for that time?

12  MR. ZINNECKER:  I have a neighborhood

13  sitter, but then I would have to go and pick him up

14  and then work from home.

15  THE COURT:  All right.  I am not going to

16  ask anyone to step down at this point.  Mr. Myers and

17  Mr. Zinnecker, if you are selected, either one or

18  both of you, we will simply attempt to work around

19  your schedules by quitting earlier than we normally

20  would do, or whatever we need to do to assist you in

21  avoiding the concerns that you have raised.

22  Mr. Perry and Ms. James, it seems to me that if you

23  are selected those are procedures that you would be

24  able to get rescheduled without too severe a

25  hardship.  It is possible that, of course, you won't

1    be selected, but if you are, it seems to me that's

2    something that could be worked out.  Thank you.

3        Let me briefly summarize the charges that have

4    been brought in this case against the defendant.

5        In Count 1 the indictment charges that on or

6    about March 12, 2008, the defendant, Casey Frakes,

7    did knowingly distribute in interstate and foreign

8    commerce by means of a computer visual depictions of

9    minors, the production of which involved the use of

10   minors engaging in sexually explicit conduct, and the

11   visual depictions were of such conduct, and that the

12   defendant ran a Limewire program that offered to

13   share images of child pornography via the internet.

14       Count 2 of the indictment charges that on or

15   about June 10, 2008, in the District of Kansas the

16   defendant, Casey Frakes, did knowingly and

17   intentionally possess one or more materials which

18   contained visual depictions of minors, the production

19   of which involved the use of minors engaging in

20   sexually explicit conduct, and the visual depictions

21   were of such conduct, which has been mailed, shipped,

22   and transported by any means, including computer, in

23   interstate and foreign commerce in violation of Title

24   18, United States Code, Section 2252(a)(4)(B).

25       My question to you all now is, has any member of

1    the panel heard or read anything about this case or

2    any dispute involving the United States Government

3    and Mr. Frakes on this subject?  If so, please raise

4    your hand.  I see no hands.

5        Let me ask counsel for the government, would you

6    please you introduce yourself to the jury and tell

7    them a little bit about your background and where you

8    practice law.

9            MS. MARTIN:  My name is Kim Martin.  I'm an

10   assistant United States attorney.  I have been an

11   assistant United States attorney for approximately 20

12   years.  I practice here in the Kansas City, Kansas,

13   office, although the District of Kansas does have

14   three offices, one in Topeka, one in Wichita, and one

15   here, and I have done that since I graduated from law

16   school.

17           THE COURT:  Thank you, Ms. Martin.  Does

18   anyone believe you are acquainted personally,

19   professionally, by reputation, or otherwise with Ms.

20   Martin?  If so, please raise your hand.  I see no

21   hands.

22       Counsel for Mr. Frakes, would you please

23   introduce yourself.

24           MR. CLARKE:  Thank you, your Honor.  My

25   name is Michael Clarke.  I go by Mike Clarke.  I have

1      been practicing since 1991.  I am in private

2      practice.  Came to eastern Kansas in 1996.  I was

3      stationed at Fort Leavenworth in the Army JAG Corps.

4      Once I left active duty in 1999, I went into private

5      practice.  I have a partner, Stephanie Wilson.  We

6      practice primarily in Lawrence, Kansas, but obviously

7      I also practice to some extent in eastern Kansas.

8              THE COURT:  Thank you, Mr. Clarke.  Does

9      anybody believe you are acquainted with Mr. Clarke in

10     any respect, personally, professionally, by

11     reputation, or otherwise?  Mr. Perry?

12             MR. PERRY:  Possibly.  You worked at JAG?

13             MR. CLARKE:  [Nodded head.]

14             MR. PERRY:  At Fort Leavenworth or at the

15     disciplinary barracks?

16             MR. CLARKE:  Actually, I saw your name on

17     the questionnaire, the information that you worked at

18     the DB.  I was the senior defense counsel at Fort

19     Leavenworth, so I had an office outside the wall and

20     inside the wall, and I supervised basically the

21     office that was inside the wall that handled the

22     disciplinary proceedings and obviously coordination

23     of counsel making contact with the inmates who were

24     inside the walls, and I was there from 1996 to '99.

25             MR. PERRY:  There could have been possible

1    contact.

2           THE COURT:  Is there anything about those

3    circumstances of Mr. Clarke's prior professional

4    life, whether or not you actually are acquainted with

5    him, that you think would affect your ability to be

6    fair and impartial to both the government and

7    Mr. Frakes in this case?

8           MR. PERRY:  No, I don't think there would

9    be anything.

10           THE COURT:  In other words, what we're

11    concerned about, of course, is, this case needs to be

12    decided based only on the evidence that's presented

13    in the courtroom and the law which I will explain to

14    the jury applies in the case, and extraneous factors

15    like what somebody formerly did in their employment

16    or whether or not someone has met someone before

17    can't come into consideration when deciding the case,

18    of course.  So that's why I ask whether any of those

19    factors would likely influence you as this case goes

20    forward.  I believe you're telling me you believe you

21    could be fair and impartial to all concerned and not

22    have this case decided based upon your past

23    acquaintance with at least what kind of work

24    Mr. Clarke previously did.  Am I right?

25           MR. PERRY:  That's correct.

1          THE COURT:  Anybody else believe they are

2     acquainted with Mr. Clarke in any respect?  I hear

3     none.

4          Ms. Martin, would you please introduce the

5     gentleman who is seated with you at counsel table.

6          MS. MARTIN:  Sitting next to me is Special

7     Agent James Kanatzer.  He works for the Bureau of

8     Immigration and Customs Enforcement.  He's been doing

9     that for approximately 20 years, and he is the lead

10    investigator in our case.

11         THE COURT:  All right.  Thank you very

12    much.  Does anybody on the jury believe you're

13    acquainted with Mr. Kanatzer in any respect?  Yes,

14    Mr. Myers?

15         MR. MYERS:  Not that I'm familiar with the

16    individual just talked about, but I'm wondering if

17    this case has something to do with the case of Shawn

18    Mullens, who was a coworker of mine who was also

19    busted by ICE, went to prison about three or four

20    months ago.

21         MS. MARTIN:  Your Honor, Agent Kanatzer was

22    the investigator on the Shawn Mullen case as well.

23         THE COURT:  Is there anything about the

24    case that otherwise involves Mr. Mullens, or is it

25    simply Mr. Kanatzer was the agent on both cases?

1      MS. MARTIN:  It's simply he was the agent

2   on both cases.

3      THE COURT:  That's the extent of the

4   involvement, that Mr. Kanatzer was involved in

5   investigating not only Mr. Mullens' case, but this

6   particular case.  Is there anything about that that

7   you think would affect your ability to be fair and

8   impartial to both sides?

9      MR. MYERS:  Yes, sir, because I knew Shawn

10   Mullens.

11      THE COURT:  Why don't you come forward and

12   let me talk to you up here.

13      (Counsel approached the bench and the

14   following proceedings were had:).

15      MR. MYERS:  I knew Shawn Mullens on a

16   somewhat personal, mostly professional level, and we

17   all knew he was guilty, basically, when he got

18   busted, sir.  He had a very unusual life.  I honestly

19   do not feel that I can feel -- I can serve on this

20   jury, knowing that this is related to that same case

21   and what I know about the case for Shawn Mullens.

22      THE COURT:  I'm still not quite following

23   you here.  Did you feel like Mr. Mullens got treated

24   unfairly?

25      MR. MYERS:  Oh, no.  I believe he got what

1    was coming to him.

2           THE COURT:  I see.  I didn't quite

3    understand where you were headed.  Thank you.

4    There's no overlap in the evidence here compared to

5    what -- this just happens to be Mr. Kanatzer's job,

6    to investigate cases that might or might not wind up

7    in prosecutions from there.  This case stands on its

8    own.  There may be evidence or there may not be

9    evidence, and it's up to the jury to decide whether

10   there is or is not.  Now, with that explanation do

11   you believe that that changes your thinking at all

12   about whether or not you could be fair?

13          MR. MYERS:  No, sir.

14          THE COURT:  Then I will excuse you, and

15   thank you for your candor.

16          (The proceedings returned to open court.)

17          THE COURT:  I've excused Mr. Myers.

18          (The next prospective juror was called

19   forward by the courtroom deputy.)

20          THE COURT:  Ms. Major, have you been able

21   to see and hear all of what's gone on so far?

22          MS. MAJOR:  Yes.

23          THE COURT:  Would you have raised your hand

24   to any of the questions I have asked so far?

25          MS. MAJOR:  Yes.

1            THE COURT:  What would that have been?

2            MS. MAJOR:  What would that have been?

3            THE COURT:  Yes.  I asked if you would have

4  raised your hand in answer to any of the questions I

5  have asked, for example, about would this be a

6  special hardship or are you acquainted with the

7  lawyers or the individuals and so forth.  Would you

8  have raised your hand?

9            MS. MAJOR:  Yes.

10           THE COURT:  What would you have raised your

11  hand about?

12           MS. MAJOR:  Oh, no.  I'm sorry.

13           THE COURT:  I think I'm having trouble

14  communicating.

15           MS. MAJOR:  Sorry.

16           THE COURT:  All right.  Is there anyone

17  else who believes they may be acquainted with Mr.

18  Kanatzer in any respect?

19       Mr. Clarke, would you please introduce

20  Mr. Frakes.

21           MR. CLARKE:  Thank you, your Honor.  This

22  is Mr. Casey Frakes.  He is 31 years old.  He's from

23  Atchison, Kansas.  He graduated from Atchison High

24  School in 1996.  He is currently employed at Pinnacle

25  Lawn Care out of Olathe -- I'm sorry, Overland Park.

1    THE COURT:  Thank you very much.  Does

2    anyone on the jury believe that you are acquainted in

3    any respect with Mr. Frakes?  Ms. Wilburn?

4    MS. WILBURN:  Yes.  I'm from Atchison,

5    Kansas, and I know his parents very well.

6    THE COURT:  Is there anything about that

7    that you think would make it difficult or impossible

8    for you to be a fair and impartial juror in this

9    case?

10    MS. WILBURN:  I'm not sure.  I think it

11    might be a little difficult.

12    THE COURT:  Why don't you come on down, and

13    let's talk about it a little bit.

14    (Counsel approached the bench and the

15    following proceedings were had:)

16    THE COURT:  I wanted to find out a little

17    bit more about the nature of your acquaintance with

18    Mr. Frakes' family so I can evaluate this better.

19    MS. WILBURN:  I have just known them all my

20    life, pretty much all my life, and my husband and his

21    dad used to go hunting quite a bit together, and

22    we're good friends.

23    THE COURT:  Social friends?

24    MS. WILBURN:  Yes.

25    THE COURT:  In and of itself that is not a

1    disqualifier to be on the jury.  In other words,

2    there's no prohibition against having a person on a

3    jury just because they are acquainted with the family

4    or with the individual who might be involved in the

5    trial.  But the question -- if, for example, if this

6    case were a local case in the Atchison County

7    courthouse, it wouldn't be surprising to have members

8    of the jury know the people that are involved in the

9    trial.  In federal court it's a little more unusual

10   because we draw jurors from a larger area, and it's a

11   little more coincidental when somebody knows

12   somebody.  The question really is -- this case, as

13   you heard me say to other people, needs to be decided

14   just on the evidence and just on the law and not

15   because of any other concerns.

16          MS. WILBURN:  Right.

17          THE COURT:  Do you think, having had an

18   opportunity to think about this a little bit, that

19   you could evaluate this case based on the evidence

20   and the law and that if you thought the government

21   met its burden of proof beyond a reasonable doubt you

22   could bring back a verdict of guilty on either or

23   both of the counts that have been brought against

24   Mr. Frakes?

25          MS. WILBURN:  I'm really not sure.  I think

1      I probably could.  That's another thing I was worried

2      about.  Are there going to be names mentioned of

3      anybody that these --

4              THE COURT:  Of other people in Atchison?

5      Are there other witnesses from Atchison?

6              THE WITNESS:  Not witnesses.  I mean the

7      subjects.

8              MS. MARTIN:  Not that I'm aware of.

9              MS. WILBURN:  Because I was kind of worried

10     about that.

11             THE COURT:  Again, Ms. Martin and

12     Mr. Clarke, I want you to correct me if I'm wrong,

13     but it's my understanding that the individuals who

14     are depicted are not local.  That's my understanding.

15     Nobody's correcting me.  Conversely, if you do not

16     believe the government has sustained its burden of

17     proof beyond a reasonable doubt on either or both of

18     the counts, do you believe that you could bring back

19     a verdict of not guilty under those circumstances?

20             MS. WILBURN:  Yes.

21             THE COURT:  All right.  I'll get right to

22     what I don't want to have happen, what I think the

23     lawyers don't want to have happen.  Your personal

24     relationship seems to be, obviously, positive with

25     Mr. Frakes' family, but I don't know what's happened

1    over all the years.  It doesn't really matter in the

2    end as long as this isn't a situation where in the

3    jury room some juror is saying, you know, I have

4    always known that kid, and he was the best kid in the

5    world; he couldn't possibly have done anything wrong;

6    or, I have always known that kid, and I knew he was

7    heading for trouble from day one.  That's what we

8    don't want to have.

9              MS. WILBURN:  I just feel really

10   uncomfortable.

11             THE COURT:  All right.  And that is

12   legitimate, but let's say that you were put in that

13   position where beyond your control I didn't excuse

14   you, you weren't excused, you had to do that job in

15   this case.  Would you be able to bring back a verdict

16   of guilty if you thought the evidence and the

17   instructions said you should?

18             MS. WILBURN:  Yes.

19             THE COURT:  Any questions that you have,

20   Ms. Martin?

21             MS. MARTIN:  No, your Honor.

22             THE COURT:  Mr. Clarke?

23             MR. CLARKE:  No, your Honor.

24             THE COURT:  All right.  Thank you.  You may

25   be seated.

1          (The proceedings returned to open court.)

2          THE COURT:  Is there anyone else who

3     believes you're acquainted with Mr. Frakes in any

4     respect?  Thank you.  I see no other hands.

5          Let me ask you to look around among your fellow

6     jurors here, and let me ask whether or not you are

7     acquainted with any of the other people on the

8     prospective jury panel other than in your capacity as

9     prospective federal court jurors.  In real life, so

10    to speak, are any of you acquainted?  I see no hands.

11    Thank you.

12         The government will certainly be calling

13    witnesses in this case because it bears the burden of

14    proof beyond a reasonable doubt.  We don't know

15    whether Mr. Frakes will or will not call witnesses.

16    He has explained to you he has no obligation to do

17    so, but to sort of speed up the next phase of the

18    process, I have asked Ms. Martin to read the names of

19    all of the prospective witnesses who might testify at

20    this trial, whether they are witnesses who might be

21    called by the government or by Mr. Frakes.  You are

22    to draw no inference, by the way, also if not all

23    these witnesses actually testify.  At the outset of a

24    trial it's sometimes not known for sure which

25    witnesses are going to come and testify, so there may

1    be more names read than people who actually come and

2    testify.  Ms. Martin, would you please read the names

3    of the prospective witnesses.

4              MS. MARTIN:  Yes, your Honor.  Potential

5    witnesses in this case would be Pamela Frakes, Jason

6    Frakes, John Howe, Agent Kanatzer, Terry Kelley, Roy

7    Shepard, Peter Latham, Todd Beard, and Ken Wilnaur.

8    Those would be the prospective witnesses, your Honor.

9              THE COURT:  Anybody on the prospective

10   jury panel believe that any of those people sound

11   like someone with whom you might be acquainted?

12   Ms. Wilburn, you've indicated that you are acquainted

13   with Mr. Frakes' mother, for example.

14              MS. WILBURN:  And also Terry Kelley.

15              THE COURT:  So why don't you come back down

16   here.  I should have done this before.  I knew that

17   was coming, and I should have -- my apologies.  Come

18   on back down.  Get your morning exercise.

19              (Counsel approached the bench and the

20   following proceedings were had:)

21              MS. WILBURN:  Atchison is a small town.

22              THE COURT:  I understand.  I don't know why

23   I didn't just follow right through.  You said in

24   addition to Mr. Frakes' mother there was another

25   prospective witness you said --

1                    MS. WILBURN:  Officer Kelley.

2                    THE COURT:  Officer Kelley.  All right.

3          Now, my questions there are, of course, having to do

4          with the very fact that they are witnesses in the

5          case.  Would you be inclined to give extra either

6          believability or lack of believability to either or

7          both of these individuals based upon your

8          acquaintance with them?

9                    MS. WILBURN:  I would try not to.

10                   THE COURT:  All right.  But there's nothing

11         in your past history -- for example, let's take the

12         police officer.  This would be a scenario that I'm

13         not attributing to you, but it is at least

14         theoretically possible that a person might have had a

15         run-in with a police officer and decided, I wouldn't

16         believe anything that guy said.

17                   MS. WILBURN:  No, never.  I just work with

18         his wife and just know them all.

19                   THE COURT:  So there's no negative thing

20         that's ever happened with regard to these people that

21         would cause you not to believe them?

22                   MS. WILBURN:  Right, no.

23                   THE COURT:  On the positive side of things,

24         it's apparent that you have positive feelings about

25         both of those witnesses that you've identified that

1    you know; is that correct?

2              MS. WILBURN:  Uh-huh.

3              THE COURT:  Now, they will come and they

4    will take the oath just like every other witness, and

5    they will be subject to -- whichever side calls them,

6    the other side will have the opportunity to ask

7    questions of them as well.  The jury's job will be to

8    try to decide whether or not what they are saying is

9    believable.  Sometimes believable means whether they

10   are fibbing or not; sometimes it means do they have

11   an accurate memory or perception of things.  It

12   doesn't necessarily mean they are intentionally

13   telling an untruth.

14        Now, based on your acquaintance with those two

15   individuals, would you then be able to evaluate their

16   testimony just like any other witness and try to

17   attempt to figure out whether or not you would give

18   them believability or credibility in this case?

19             MS. WILBURN:  I think so.

20             THE COURT:  All right.  Ms. Martin, do you

21   have any further questions?

22             MS. MARTIN:  Would there be anything about

23   your relationship with either of those people that

24   would make you -- let's assume that there was a

25   difference between their testimony.  Is there

1    anything about your relationship with either one of

2    them that would make you tend to believe one over the

3    other?

4            MS. WILBURN:  I don't think so.

5            MS. MARTIN:  And so is there anything

6    about -- you said you work with Detective Kelley's

7    wife?

8            MS. WILBURN:  Uh-huh.

9            MS. MARTIN:  Is there anything about your

10   jury service that would make it uncomfortable for you

11   to go back to work afterwards, depending on what your

12   verdict was, that you would have in the back of your

13   mind in the jury room?

14           MS. WILBURN:  Well, I feel like that

15   anyway, just knowing them.

16           MS. MARTIN:  Right.  So you feel like it's

17   going to be in the back of your mind during jury

18   deliberations?

19           MS. WILBURN:  I do, yeah.

20           MS. MARTIN:  Do you think that it will

21   affect your ability to review the evidence and --

22           MS. WILBURN:  I hope not, but I can't say

23   100 percent it wouldn't be back there.

24           MS. MARTIN:  Right.  Obviously, she's going

25   to testify.  Mrs. Frakes will testify.  You'll hear

1     her testimony.  Will you have that in the back of

2     your mind in jury deliberations, gosh, I really like

3     this woman, and I don't want to send her son to jail?

4             MS. WILBURN:  I hope not, but like I said,

5     I can't say that it wouldn't be back there in my mind

6     kind of playing a little role.  I don't know.

7             THE COURT:  Mr. Clarke, do you have any

8     questions?

9             MR. CLARKE:  I do, your Honor.  Ma'am,

10     could you give us a little more detail in terms of

11     your relationship with Mr. Kelley and his wife?

12             MS. WILBURN:  I just know them and I

13     work -- I don't work closely with Stacy, his wife,

14     but I know her very well.

15             MR. CLARKE:  Do you work in the same

16     business, same building?

17             MS. WILBURN:  Yes.  We both work at the

18     Atchison Hospital.  She works for home health on the

19     second floor; I work for medical records on the

20     first.  Social events.

21             MR. CLARKE:  Have you ever been to their

22     house?

23             MS. WILBURN:  No.

24             MR. CLARKE:  Have they ever been to your

25     house?

1          MS. WILBURN:  No.

2          MR. CLARKE:  I don't have anything further.

3          THE COURT:  Thank you.  You may be seated.

4          (The proceedings returned to open court.)

5          THE COURT:  Does anyone else sitting out

6     here in the well of the courtroom believe you're

7     acquainted with any of the individuals who have been

8     identified as prospective jurors?  Ms.Silverman?

9          MS. SILVERMAN:  It went over my head

10    before.  I am not acquainted with the juror himself,

11    but his family, his mother-in-law specifically, and

12    his wife.

13         THE COURT:  All right.  Could you tell us

14    which other juror that is.

15         MS. SILVERMAN:  Bob Hennecke.  I'm sure

16    that it's -- I know his wife and his mother-in-law,

17    but I don't think it would have any --

18         THE COURT:  Mr. Hennecke is back over here.

19    Mr. Hennecke, I don't sense a total recognition at

20    least on your part here; right?

21         MR. HENNECKE:  Right.

22         THE COURT:  Ms. Silverman, the reason I

23    asked that question -- and thank you for bringing it

24    to our attention.  I asked the question for this

25    reason.  The role of the juror is sort of a

1   complicated one in a way because in one respect
2   you're serving as part of a group, 12 people to
3   deliberate and arrive at a unanimous verdict, if they
4   can.  Yet by the same token each individual juror is
5   expected to use his or her own perceptions and common
6   understandings of life and so forth and not to just
7   become overly or unduly influenced by the fact that
8   somebody else is on the jury.  For example, if a
9   person is on there with his or her boss, there might
10  be a concern that that juror would be too deferential
11  to the boss or maybe use this as a time to show the
12  boss what they really think of them, but the point is
13  there could be some personal dynamic that would
14  interfere with their exercising their individual role
15  as a juror.  Is there anything about the fact of your
16  acquaintance with Mr. Hennecke's family that would
17  cause there to be a problem if you both served on the
18  jury in this case?

19          MS. SILVERMAN:  I think not.

20          THE COURT:  Thank you very much.  Let me
21  now ask whether any of the prospective jurors have
22  ever previously served as a juror either in a
23  criminal or a civil case or has been the member of a
24  grand jury in either federal or state court.  When I
25  say state court, usually people think of that as the

1    Johnson County court or the Wyandotte County court or
2    the Atchison County court or whatever it might happen
3    to be.  Has anybody previously served on a jury?  If
4    so, please raise your hand.  I will now follow up and
5    get some details.  Let me begin with Ms. Wilson; is
6    that correct?
7              MS. WILSON:  Uh-huh.
8              THE COURT:  Could you tell us when and
9    where you have previously served as a juror.
10             MS. WILSON:  It was Wyandotte County.
11             THE COURT:  How long ago would that have
12   been?
13             MS. WILSON:  About two years?
14             THE COURT:  Was that a criminal or civil
15   case?
16             MS. WILSON:  Criminal.
17             THE COURT:  What were the nature of the
18   charges?
19             MS. WILSON:  Breaking and entering.
20             THE COURT:  All right.  Did the jury arrive
21   at a verdict in that case?
22             MS. WILSON:  Yes.
23             THE COURT:  What was that verdict?
24             MS. WILSON:  Not guilty.
25             THE COURT:  All right.  Were you the

1    foreperson or prospective juror in that case?

2              MS. WILSON:  No.

3              THE COURT:  All right. Thank you.  Hands in

4    the next row?  Ms. Grogan?

5              MS. GROGAN:  Yes.  I served as a juror in a

6    felony murder case in Wyandotte County.  It was

7    probably between five and eight years ago, and I was

8    the alternate.

9              THE COURT:  You were an alternate.  All

10   right.  Did you not deliberate ultimately?

11             MS. GROGAN:  I was in the room.

12             THE COURT:  Okay.  Did the jury arrive at a

13   verdict in that case?

14             MS. GROGAN:  Yes.  Guilty.

15             THE COURT:  You weren't the foreperson or

16   presiding juror?

17             MS. GROGAN:  No.

18             THE COURT:  Any other hands in that row?

19   Actually, I'll get you as I come around to the other.

20   Any hands in the front?  Mr. Dallman?

21             MR. DALLMAN:  Yes.  It was Leavenworth

22   County, probably about four years ago.  It was a

23   criminal trial.

24             THE COURT:  Do you remember the nature of

25   the charges?

1    MR. DALLMAN:  It was two charges, aiding

2    and abetting a minor and drug possession.

3    THE COURT:  All right.  Did the jury arrive

4    at a verdict?

5    MR. DALLMAN:  Yes.

6    THE COURT:  What was that verdict?

7    MR. DALLMAN:  Split.  Not guilty on the

8    aiding and abetting and guilty on the drug

9    possession.

10    THE COURT:  All right. Was aiding and

11    abetting --

12    MR. DALLMAN:  He was the boyfriend, and she

13    was a minor runaway.

14    THE COURT:  Were you the foreperson or

15    prospective juror?

16    MR. DALLMAN:  No.

17    THE COURT:  All right.  I saw a hand from

18    Ms. Vannaman?

19    MS. VANNAMAN:  Yes.  This was in Johnson

20    County probably about ten or so years ago, and it was

21    a criminal case, drug possession, and we found him

22    not guilty.

23    THE COURT:  Not guilty?  And were you the

24    foreperson?

25    MS. VANNAMAN:  No.

1          THE COURT:  Thank you.  Any other hands?
2     Mr. Wright?
3               MR. WRIGHT:  It was Harris County, Houston,
4     Texas, and it was probably 15 years ago.  I was a
5     juror on two civil cases, and I don't actually
6     recollect what the --
7               THE COURT:  How they came out?
8               MR. WRIGHT:  Yeah.
9               THE COURT:  Were you the foreperson or
10    presiding juror on either of them?
11              MR. WRIGHT:  No.
12              THE COURT:  Did I see another hand?
13    Ms. Hardin?
14              MS. HARDIN:  Yes.  It was in Johnson County
15    a couple years ago.  It was a DUI, and it was a
16    conviction.
17              THE COURT:  All right.  Were you the
18    foreperson or presiding juror?
19              MS. HARDIN:  No.
20              THE COURT:  All right.  Mr. Vanhoose, did
21    you have your hand up?
22              MR. VANHOOSE:  Yes.  Johnson County, ten
23    years ago, civil suit, slander, found them guilty.
24              THE COURT:  Were you the presiding juror or
25    foreperson?

1          MR. VANHOOSE:  [Shook head.]

2          THE COURT:  Mr. Howell, did you have your

3     hand up?

4          MR. HOWELL:  Yes.  Four or five years ago,

5     a civil case in Johnson County.  I was an alternate,

6     and I don't know what the outcome was.

7          THE COURT:  All right.  Thanks.  Anybody

8     else in the chairs over there?  Ms. Schneider?

9          MS. SCHNEIDER:  Johnson County, three years

10    ago.  It was a civil litigation, and they settled

11    after the first witness.

12         THE COURT:  All right.  Thank you.

13    Ms. Caputo?

14         MS. CAPUTO:  Johnson County in the late

15    eighties, assault, and he was found not guilty.

16         THE COURT:  Were you the prospective juror

17    or foreperson?

18         MS. CAPUTO:  [Shook head.]

19         THE COURT:  Is that a no?

20         MS. CAPUTO:  No.

21         THE COURT:  Any other hands in the chairs?

22    Ms. McMahon?

23         MS. MCMAHON:  Here a couple years ago, age

24    discrimination, and then a drug case.

25         THE COURT:  Was I the judge in either of

1          those cases?

2                    MS. MCMAHON:  Yes.

3                    THE COURT:  Welcome back.  All right.  And

4          did the jury arrive at verdicts in those cases?

5                    MS. MCMAHON:  Both cases, against and a not

6          guilty, and I was not a foreman.

7                    THE COURT:  All right.  Now, on the drug

8          case what was the verdict?

9                    MS. MCMAHON:  Not guilty.

10                   THE COURT:  Not guilty.  All right.

11         Back -- anybody else I missed?  Mr. Newton?

12                   MR. NEWTON:  Some years back in Wyandotte

13         County.  It was a civil case, and I was the

14         foreperson.

15                   THE COURT:  Anyone else I may have missed?

16         I have several follow-up questions I want to address

17         with all of you who raised your hands.

18              First of all, was there anything about your

19         prior jury service that you think would make it

20         difficult or impossible for you to serve as a juror

21         in this case, such as, having served as juror before,

22         you feel like you learned things about the justice

23         system that have just caused you to have a bad taste

24         in your mouth and you just don't think you could

25         function again as a juror?  Anything like that?  If

1    so, please raise your hand.  I see no hands.

2        Do any of you believe that as a result of your

3    prior jury service you have acquired special

4    knowledge about how things work in a way that you

5    think that might affect the manner in which you would

6    serve as a juror this time?  Anything like that

7    that's occurred?  I see no hands.

8        Now, for those of you who served on civil cases,

9    of course, you are instructed that the burden of

10    proof was probably something along the lines of a

11    preponderance of the evidence, meaning more probably

12    true than not true.  But as we all, I think, know

13    from common knowledge, watching television shows, or

14    whatever it might happen to be, the burden of proof

15    in a criminal case, as I have already explained it,

16    is beyond a reasonable doubt.  That's a higher burden

17    of proof.  It's a different burden of proof than the

18    one that's in civil cases.  Do any of you who have

19    served as jurors on civil cases believe that you

20    would be confused by the fact that you have heard a

21    judge tell you in another case, in a civil case, that

22    the burden of proof was preponderance of the evidence

23    in that case?  If so, please raise your hand.  All

24    right.  I see no hands.

25        Now, if in response to either of these next

1    couple of questions you would like to come forward,

2    raise your hand, and I will ask you to do so.

3    Otherwise, we can talk about it in open court.

4         Let me first ask whether any member of the panel

5    at any time has been involved in a criminal matter in

6    any court that concerned either you, any member of

7    your family, a close friend, or your business, or

8    anything like that, in which you were either a

9    defendant, a witness, or a victim.  In other words,

10   any involvement at all in the criminal justice system

11   that's come close to home for you, I would like to

12   find out about that.  There's a yes.

13             MR. KING:  Yeah.  I need to come to the --

14             THE COURT:  Come on up.

15             (Counsel approached the bench and the

16   following proceedings were had:)

17             THE COURT:  Mr. King; is that correct?

18             MR. KING:  Yeah.  I have been arrested

19   twice.  I have been charged with -- I think it was

20   something like criminal mischief or something.  The

21   first time I was arrested was for possession of

22   marijuana, and the second time was for criminal

23   damage or criminal mischief or something like that.

24   I can't remember.  It never went to trial.  I mean, I

25   was -- it was dismissed both times, but I was a

1    defendant.

2              THE COURT:  All right.  Where did these

3    things occur?

4              MR. KING:  Johnson County.

5              THE COURT:  And how long ago?

6              MR. KING:  The first one was in '04.  I

7    think the other one was in '05.

8              THE COURT:  Do you feel like you were

9    treated fairly by the system or --

10             MR. KING:  Yeah.

11             THE COURT:  Do you harbor any sort of ill

12   feelings about what happened to you?

13             MR. KING:  No.

14             THE COURT:  Is there anything about your

15   prior experience that you think would affect your

16   ability to be fair and impartial both to the

17   government and to Mr. Frakes if you were a juror in

18   this case?

19             MR. KING:  I don't think so.

20             THE COURT:  Thanks.  Any questions from

21   you, Ms. Martin?

22             MS. MARTIN:  No, your Honor.

23             THE COURT:  Mr. Clarke?

24             MR. CLARKE:  I have a follow-up question.

25   Were the charges dismissed before you ever made any

1   court appearances, or did you have to actually go

2   make court appearances?

3            MR. KING:  I had to make an appearance,

4   yeah.  I had to make a few of them.

5            THE COURT:  All right.  Thank you.

6            (The proceedings returned to open court.)

7            THE COURT:  Anyone else?  I'll start in the

8   back to keep my mind better on that.  Ms. Wilson?

9            MS. WILSON:  Can I come up?

10           THE COURT:  Counsel?

11           (Counsel approached the bench and the

12   following proceedings were had:)

13           MS. WILSON:  I have a son that's involved

14   in a criminal case, an assault case.

15           THE COURT:  Where is that?

16           MS. WILSON:  Wyandotte County.

17           MS. MARTIN:  I'm sorry.  I didn't hear.

18           THE COURT:  She has a son involved in an

19   assault case in Wyandotte County.

20       Has he been prosecuted at this point?

21           MS. WILSON:  He's awaiting trial.

22           THE COURT:  Were you about to say something

23   more when I interrupted you?

24           MS. WILSON:  Well, there's another charge

25   on there, threat.  He supposedly made a threat.

1          THE COURT:  Do you feel like he's been
2     treated fairly thus far?
3          MS. WILSON:  Uh-huh.
4          THE COURT:  Do you harbor any ill feelings
5     about what's happened so far?
6          MS. WILSON:  No.
7          THE COURT:  Is there anything about that
8     experience that you think would affect your ability
9     to be fair and impartial both to the government and
10    Mr. Frakes?
11         MS. WILSON:  No.
12         THE COURT:  Ms. Martin, any questions?
13         MS. MARTIN:  No.
14         THE COURT:  Mr. Clarke?
15         MR. CLARKE:  No.
16         THE COURT:  You may be seated.
17         (The proceedings returned to open court.)
18         THE COURT:  Ms. Grogan?
19         MS. GROGAN:  I was a witness for the State
20    of Kansas in a rape and sodomy case in '88 or '89.
21         THE COURT:  Did you actually testify at
22    trial?
23         MS. GROGAN:  Uh-huh.
24         THE COURT:  Was this in a professional
25    capacity or a capacity of having observed something

1    occur?

2              MS. GROGAN:  Observed something.

3              THE COURT:  Okay.  And is there anything

4    about that experience that you think would affect

5    your ability to be fair and impartial here?

6              MS. GROGAN:  [Shook head.]

7              THE COURT:  I need you to answer out loud.

8              MS. GROGAN:  No.

9              THE COURT:  Thank you.  Other hands in the

10   jury box itself?  I see none.  In the row in front of

11   the jury box?  Ms. Vannaman?

12             MS. VANNAMAN:  If I could come up?

13             THE COURT:  All right.

14             (Counsel approached the bench and the

15   following proceedings were had:)

16             MS. VANNAMAN:  I have two sons who have

17   been in court before, one DUI and, he says, police

18   brutality, and also our youngest son has a mental

19   health problem.  He was arrested.  It just left a

20   sour taste in my mouth.

21             THE COURT:  You had some negative feelings?

22             MS. VANNAMAN:  Yes.

23             THE COURT:  What was he arrested for?

24             MS. VANNAMAN:  He kicked a hole in wall.

25   We called the police.  We wanted him to go to the

1 hospital.  They arrested him.  Charges were dropped,

2 but the whole process was not correct.

3    THE COURT:  Do you believe that's something

4 you could set aside and evaluate this case based only

5 on the evidence and the law?

6    MS. VANNAMAN:  I don't know.  I would try,

7 but I don't know.

8    THE COURT:  Obviously, there are some

9 similarities to this case and yours in the sense that

10 Mr. Frakes is a young man.

11    MS. VANNAMAN:  Uh-huh.

12    THE COURT:  I don't know the age of your

13 children.

14    MS. VANNAMAN:  In their twenties, yeah.

15    THE COURT:  A young man who has been

16 accused by the government of committing crimes, and

17 he's pled not guilty and is putting the government to

18 the burden of proof, yet on the other hand the

19 subject matter is different --

20    MS. VANNAMAN:  I understand.

21    THE COURT:  -- obviously, and there's no

22 indication from anything I've heard here that there

23 are people who were involved in your son's matter

24 that are involved here; correct?

25    MS. VANNAMAN:  No, no.

1          THE COURT:  As you think about that then --

2     let me put it to you this way.  What we don't want is

3     a juror who in the jury room says, well, whatever the

4     evidence is, whatever the law is, I just can't go

5     there, or, I'm going to find somebody guilty just

6     because, or, I'm going to find them not guilty just

7     because.  We can't have that, obviously.

8          MS. VANNAMAN:  No.

9          THE COURT:  Is that something you think

10     could occur here?

11          MS. VANNAMAN:  No.  I just think there's a

12     lot of variables that happen that can be avoided that

13     maybe sometimes aren't with the justice system.

14          THE COURT:  If the government puts on

15     evidence in this case that persuades you beyond a

16     reasonable doubt that the defendant is guilty of one

17     or both of the charges according to what I explain to

18     you the law is, do you believe you could bring back a

19     verdict of guilty on those charges?

20          MS. VANNAMAN:  Possibly.  With real good

21     evidence, possibly, yeah.

22          THE COURT:  Well, the government's burden

23     is beyond a reasonable doubt.

24          MS. VANNAMAN:  Okay.

25          THE COURT:  Would you hold it to beyond all

1    doubt whatsoever?

2              MS. VANNAMAN:  I would hope not.  I don't

3    know that.

4              THE COURT:  All right.  Conversely, if the

5    government's evidence fails to sustain its burden of

6    proof beyond a reasonable doubt, do you believe that

7    you could bring back a verdict of not guilty?

8              MS. VANNAMAN:  Yes.

9              THE COURT:  Ms. Martin, do you have any

10   questions?

11             MS. MARTIN:  Do you feel because of your

12   son's situation that you are already having negative

13   feelings about the evidence as it would come in and

14   that you would, as the judge said, hold the

15   government to putting more evidence on?

16             MS. VANNAMAN:  Possibly.  I just -- I don't

17   know.  I think there's a lot of evidence that we

18   don't see.

19             MS. MARTIN:  And because of that, because

20   of your situation, do you believe that you would be

21   speculating about what evidence you don't see?

22             MS. VANNAMAN:  Possibly.

23             MS. MARTIN:  And that you would demand more

24   from the government than you would in any other sort

25   of situation?

1          MS. VANNAMAN:  Possibly.  I don't know.  I

2     would not want to do that, but I don't know.

3          MS. MARTIN:  Everybody wants to be fair, I

4     know.  What we're talking about is whether or not in

5     your heart you believe that you would expect more out

6     of the government in the way of presentation of

7     evidence because of your situation.

8          MS. VANNAMAN:  Possibly.  It's hard, not

9     just because of that, but it's hard for me -- unless

10    I know 100 percent, it's hard for me to find someone

11    guilty.

12         MS. MARTIN:  So you would be asking for

13    proof beyond all possible doubt?

14         MS. VANNAMAN:  Possibly.  That's just how I

15    am, and I know it's probably not right.

16         THE COURT:  Mr. Clarke, do you have any

17    questions?

18         MR. CLARKE:  To follow up on Ms. Martin's

19    questions, she's asked you about whether or not you

20    would hold the government to a high standard.

21    Obviously, I think the judge has described that the

22    government has a high standard in a criminal case.  I

23    would anticipate that the judge would give you an

24    instruction that what you believe is reasonable doubt

25    is a personal decision, not one that's open to some

1    sort of formula or specific definition.  With that in

2    mind, we all have biases and prejudices.

3              MS. VANNAMAN:  I know.

4              MR. CLARKE:  Nevertheless, could you listen

5    to the evidence as presented?

6              MS. VANNAMAN:  Yes.

7              MR. CLARKE:  Do you think ultimately if the

8    evidence presented to you leads you to believe that

9    Mr. Frakes is innocent or not guilty, can you vote

10   for a verdict of not guilty?

11             MS. VANNAMAN:  Yes.

12             MR. CLARKE:  And by the same token, if you

13   believe the evidence presented to you establishes

14   that he's guilty, will you vote for a verdict of

15   guilty?

16             MS. VANNAMAN:  I would hope that I would be

17   able to.  You know what I mean?  I am embarrassed.

18   I'm sorry.  That's just how I feel.  I don't want --

19             THE COURT:  And let me get back in here.  I

20   think for anybody faced with jury service it may not

21   be possible to say 100 percent for sure how they are

22   going to react.

23             MS. VANNAMAN:  I know.

24             THE COURT:  That's part of being a human.

25   You can't 100 percent say how it's going to be.  But

1  what we need out of you, I think, is your best

2  assessment, because my next question will be

3  ultimately here, will you decide this case just on

4  the evidence and just on the law and not substitute

5  your own view of how life ought to be?  If your

6  answer to that question is yes, that's one thing.  If

7  your answer is, no, I'm going to decide this based on

8  things that go beyond the evidence and go beyond the

9  law, then we should excuse you.

10      MS. VANNAMAN:  I would try not to decide it

11  outside of what I heard.  I would try not to.

12      THE COURT:  Having had this conversation at

13  the bench about this, is that more likely to make you

14  able to do that now that you're really conscious of

15  what your duty would be along those lines?  Because

16  you would take an oath as a juror to do that.

17      MS. VANNAMAN:  I guess it would depend on

18  how good the evidence was.  I don't know what else to

19  say.  I'm sorry.

20      MS. MARTIN:  Your Honor, what I think I

21  hear her saying is that she's going to require the

22  government to prove the defendant guilty 100 percent,

23  she's going to need all of her doubts assuaged, and I

24  want her to correct me if that's --

25      MS. VANNAMAN:  That's probably true.

1    THE COURT:  Thank you.  Why don't you go on

2    back.  We may visit some more.  Ms. Martin?

3    MS. MARTIN:  Your Honor, we would ask to

4    have her removed for cause.  I think her personal

5    situation is such that she would require the

6    government to meet a higher burden than is legally

7    required.

8    THE COURT:  Mr. Clarke?

9    MR. CLARKE:  Your Honor, I don't hear that

10   from the juror.  What she said is that she would hold

11   the government to a high standard, which is what the

12   government has to do in this case, and she said that

13   she would want the government to resolve the doubt

14   that she has before she would convict.  I think

15   obviously this is why we don't get into defining

16   reasonable doubt.  I think we have gotten pretty

17   close to trying to define reasonable doubt with that

18   juror as opposed to simply leaving it to her to say

19   reasonable doubt.  And it's up to her to decide

20   what's reasonable doubt.

21   THE COURT:  Well, I may or may not agree

22   with what you just said, but at this juncture I'm not

23   going to grant your request.  I want to see how she

24   reacts to a few more questions here.  I think it's a

25   close question, but you can renew your objection.

1          MS. MARTIN:  Your Honor, if I might for the

2     record, I want to say I believe what she indicated

3     was she would request all doubt be assuaged.

4          THE COURT:  That's where I want to come

5     back with her one more time after she's had a chance

6     to think about that, because in all fairness, I don't

7     criticize counsel for doing this, but you led her

8     down that path, and I want to let her think about it

9     a little bit.

10          MS. MARTIN:  I understand.

11          THE COURT:  And I'll come back to it.

12          (The proceedings returned to open court.)

13          THE COURT:  Anyone else here who has an

14     answer with regard to this particular question with

15     regard to involvement in the criminal justice system?

16     Mr. Zinnecker?

17          MR. ZINNECKER:  Yes.  Also a witness in a

18     case against my former company.  It was an

19     embezzlement case.

20          THE COURT:  Did you actually testify in

21     court?

22          MR. ZINNECKER:  It was -- they had a

23     transcript there and everything outside of the court,

24     but they never called me in to -- because they ended

25     up settling out.

1      THE COURT:  Like a deposition, perhaps?

2      MR. ZINNECKER:  Yes.

3      THE COURT:  Is there anything about that

4   whole experience that you think would affect your

5   ability to be fair and impartial here?

6      MR. ZINNECKER:  I don't think so.

7      THE COURT:  Anyone else that I may have

8   missed?  Let me go back to Ms. Hansen.

9      MS. HANSEN:  I was a witness in a civil

10   case between Landmark and my neighbor.

11      THE COURT:  Did you actually testify at

12   that?

13      MS. HANSEN:  Yes.

14      THE COURT:  Anything about that case that

15   would affect your verdict?

16      MS. HANSEN:  No.

17      THE COURT:  Mr. Perry?

18      MR. PERRY:  About 40 years ago, 40 some

19   years ago, I had to testify in federal court on a

20   labor dispute.

21      THE COURT:  Anything about that that would

22   affect your ability to be fair and impartial?

23      MR. PERRY:  Not on something like that, no.

24      THE COURT:  I realized as I was thinking

25   about this that I neglected to ask you a question.  I

1    want to go back and pick up.  It's somewhat out of

2    sequence of when I would normally ask it.  I asked

3    you earlier about acquaintance with Mr. Kanatzer, and

4    we discussed that, but I didn't ask you whether any

5    of you are acquainted with other people who may be

6    involved in law enforcement in any capacity.  By that

7    I mean it could be a local police person, it could be

8    a sheriff, it could be a federal agent of some kind,

9    it could be a prosecutor or a judge, however you want

10   to define it, but somebody who is involved in the

11   criminal justice system.  Are any of you friends or

12   acquaintances of people in the criminal justice

13   system?  I'll start with you, Ms. James.

14           MS. JAMES:  My nephew is a policeman in

15   Johnson County.

16           THE COURT:  Thank you.  Next hand was Ms.

17   Wilburn.

18           MS. WILBURN:  I know quite a few of the law

19   enforcement officers and lawyers in Atchison.

20           THE COURT:  All right.

21           MS. WILBURN:  Judges.

22           THE COURT:  All right.  Like you said,

23   Atchison is not as large a town as we --

24           MS. WILBURN:  That's right.

25           THE COURT:  Ms. Hansen?

```
 1                  MS. HANSEN:  My father is a retired
 2        corrections officer; my brother is currently a
 3        corrections officer; and my brother-in-law is a
 4        border patrol agent.
 5                  THE COURT:  All right.  And corrections
 6        officers where?
 7                  MS. HANSEN:  Ellsworth.
 8                  THE COURT:  All right.  Mr. Duryea?
 9                  MR. DURYEA:  I have two friends on the
10        Wyandotte County Police Department, and my son is a
11        detective.
12                  THE COURT:  Here in Wyandotte County as
13        well?
14                  MR. DURYEA:  No.
15                  THE COURT:  Whereabouts?
16                  MR. DURYEA:  Troy, Missouri, outside St.
17        Louis.
18                  THE COURT:  All right.  Anybody else with
19        those connections?  Mr. Howell?
20                  MR. HOWELL:  My stepson is a Kansas City,
21        Missouri, police officer.  His wife is a member of
22        the Secret Service.
23                  THE COURT:  Anybody else in the chairs up
24        here?  All right.  In the back?  Mr. Newton?
25                  MR. NEWTON:  My brother-in-law is an
```

1          officer for Kansas City, Kansas.

2                    THE COURT:  Mr. Hennecke?

3                    MR. HENNECKE:  My stepfather is retired

4          from the Kansas City Missouri Police Department.  My

5          brother works for the Johnson County -- the official

6          title, he's in charge of interpreter services for the

7          Johnson County court system, and I work with my

8          uncle, who is an attorney and real estate broker.

9          I'm a real estate agent, so I don't really work in

10         the law aspect of the practice.  He is not a criminal

11         defense attorney.

12                   THE COURT:  Thank you.  Mr. Sickel?

13                   MR. SICKEL:  My father is a retired

14         attorney.

15                   THE COURT:  Did he do work on the criminal

16         side?

17                   MR. SICKEL:  No, no.  Civil.

18                   THE COURT:  Anybody else?  All right.  Let

19         me ask a couple follow-up questions about that.

20         First of all, with regard to those of you who have

21         described folks who were involved in law enforcement

22         in some capacity that are related to you or with whom

23         you're acquainted, do you know -- do any of you know

24         that those folks are involved in the investigation or

25         prosecution of cases involving alleged possession or

1    distribution of child pornography?  If so, please

2    raise your hand.  I see no hands.

3        Now a more general question.  Based upon your

4    acquaintance or relationship to people involved in

5    law enforcement, do any of you believe that that in

6    and of itself would cause you to tend to favor one

7    side or the other in a case such as this, either the

8    government or the defendant, simply because of your

9    acquaintance with or relationship to people in law

10   enforcement?  If so, please raise your hand.  All

11   right.  I see no hands.

12           MS. MARTIN:  Your Honor, could we approach

13   the bench, please?

14           THE COURT:  You may.

15           (Counsel approached the bench and the

16   following proceedings were had:)

17           MS. MARTIN:  Your Honor, I have on my list

18   Juror No. 15 as Melissa Watts.  My form indicates

19   that her occupation is attorney, and she did not

20   raise her hand.

21           THE COURT:  I'll follow up and inquire

22   about that.

23           MR. CLARKE:  She does civil litigation.

24           MS. MARTIN:  That could be.  I don't know

25   her.

1          THE COURT:  I suspect that's the answer.  I

2     will follow up and ask her about that.

3          MS. MARTIN:  Thank you.

4          (The proceedings returned to open court.)

5          THE COURT:  Now, clarifying the question I

6     asked before with regard to involvement with law

7     enforcement, there are some answers that have

8     addressed acquaintances of lawyers in the civil side

9     of things, so let me now just inquire, are any of you

10    yourselves lawyers or involved in -- either related

11    to or friends with people who are involved on the

12    civil side of law practice other than what we have

13    already had?  Ms. Watts, can you tell us a little bit

14    about that.

15         MS. WATTS:  I practice with Shornhurst

16    Austin & Kennard.  My practice is solely a civil

17    practice.

18         THE COURT:  What sorts of civil things?

19         MS. WATTS:  Everything from mechanics

20    liens, medical malpractice, products liability.

21         THE COURT:  Do you try cases yourself?

22         MS. WATTS:  I have not tried one, no.

23         THE COURT:  Have you sat in during trials

24    in cases?

25         MS. WATTS:  I have tried cases in the firm

1    that I was previously with, which was Cohen McNeile &

2    Pappas.  I have been with Shornhurst Austin Kennard

3    for -- it was three years in June.  I primarily now

4    do mechanics' liens, breach of contract-type

5    enforcement, things in Kansas and Missouri.

6              THE COURT:  Do you consider yourself

7    knowledgeable about the Federal Rules of Evidence?

8              MS. WATTS:  Somewhat.

9              THE COURT:  Have some of the practices you

10   have had been involved in federal court?

11             MS. WATTS:  Some of our cases are filed in

12   federal court, yes.

13             THE COURT:  When a person who is legally

14   trained is on the jury, obviously, there are a couple

15   of concerns that need to be addressed.  One is,

16   naturally, as someone who is legally trained, even

17   though you don't practice in the criminal area, you

18   have been taught about criminal law.  If you practice

19   in civil litigation in federal court, you've had some

20   experience with at least the Federal Rules of

21   Evidence, if not other legal rules that will be

22   involved in this case.  I will instruct you, of

23   course, as I will instruct everybody else, that it's

24   the jury's responsibility to decide what the facts

25   are.  It's the jury's responsibility alone to do

1    that.  I have no role as the judge in trying to

2    decide what the facts are.  I don't sit in the

3    deliberation room and sort of put in my two cents

4    about what I think happened or didn't happen.

5         By the same token, it is exclusively the judge's

6    role to explain what the law is, and it would violate

7    the oath of a juror if a juror substituted their own

8    view.  For example, a lawyer could second-guess the

9    judge's rulings and say, wait a minute.  That

10   shouldn't have come into evidence.  That violates the

11   rule against whatever.  You know, there could be some

12   thought process that would suggest that the juror

13   thought the judge should not have let certain

14   evidence in.  By contrast, any other thing in the

15   case that the judge might instruct about, the juror

16   who is legally trained might say, wait a minute.  In

17   law school I learned the rule was so-and-so.

18        Now, if you are selected to serve as a juror on

19   this case, do you believe you could set all of that

20   aside, follow the instructions the court gives you,

21   and not substitute your own judgment for that of the

22   court as the person whose responsibility it is to

23   decide and rule on and instruct on legal questions in

24   the case?

25             MS. WATTS:  I do believe I could follow the

```
 1            court's instructions.

 2                     THE COURT:  Anybody else in that situation?

 3            Ms. Schneider?

 4                     MS. SCHNEIDER:  Not quite the same.  I'm a

 5            paralegal.

 6                     THE COURT:  Where do you work?

 7                     MS. SCHNEIDER:  I work for a corporation.

 8                     THE COURT:  And are they involved in

 9            litigation?

10                     MS. SCHNEIDER:  No.  We send our litigation

11            to outside counsel.

12                     THE COURT:  What do you do as a paralegal

13            working with the corporation?

14                     MS. SCHNEIDER:  Drafting contracts.

15                     THE COURT:  Do you ever do any work that

16            takes you into court?

17                     MS. SCHNEIDER:  No.

18                     THE COURT:  All right.  Is there anything

19            you think about being a paralegal that would affect

20            your ability to be fair and impartial here?

21                     MS. SCHNEIDER:  No.

22                     THE COURT:  Anybody else with a hand?

23            Mr. Murray?

24                     MR. MURRAY:  I have responsibility over a

25            security department in a hospital.
```

         1              THE COURT:  Anything about that that you

         2     think would affect your ability to be fair and

         3     impartial?

         4              MR. MURRAY:  I don't believe so.

         5              THE COURT:  Mr. Perry?

         6              MR. PERRY:  Yeah.  Where I work at, we

         7     deal -- you know, I have to deal with a lot of this

         8     same thing we're going to be dealing with here.  I

         9     have to work these inmates, and I just --

        10     sometimes --

        11              THE COURT:  Let me ask you to come forward,

        12     if you would, please, so we can visit about that.

        13              (Counsel approached the bench and the

        14     following proceedings were had:)

        15              THE COURT:  Mr. Perry, for the record, what

        16     is your employment?

        17              MR. PERRY:  I work at the United States

        18     Disciplinary Barracks.  I work inmates.

        19              THE COURT:  And when you say you work

        20     inmates, what do you mean by that?

        21              MR. PERRY:  We employ them, keep them busy,

        22     keep them out of trouble.  We have a tremendous

        23     amount of sex crimes, a lot of child molestation, a

        24     lot of pornographic stuff.  I personally have caught

        25     inmates trying to save pornographic material, you

1    know, soldiers send or wives send photographs to

2    their husbands, and they would come back and -- what

3    we do is repair field equipment for the Army, and

4    they would find this stuff, and I would -- I would

5    locate it and find it and have to destroy it or turn

6    them in.

7         THE COURT:  Now, has that caused you to

8    come to this proceeding today with a preconceived

9    notion that someone who has been charged in

10   federal court by a grand jury with possession and

11   distribution of child pornography is probably guilty?

12        MR. PERRY:  I have actually worked inmates

13   with the same crime as this, and I felt as soon as

14   they were released, by just listening to them, that

15   they were going to commit the crime again.

16        THE COURT:  Well, my question to you here

17   is, does that mean then that you have come to this

18   case already kind of having made up your mind?

19        MR. PERRY:  Not really, but I just have a

20   feeling about it because I deal with them and I've

21   read a lot of their cases.

22        THE COURT:  All right.  Obviously, there's

23   been no evidence presented yet in this case.

24        MR. PERRY:  No.

25        THE COURT:  And I don't know what the

1    evidence is going to be myself, honestly, but there's

2    been no evidence presented in this case whatsoever.

3    So as we sit here right now, Mr. Frakes, we don't

4    know whether he has or has not done the things which

5    the government said he did, and the government has to

6    prove beyond a reasonable doubt that he did those

7    things.  Would you hold the government to that burden

8    of proof, beyond a reasonable doubt, or would you

9    kind of say, well, where there's smoke, there's fire.

10    They have charged him with it; he must be guilty.

11           MR. PERRY:  You can't do that.  You know,

12    he's innocent until proven guilty.

13           THE COURT:  You would make them prove this

14    case to you beyond a reasonable doubt before you

15    brought back a verdict of guilty?

16           MR. PERRY:  Yes.  Like I said, I'm just

17    uncomfortable with some . . .

18           THE COURT:  The next question I'm going to

19    ask the panel has to do with the subject matter of

20    this case being child pornography.  I'm going to ask

21    the jurors as a whole, so I'll ask you while you're

22    here whether or not the mere fact that this case

23    involves allegations about child pornography is such

24    an emotional subject or such a volatile subject that

25    the mere subject matter itself would make it so that

1    you couldn't be objective about it.  Is there

2    anything like that that you think because there are

3    allegations of child pornography you might bend over

4    a little bit more backwards to help one side or the

5    other?

6              MR. PERRY:  No.  Like I said, I deal with

7    them every day.  I try to -- it's to the point that I

8    have worked there so long that it's become

9    indifference.

10             THE COURT:  If the government in this case

11   puts on its case, its evidence, and you think, you

12   know what, they have not proven their case to me

13   beyond a reasonable doubt, would you be able to walk

14   back into this room and give a verdict of not guilty

15   in this case?

16             MR. PERRY:  I would hope to God I could,

17   your Honor.

18             THE COURT:  Thank you.  Follow-up

19   questions?

20             MS. MARTIN:  No, your Honor.

21             THE COURT:  Mr. Clarke?

22             MR. CLARKE:  I do, your Honor.  How long

23   have you worked at the DB?

24             MR. PERRY:  Since 1991.

25             MR. CLARKE:  And am I correct that during

1  that time the nature of the inmate population -- the

2  character of the inmate population has changed; true?

3          MR. PERRY:  Yes.

4          MR. CLARKE:  And the length of time that

5  they have their sentences there has changed

6  substantially; true?

7          MR. PERRY:  True.

8          MR. CLARKE:  And the percentage of the

9  population that are there for sex crimes has gone up

10  substantially, hasn't it, during that time period?

11          MR. PERRY:  Tremendous.

12          MR. CLARKE:  And it sounds to me like you

13  group inmates with sex offenses in a different

14  category than everybody else to some extent.

15          MR. PERRY:  You try not to but it's there.

16          MR. CLARKE:  Based upon your experience is

17  there anything that you can put your thumb on and

18  say, this is why they are different in my mind?

19          MR. PERRY:  The only thing that -- I truly

20  believe there's no rehabilitation for them.  There's

21  not.  They seem to be the biggest offenders that come

22  back into our system or some other system.

23          MR. CLARKE:  Now, are there personal

24  characteristics that you've identified in these

25  people that you look at and say, this is something

1    that is consistent with someone who is a child sex

2    offender, for example?

3                MR. PERRY:  Can you say that again.

4                MR. CLARKE:  Is there some personal

5    characteristic that you've noticed that you pick up

6    on that you say, I see this in a lot of the child sex

7    offenders, this personality trait, or something of

8    that nature?

9                MR. PERRY:  You can at times, yes.  Some of

10   them you can just -- you almost look at them and say,

11   I bet you that is a child sex -- like I said, I have

12   worked there a long, long time.  I have seen a

13   tremendous lot of sex offenders.  I've read some of

14   the cases.  Makes you sick.

15               MR. CLARKE:  Do you think that you would be

16   more or less predisposed to find someone guilty in a

17   case involving allegations of sex crime versus, let's

18   say, a battery or drug case?

19               MR. PERRY:  Only thing I can say is, I

20   would try to be very impartial, try to make a sound

21   judgment on it.  I would try to keep my personal

22   feelings out of it.

23               MR. CLARKE:  One of the things you said was

24   that you were concerned that when they get out of

25   there that you were concerned that they would

1      reoffend.

2              MR. PERRY:  Past history has shown that.

3              MR. CLARKE:  When you say that, are you

4      referring to people who have been accused of actually

5      sexually abusing children versus people who may

6      have -- one of the allegations in this case concerns

7      simply possession of child pornography.

8              MR. PERRY:  I'm mostly -- we mostly deal

9      with actual child molestation.

10             THE COURT:  And the record should reflect

11     that there are no allegations of child molestation in

12     this case.

13            MR. PERRY:  I understand that, your Honor.

14            THE COURT:  This is a case of alleged

15     possession and/or distribution of child pornography

16     by means of the internet.

17            MR. PERRY:  I understand that.  Like I

18     said, I did have one person that was my clerk that

19     was the same, and he made the statement before he

20     left, they are not going to take it away from me.

21            MR. CLARKE:  How long was he your clerk?

22            MR. PERRY:  For probably a year.  You know,

23     I will try to make a sound decision based on

24     evidence.

25            THE COURT:  Thank you, Mr. Perry.  You may

1    resume your seat.

2             (The proceedings returned to open court.)

3             THE COURT:  Were there any other hands up?

4             MR. TRYTTEN:  I don't think this means

5    anything.

6             THE COURT:  Pronounce your name for me,

7    please.

8             MR. TRYTTEN:  Trytten.

9             THE COURT:  Thanks.

10            MR. TRYTTEN:  My cousin is a retired

11   federal judge, and one of the corporate attorneys I

12   dealt with in business was convicted of bringing

13   pornographic material into the United States.

14            THE COURT:  All right.  Is there anything

15   about either of those things that would affect your

16   ability to be fair and impartial here?

17            MR. TRYTTEN:  I don't see where.

18            THE COURT:  Who is your cousin?

19            MR. TRYTTEN:  Russell Wilson in Minnesota.

20            THE COURT:  All right.  Thank you.  Anybody

21   else that had your hand up?  Ms. James?

22            MS. JAMES:  My fiance is an attorney with

23   the California Bar Association.  It's contractual,

24   not --

25            THE COURT:  Not criminal?  All right.

1    Thank you.  Anybody else that I may have missed?

2         Let me ask this next question.  I indicated

3    previously here that the subject matter of this case

4    involves allegations of possession and/or

5    distribution of child pornography over the 'net.

6    There are no allegations of molestation or those

7    kinds of things in this case.  Let the record be

8    clear about that.  The allegations are possession

9    and/or distribution of child pornography by means of

10   the internet.  That subject matter itself is one that

11   I want to make sure that there's nobody whose

12   reaction is, if those are the allegations, I can't

13   sit on the case, either because you just think that

14   there should be no laws which prohibit people from

15   possessing or distributing child pornography on the

16   one hand and therefore you could not find someone

17   guilty regardless of the evidence based upon your

18   views of what the law should be, or on the other hand

19   that the subject matter you think is such that, well,

20   if they have said somebody is involved in child

21   pornography, that's enough for me.  I think that's so

22   bad I would find them guilty automatically almost

23   without even hearing much evidence in the case.  Is

24   there anyone that has those kind of feelings on

25   either of those extremes about the subject of child

1  pornography as being the nature of the charges in

2  this case?

3         MR. DURYEA:  I do.

4         THE COURT:  Mr. Duryea, why don't you come

5  forward.  Let's talk about it.

6         (Counsel approached the bench and the

7  following proceedings were had:)

8         THE COURT:  Let's let you explain what you

9  would like to explain.

10        MR. DURYEA:  Okay.  That type of thing just

11  sickens me, quite frankly.  I have had children, and

12  if someone did that to my children and I could have

13  got my hands on them, I would have beat the hell out

14  of them.  I don't think the laws are strict enough,

15  and I see too many times these people get patted on

16  the hand and that's about it, and so that's my

17  feelings on it.

18        THE COURT:  All right.  Now, let me just

19  explore some aspects of that with regard to your

20  service, potentially, on this jury.  First of all,

21  with regard to this case, it is not about whether or

22  not possession or distribution of child pornography

23  is good or bad.  The law has defined it as illegal;

24  therefore, that's not the debate we're having here.

25  The question in this case for the jury is to

1    determine whether or not the government's evidence

2    persuades the jurors beyond a reasonable doubt that

3    the defendant did what the government said he did,

4    which is to possess child pornography and to

5    distribute child pornography.  Now, the concepts of

6    possession and distribution are legal ideas that

7    you'll be instructed on by the court later on, and

8    you'll be expected to apply those instructions to the

9    evidence that the government gives to you, but you

10    will not be asked to sort of second-guess the laws

11    and say whether or not you think child pornography is

12    a good or bad thing.  Do you think -- understanding

13    that you think child pornography is a bad thing, do

14    you believe that if the government puts on its case

15    here and despite what your feelings are you think

16    they have not satisfied you beyond a reasonable doubt

17    that the defendant did what they said he did, do you

18    believe you could bring back a verdict of not guilty?

19          MR. DURYEA:  If they could not prove their

20    case?

21          THE COURT:  Right.  Could you bring back a

22    verdict of not guilty, or would you simply say, you

23    know, where there's smoke, there's fire.  They have

24    charged this guy with it, and by golly --

25          MR. DURYEA:  I may not like it, but I'm not

1      going to put someone in jail just because I don't

2      like it, if that's what you're asking me.

3              THE COURT:  That's a very succinct way of

4      putting it, Mr. Duryea, and that really is the point,

5      because people have all sorts of views, and it's

6      perfectly permissible for you to have the views that

7      you have about child pornography.  The real question

8      is, would you let those views get in the way of

9      deciding this case just on the evidence and the law?

10

11             MR. DURYEA:  I would certainly hope not.

12             THE COURT:  Do you also understand that

13     punishment is not something that the jury will be

14     called upon to do?  If the defendant were to be found

15     guilty, that's something that the court has to do,

16     and the jury doesn't play -- will not be asked to

17     play a role in that.

18             MR. DURYEA:  I understand that.

19             THE COURT:  Is that something that is so

20     troubling to you that you think that would get in

21     your way of doing part of the job that you are

22     supposed to do, and that is, determining whether or

23     not the government has satisfied its burden of proof?

24     The reason I ask that, of course, is your statement

25     about hand slaps and so forth.

1          MR. DURYEA:  Yeah.  Yeah, I might have

2     trouble with that.

3          THE COURT:  I think it's important for you

4     to not assume that you know all there is to know

5     about how people who are found guilty of these crimes

6     are dealt with.

7          MR. DURYEA:  I'm not trying to do that,

8     your Honor.

9          THE COURT:  And I'm neither criticizing you

10    nor confronting you on that point.  I just want to

11    have you think in terms of what your job is here.  If

12    you're on this jury, your job is not to score a point

13    for society; your job -- and I don't mean to be silly

14    about that, but it is important, I think, to

15    underscore that your job is to decide whether or not

16    the government has met its burden of proof beyond a

17    reasonable doubt as the law of this country exists

18    here and now.  If that's something you think you

19    could not do because of your personal views, I will

20    excuse you.  If, on the other hand, you believe that

21    you can set aside your personal views in evaluating

22    that evidence and deciding whether or not the

23    government has satisfied its burden of proof under

24    the law as I instruct you, that's a different matter.

25    How do you react to that?

1    MR. DURYEA:  I don't think I could set them

2    aside.

3        THE COURT:  All right.  You're excused.

4    Thank you, Mr. Duryea.

5        (The proceedings returned to open court.)

6        THE COURT:  Mr. Duryea, please check back

7    in Friday, July 24, after 6:00 p.m.

8        MR. DURYEA:  Yes, your Honor.

9        (The next prospective juror was called

10   forward by the courtroom deputy.)

11       THE COURT:  Mr. Stevens, have you been able

12   to see and hear what has gone on so far?

13       MR. STEVENS:  Yes.

14       THE COURT:  Would you have raised your hand

15   in answer to any of the questions that I have asked

16   so far?

17       MR. STEVENS:  The only ones would be on

18   conflicts.  I have a medical procedure Thursday that

19   possibly could be delayed, but no later than next

20   week, and I have -- I'm out of town on Monday.  I

21   received a prior excuse on that for this coming

22   Monday.

23       THE COURT:  All right.

24       MR. STEVENS:  But nothing else.

25       THE COURT:  You would be back by Tuesday?

1     MR. STEVENS:  Yes.

2          THE COURT:  All right.  Thank you.  Anybody

3     else with an answer or you would have raised your

4     hand to my question about the subject matter of this

5     case and strong feelings about it?  Mr. Siberg?

6          MR. SIBERG:  Do you want me to approach

7     or --

8          THE COURT:  Well, come on down.

9          (Counsel approached the bench and the

10    following proceedings were had:)

11         MR. SIBERG:  I'm not sure this is the

12    appropriate format to answer this question, but I'm

13    going to at this point anyway.  It's not so much the

14    subject matter, but it's the distribution method, and

15    why I say that is, I'm in an industry which survives

16    on not sharing information without copyright.  I work

17    in the music industry, and so when Limewire is

18    involved, that impacts my business, and so any file

19    sharing, whether it be copyrighted material or not,

20    affects my -- I don't want to say -- my opinions

21    about people who use those services.

22         THE COURT:  A couple things.  One is on the

23    direct point.

24         MR. SIBERG:  Uh-huh.

25         THE COURT:  Would you be so irritated about

1    someone who used the Limewire service that you would

2    be inclined to find them guilty of a crime which

3    otherwise the government's evidence didn't show they

4    had committed?

5              MR. SIBERG:  I would like to think that I

6    would be above that.

7              THE COURT:  Hopefully you wouldn't be so

8    mad that you would find somebody guilty of something

9    they didn't do.

10             MR. SIBERG:  Right.  That would not --

11             THE COURT:  Now, I'm not familiar with

12   Limewire at all.  This is the first exposure I've had

13   to it at all.  I'm familiar with some other file

14   sharing programs, but I don't know anything about

15   this particular program.  The role of the jury in

16   this case is to evaluate the evidence as presented

17   and take it in the context of the instructions that I

18   will give you on the law and decide whether or not

19   the government has sustained its burden of proof.

20        Now, personal aspects about things simply are

21   not an appropriate part of that evaluation process,

22   and it would not be right for a juror to take into

23   account some sort of extraneous factor and say, for

24   example, I think a person who uses a particular file

25   sharing program is a bad person.  I'm using that as a

1    general term.

2              MR. SIBERG:  Sure.

3              THE COURT:  And therefore because of that I

4    think they must have committed this crime.

5              MR. SIBERG:  Right.

6              THE COURT:  It's perfectly fine to think

7    they are a bad person, but to then draw the next

8    conclusion, that they must have committed this crime,

9    is where it would be improper and violating a juror's

10   oath.  Do you think you could make that distinction?

11             MR. SIBERG:  I can calm your fears on that.

12   I can make that distinction, yes, but I wanted to let

13   you know that.

14             THE COURT:  No, no, no.  You're doing the

15   right thing, but I have to ascertain exactly where

16   you're coming from.

17             MR. SIBERG:  Absolutely.

18             THE COURT:  The other question is, you do

19   seem to have quite a bit a knowledge about the

20   Limewire program, and just as I asked the woman who

21   is a lawyer about her substituting her views about

22   legal things for what the court says the law is, it

23   also isn't proper for a juror to become sort of like

24   an expert witness back in the deliberation room.

25   There will be testimony presented at trial about, I

1    assume, about the Limewire program, how it works,

2    etc., etc.  Of course, you have to evaluate that like

3    any other juror if you're selected based upon your

4    experiences in life up to this point, but it isn't

5    appropriate, for example, for a juror to get back in

6    the deliberation room and say, look, I know a lot

7    more about this subject than the witness who

8    testified, or whatever, because you're not subject to

9    cross examination, what did you think about this?

10   What did you think about that?  Oh, my God, good

11   point.  I hadn't thought about that.  The whole

12   process we have in the courtroom is to make sure when

13   a witness testifies about something everybody can

14   rest assured that they have thought about all the

15   things they can think about.  So would you be able to

16   keep from being sort of an expert witness in the

17   deliberation room about this Limewire program if

18   you're selected?

19        MR. SIBERG:  I would like to feel that I

20   would be as professional about that as I possibly

21   could, yes.

22        THE COURT:  Do you have any questions?

23        MS. MARTIN:  No, your Honor.

24        THE COURT:  Mr. Clarke?

25        MR. CLARKE:  No, your Honor.

1          (The proceedings returned to open court.)

2          THE COURT:  Ms. Caputo?

3          (Counsel approached the bench and the

4     following proceedings were had:)

5          MS. CAPUTO:  A crime of this nature is

6     really heart-breaking for me.  Any crime with a child

7     or elderly is always hard for me to deal with.  I

8     have two beautiful girls, and the thought of them

9     being victims like this breaks my heart.  I can't

10    imagine.  I just can't.

11         THE COURT:  Now, obviously, I don't think

12    there's any question here about the validity of what

13    you're saying.  You've expressed views that I'm sure

14    most everybody in this room would absolutely share.

15         MS. CAPUTO:  Yeah.

16         THE COURT:  The issue in this case, of

17    course, is not whether possessing or distributing

18    child pornography is good or bad; the issue in this

19    case is whether or not the government's evidence

20    proves beyond a reasonable doubt that Mr. Frakes did

21    what they said he did.  Did he possess these

22    materials or not?  Did he distribute these materials

23    or not?  And I'm oversimplifying it.  Those terms are

24    subject to some legal definitions and so forth, but

25    my point is that that's the process here that the

1     juror needs to be engaged in if they are going to sit

2     on this case, is, did what the government says

3     Mr. Frakes did, did that happen according to the

4     instructions that the court gives you?

5         Now, what we would not want to have happen would

6     be to have a juror who says, you know, I don't really

7     know whether the government has satisfied their

8     burden of proof or not, but it's close enough, sort

9     of where there's smoke, there's fire, or, this is

10    such a horrendous thing that I'm going to find this

11    person guilty because I would rather err on the side

12    of that than something else.  Do you see what I'm

13    saying the distinction is there?

14        MS. CAPUTO:  Yes.

15        THE COURT:  Do you believe that your

16    feelings about this are so strong that you would be

17    unable to decided this case solely on the evidence

18    and the law but would instead allow your personal

19    feelings to take over?

20        MS. CAPUTO:  It's kind of hard, hard one

21    for me.

22        THE COURT:  It's a very hard question.

23        MS. CAPUTO:  I'm a fair person, honest, and

24    I would want to be -- I would want not to be

25    judgmental.  I am kind of -- to be honest, I'm almost

1    thinking that I might tend to lean in the direction

2    that there's a possibility that that happened, that

3    that crime might have happened.

4           THE COURT:  And you mean you think there's

5    a possibility -- I want to make sure I understand

6    what you're saying.  Are you saying you think there's

7    a possible that your feelings would sort of overcome

8    your ability to evaluate it objectively?  Is that

9    what you're saying?

10          MS. CAPUTO:  I think it's possible, yes.

11          THE COURT:  Okay.  Understanding that if

12    you are selected you will take an oath that says that

13    you will decide the case solely on the evidence and

14    on the law, do you think you -- and having had this

15    occasion to think about it and confront the fact that

16    that's what your role would be, do you think that you

17    could overcome that and serve according to that oath

18    to decide the case exclusively on the evidence and on

19    the law?

20          MS. CAPUTO:  I would be truthful.  I can do

21    that and make a judgment according to the evidence.

22          THE COURT:  Here is the bottom line in that

23    respect.  If the government sustains its burden of

24    proof and satisfies you beyond a reasonable doubt

25    that the defendant is guilty of one or both of the

1    charges, I understand you would be able to bring back

2    a verdict of guilty; is that correct?

3            MS. CAPUTO:  I'm sorry.  Could you --

4            THE COURT:  If the government satisfies you

5    that they have met their burden of proof beyond a

6    reasonable doubt that the defendant is guilty, you

7    would be able to bring back a verdict of guilty on

8    one or both counts, whatever the circumstances are;

9    is that correct?

10           MS. CAPUTO:  Uh-huh.

11           THE COURT:  Likewise, if the government in

12    your view does not sustain its burden of proof, no

13    matter if you think, well, I think he probably did

14    it, I think he more likely than not did it, but I

15    don't think it's beyond a reasonable doubt that he

16    did it, would you then be able to bring back a

17    verdict of not guilty on those charges, even

18    harboring some thoughts that you think he probably

19    did it?  Because that's the standard, beyond a

20    reasonable doubt, not beyond all doubt, but beyond a

21    reasonable doubt.

22           MS. CAPUTO:  If I had a gut feeling that he

23    might have been guilty as charged but the evidence

24    shows otherwise, would I be able to say not guilty?

25           THE COURT:  Could you vote not guilty?

1   That's right.

2           MS. CAPUTO:  Probably.  It's hard to

3   separate my gut feelings, emotions in this particular

4   field.

5           THE COURT:  Believe me, I totally

6   understand.  And nobody is criticizing you here.

7   You're not on the -- I know you feel on the spot.

8   We're hovering over you like we're about to pull out

9   a rubber hose or something, but that is not what

10  we're trying to do.  We're just trying to find out

11  whether you think you could overcome on this

12  particular subject the strongly held views you have

13  and decide this case objectively on the evidence and

14  bring back a verdict of not guilty even if you

15  thought it was more likely true than not that the

16  defendant was guilty if you don't think the

17  government has persuaded you beyond a reasonable

18  doubt that he's guilty.

19          MS. CAPUTO:  I could probably do that.

20          THE COURT:  Do you have any questions, Ms.

21  Martin?

22          MS. MARTIN:  As you stand here today, do

23  you feel that the defendant is guilty right now?  You

24  haven't heard any evidence.

25          MS. CAPUTO:  I haven't heard any evidence.

1    To be honest, I'm kind of assuming that he may be.

2    To me, I don't see how he could get this far and not

3    be.

4         MS. MARTIN:  The law requires that he has

5    the right to have a jury trial, and we can come in

6    here, and we can present evidence, and if there would

7    be maybe a hole in the evidence where there was some

8    reason why you weren't convinced beyond a reasonable

9    doubt -- and that's what trials are for, for you guys

10   to decide.

11        MS. CAPUTO:  Right, uh-huh.

12        MS. MARTIN:  Do you think that you would

13   listen to the evidence and require me to present that

14   evidence to you before you would be willing to vote

15   guilty?

16        MS. CAPUTO:  I would be able to do that, to

17   listen.

18        MS. MARTIN:  You would require that of the

19   government?

20        MS. CAPUTO:  Yes, I would require that.

21        THE COURT:  If I were to ask you right now,

22   if I said right now you have to vote guilty or not

23   guilty, how would you vote?

24        MS. CAPUTO:  My gut feeling would say

25   guilty.

1      THE COURT:  Okay.  Now, let's walk you back

2   through.  I mentioned the presumption of innocence;

3   right?

4      MS. CAPUTO:  Right.

5      THE COURT:  So we start off with the idea

6   that -- and the reason for all this is to protect

7   every one of us.  Nobody wants the government walking

8   in our house and saying, you know, you did a crime.

9   I'm going to haul you off to court.  I'm going to put

10   you in front of a bunch of people and a guy in a

11   black robe, and we're going to put you in jail

12   because we don't like you.  That's why we have these

13   protections built into our system, is to protect each

14   and every one of us from a government which hopefully

15   we never have which would do something like that.

16   Therefore, when somebody walks into this courtroom,

17   it's as if that person -- it counts for nothing that

18   that person is having to sit there right now because

19   there is no evidence against that person.  Maybe

20   somebody somewhere who has a badge, or whatever, has

21   said they did something wrong, but that doesn't count

22   for anything until you, the jury, hear what the

23   evidence is and see whether or not they really have

24   satisfied that burden of proof.  That's how we

25   protect everybody from getting -- having that

1   situation occur.  Now, therefore, as we sit here

2   today with the presumption of innocence and no

3   evidence having been presented, if you had to vote

4   right now, the only possible vote is not guilty

5   because you've heard no evidence and the law presumes

6   Mr. Frakes to be not guilty.

7           MS. CAPUTO:  Okay.

8           THE COURT:  Now that I've explained it in

9   more detail, do you disagree with that conclusion?

10          MS. CAPUTO:  No, I agree with it, and I

11  respect it, and I agree with that.

12          THE COURT:  All right.  Mr. Clarke?

13          MR. CLARKE:  Ma'am, when we first came up

14  here, it seemed like you were starting to feel

15  emotional, tears, whatever, and one question I have

16  for you is, was that because this is something that's

17  nerve-wracking to be up here, or was it more you were

18  kind of feeling the emotion of the subject matter?

19          MS. CAPUTO:  Subject matter.

20          MR. CLARKE:  With that in mind, if you are

21  ultimately selected to participate in this jury, you

22  would be expected to go back to deliberations and be

23  able to discuss the evidence as presented freely with

24  the other jurors.  Do you have any concern that your

25  emotional feelings about the subject matter would

1    hinder your ability to freely discuss the evidence

2    that you heard during the course of the trial?

3            MS. CAPUTO:  I think I could discuss it.

4            MR. CLARKE:  Do you think that it would --

5    I don't have a reason to suspect this, but do you

6    think that it would cause you to maybe try to rush to

7    a verdict just to avoid dealing with the subject

8    matter any more?

9            MS. CAPUTO:  No.

10           THE COURT:  Ms. Martin?

11           MS. MARTIN:  I don't have anything.

12           THE COURT:  Counsel, remain here, if you

13   would, for a second.  What I would plan on doing is

14   taking a lunch recess after I complete my portion of

15   the voir dire.  I told you yesterday my preference in

16   life is to not have it work that way, but I had a

17   sneaking suspicious we would have a few of these

18   conversations with folks.  Then we will pick up with

19   your all's portion of the voir dire after lunch.

20   Whenever we stop, we stop, but that's what we will

21   do.

22           (The proceedings returned to open court.)

23           THE COURT:  Were there other hands on that

24   particular subject about the nature of this

25   particular case?  All right.  I see no hands.

1        Now, let me just say to you all, by the way,

2    normally we take breaks at about somewhere between an

3    hour and a half, hour, 45 minutes.  Because of the

4    way in which the jury selection process works, I'm

5    going to ask you to bear with me just a little bit

6    longer here this morning before we take a break.  My

7    motive is to try to get this over sooner for those of

8    you, which is most of you, who will be excused so you

9    can get on about your life.  I realize that that's a

10   bit of an imposition in many respects to keep going

11   straight ahead, but if you'll bear with me,

12   hopefully, that will make this go more efficiently

13   for everybody concerned.  Let me ask this question to

14   all of you, and it's a corollary, really, of some of

15   the things we have been talking about, but I'm going

16   to ask you in a legalese way and then in plain

17   English.

18       My question is this.  If you are selected to sit

19   on this case, will you be able to render a verdict

20   solely on the evidence presented at the trial and on

21   the law as I will give it to you in my instructions,

22   disregarding any other ideas, notions, or beliefs

23   about the law you may have developed in your life's

24   experience?

25       If your answer is no, please raise your hand.  I

see no hands.  Let me say the more plain English
version of it.  I'm not sure I would know what that
question is if I heard it for the first time.  I've
read it a bunch of times.  I think I know what it
means, but I'm not sure if I would if I were you.
Here is what this is about.  The role of the jury is
to decide what the facts are, and you alone will be
the judges of the facts.  By the same token the judge
is exclusively the person who tells you what the law
is.  You may hear in my instructions that I give you
a description of the law, and you might say, wait a
minute.  I don't think that's correct.  I watched,
you know, Law and Order the other night, and they
said the law was something different.  Well, if I've
gotten it wrong, there's an appeals court who can
straighten me out.  It's not your job to second-guess
whether or not I've gotten it right.  Second, you
might hear me say what the law is, and you might say,
that may be the law, but that's a bad law, and this
is my chance to make it right, and I'm going to apply
a different version of what the law ought to be.
That would also violate the oath of a juror.  If a
law is wrong, it ought to be changed by Congress or
by the Supreme Court, but it isn't supposed to be
changed by you and me.  My job is to tell you what I

1   believe the law is.  If I get it wrong, somebody will

2   set me straight.  Your job is to apply that law as I

3   give it to you.  Now, is there anybody who believes

4   that you could not follow that approach and adhere to

5   the court's instructions?  If that's a problem for

6   anybody, please raise your hand.  I see no hands.

7        Now, Ms. Scheurer, I would like to have the

8   prospective jurors answer the biographical questions,

9   if you would.  You have handouts for the folks out

10  front?

11            THE COURTROOM DEPUTY:  I do.

12            THE COURT:  For those of you who are in the

13  jury box, you can look at the screen, and we will get

14  started with you as Ms. Scheurer hands out the sheets

15  to the other people.  Ms. McNemee, if you would begin

16  by answering the questions on the screen, I would

17  appreciate it.

18            MS. MCNEMEE:  Out loud; right?

19            THE COURT:  Yes, ma'am.  Thank you.  That

20  would be helpful.

21            MS. MCNEMEE:  Number one, Highland, Kansas,

22  is my residence.

23            THE COURT:  All right.

24            MS. MCNEMEE:  Occupation, I do payroll at a

25  community college.  Marital status is I'm married.

1    Spouse's occupation, he works for Snorkel at Elmwood,

2    Kansas.  Amount of education, I have one year of

3    college.  Number of children, I have two.  One is 24

4    and the other one is 29.  Michael, my son, is 24.

5    He's in the Army.  This is his seventh year.  And my

6    daughter is a CPA in Topeka.

7              THE COURT:  Thank you very much.

8    Mr. Lumianski?

9              MR. LUMIANSKI:  I live in Leawood, Kansas.

10   I have been a business owner for 28 years, and I sold

11   it last year.  I'm married.  My wife is a housewife.

12   I have four years of college.  I have four children,

13   44 and 42 and 40 and 38.  Two of them live in

14   Overland Park, and one lives in Orange County,

15   California; one lives in Brooklyn, New York.

16             THE COURT:  Thank you.  Ms. Silverman?

17             MS. SILVERMAN:  I live in Overland Park.  I

18   am retired.  Marital status, married.  My husband

19   works for Price Chopper.  I've had some college,

20   about three years.  No degree.  I have two children,

21   39 and 35.  One lives in Boston, Massachusetts, and

22   the other lives here in Overland Park.

23             THE COURT:  Thank you.  Ms. James?

24             MS. JAMES:  Olathe is my residence.  I'm a

25   director of marketing.  I am single.  My fiance is a

1   lawyer.  I have three years of college.  I didn't get

2   my degree.  I have two children.  My son is 46; my

3   daughter is 43.  My son has a lumber company.  My

4   daughter is a housewife.  My son lives in Holt,

5   Missouri, and my daughter lives in Tonganoxie,

6   Kansas.

7           THE COURT:  Thank you.  Ms. Wilburn?

8           MS. WILBURN:  Atchison.  I work in medical

9   records at the Atchison Hospital.  I'm married.  My

10  husband works for the Union Pacific Railroad.  He is

11  off on medical leave right now.  I graduated from

12  high school.  I have two children.  My daughter is

13  34; my son is 32.  My daughter works for payroll at

14  Farmland, and she resides in Westin, Missouri.  My

15  son is 32.  He works as a head of maintenance down at

16  Leavenworth at the fort.

17          THE COURT:  Ms. Hansen?

18          MS. HANSEN:  Effingham, Kansas.  I am a

19  teacher.  I am single.  I have two bachelor's degrees

20  and no children.

21          THE COURT:  Thank you.  Ms. Wilson?

22          MS. WILSON:  I live in Edwardsville,

23  Kansas.  I'm an assistant manager in the retail

24  business.  I'm divorced.  I have four years of

25  college.  I have two sons.  One is 32 and one is 26.

1    One lives in New York and one in Edwardsville.

2                THE COURT:  Thank you.  Ms. Major?

3                MS. MAJOR:  Kansas City, Kansas, is my

4    residence.  Occupation, I work at St. Luke's

5    Hospital.  I am married.  My spouse's occupation is

6    retired.  Amount of education, 12 years of education.

7    Number of children, one, and he's 43 years old, and

8    his occupation is UPS.

9                THE COURT:  Thank you.  Mr. Murray?

10               MR. MURRAY:  Lenexa, Kansas.  I'm a

11   director of security at a hospital.  I'm married.  My

12   wife is a meeting planner.  I have a master's degree.

13   I have one daughter, 13 years old.

14               THE COURT:  Thank you.  Mr. Perry?

15               MR. PERRY:  My residence is rural

16   Leavenworth County, closer to Tonganoxie.

17   Occupation, work in the United States Disciplinary

18   Barracks.  Marital status, married.  Spouse is

19   retired.  I have 12 years of education.  I have two

20   stepchildren.

21               THE COURT:  Thank you.  Mr. Trytten?

22               MR. TRYTTEN:  I live in Overland Park.  I'm

23   retired for three years.  Prior to that I was

24   vice-president of International Paper, importing.

25   Married.  My wife is an RN who substitutes as a nurse

1    at Olathe schools.  I have a college education.  I

2    have two boys, 36 and 32.  Thirty-six-year old is in

3    sales, lives in Wichita.  The 32-year-old manages

4    property and lives in Lawrence.

5                THE COURT:  Thank you.  Mr. Siberg?

6                MR. SIBERG:  My residence is in Olathe.  I

7    am a music manager with Barnes & Noble.  I have a

8    lovely wife who is a licensed massage therapist, and

9    I actually have a bachelor's degree plus two years of

10   grad school, but I did not complete that degree.

11               THE COURT:  Thanks.  Mr. King?

12               MR. KING:  I live in Mission, Kansas.  I'm

13   a restaurant manager.  I am not married, and I have

14   got a high school equivalency.  No children.

15               THE COURT:  Thank you.  Ms. Grogan?

16               MS. GROGAN:  I live outside of Basehor,

17   Kansas, and I am a call center manager for a

18   telecommunications company.  I am married.  My spouse

19   is a truck driver for a company in Lansing.  I have a

20   bachelor's degree, two children, daughters.  One is

21   27, and she's a school teacher, high school teacher,

22   in Fort Worth, Texas.  The other one is 22, and she's

23   going to KU nursing program, and she lives in Kansas

24   City, Kansas.  I have three stepchildren.

25               THE COURT:  Thank you.  Ms. Watts?

1          MS. WATTS:  I live in Overland Park,

2     Kansas.  I'm an attorney.  I'm married.  My husband

3     is associate corporate counsel at Community America

4     Credit Union.  I have my law degree.  I have three

5     children, 13, three, and one.

6          THE COURT:  Thank you.  Mr. Dallman?

7          MR. DALLMAN:  I live in Lawrence, Kansas.

8     I'm a sales manager.  I am married.  My wife is a

9     real estate broker.  I have a bachelor's degree, one

10    child.  His age is six, so he doesn't have an

11    occupation.

12         THE COURT:  Thank you.  Ms. Wiltsey?

13         MS. WILTSEY:  Overland Park, Kansas.  My

14    occupation, I'm an insurance sales specialist for a

15    financial services company here in Kansas City.  I'm

16    single.  I'm getting married in December.  My fiance

17    is in the freight business.  I have a bachelor's

18    degree, several insurance licenses.  I have four

19    children, 24, 22, 20, and 18.

20         THE COURT:  Thank you.  Ms. Vannaman?

21         MS. VANNAMAN:  I live in Overland Park,

22    Kansas.  I'm a para educator for Shawnee Mission

23    School District and also a real estate agent.  I am

24    married.  My husband just retired after 33 years as a

25    claims manager.  I have two and a half years of

1 college, and I have a 31-year-old son who is a

2 firefighter.  He lives in Overland Park.  I have a

3 29-year-old son who is a massage therapist in Miami,

4 and I have a 26-year-old son, not working.  Lives in

5 Overland Park.

6     THE COURT:  Thank you.  Mr. Wright?

7     MR. WRIGHT:  I live in Mission, Kansas.

8 I'm a computer graphics designer.  I am married.  My

9 wife is a bankruptcy paralegal.  I have a master's in

10 education and no children.

11     THE COURT:  Thank you.  Ms. Hardin?

12     MS. HARDIN:  I live in Lenexa.  I'm a

13 nurse.  I'm married.  My husband is an accountant.  I

14 have my bachelor's, and I'm currently enrolled in

15 grad school for my master's.  I have three children,

16 19, 17, and 12.  They are all students and live in

17 Lenexa with me.

18     THE COURT:  Mr. Vanhoose?

19     MR. VANHOOSE:  I live in Olathe.  I am a

20 manager of quality operations for Honeywell.  I'm

21 married.  My spouse is a clinical research resource

22 nurse at the Olathe Hospital.  Two years of college.

23 Two children: one, 28, is an engineer; one, 26, and

24 she's a nurse.

25     THE COURT:  All right.  Thank you.

1          Mr. Howell?

2                    MR. HOWELL:  I live in Shawnee, Kansas.  I

3          am a school bus driver for the De Soto School

4          District.  Prior to that I was a maintenance manager.

5          I'm married.  My spouse is a nurse anesthetist.  I

6          have a bachelor's degree.  I have a stepson I

7          mentioned earlier, and I have a 41-year-old daughter

8          who is an insurance underwriter, and she lives in

9          Lenexa.

10                   THE COURT:  Mr. Aupperle?

11                   MR. AUPPERLE:  Yes.  I live in Lenexa,

12         Kansas.  I have been retired for the last year and a

13         half.  Prior to that I was vice-president of sales

14         and marketing for a company for 36 years.  I am

15         married.  My wife is a surgery scheduler for a

16         doctor's office.  I have a bachelor's degree in

17         business administration.  I have three children.  My

18         oldest daughter is 39.  She's a landscape architect.

19         She lives in Prairie Village.  My son is project

20         manager for a construction company in Durango,

21         Colorado.  My third daughter, or my third child, is a

22         physical therapist, and she lives in western Shawnee.

23                   THE COURT:  Thank you.  Ms. Caputo?

24                   MS. CAPUTO:  I'm from Olathe, and I am a

25         graphic designer, and my husband is a stay-at-home

1    dad, and I have a BFA, and I have two children.  One

2    is nine and one is six.

3              THE COURT:  Thank you.  Ms. Schneider?

4              MS. SCHNEIDER:  I live in Overland Park.

5    I'm a paralegal, and prior to that I was a case

6    manager.  I'm divorced, and I have a bachelor's

7    degree plus a paralegal program certification.  I

8    have four children, 12, 14, 16, 18.  They all live at

9    home.  One is going to KU in the fall.

10             THE COURT:  Mr. Stevens?

11             MR. STEVENS:  I live in Lenexa, Kansas.

12   I'm just retired from Associated Press.  I'm married.

13   My wife is in the health care business.  I have a

14   master's in journalism.  Three children, 35-year-old

15   daughter in New York City who is in public relations;

16   32-year-old daughter in Olathe who is a teacher; and

17   a 24-year-old son who is in Seattle and runs a music

18   company.  And that's it.

19             THE COURT:  With regard to your background

20   in the news media, what sorts of areas did you cover

21   in terms of subject matter?

22             MR. STEVENS:  Associated Press covers many

23   lead stories of statewide, national, and

24   international significance of all kinds.

25             THE COURT:  Did you cover -- obviously, my

1    real question -- I should have been more pointed to

2    begin with.  Did you have occasion to cover court

3    matters or specifically matters involving anything to

4    do with allegations of child pornography?

5              MR. STEVENS:  No.  I have been out of the

6    news coverage part of it for quite a while.

7              THE COURT:  Thank you.  Ms. McMahon?

8              MS. MCMAHON:  Shawnee, Kansas.  I'm a

9    purchasing manager.  I'm married.  My husband is a

10   store director in retail.  I have about a year of

11   college.  I have three boys, 18, 20, and 26.  Two of

12   them still live at home; the third one lives in

13   Pittsburg, Kansas.

14             THE COURT:  Thank you.  Mr. Zinnecker?

15             MR. ZINNECKER:  I live in Overland Park.  I

16   am in sales information technology.  I am married.

17   My wife is in sales, health care.  I have two years

18   of college, and I have a nine-year-old boy.

19             THE COURT:  Thank you.  Mr. Johnson?

20             MR. JOHNSON:  Olathe, restaurant business,

21   single, some college.

22             THE COURT:  Mr. Newton?

23             MR. NEWTON:  Kansas City, Kansas.  I'm a

24   relay tech for the Board of Public Utilities here in

25   Kansas City, Kansas.  Prior to that -- I have only

1    been there for four years.  For 26 years prior to

2    that I was an avionics technician.  I worked in

3    avionics for Honeywell.  Marital status, I have been

4    married 25 years.  My spouse's occupation, she has a

5    home printing business.  My amount of education, I

6    went to technical school.  I have two children.  My

7    daughter is 34.  She's a teacher within Kansas City,

8    Kansas.  My son is 21, and he works for Fed Ex.

9              THE COURT:  Thank you.  Mr. Hennecke?

10             MR. HENNECKE:  I live in Overland Park.  I

11   am a real estate agent.  Prior to that I was an

12   athletic director.  I am married.  My wife is a

13   massage therapist.  I have four years of college, and

14   we have one child, a son, three years old.

15             THE COURT:  Thank you.  Mr. Sickel?

16             MR. SICKEL:  City is McCloud.  I work for

17   Crawford Sales Company, inventory manager there.

18   Single.  Bachelor of science, political science.

19             THE COURT:  Thank you.  I have a few more

20   questions before we take our lunch recess.

21        The law presumes all criminal defendants

22   innocent until proven guilty beyond a reasonable

23   doubt by the evidence.  Is there anyone who believes

24   that a defendant is guilty just because he or she was

25   indicted, in other words, that the criminal charges

1    were brought?  Does anybody feel that way?  If so,

2    please raise your hand.  I see no hands.

3         On the other hand, is there anyone who would not

4    be able to find a defendant guilty regardless of the

5    evidence simply for philosophical reasons, because

6    for religious or other concerns you simply could not

7    find another human being guilty of a crime?  If so,

8    please raise your hand.  Yes, Mr. Siberg?

9         MR. SIBERG:  I would like to say that I

10   don't think that I would ever not be able to reach a

11   conclusion, but to pass judgment on another person is

12   something that would deeply impact my -- not my

13   beliefs, but how I would approach doing that for

14   others.

15        THE COURT:  All right.  As I think I

16   understood what you said at the beginning, you

17   believe that you would be able to do that if you were

18   called upon to do so; it's just not something you're

19   comfortable with.  I may have understood --

20        MR. SIBERG:  No, and it is -- it's

21   something that would deeply affect, obviously, many

22   people, so it would affect me as well.

23        THE COURT:  And, you know, in some respects

24   I hope we would all share that.  Whatever the result

25   of this case is, it is very serious for all

1   concerned, and I would hope we would all share that

2   sense as we move forward.  But I gather you're not

3   telling me you couldn't do it; am I right?

4           MR. SIBERG:  Correct.

5           THE COURT:  All right.  The law does not

6   require the government to prove its case beyond all

7   doubt.  The law recognizes that the human mind may

8   conceive some doubt as to any proposition.  Would any

9   of you require the government to prove its case

10  beyond all doubt before you would arrive at a guilty

11  verdict?  If so, please raise your hand.

12      Would any of you give additional consideration

13  or less consideration or weight to the testimony of

14  law enforcement personnel or government employees

15  than to any other witness?  If so, please raise your

16  hand.  I see no hands.

17      The purpose of that question is to find out

18  whether, obviously, people have those views, but a

19  person's occupation or background, or whatever,

20  doesn't matter.  We evaluate their testimony based

21  upon their training, their education, their

22  experience, their ability to perceive how you believe

23  they seem to be to you with regard to the

24  truthfulness of their testimony, and merely because a

25  person's occupation is in law enforcement, for

example, is not a reason either to believe or
disbelieve that particular witness in and of itself.
Does anybody disagree with that principle?  I see no
hands.

Do any of you think that the burden which the
law places upon the government to prove the defendant
guilty beyond a reasonable doubt is too great a
burden?  In other words, do any of you disagree with
that?  If so, please raise your hand.  I see no
hands.

Is there any member of the jury who believes
that the defendant must have done something wrong or
he would not be on trial?  Anybody have that belief?
I see no hands.

Conversely then do each of you understand that
as the defendant sits here before you today he is no
more guilty of anything than any member of the jury
panel or any other participant in the trial,
including me or the lawyers or anybody else?  Anybody
disagree with that notion?  I see no hands.

Do you then understand that if you were called
upon to vote right now, guilty or not guilty, you
would have to vote not guilty because the presumption
of innocence would control in the face of absolutely
no evidence having been presented?  Anybody disagree

1    with that principle?  I see no hands.

2        You've heard the questions I've put to you.  Do

3    any of you know any other reason why you could not

4    sit on this jury and render a fair and impartial

5    verdict based on the evidence presented and in the

6    context of the instructions which I will give you on

7    the law?  If you know of any reason yourself, please

8    raise your hand.  I see no hands.

9        Put another way, if you were one of the

10    participants in the case, one of the lawyers or case

11    agent or defendant in the case, would you be

12    comfortable with a juror such as yourself?  If not,

13    please raise your hand.  I see no hands.

14        We're now going to recess here, and I'm going to

15    ask you to report to Room 180, if you would, at --

16    what is realistic, Ms. Scheurer, in terms of

17    turn-around time for them to get something to eat?

18            THE COURTROOM DEPUTY:  We can do it in an

19    hour.

20            THE COURT:  We don't get a cut of what they

21    make downstairs, but there is a place to eat

22    downstairs.  Ms. Scheurer has put her on notice that

23    there may be some people showing up.  Let me ask you

24    to report to Room 180 -- that's where you began

25    today -- at five minutes until one, and we will try

1     to resume as close to 1:00 o'clock as possible.

2     Again, I do this to try to expedite this for those of

3     you who are not going to serve.

4         Let me give you a cautionary instruction.  This

5     applies to all of you, those of you who have not yet

6     had the opportunity to come forward, you may still.

7     We are about to take a break, and I want to tell you

8     a few things that are very important.

9         Until this process is completed, you are not to

10     discuss this case with anyone, whether members of

11     your family, people involved in the trial, or anyone

12     else, and that includes your fellow prospective

13     jurors.  If anyone approaches you and tries to

14     discuss what we're doing here today with you, please

15     inform me by letting either myself or Ms. Scheurer or

16     Ms. Saragusa or any of the other court personnel that

17     I have identified know about that immediately.

18         Also, you must not read or listen to anything

19     that concerns the trial or to do anything which

20     touches on the case or the subject matter.  In other

21     words, some of you may have access to devices by

22     which you could access the internet and decide, I

23     would like to find more out about some of the things

24     I've heard talked about today.  Do not do that.  That

25     would violate your oath as jurors if you attempted to

1     try to find out information about the subject matter

2     of this case.  All the information that is pertinent

3     to this case will be presented to you here in the

4     courtroom.

5          Finally, you must not talk about anything with

6     any person who is involved in the trial, even someone

7     that has nothing to do with the trial.  The

8     courthouse looks big from the outside, but there are

9     only so many places to go.  You're likely to run into

10    the participants somewhere in the hallways, or

11    whatever.  I'm sure ordinarily they would greet you

12    and be friendly.  They all know not to do that, and

13    now you know not to do that so we can preserve the

14    notion of impartiality that is so crucial here.  If

15    you need to speak with me about any of these things,

16    simply let one of the court personnel know, and we

17    will take care of that.  We are now in recess until

18    1:00 p.m.

19              (The luncheon recess was taken.)

20              THE COURT:  Let me first ask the members of

21    the prospective jury panel, while you were on break,

22    were any of you approached by anyone about the

23    matters concerned in this trial?  If so, please raise

24    your hand.  I see no hands.

25         Did any of you have occasion to discuss anything

1   which occurred this morning in connection with this

2   case over your noon break?  If so, please raise your

3   hand.  I see no hands.

4       With that, Ms. Martin, I will afford you the

5   opportunity for follow-up examination.

6           MS. MARTIN:  Thank you, your Honor.  Good

7   afternoon.  You'll be really happy to know that since

8   the judge was so thorough the questions I have are

9   about half.  Hopefully, this is almost over.  I like

10  to try to answer the same questions you had to answer

11  so you know something about me as well.  I live in

12  Shawnee, Kansas.  I'm an assistant United States

13  attorney, and I have been for the last over 20 years.

14  I am divorced.  I have two children, and I have a

15  15-year-old son who is learning to drive, so you

16  might want to stay off the street, and a ten-year-old

17  daughter.  So that's my background.

18      My job today is to ask you questions just like

19  the judge did and to determine whether there might be

20  some reason why you shouldn't sit on this jury.  We

21  often say -- as lawyers we often say we're looking

22  for a fair and impartial jury, and that's not really

23  accurate because it doesn't mean that you can't be

24  fair or that you're not a fair person.  It might mean

25  that this type of case just isn't for you.

1          And the example I usually give is drug cases.

2     Sometimes in cases involving the distribution of

3     drugs there are people who have had family members or

4     close friends who have had drug addiction problems,

5     and because of their own personal experiences, they

6     just couldn't really be fair to the defendant or to

7     the government based on their personal circumstances,

8     they couldn't put their personal circumstances aside.

9     It doesn't mean that they are not a fair person.  It

10    just means that kind of case really isn't for them.

11    I know we have talked among some of you about this

12    same topic, but do any members of the jury panel

13    believe that this type of case just isn't the kind of

14    case they could sit in judgment about and render a

15    fair verdict because of their personal circumstances?

16    Okay.

17         Again, the questions I'm going to ask aren't

18    designed to embarrass you.  If you feel like you need

19    to discuss your answers at the bench, raise your

20    hand.  Obviously, we have done quite a bit of that,

21    so don't hesitate to do that again.

22         The defendant in this case is entitled to a fair

23    trial, and that's really easy to see because you sit

24    here day after day after day and you look at him, and

25    you might look at his family members who come to

1   watch the trial, or maybe some of their family

2   members even testify.  So that's a concept that

3   everybody really gets, that that defendant sitting

4   over there is entitled to be treated fairly by our

5   system.  The opposite is exactly true as well.  The

6   United States is also entitled to a fair trial, the

7   same fair trial that the defendant is entitled to.

8   In other words, the United States, even though I'm

9   the only person you're going to see to represent the

10  United States, they are also entitled to the same

11  fair trial and the same just verdict as the

12  defendant.  Does anybody here feel like that

13  shouldn't be the case, that the defendant should be

14  more entitled to a fair trial than the United States

15  because he's the one on trial?

16      Does anybody have any negative feelings about

17  the United States Government -- and we're just going

18  to leave out the Internal Revenue Service altogether.

19  So except for the Internal Revenue Service, do any of

20  the members of the jury panel feel like they just

21  really have bad feelings about the United States

22  Government as a whole?  I saw you make a face.

23          MR. TRYTTEN:  Well, I'm not real happy with

24  what's going on.

25          MS. MARTIN:  Okay.  But the country as a

1   whole is okay; it's just maybe the --

2           MR. TRYTTEN:  -- direction.

3           MS. MARTIN:  The direction?  I understand

4   that.

5       When I first started out, somebody told me I

6   should ask this question, and I keep asking it even

7   though I don't think anybody would tell me if they

8   really did.  Does anybody belong to any groups that

9   have an anti-government agenda?  Would you tell me if

10  you did?  That's kind of the issue.  I think we have

11  asked about whether you know us or the defense

12  attorneys.  We haven't asked if anybody on the

13  jury panel has ever had any close friends or family

14  members that were convicted of a crime.  Ms. Grogan?

15          MS. GROGAN:  Yeah.  A former husband.

16          MS. MARTIN:  Okay.  Anything about that

17  circumstance that makes you feel like you have strong

18  feelings one way or the other?

19          MS. GROGAN:  [Shook head.]

20          MS. MARTIN:  Okay.  Let me go in the back.

21  Actually, I know your name by heart.  Ms. Wilson?

22          MS. WILSON:  My cousin was convicted and is

23  in prison.

24          MS. MARTIN:  Did you feel that he was

25  treated fairly by the system?

1          MS. WILSON:  Oh, yeah.

2          MS. MARTIN:  And you don't have any

3     feelings one way or the other regarding either

4     antipolice or prodefendant in this case because of

5     that?

6          MS. WILSON:  No.

7          MS. MARTIN:  Okay.  Yes?

8          MR. KING:  My father is a convicted felon.

9     He was convicted of fraud.

10         MS. MARTIN:  Did you feel like he got

11    treated fairly by the system?

12         MR. KING:  I don't know.  This was before I

13    was born.

14         MS. MARTIN:  So you didn't really know him

15    at that time?

16         MR. KING:  No.  I wasn't alive.

17         MR. PERRY:  A stepdaughter convicted of

18    drugs.

19         MS. MARTIN:  And was there anything -- did

20    you feel like she got treated fairly by the system?

21         MR. PERRY:  Yeah.

22         MS. MARTIN:  So there's nothing about that

23    circumstance that leads you to have any strong

24    feelings one way or the other?

25         MR. PERRY:  Probably the only way she's

```
1          going to stop.
2                    MS. MARTIN:  Anybody in the front?
3                    MS. HARDIN:  My brother on drug charges,
4          and he's several years older.  I was a child when it
5          happened.  I don't really remember a lot about it.
6                    MS. MARTIN:  What about your family
7          circumstances?  How did that affect your family?  Did
8          your family -- I'm sure they talked about it.  Even
9          though you were young, it was a topic of
10         conversation?
11                   MS. HARDIN:  Right.
12                   MS. MARTIN:  Did anybody feel like he got
13         railroaded?
14                   MS. HARDIN:  No.  I think everybody in my
15         family thought he was treated fairly.
16                   MS. MARTIN:  Anybody else?
17                   MR. TRYTTEN:  Cousin, check charges,
18         multiples.  He just thought all banks had money in
19         them.
20                   MS. MARTIN:  They don't?  I had a friend
21         who thought you could write checks as long as you had
22         checks.
23              We talked about being a witness.  Has anybody
24         been the victim of a crime?
25                   MR. KING:  My house was broken into 32
```

```
 1        years back.

 2                    MS. MARTIN:  Was anybody ever caught?

 3                    MR. KING:  Yeah.

 4                    MS. MARTIN:  So you called the police?

 5                    MR. KING:  Well, my mom did, yeah.

 6                    MS. MARTIN:  And they came out took a

 7        report?

 8                    MR. KING:  Yeah.  They were still there

 9        when I came home.

10                    MS. MARTIN:  Oh, so they were caught in the

11        act?

12                    MR. KING:  They were in the house when I

13        came home.

14                    MS. MARTIN:  So they got caught in the act?

15                    MR. KING:  Pretty much, yeah.  They got

16        caught down the street.  They ran and they caught

17        them.

18                    MS. MARTIN:  They were prosecuted and

19        convicted, I assume?

20                    MR. KING:  Yeah.

21                    MS. MARTIN:  Was there anything about that

22        circumstances that --

23                    MR. KING:  No.

24                    MS. MARTIN:  Anybody else?

25                    MR. DALLMAN:  Brother-in-law, drug charges.
```

1          MS. MARTIN:  He was convicted?

2          MR. DALLMAN:  I think so, yeah, because he

3     served a little time.

4          MS. MARTIN:  Was there anything about that

5     circumstance that leads you to have any strong

6     feelings about the --

7          MR. DALLMAN:  No.  He was treated very

8     fairly, almost too fairly.

9          MS. MARTIN:  Anybody else?

10         MR. LUMIANSKI:  I had an embezzlement over

11    a business.

12         MS. MARTIN:  You had somebody who embezzled

13    money from your business?

14         MR. LUMIANSKI:  Uh-huh.

15         MS. MARTIN:  Were they caught?

16         MR. LUMIANSKI:  They were.

17         MS. MARTIN:  I'm assuming the police came

18    out, investigated, and were able to make a case

19    against that person?

20         MR. LUMIANSKI:  They did.  And there was

21    also an FBI issue because it was across state lines.

22         MS. MARTIN:  So it was a federal case?

23         MR. LUMIANSKI:  Uh-huh.

24         MS. MARTIN:  Did you feel that the FBI did

25    a good job in the investigation?

```
1                    MR. LUMIANSKI:  No.

2                    MS. MARTIN:  Okay.  Why is that?

3                    MR. LUMIANSKI:  They didn't pursue it

4         quickly or effectively.

5                    MS. MARTIN:  Did they ultimately find the

6         people who did the embezzlement?

7                    MR. LUMIANSKI:  Yes.

8                    MS. MARTIN:  And they were charged?

9                    MR. LUMIANSKI:  I did.

10                   MS. MARTIN:  You found them?

11                   MR. LUMIANSKI:  Yes.

12                   MS. MARTIN:  And those people -- that

13        person -- this was a person or persons?

14                   MR. LUMIANSKI:  It was one person.

15                   MS. MARTIN:  Were they charged?

16                   MR. LUMIANSKI:  Yes.  They went to jail.

17                   MS. MARTIN:  Okay.  So then ultimately --

18        they were slow to react, but ultimately you were able

19        to get some investigation done and a prosecution

20        done?

21                   MR. LUMIANSKI:  After pushing and shoving.

22                   MS. MARTIN:  Right.  Well, sometimes the

23        government does move very slowly, but obviously you

24        have some feelings about that circumstance.  Do you

25        believe that the professionalism of the FBI or
```

1    government agents in general are in question?

2              MR. LUMIANSKI:  No.

3              MS. MARTIN:  All right.  The defendant in

4    this case is charged with a federal crime that makes

5    it unlawful to distribute images of children engaging

6    in sexually explicit conduct, and he's also charged

7    with distributing those images, and I refer to these

8    laws because they have specific terms and specific

9    meaning.  For instance, you will hear that the term

10   minor under the federal law means somebody under the

11   age of 18 years old.  Now, because we have all kind

12   of grown accustomed in our culture, I'm going to

13   refer to these kinds of charges as child pornography

14   charges.  I want to make sure that everyone is okay

15   with that shorthand term but that once you get the

16   more specific definitions that you'll follow those

17   more specific definitions.  Can you do that for me?

18   Okay.

19        In this case the United States is alleging that

20   the defendant used a program called Limewire to

21   download these movies of children that are engaged in

22   sexually explicit conduct.  That is part of the

23   Limewire program.  The defendant agreed to share

24   those movies with other people.  Is anybody here

25   familiar with Limewire?  Okay.

1      Mr. Siberg, I know we talked about this briefly

2   at the bench.  You are familiar with how Limewire

3   actually functions and how you go about obtaining

4   things from Limewire?

5           MR. SIBERG:  Uh-huh.

6           MS. MARTIN:  Okay.  Would you be tempted to

7   act as an expert if, for instance, you're back in the

8   jury room and there's a discussion about how Limewire

9   works and one of the jury members has an idea of how

10  it works but you know that it's different?  Would you

11  be tempted to basically be an advisor?

12          MR. SIBERG:  That's a complicated question.

13          MS. MARTIN:  I know.

14          MR. SIBERG:  Based on previous experience,

15  it would be hard for me to separate that information,

16  but I believe I could hold to that, yes.

17          MS. MARTIN:  What if they were dead wrong

18  but there wasn't any evidence to prove they were dead

19  wrong but you knew based on your experience that they

20  were wrong?

21          MR. SIBERG:  I would have to set that

22  aside.

23          MS. MARTIN:  So you wouldn't speak up and

24  say, nope, that's not really how Limewire works?

25          MR. SIBERG:  I guess I don't have a great

1    answer for that.  I'm not sure how that would play

2    out.  I would like to think that I would keep

3    whatever information is distributed through the

4    court.

5              MS. MARTIN:  But then -- okay.  Mr. King?

6              MR. KING:  I would probably feel compelled

7    to tell them how it actually works, yeah.

8              MS. MARTIN:  So do you think that if the

9    judge instructed you that you weren't to do that that

10   you would be able not to?

11             MR. KING:  Yeah.

12             MS. MARTIN:  So, again, in the same

13   scenario you guys are having a discussion back in the

14   jury room and somebody said, well, remote users can

15   put stuff in your shared file, and that's what

16   they --

17             MR. KING:  Is that true?

18             MS. MARTIN:  So you don't know whether

19   that's true or not?

20             MR. KING:  No.

21             MS. MARTIN:  So you don't know for certain

22   how that works?

23             MR. KING:  Not that -- I have a general

24   idea how it works.

25             MS. MARTIN:  So you don't think there would

1    be any temptation on your part to set the record

2    straight?

3              MR. KING:  I don't think so.

4              MS. MARTIN:  Who else was over here?

5              MS. MCMAHON:  My kids have used it.  That's

6    all I know.

7              MS. MARTIN:  You yourself haven't used it?

8              MS. MCMAHON:  No.

9              MS. MARTIN:  You just have heard the term?

10             MS. MCMAHON:  I know what it is.  It used

11   to be on our computer.  It's not any longer.  I have

12   listened to a song the kids have downloaded for me.

13             MS. MARTIN:  What about other types of file

14   sharing software?  I think Napster might have been

15   the very first to allow people to share computer

16   files amongst each other.  Anybody familiar with any

17   other types of file share programs?

18             MS. GROGAN:  I'm vaguely familiar with how

19   they work.

20             MS. MARTIN:  What about you?  Do you

21   think -- you said you were vaguely familiar with how

22   they work, so you wouldn't be tempted to act as an

23   expert?

24             MS. GROGAN:  No.

25             MS. MARTIN:  As you're thinking about these

```
 1        questions, if you change your mind or have something
 2        more to say, will you promise to raise your hand?  I
 3        know sometimes you sit there and you think and later
 4        on, you know what?  I want to add something to that.
 5        So please raise your hand and let me know.
 6             Do any of the members of the jury panel use
 7        Limewire?  You don't any more?  Or your children
 8        don't any more?
 9                  MS. MCMAHON:  [Shook head.]
10                  MS. MARTIN:  Have any of you used it in the
11        past?
12                  MS. WILBURN:  If I have, I don't know
13        because I'm not that familiar with all that stuff.
14                  MS. MARTIN:  Has anybody ever downloaded
15        music onto their computer?
16                  MR. DALLMAN:  I-Tunes.
17                  MR. KING:  I would like to add that I'm
18        also familiar with the other programs that you --
19                  MS. MARTIN:  And you downloaded music to
20        your computer?
21                  MR. DALLMAN:  Through I-Tunes.
22                  MS. MARTIN:  Let me see if I can do this in
23        a more orderly fashion.  All right.  How about in the
24        back row?  Has anybody downloaded music?
25        Mrs. Wilson?
```

1          MS. WILSON:  Through I-Tunes.

2          MS. MARTIN:  And that, you know, you buy a

3     card and you pay for music; right?

4          MS. WILSON:  [Nodded head.]

5          MS. MARTIN:  Anybody in the middle row?

6          MR. MURRAY:  I-Tunes.

7          MS. WATTS:  I-Tunes.

8          MS. VANNAMAN:  Just little music clips for

9     projects at school.

10         MS. MARTIN:  What did you use to download

11    those music clips?

12         MS. VANNAMAN:  I don't know.  Just save

13    and -- I don't know.  No special program.  I don't

14    know.

15         MS. MARTIN:  Okay.  All right.

16         MR. WRIGHT:  I-Tunes.

17         MS. HARDIN:  I-Tunes and I believe Rhapsody

18    years ago.

19         MS. MARTIN:  Right.  Are they still in

20    existence?

21         MS. HARDIN:  I don't know.

22         MR. AUPPERLE:  I-Tunes.

23         MS. SCHNEIDER:  Aries.

24         MS. MARTIN:  Is that a for-pay downloading?

25         MS. SCHNEIDER:  You pay a one-time fee, and

1    you can download as much as you want.

2              MR. STEVENS:  I-Tunes.

3              MR. ZINNECKER:  I-Tunes.

4              MS. MARTIN:  How many of you have a

5    computer at home?  Almost everybody.  Okay.  And how

6    many of you use your computer to access the internet?

7    Almost everybody.  Is anybody in the computer

8    business?

9              MR. ZINNECKER:  I am, yes.  The company I

10   work for, we develop software that ties the company's

11   ERP system with data collection devices.

12             MS. MARTIN:  Are you part of the program

13   that develops the software?

14             MR. ZINNECKER:  No.  I work with the

15   devices themselves.

16             MS. MARTIN:  The hardware?

17             MR. ZINNECKER:  The hardware, uh-huh.

18             MS. MARTIN:  And is there anything about

19   your experience with hardware that would make you

20   feel tempted -- obviously, this case is going to

21   involve the use of a computer and use of the

22   internet.  Is there anything about your experience

23   with how the hardware works that would make you

24   tempted to act as an expert?

25             MR. ZINNECKER:  I might be tempted, but if

1      I was told not to release that knowledge, then I

2      would be able to not say anything.

3              MS. MARTIN:  Now, again, what if they are

4      having a discussion and they are saying, this is how

5      the hardware works, and this is how it's divided up,

6      and you know that's not the case?

7              MR. ZINNECKER:  I don't feel that's my

8      responsibility to explain that to them.  It's

9      probably yours to show that.

10             MS. MARTIN:  And what if they are about to

11     make a decision based upon their wrong assumption, in

12     other words, they are about to decide whether the

13     defendant is guilty or not guilty based upon a wrong

14     assumption about how the computer hardware functions?

15             MR. ZINNECKER:  I might -- I would probably

16     share that information.

17             MS. MARTIN:  Okay.  Let's assume for

18     whatever reason you couldn't share that information.

19     Would you be able to stick to your guns and vote

20     differently than everybody else because you would --

21             MR. ZINNECKER:  Yes.

22             THE COURT:  All right. How many people use

23     their computers at work?  Almost everybody.  We

24     talked about specialized computer training, and I

25     think we missed somebody.  I think, Mr. Wright, do

1          you have some computer skills?

2                    MR. WRIGHT:  Yes.

3                    MS. MARTIN:  What are those?

4                    MR. WRIGHT:  I use a computer every day.

5                    MS. MARTIN:  And what do you use your

6          computer for?

7                    MR. WRIGHT:  Graphic design and

8          illustration.

9                    MS. MARTIN:  Okay.  And what sort of things

10         are you able to do with your computer that obviously

11         I wouldn't be able to do?

12                   MR. WRIGHT:  Everything from medical

13         illustration to technical illustration,

14         three-dimensional drawings, animation.

15                   MS. MARTIN:  Okay.  And what about your

16         computer knowledge and the skills that you have with

17         your computer?  It's kind of the same questions I was

18         just asking him.  Do you believe that there's

19         anything about your training with computers or your

20         use of computers that makes you more knowledgeable

21         about them than maybe other people on the jury panel?

22                   MR. WRIGHT:  If so, I probably wouldn't --

23         most of it is directed towards art and design, so --

24                   MS. MARTIN:  What about the way the

25         computer functions, or the software, how it

1      functions?  Are you familiar with that sort of thing?

2                  MR. WRIGHT:  If it's graphics-related,

3      probably, but other than that --

4                  MS. MARTIN:  Does anybody feel like the

5      government should regulate the internet more?

6      Anybody think that it should be regulated less?

7      Everything thinks it's just right?  Okay.  How many

8      think that the government shouldn't regulate the

9      internet at all?  Would the fact that this case --

10     and we have talked a little bit about this, the

11     nature of the case, and what I want to suggest here

12     to everyone is that part of the evidence in this case

13     will be the movies themselves, and they are going to

14     be probably going to be unpleasant and distasteful to

15     you; however, that prospect all by itself wouldn't be

16     a reason to be removed from the jury because in a lot

17     of cases you're required to look at gruesome things,

18     or distasteful or unpleasant things.  But having said

19     that, is there anybody on the jury panel who thinks

20     for some reason that viewing this evidence would just

21     simply be too much for them and they just simply

22     couldn't look at the evidence and so therefore

23     couldn't help render a verdict?

24                 MR. ZINNECKER:  It would be hard for me.

25                 MS. MARTIN:  Okay.  Let's start over here.

1      We will make our way around.  Ms. Wilburn?

2                 MS. WILBURN:  I think it would be pretty

3      hard to watch.

4                 MS. MARTIN:  Let me just say this up front

5      for everybody.  Nobody expects that it's going to be

6      easy.

7                 MS. WILBURN:  I understand that.

8                 MS. MARTIN:  What I'm asking is if it's

9      going to be so difficult that you would have trouble

10     considering the evidence and then applying that

11     evidence to the law.

12                MS. WILBURN:  Not knowing what I'm going to

13     see, it's hard to say that, but it could be.

14                MS. MARTIN:  Okay.  So you're the person

15     sitting there trying to judge this for yourself.  If

16     there are images -- and as I said earlier, child

17     pornography is the sexually explicit images of

18     children, children engaging in sexually explicit

19     conduct.  Having said that, do you believe that your

20     feelings are strong enough that it would prevent you

21     from being fair?

22                MS. WILBURN:  I can't honestly say because

23     I have never been in that situation to know.

24                MS. MARTIN:  Would you be able to look at

25     the movies and watch them?

```
1              MS. WILBURN:  I don't know.

2              MS. MARTIN:  Fair enough.  Nobody knows

3     what they are going to see, obviously, so it's

4     difficult.  What I'm getting at, you know, as you sit

5     here, that that type of movie is going to make it

6     impossible for you to reach a fair conclusion in the

7     case.  I saw somebody else's hand.  Anybody else on

8     this side?  Okay.  Ms. James?

9              MS. JAMES:  Seeing the movie, once you see

10    a little bit of it and you see that it's a sexual

11    thing between children, then there's -- what point is

12    it to watch that for very long?  Because you're not

13    trying to decide if that's a movie that is sexual

14    between children.  I guess what I'm getting at is

15    that you don't have to sit there and watch this, you

16    know, and keep watching it, I wouldn't think, because

17    I think it would probably make most people upset to

18    see that.

19             MS. MARTIN:  Now, I guess one of the

20    questions is, how do we -- how would I determine if

21    there's a movie that's a piece of evidence, how do

22    you determine when to cut it off?  Because it's an

23    entire movie clip.

24             MS. JAMES:  How long of clips are you

25    talking about?
```

1          MS. MARTIN:  I think there's one -- I don't

2     think any of them are tremendously long.  Let me just

3     say that I do think there's one that I believe is a

4     compilation video, and it's a little bit longer,

5     maybe four minutes, maybe four or five minutes.

6          MS. JAMES:  I guess I still think that when

7     you first see two children engaged in some sort of

8     act that you've seen what it is that you're trying to

9     present.  So for somebody to sit there and watch it

10    and get angrier and angrier, you know, or more upset,

11    or whatever, about it --

12         MS. MARTIN:  I guess one of the problems

13    is, if, as we allege, the defendant had these movies

14    on his computer, the evidence is it was on his

15    computer, and by trying to make it shorter to make it

16    easier, it alters the evidence, and somebody else,

17    myself or the agents, are making a judgment then

18    about what the jury should see rather than just

19    showing them what was there.  Would you have a

20    tendency to hold that against the government if they

21    played the entire video clip?

22         MS. JAMES:  No, I wouldn't, but I can see

23    people getting -- I can see myself getting upset

24    seeing it, and so I guess for me I think if I see

25    that, I see a little bit of it and I see what that's

1 all about, it almost doesn't matter if it's two hours

2 long or two seconds or ten seconds, or whatever.

3    MS. MARTIN:  I understand.  Thank you.  Was

4 there anybody else?

5    MR. ZINNECKER:  It would be hard to see the

6 images, and I don't know if I could be fair with it.

7    MS. MARTIN:  In what way?  I mean, more

8 difficult than some other grisly thing that you have

9 to see in a jury trial?

10    MR. ZINNECKER:  Yeah.  I mean, if it's

11 involving kids, and having a nine-year-old -- I mean,

12 it would just be too -- I don't know if I can't --

13    MS. MARTIN:  Would you automatically think

14 that the defendant was guilty because you saw these

15 video clips?

16    MR. ZINNECKER:  I don't know if I would

17 consider it that, but I don't know if I would be able

18 to watch the whole clip completely to give an

19 objective view of it.

20    MS. MARTIN:  Would you be able though to

21 look at the video clip, determine whether or not you

22 believed it was images of children engaged in

23 sexually explicit conduct?

24    MR. ZINNECKER:  I could probably do that.

25    MS. MARTIN:  Did anybody else have any

1  thoughts or comments?

2           MS. CAPUTO:  Kind of along the lines with

3  him, I wouldn't be able to watch the whole thing.

4  Probably a second of it.  That even might be hard to

5  do for me.

6           MS. MARTIN:  Do you think that your ability

7  would be -- your ability to judge the evidence would

8  be impaired?

9           MS. CAPUTO:  I don't know if I would be

10  able to view the evidence in its entirety.

11           MS. MARTIN:  Okay.  And because of that do

12  you think that you would be unable to reach a verdict

13  that matched with the facts?

14           MS. CAPUTO:  It's hard for me to say.

15           MS. MARTIN:  Thank you.  Anybody else?

16  Okay.  Does anyone in the jury panel condone sexual

17  activity between minors and adults?  That almost

18  sounds like a ridiculous question, but there are

19  organizations out there that promote sexual activity

20  between adults and minors, so I ask it.  Again, it's

21  probably one of those questions that you wouldn't

22  tell me even if you did.

23      Will any of you have difficulty discussing

24  sexual matters with other members of the jury panel?

25  If you get back into the jury room, there's going to

1    maybe be discussions about sexual activity, including

2    masturbation, sadomasochistic images, lascivious

3    exhibition of the genitals.  Would any of you just

4    feel so private that you don't think that you could

5    have those discussions with other people?

6         Have you or anyone close to you ever been the

7    victim of sexual abuse?

8         Have you or anyone close to you, friends, family

9    members, ever been accused of child sexual abuse?  We

10   have two hands.

11             MR. MURRAY:  I have an uncle that was

12   convicted of --

13             MS. MARTIN:  He was convicted?

14             MR. MURRAY:  [Nodded head.]

15             MS. MARTIN:  And how close of a relative

16   was he to you?  Did he leave nearby?

17             MR. MURRAY:  He did not live nearby, wasn't

18   that close.

19             MS. MARTIN:  I assume that was a topic of

20   conversation amongst the family?

21             MR. MURRAY:  [Nodded head.]

22             MS. MARTIN:  And did they believe he was

23   treated fairly by the system?

24             MR. MURRAY:  Yes, I believe so.

25             MS. MARTIN:  Was there anything about that

1    circumstance that happened to your family that would

2    impact your judgment in this case?

3              MR. MURRAY:  No.

4              MS. MARTIN:  Mr. --

5              MR. PERRY:  I have a stepdaughter, accused

6    me of it.

7              MS. MARTIN:  Okay.  How did that play out?

8    It was accused.  I'm assuming it went away?

9              MR. PERRY:  You know, I went through the

10   investigation with the sheriff's department and

11   everything, took a polygraph.  It was her

12   imagination, her drugs, whatever.

13             MS. MARTIN:  Was there anything about that

14   circumstance -- obviously, you had to go through this

15   whole ordeal.  Was there anything about that that

16   gives you pause one way or the other with regard to

17   this particular case?

18             MR. PERRY:  I don't think so.

19             MS. MARTIN:  Okay.  Mr. --

20             MR. SIBERG:  I need to back up a question.

21             MS. MARTIN:  Okay.

22             MR. SIBERG:  Before I knew my wife, she

23   actually had been raped.

24             MS. MARTIN:  Okay.

25             MR. SIBERG:  And at that time she was

1    underage and based on personal reasons decided not to

2    pursue a trial.

3         MS. MARTIN:  And, obviously, that's a very

4    traumatic event, and she decided not to pursue it.

5    Was it a relative or a close friend?

6         MR. SIBERG:  I honestly don't know the

7    perpetrator, but, you know, it was really before we

8    got involved, but it was something relatively recent

9    in her memory.

10        MS. MARTIN:  So it's something the both of

11   you have been dealing with since you met her.  Is

12   there anything about the circumstances of your wife's

13   situation that would make it difficult for you to sit

14   here and listen to the evidence and, again, watch the

15   videos?

16        MR. SIBERG:  I believe I could watch them.

17        MS. MARTIN:  Okay.

18        THE COURT:  All right.  Ms. Martin, your

19   time has expired.

20        MS. MARTIN:  Oh.

21        THE COURT:  Mr. Clarke?

22        MR. CLARKE:  Thank you, your Honor.

23        THE COURT:  You may proceed.

24        MR. CLARKE:  I'm going to follow up on one

25   of Ms. Martin's questions that she just asked you.

1    In past experience in going through jury selection we

2    have asked questions to potential jurors about

3    whether or not they have ever been the victim of a

4    sex crime or have known someone close to them who has

5    been a victim of a sex crime.  Oftentimes we don't

6    get any affirmative responses, nobody wants to raise

7    their hand, and I understand that because it's fairly

8    personal.  It can be embarrassing.  What we find is

9    that after a while people will start raising their

10   hands once somebody else has raised their hand and

11   come forward, maybe, and offered up their own

12   personal experiences and background.  What we don't

13   want you to do is sit there going, I really should be

14   raising my hand, but I just don't want to draw

15   attention to myself, or, I don't want to be the first

16   person to do so.  So I'm going to revisit that

17   question and ask you if you've got a situation where

18   you or somebody close to you has been a victim of a

19   sex crime.  What I would like you to do is just raise

20   your hand and with the judge's permission so as not

21   to embarrass you have you come up, and we can discuss

22   it on the side there with the noise machine going so

23   it's not such a public thing.  With that in mind does

24   anyone else have an experience that they think that

25   they ought to share with us, let us know that they

1  know somebody who has been the victim of a sex crime?

2          MR. HENNECKE:  It didn't come to mind until

3  the gentleman shared his story, but my wife before I

4  knew her also was the victim of a sexual assault.  I

5  don't know any of the details.  There was no trial.

6          MR. CLARKE:  I understand.  Do you

7  understand -- do you think that -- obviously, it

8  wasn't your personal experience, but your connection

9  with that, would it impact your ability to be a fair

10 and impartial juror in this case?

11         MR. HENNECKE:  I don't think so.

12         MR. CLARKE:  Thank you.  I had a hand over

13 here.  Ms. Hansen?

14         MS. HANSEN:  I had a student who was

15 date-raped.

16         MR. CLARKE:  And how long have you been a

17 teacher?

18         MS. HANSEN:  Eleven years.

19         MR. CLARKE:  And what grade is this

20 student?

21         MS. HANSEN:  She was a sophomore.

22         MR. CLARKE:  In high school?

23         MS. HANSEN:  Yes.

24         MR. CLARKE:  When it occurred?  How long

25 ago was that?

1          MS. HANSEN:  Five years.

2          MR. CLARKE:  Did you have detailed

3    discussions with her about what happened?

4          MS. HANSEN:  No.  She came in, told me

5    about the situation, and I sent her to the school

6    counselor.

7          MR. CLARKE:  Did you have any further

8    involvement after that?

9          MS. HANSEN:  No.

10         MR. CLARKE:  Anyone else?  Yes, ma'am.

11   Ms. --

12         MS. WILTSEY:  I would prefer to discuss

13   mine privately.

14         THE COURT:  Please come forward.

15         (Counsel approached the bench and the

16   following proceedings were had:)

17         THE COURT:  Ms. Wiltsey?

18         MS. WILTSEY:  Yes.  It was my daughter.

19   She was raped by her father when she was 12, and

20   after she was raped she called me and told me it had

21   happened.  He had been drinking.  I took her to

22   Children's Mercy.  She had the rape kit done.

23   Ultimately they went through the investigation and

24   did everything.  To make a long story short, we were

25   going to go to trial.  The DNA came back positive for

1          the rape kit, and he committed suicide.  We

2          ultimately never made it to trial, but he was going

3          to trial.

4                    THE COURT:  All right.  Thank you.  It's

5          your examination, Mr. Clarke, so I'll let you

6          proceed.

7                    MR. CLARKE:  Thank you.  How, if at all, do

8          you think that experience might come into play in

9          your serving as a juror in this case?

10                   MS. WILTSEY:  I don't see -- I personally

11         don't see where it would because I think it's a

12         completely separate issue, what happened with her.

13         It wasn't even as if it was a stranger.  Again,

14         typically when something like that happens it's

15         usually somebody who is close to you or somebody that

16         you know.  In that case it was.  So more of my

17         anxiety and more -- most of my issues that I had were

18         obviously towards him.  He was the father of my

19         daughter, and, of course, I expected him to be there,

20         and trusted him.  If you can't trust that person,

21         then who do you trust?  So if we were having a

22         different type of a case and that was more of the

23         content of it, then I think I would have been gone in

24         the first five minutes because I just don't think I

25         would have been able to sit through that.

1          MS. MARTIN:  I don't have anything.

2          MR. CLARKE:  I would like to follow up on

3     that, not to step on Ms. Martin's toes.

4          MS. MARTIN:  No.

5          MR. CLARKE:  I think some of the evidence

6     that the government may present in this case would be

7     that one of the children who are depicted in these

8     videos were -- at least one was the victim.

9          THE COURT:  You may respond, Ms. Martin.

10          MS. MARTIN:  What I was going to say is,

11     maybe we should talk about this without the juror

12     present.  We can bring her back up if necessary.

13          THE COURT:  Ma'am, why don't you step back

14     over here.

15          MS. MARTIN:  Your Honor, what I was going

16     to say is that is exactly the case on one of the

17     videos.  The perpetrator and the person who filmed

18     the video was the biological father of this girl.

19          THE COURT:  Is that relevant evidence in

20     the case?

21          MS. MARTIN:  I wasn't planning to put that

22     on.  The only thing that might -- the only reason

23     that might spring up is, we have two interstate nexus

24     witnesses, one of which is the detective who

25     investigated that crime, to say that the crime

1 occurred in Richland, Washington, and that therefore

2 those images were created there and they were -- the

3 only way that -- I can talk to him about making sure

4 that doesn't come in.  The only question I would have

5 is if something came up during cross examination.

6     THE COURT:  Is that an area you would

7 envision getting into on cross examination for any

8 reason?

9     MR. CLARKE:  Not in that manner, no, your

10 Honor.

11     MS. MARTIN:  And I would tell him that that

12 wouldn't be relevant to his testimony, the

13 perpetrator and his relationship to the victim,

14 because that wouldn't be relevant other than if he

15 would blurt it out or it came across from cross

16 examination.

17     MR. CLARKE:  I suppose another issue along

18 those same lines is that some of the movie file

19 names, which I imagine are going to come into

20 evidence, include terminology and phrases like incest

21 and mother waking up son to rape daughter and stuff

22 like that.

23     MS. MARTIN:  Those are listed in there.

24 Those are just the titles.

25     THE COURT:  Let's bring the prospective

1      juror back.  You can ask her questions about those

2      titles and see if, understanding that those are the

3      titles, whether or not that would trigger whatever it

4      is you would be concerned about at trial.

5           Mr. Clarke, if you would like to proceed with

6      your examination.

7                MR. CLARKE:  Thank you.  Ma'am, one of the

8      issues that we just discussed was that during the

9      course of the trial we anticipate that evidence will

10     be presented concerning the names that are associated

11     with some of the video files.  Some of the names

12     associated with those files contain words like

13     incest, may contain titles that suggest incest,

14     mother, son, father, daughter, those kinds of things.

15     Now, there's no allegation in this particular case --

16     I don't think any evidence will be presented that my

17     client participated in anything like that.

18                MS. WILTSEY:  Right.

19                MR. CLARKE:  The question is, hearing those

20     title names, if those title names were presented in

21     evidence, would that unduly affect your ability to

22     serve as a juror in this case?

23                MS. WILTSEY:  I don't think so.  I think

24     the reason why is because there has been so much time

25     that has elapsed and it's not -- you know, it's not

1    something that happened, you know, within the last

2    year or two; it's been several years.  She's a young

3    adult and has a baby now.  As a family we have had to

4    grow and heal from that and kind of move on.  It's

5    not something that's going to go away.  But, again,

6    if this was a trial about something -- he

7    specifically did that or he is the one that actually

8    produced and directed, then I think, yeah, I would

9    definitely have an issue with that.  But considering

10   he's not the person that did that, then I guess I

11   just see it differently.  I can separate the two.

12            THE COURT:  Anything further?  All right.

13   You may resume your seat.

14            (The proceedings returned to open court.)

15            MR. CLARKE:  Is there anyone else that

16   feels that they would be more comfortable approaching

17   the bench and having a sidebar conference about an

18   issue of this nature?

19       Ms. Martin asked you about computer usage,

20   questions along those lines.  Quite frankly, sitting

21   back where I was, I couldn't see, so I'm going to

22   revisit some of those questions.  I'll turn them

23   around a little bit.  Instead of asking who has a

24   computer at home, would you raise your hand if you

25   don't have a personal computer in your home.

1      Negative response from all members.

2            Would you raise your hand if you don't use a

3      personal computer at work in some way, shape, or

4      form, if you don't use a computer at work.  I'll

5      start with Mr. Lumianski.

6                  MR. LUMIANSKI:  I'm retired.

7                  MR. CLARKE:  You're retired, so is that why

8      you don't use one at work any more?

9                  MR. LUMIANSKI:  Yes.

10                 MR. CLARKE:  Who was next?

11                 MR. TRYTTEN:  Same.

12                 MR. CLARKE:  Let me stick with the back row

13     first.  Anyone else not use a computer at work?

14                 MS. SILVERMAN:  I'm retired also.

15                 MR. CLARKE:  Ms. Silverman, you're retired,

16     so you don't use one at work.  Let me amend that

17     question to say, assuming you still work, is there

18     anyone that doesn't use a computer at work?  Now we

19     will go to Mr. Trytten.

20                 MR. TRYTTEN:  I'm retired.

21                 MR. CLARKE:  Okay.  That resolved your

22     issue.  Mr. King?

23                 MR. KING:  I work in the kitchen, so

24     there's no computer at work.

25                 MR. CLARKE:  Anyone else in that row?

1       Ms. Major?

2                   MS. MAJOR:  I'm in housekeeping, so I don't

3       use one.

4                   THE COURT:  All right. Thank you.  Starting

5       with the row with Ms. Watts, anybody here not use a

6       computer at work who is working?  Negative response.

7       Mr. Howell's row, anybody there not use a computer at

8       work?  Mr. Howell?

9                   MR. HOWELL:  I'm semiretired.  When I work,

10      I drive a bus, so I don't use one.

11                  MR. CLARKE:  I understand.  All right.  And

12      then finally the back row.  Mr. Johnson?

13                  MR. JOHNSON:  Same.  I'm in the restaurant

14      business.

15                  MR. CLARKE:  Anyone else in that row?  Is

16      there anyone who has had any specialized training in

17      either programming, whether it be Cobalt or Autocad,

18      C Plus, whatever it is?  Anybody had specialized

19      computer training?  We have an affirmative response

20      from Mr. Siberg.  Can you tell us the nature of the

21      training.

22                  MR. SIBERG:  I have a bachelor's degree in

23      electronics engineering technology.  Obviously,

24      that's what we did.  There was a lot of electronical

25      knowledge and then software as well.

1           MR. CLARKE:  Obviously, I'm going to guess

2      that you're pretty comfortable with a computer.

3           MR. SIBERG:  Pretty comfortable.

4           MR. CLARKE:  On your personal computer do

5      you use XP, Apple?

6           MR. SIBERG:  I use XP.

7           MR. CLARKE:  Anyone else have any

8      specialized computer training?  Ms. Grogan?

9           MS. GROGAN:  A long time ago, like 1980.

10     It was computer programming in Wichita.

11          MR. CLARKE:  All right.  And have you ever

12     used that in terms of employment, that training?

13          MS. GROGAN:  No.

14          MR. CLARKE:  I'm going to go back to

15     Ms. Wilson.

16          MS. WILSON:  My degree is in computer

17     information systems, so I have C Plus files.

18          MR. CLARKE:  And have you used that in the

19     employment context at all?

20          MS. WILSON:  I have in the past.

21          MR. CLARKE:  And are you a Windows user, or

22     do you use Mac?

23          MS. WILSON:  Windows.

24          MR. CLARKE:  Are you familiar enough with

25     Windows that you could, for example, set up at your

1    home various profiles for different users?

2              MS. WILSON:  Uh-huh.

3              MR. CLARKE:  In fact, have you done that?

4              MS. WILSON:  Uh-huh.

5              MR. CLARKE:  Anyone else in this area?  I

6    had somebody over here in my peripheral vision.

7    Probably Mr. Zinnecker.  Go ahead.

8              MR. ZINNECKER:  I have an A Plus

9    certification.

10             MR. CLARKE:  And for a layperson, what's

11   that?

12             MR. ZINNECKER:  It's repairing computers.

13   So I can take them apart and put them together.

14             MR. CLARKE:  I see.  In response to Ms.

15   Martin's questions, it sounded like you go more with

16   the hardware of the computers.

17             MR. ZINNECKER:  That's right.

18             MR. CLARKE:  Do you use diagnostic

19   software?

20             MR. ZINNECKER:  We use programs with Active

21   Sync or TCM so we can switch files, download files

22   onto devices, manage them, a program called TCM, and

23   that way we can transfer files to the devices.

24             MR. CLARKE:  You're familiar with Citrix?

25             MR. ZINNECKER:  Yes.

1    MR. CLARKE:  Maybe I'm correct in saying

2    that a less fancy term for Citrix is Go to My PC.

3    It's Citrix based.  Does anybody use Go to My PC?  If

4    you do, raise your hand.  All right.  Looks like

5    Ms. McMahon.

6    MS. MCMAHON:  I'm not A Plus certified;

7    I've taken the classes.  I have a Go to My PC

8    account, and I manage 20 computers at my work office.

9    MR. CLARKE:  So when you say you manage it,

10   does that mean you're responsible for maintaining the

11   software, making sure that it's up to date, or what?

12   MS. MCMAHON:  Most of these maintain

13   themselves.  I fix them if they break.

14   MR. CLARKE:  So if the driver is not

15   working for the printer, is that something you do, or

16   are you talking about if the hardware starts to go

17   bad?

18   MS. MCMAHON:  I can replace a hardware.  I

19   don't diagnose them.  I can replace RAM.  I can

20   install software.

21   MR. CLARKE:  So you use Go to My PC?

22   MS. MCMAHON:  I have an account.  I used it

23   this week.

24   MR. CLARKE:  And what do you use it for?

25   Are you transferring files, or are you just using it

1      so you can check your work email?

2              MS. MCMAHON:  I use it so I can remotely

3      check my work email.  I also use it if I'm not in our

4      office so that I can get to my office PC when I'm

5      traveling.

6              MR. CLARKE:  Does anyone else use Go to My

7      PC?

8              THE COURT:  You have a hand over there.

9              MR. ZINNECKER:  My office uses Citrix as a

10     remote and to do time and attendance.

11             MR. CLARKE:  I think Windows XP, at least

12     Professional, has some built in capabilities that

13     would allow you to access your computer remotely

14     without using something like Citrix or Go to My PC.

15     Does anyone use XP Professional or some other

16     software that we haven't talked about to remotely

17     access a computer?  I'll start with Mr. Dallman.

18             MR. DALLMAN:  As a sales manager my company

19     accesses my computer through Citrix and to fix

20     problems, or whatever.  I don't access them; they

21     access mine.

22             MR. CLARKE:  And right behind you.

23     Mr. Murray?

24             MR. MURRAY:  I can sign on from home and

25     look at my computer, you know, my desk top.

1          MR. CLARKE:  Do you do that frequently?

2          MR. MURRAY:  I do.  I don't know any of

3   the -- I don't know how it works.

4          MR. CLARKE:  Somebody showed you and it's

5   worked?

6          MR. MURRAY:  Yep.

7          MR. CLARKE:  I'm going to jump back up to

8   Ms. -- would you pronounce your name for me.

9          MS. WILTSEY:  Wiltsey.  I have the same,

10   but I'm kind of like he is where the crew put it on

11   my computer, on my laptop, so when I travel I can get

12   it from the airplane or wherever I am, and I just log

13   in and do what I need to do.

14          MR. CLARKE:  Thank you.  Ms. McNemee?

15          MS. MCNEMEE:  I can also access mine from

16   home from the -- work and be at home, but I don't

17   know how it works.

18          MR. CLARKE:  Do you access the computer

19   remotely often?

20          MS. MCNEMEE:  Oh, maybe two or three times

21   a month, not very often.  I'm at work all the time.

22          MR. CLARKE:  Anyone else?  It looks like

23   I've got Ms. James.

24          MS. JAMES:  I do that too.  I don't know

25   how it works, but it's a remote desk top, and I can

1   work from home or wherever I am.

2            MR. CLARKE:  Thank you.

3            MR. VANHOOSE:  The same.  I have remote

4   access.  I have seen the things you mentioned on my

5   computer.  I have no idea how it works.  Somebody

6   fixed it for me.  Somebody put them in.  I have no

7   idea how it works, but I have access all the time

8   anywhere from the country.

9            MR. CLARKE:  Ms. Grogan?

10            MS. GROGAN:  Remote access via Cisco VPN

11   Client.

12            MR. CLARKE:  All right.  And that was

13   probably over 90 percent of our heads, just what you

14   said there.  I get it generally.  Ms. Watts?

15            MS. WATTS:  I work from home quite often,

16   so we have a remote desk top access on Microsoft Web

17   Outlook Access.

18            MR. CLARKE:  All right.  Now, piggyback on

19   that, has anyone used that capability to access

20   someone else's PC from their PC?  For example, at my

21   office I may be able to simply go through my office

22   network and access my partner's PC and see what files

23   she has under a certain directories on her computer.

24   Has anybody else ever done that?  It looks like,

25   Ms. Wilson, you've done it?

1          MS. WILSON:  We work with a program called

2    Reach Out.  When my users have problems, they contact

3    me, and I can go into their computer and fix it or

4    see what was wrong.

5          MR. CLARKE:  I understand.  Ms. James?

6          MS. JAMES:  I can just go to my remote desk

7    top, and I can pick up somebody else's because I have

8    their passwords and stuff, some of the other people.

9          MR. CLARKE:  And, Mr. Vanhoose, I saw that

10   you might have that same experience?

11         MR. VANHOOSE:  I don't have admin rights.

12   I have enough people to use my computer with access

13   to their computer, but I don't have admin rights.

14         MR. CLARKE:  Anyone else?  Ms. McMahon?

15         MS. MCMAHON:  I can access other people's

16   computers.

17         MR. CLARKE:  Anyone else that I left out

18   there?  Doesn't look like it.

19      Do you have a Facebook page?  Would you raise

20   your hand.  All right.  Thank you.

21         MS. MCNEMEE:  I have a question.  I'm not

22   sure whether I do or not.  That's how I am.  I can

23   access Facebook because my daughter has it.  Does

24   that mean I have it?  Do I have to have Facebook to

25   access Facebook?

1          MR. CLARKE:  I don't think you do.

2          MS. MCNEMEE:  I don't think I do either,

3     but I might.

4          MR. CLARKE:  Sure.  I understand.  Well,

5     thank you very much.  That gives me a sense of your

6     computer literacy.

7          And I suspect there's going to be a lot of

8     computer evidence in this particular case, as Ms.

9     Martin alluded to in her questioning.  There's also

10    going to be a lot of evidence dealing with the

11    uncomfortable subject of pornography.

12         Quite frankly, I have friends and family who

13    think that if they were in your shoes and I asked

14    them a question along the lines of, would you hold it

15    against somebody or think less of them if you knew

16    that they looked at pornography on a regular basis,

17    I'm confident some of them would raise their hands,

18    and I would appreciate the fact that they did that,

19    that they were honest enough to tell us that.  So I'm

20    going to ask you that question, and I hope you feel

21    comfortable enough, having been with us now for

22    hours, that you would share that with us.  It doesn't

23    mean you're a bad person; maybe just the opposite;

24    but we would like to know.  If the evidence is

25    presented that Mr. Frakes has looked at pornography,

1  does that in and of itself -- in your mind would that

2  make him a bad person?

3  THE COURT:  Mr. Clarke, to clarify, I think

4  you're asking, if he looked at adult pornography,

5  which is otherwise legal.  Is that what you're asking

6  about?

7  MR. CLARKE:  That's correct, your Honor.

8  THE COURT:  All right.

9  MR. CLARKE:  Thank you.  So get in touch

10  with your inner self about your own biases.  We all

11  have them.  It's not bad to have biases.  It makes

12  you human.  Does anyone think that looking at

13  pornography itself makes you a bad person or would

14  cause you to think less of that person because they

15  looked at it?

16  MR. MURRAY:  I might not hire somebody.  I

17  wouldn't want to judge them and say they are a bad

18  person.  If I knew that, I might -- that might affect

19  my decision in something like that.

20  MR. CLARKE:  And that's a perfect answer.

21  That's what we're looking for, is to know you might

22  use it as a discriminatory -- all things being equal,

23  you might pick one applicant over the other because

24  you knew that they looked at pornography.

25  MR. MURRAY:  Yes.

1          MR. CLARKE:  Hearing Mr. Murray's answer to

2     that question, does that cause anyone else to think

3     the same thing, I might do the same thing if I knew?

4     Ms. Wilburn?

5          MS. WILBURN:  If I had a business, I would

6     be the same way if I knew somebody . . .

7          MR. CLARKE:  Now, do you think -- I'm

8     assuming that pornography in itself, whether or not

9     somebody looked at it, probably wouldn't have any

10     direct impact on your business, so there is something

11     else that that says about the person to you that

12     causes you to maybe think that way.  Would you agree

13     with me?

14          MS. WILBURN:  Yes.

15          MR. CLARKE:  And can you articulate what it

16     is?

17          MS. WILBURN:  Just -- no, not really.

18          MR. CLARKE:  All right.  That's fair

19     enough.  Anyone else similar to Ms. Wilburn?

20          MR. TRYTTEN:  If somebody was that obvious

21     about it that I would know about it, then I think it

22     would affect me, or it would affect my opinion, or

23     whatever, but they would have to be obvious about it

24     or I don't think I would know it.

25          MR. CLARKE:  That's a good answer.  Fair

1    point.  All right.  Anyone else?  Ms. Caputo?

2         MS. CAPUTO:  If they were obvious, like

3    that gentleman said, I would think less of them, but

4    I don't know if I would think of them as, like, a

5    terrible person, because I know a lot of people do

6    so.

7         MR. CLARKE:  I understand.  That's a good

8    point.  Anyone else?  You know, obviously, the judge

9    has told you the general nature of the charges, and

10   so you probably have some idea of the evidence that

11   you anticipate to hear in this particular case, and

12   I'm wondering if any of you now sitting here are

13   concerned that if you were to reach a verdict of not

14   guilty in this case, does anyone have concern that

15   that would be letting someone down, whether it be the

16   prosecutor or the people depicted in the videos?

17   Does anybody feel like they would be letting somebody

18   down if you reached a verdict of not guilty?

19        MR. SIBERG:  I think I'm going to have a

20   definite yes one way or the other, no matter what the

21   verdict is, to answer your question.

22        MR. CLARKE:  You're going to feel like you

23   let somebody down no matter which way?

24        MR. SIBERG:  Like I stated before, it's

25   going to affect a lot of people, so it will affect me

1     as well, so my decision is going to be pertinent to

2     other people, and that's . . .

3              MR. CLARKE:  Ms. Wilburn, I saw you kind of

4     shaking your head.

5              MS. WILBURN:  I kind of feel -- I feel a

6     lot like he does.

7              MR. CLARKE:  Anyone else feel that way?

8     Does anyone feel concerned that if you reached a not

9     guilty verdict that somehow that would be showing

10    support for child pornography, like that would be

11    somehow a vote that child pornography is okay?

12    Anybody feel that way?  Mr. Perry, I don't know if

13    you were just moving around.

14             MR. PERRY:  I have back problems.

15             MR. CLARKE:  So if we were at an auction,

16    you would have bought it.

17        There are some initiatives around town, various

18    forums that are antipornography, and some have been

19    in the forefront.  Quite frankly, in some of the

20    church bulletins this weekend and last weekend there

21    have been full page, not ads, but articles dealing

22    with an antipornography campaign through one of the

23    churches.  Did anybody see that this weekend in a

24    church bulletin or otherwise?  All right.

25        In order to coach these days, youths, you have

1       to go through training programs or to participate in

2       school activities.  As an adult, if you're not a

3       teacher, at least in Catholic schools, you have to go

4       through special training.  It's called Virtues.  Has

5       anyone gone through the Virtues training program?

6       That's Mr. Dallman.

7                   MR. DALLMAN:  Uh-huh.

8                   MR. CLARKE:  You went through the Virtues

9       program?

10                  MR. DALLMAN:  My son is in Catholic school.

11                  MR. CLARKE:  How long ago was that?

12                  MR. DALLMAN:  It would have been fall, this

13      past school year.

14                  MR. CLARKE:  Did that -- was that primarily

15      comprised of watching a video of a couple gentlemen

16      talking about their criminal activity?

17                  MR. DALLMAN:  Their experiences, yes,

18      uh-huh.

19                  MR. CLARKE:  And you were given some

20      written materials to take and read as well; is that

21      right?

22                  MR. DALLMAN:  Correct, uh-huh.

23                  MR. CLARKE:  Anything about that program,

24      do you think, is going to affect your ability to sit

25      on this jury today?

1      MR. DALLMAN:  No.  I think it just opened

2   my eyes that it actually happens, you know.

3      THE COURT:  There was another hand also.

4      MR. CLARKE:  I'm sorry.

5      MR. HOWELL:  I went through something

6   called Safe and Sacred Spaces.  It's a training for

7   anyone working with youth or disadvantaged adults.

8      MR. CLARKE:  And how long ago was that?

9      MR. HOWELL:  Five years ago.

10      MR. CLARKE:  Do you think anything about

11   that would impact your ability to be a juror in this

12   case?

13      MR. HOWELL:  No.

14      MR. CLARKE:  Does anybody watch -- I'll go

15   through a list of TV shows.  I'm curious to know who

16   watches these shows on a regular basis.  Who watched

17   NYPD Blue?  If you watched that show on a regular

18   basis, raise your hand.  All right.  How about CSI,

19   any of the CSI shows?  All right.  About half of you

20   watched those shows.  Truth be told, I don't watch

21   those shows, but just by chance I happened to watch a

22   show, CSI New York, about two weeks ago, and it was

23   the first time I've seen it, and the name of the show

24   was Rush to Judgment.  Did anybody see that show?  If

25   it rings a bell, it had to do, unfortunately, with

1    child pornography and a wrestling coach who was

2    murdered.  Does that ring a bell with anyone?  Did

3    anybody see that show?  Ms. Wilson, you saw that

4    show?

5              MS. WILSON:  Uh-huh.

6              MR. CLARKE:  Did you see it just a couple

7    weeks ago?

8              MS. WILSON:  Yeah, it was a couple weeks

9    ago.

10             MR. CLARKE:  Did you watch the whole show?

11             MS. WILSON:  I was in and out.

12             MR. CLARKE:  Now, I think, as the judge has

13   described for you, what you may see on TV doesn't

14   mean that that's reality.

15             MS. WILSON:  Right.

16             MR. CLARKE:  Can you put what you saw on

17   that show aside and just focus on the evidence that's

18   presented in this case?

19             MS. WILSON:  Oh, yes.

20             MR. CLARKE:  I'm going to give everyone a

21   Hobson's choice.  I'm going to ask you to say that

22   you're a quick decision-maker or a deliberate

23   decision-maker, take a long time to make a decision,

24   one or the other.  You can't be middle ground.  So if

25   you think that you would describe yourself as a quick

1  decision-maker, would you raise your hand.  All

2  right.  So basically I've got three people in the

3  back row.

4          MS. HARDIN:  At work I'm a quick decision

5  maker because I have to be, but it's totally

6  different than what my personal life is.  I'm a

7  nurse, so I have to act quick.

8          MR. CLARKE:  Right.  But if you're trying

9  to decide where to go on vacation and --

10          MS. HARDIN:  Yeah, no, no, deliberate.

11          MR. CLARKE:  I understand.  Ms. Hansen?

12          MS. HANSEN:  Same thing.  At work, you

13  know, you have to make some decisions, like classroom

14  management and stuff like that, but otherwise I have

15  to research everything to death.

16          MR. CLARKE:  All right.  Having gone

17  through this, is there anyone now, having spent a

18  couple hours with the judge and the prosecutor and I,

19  is there anyone sitting here who thinks you have a

20  strong suspicion that Mr. Frakes is guilty?  Anyone

21  feel that way?  It would be all right if you do.  We

22  want to know about it.  No?  All right.  Thank you,

23  your Honor.

24          THE COURT:  Very well.  Do the parties pass

25  for cause?

1          MS. MARTIN:  Your Honor, could we approach

2     the bench?

3          THE COURT:  Please do.

4          (Counsel approached the bench and the

5     following proceedings were had:)

6          MS. MARTIN:  Your Honor, I wanted to

7     revisit Ms. Vannaman's issue.  She sat there through

8     a couple times --

9          THE COURT:  I'm sorry, which --

10          MS. MARTIN:  Sally Vannaman, if I'm

11     pronouncing that correctly.  She was the one who is

12     in the front with the jean jacket who had the issue

13     with the son.  The way it was left the last I recall,

14     she indicated that she would hold the government to a

15     higher burden than beyond a reasonable doubt, and I

16     think the term she even used was 100 percent, that

17     she would have to be sure 100 percent.  That was the

18     percentage that she gave.  She sat there quietly.

19     She didn't make any responses to any further

20     questions during the questioning, although that topic

21     really never got raised again, although I did see her

22     start to raise her hand a couple of times in response

23     to the difficult issue -- the difficulty issue of

24     sitting in the case, and I ask that she be struck for

25     cause because I think that she is going to require a

1    higher standard.

2         I would say on the flip side of that, also

3    Mrs. Caputo, I think she's on the flip side of that.

4    I think she might require the government to have a

5    lesser burden, but I wanted to revisit both of those

6    people because I think that they are in a particular

7    situation that we visited up here about, and I think

8    at least with regard to Ms. Vannaman, she's going to

9    hold us to a higher burden.

10                  THE COURT:  Mr. Clarke?

11                  MR. CLARKE:  Judge, I view them in the same

12   light as Ms. Martin.  I think they were polar

13   opposites of each other in terms of which way they

14   were leaning.  I think Ms. Caputo seemed more

15   emotional about it than Ms. Vannaman, so those are

16   the two witnesses that I have some question about --

17   potential jurors I have a question about.

18                  THE COURT:  Let me ask this.  Do you

19   oppose -- this is not like a horse trading thing

20   where if you give me that one I'll give you that one,

21   but I have reservations about both.  I don't think

22   I'm in a position where I feel obligated to grant the

23   cause motions as to either because Ms. Vannaman, when

24   I came back and asked the question about the burden

25   of proof and holding the government to a higher

1  standard, at the end of my questions she did not

2  raise her hand to that.  With all due with respect, I

3  have some questions about the way she responded at

4  the bench, yet -- I have to use a phrase of one of

5  the individuals -- in my gut I have some concern

6  about where Ms. Vannaman is coming from.  I feel a

7  little bit the same way about Ms. Caputo, but I think

8  her answers were such that I am comfortable that she

9  rehabilitated herself as someone who indicated she

10  could do this job.  But if the two of you are willing

11  to say, look, why don't we scratch the two who are

12  questionable, understanding we're going to draw two

13  more out and have to go through all this -- and who

14  knows what we're going to get? -- you can persuade

15  me.  Mr. Clarke, are you amenable to that approach?

16              MR. CLARKE:  I am, your Honor.

17              THE COURT:  I will strike those two.  We

18  will call two more and go from there.

19              MS. MARTIN:  Thank you, Judge.

20              (The proceedings returned to open court.)

21              THE COURT:  I'm going to excuse at this

22  time Ms. Vannaman and Ms. Caputo, and I would ask

23  both of you, with our thanks for your service today,

24  to report back in Friday, July 24, after 6:00 p.m.

25  You are excused at this time.  Thank you.  Ms.

1       Scheurer, would you please read the names.

2               (The next two prospective jurors were

3       called forward by the courtroom deputy.)

4               THE COURT:  Ms. Logan and Mr. Koelsch, were

5       you able to see and hear everything which has gone on

6       in open court thus far?

7               (Affirmative responses.)

8               THE COURT:  All right.  Both have indicated

9       in the affirmative.  Would either of you have raised

10      your hand in answer to any of the questions that I

11      put to the panel?  I realize you may want me to go

12      back and refresh your recollection about some of

13      those things, but can you think of anything as you

14      sit here right now that you would have raised your

15      hand about at the time?  Ms. Logan?

16              MS. LOGAN:  Yeah.  My uncle is a retired

17      district court judge.

18              THE COURT:  All right. And where is that?

19              MS. LOGAN:  He was with the Tenth District

20      here.

21              THE COURT:  Here in Wyandotte County?

22              MS. LOGAN:  Yeah.  Well, it was Tenth

23      Circuit Court of Appeals, James K. Logan.

24              THE COURT:  Oh, sure.  He was the dean of

25      the law school when I started law school.  Sure.

1        MS. LOGAN:  We're actually first cousins.

2    His dad and my dad were brothers.

3        THE COURT:  Sure.  Pardon me for being so

4    dense.  All right.  Is there anything about that that

5    you think would affect your ability to be fair and

6    impartial here?

7        MS. LOGAN:  No.

8        THE COURT:  All right.  Any other questions

9    that you think you would have raised your hand in

10    response to?

11        MS. LOGAN:  Nothing that -- no.

12        THE COURT:  You're not acquainted with this

13    case?  And if I'm wrong about any of these --

14        MS. LOGAN:  I'll stop you.

15        THE COURT:  Right.  You're not acquainted

16    with the lawyers; you're not acquainted with the

17    participants; you're not acquainted with other people

18    involved in law enforcement.  Your views about the

19    subject matter are not so strong that they would keep

20    you from being able to resolve this case based on the

21    evidence and the law.  You would follow my

22    instructions as given to you.  You wouldn't hold the

23    government to any lower or higher burden of proof

24    than what the law requires.  You wouldn't give

25    government witnesses any more or less degree of

1    credibility than other witnesses.  You would decide

2    this case simply according to the evidence and the

3    law in the courtroom.  Is that a fair statement?

4              MS. LOGAN:  As instructed.

5              THE COURT:  All right.  Now, have you ever

6    served on a jury before?

7              MS. LOGAN:  No, sir.

8              THE COURT:  Let's get the biographical

9    details.  Ms. Scheurer, will hand you the little

10   sheet --

11             MS. LOGAN:  City of Lansing.  I'm an

12   optician, so trade school.  I'm divorced.  Again,

13   some trade school plus a full diploma, and I have six

14   children.  They are --

15             THE COURT:  This is the hard part.

16             MS. LOGAN:  -- 27, she's a housewife, and

17   she lives in Kansas City, Kansas; 26, and he works in

18   the restaurant industry, and he's in Lansing; 23, and

19   he works for a financial company, and he's in

20   Overland Park; then 14 and 11 and 11, and they are

21   students, and they are home with me.

22             THE COURT:  Thank you very much.  I will

23   give counsel an opportunity to do some follow-up

24   questions as well, but can you recall any of the

25   questions that either Ms. Martin or Mr. Clarke asked

1          that you would have responded to at some level?

2                    MS. LOGAN:  None that I can recall that

3          sparked anything.

4                    THE COURT:  Mr. Koelsch, let me go to you.

5          Would you have raised your hand in response to any of

6          those questions?

7                    MR. KOELSCH:  Well, ten or 12 years ago I

8          was up here on a grand jury.

9                    THE COURT:  All right.

10                    MR. KOELSCH:  For a year and a half.

11                    THE COURT:  Where are you from, by the way?

12                    MR. KOELSCH:  Paola.

13                    THE COURT:  Did that grand jury have the

14          occasion to investigate any alleged child pornography

15          crimes?

16                    MR. KOELSCH:  No.

17                    THE COURT:  All right.  Is there anything

18          that you feel that you learned through that grand

19          jury process that would have you start out more on

20          one side of the fence compared to the other as a

21          result of that service?

22                    MR. KOELSCH:  No, sir.

23                    THE COURT:  In other words, you would be

24          able to treat both the government and the defendant

25          equally and decide this case based on the evidence

1    and the law and nothing else; is that correct?

2         MR. KOELSCH:  Yes, sir.

3         THE COURT:  All right.  Would you have

4    answered affirmatively to any of the other questions,

5    knowing the people or any of those kinds of things?

6         MR. KOELSCH:  No.

7         THE COURT:  Now if you would answer the

8    questions from the biographical sheet, I would

9    appreciate that.

10        MR. KOELSCH:  I live in Paola.  I'm retired

11   from being a school janitor at the school district

12   there, but I do operate a cleaning service that I

13   operate myself.  I'm married.  We have been married

14   for 30 years.  My spouse is a housewife.  I had a

15   high school education, and I had seven children

16   ranging from 30 to 20.  You want to know where they

17   all are?

18        THE COURT:  Ms. Logan had to do it.  You've

19   got one more.

20        MR. KOELSCH:  The oldest is 30; she's a

21   teacher in Wichita.  The next one is from Pleasanton,

22   Kansas, and he mows lawns, lawn care service.  The

23   next one is in Salina; he works for Sam's Club.  The

24   next one is in Washington, state of Washington, and

25   she's just a housewife.  The next one is in college

1     in Wichita.  The next one is in college in Wichita.

2     The youngest one is a butcher at Price Chopper in

3     Paola.

4             THE COURT:  Well done.  All right.  Now, I

5     know these questions will be coming in terms of

6     computer aspects because that's something that was

7     asked.  Do you use a computer, Ms. Logan, at home and

8     at work?

9             MS. LOGAN:  Uh-huh.

10            THE COURT:  I need you to answer yes or no.

11            MS. LOGAN:  I'm sorry.  Yes.

12            THE COURT:  Do you program your own

13     computer?

14            MS. LOGAN:  No, sir.

15            THE COURT:  So you're just a user?  People

16     can show you how to do it?

17            MS. LOGAN:  Right.

18            THE COURT:  Do you have knowledge about

19     file sharing programs, any of those kinds of things?

20            MS. LOGAN:  Bear Share was one that my

21     oldest daughter used.  That was a music exchange.  I

22     have also heard of Limewire.

23            THE COURT:  Okay.  Very good.  Thank you.

24     Mr. Koelsch, how about you with regard to computers?

25            MR. KOELSCH:  I have a computer.  It's not

1     hooked up to no networks.  The kids had it hooked up

2     to a network when they were home.  I know nothing

3     about them.

4             THE COURT:  All right.  That's good with

5     me.  Ms. Martin, I'll give you a couple minutes here

6     with regard to these prospective jurors.

7             MS. MARTIN:  Thank you, Judge.  You

8     indicated that you had some Bear Share on your

9     computer?

10            MS. LOGAN:  My daughter did.

11            MS. MARTIN:  Did you ever use it?

12            MS. LOGAN:  No, huh-uh.  She was -- I mean,

13     it was when I would hang out with her and we would be

14     doing stuff and she would -- I just was familiar with

15     watching her do it.  It's not on my computer.

16            MS. MARTIN:  It's not on your computer?

17            MS. LOGAN:  No.  It's on hers.  Like I

18     said, I had some experience watching her.

19            MS. MARTIN:  She didn't teach you how to go

20     out and search for things and pick things out and

21     download them?

22            MS. LOGAN:  No.  She did it all.

23            MS. MARTIN:  Okay.  You just watched?

24            MS. LOGAN:  Yeah.

25            MS. MARTIN:  All right.  And so would it be

1    safe to say that you wouldn't try to hold yourself

2    out as an expert in the jury room about it?

3              MS. LOGAN:  No way.  I know just enough

4    about it to be dangerous.

5              MS. MARTIN:  All right.  What about your

6    use of the internet?  Do you use the 'net?

7              MS. LOGAN:  Uh-huh.

8              MS. MARTIN:  About how often would you say

9    that you access the internet?

10             MS. LOGAN:  Every day.

11             MS. MARTIN:  Is that for email?

12             MS. LOGAN:  Uh-huh.

13             MS. MARTIN:  Anything else.  Shopping?

14             MS. LOGAN:  Some shopping.  Most of it is

15   basically my children are on AOL, and so I get on

16   every day to see -- especially, like, they have been

17   in Colorado the last two weeks.  It sends me an

18   activity report so I can look and see what they are

19   doing.

20             MS. MARTIN:  What about Facebook?  I think

21   he asked about Facebook.

22             MS. LOGAN:  I have a My Space.  I haven't

23   gotten to Facebook yet.

24             MS. MARTIN:  I'm assuming those are pretty

25   similar, that you can go on and chat with other

```
 1      people and they can post things on your My Space?

 2                    MS. LOGAN:  Uh-huh, yes.  They can send you

 3      e-mails and -- yeah.

 4                    MS. MARTIN:  Now, I talked more

 5      specifically with everybody else about the nature of

 6      the crime and the items of evidence that are likely

 7      to be presented.  Is there anything about that that's

 8      going to be particularly difficult for you?

 9      Obviously, it's going to be difficult for everybody.

10                    MS. LOGAN:  That was my thought.

11                    MS. MARTIN:  It's everybody?

12                    MS. LOGAN:  Yeah.

13                    MS. MARTIN:  Okay.

14                    THE COURT:  Why don't you put on another

15      minute there, Ms. Scheurer.

16                    MS. MARTIN:  Thank you.  Mr. Koelsch, you

17      were on a grand jury here in Kansas City, Kansas?

18                    MR. KOELSCH:  Yes.

19                    MS. MARTIN:  Do remember me?

20                    MR. KOELSCH:  Vaguely.  I remember the

21      judge.

22                    MS. MARTIN:  Was it this judge who presided

23      over the grand jury?

24                    MR. KOELSCH:  Well, we had two or three

25      would come in different times.  It was over an
```

1    18-month period.  It depended who was available.

2                    MS. MARTIN:  In the grand jury you saw

3    everybody from my office; right?

4                    MR. KOELSCH:  Probably.

5                    MS. MARTIN:  Okay.  So it wouldn't be

6    unusual that -- I was trying to place you.

7                    MR. KOELSCH:  I'm not so sure you were

8    here.  It was a gentleman, I know.

9                    MS. MARTIN:  I have been here for almost 15

10   years.

11                   MR. KOELSCH:  Well, it was early nineties

12   when I was here.

13                   MS. MARTIN:  Maybe we did miss.  I just

14   want make sure that I wasn't --

15                   MR. KOELSCH:  I don't know you, so --

16                   MS. MARTIN:  Okay.  Is there anything about

17   the type of case we're going to be listening to that

18   would make you feel particularly uncomfortable, make

19   you not feel that you could look at the evidence and

20   judge the defendant fairly?

21                   MR. KOELSCH:  I'm not going to say I

22   couldn't look at it, but I feel uncomfortable with

23   it, yes.

24                   MS. MARTIN:  And I assume that's true with

25   everybody.

1          MR. KOELSCH:  I feel uncomfortable.  I've

2     seen pornography, yes, but --

3               THE COURT:  All right.  Mr. Clarke?

4               MS. MARTIN:  That's all I have.

5               MR. CLARKE:  Thank you, your Honor.  Ma'am,

6     Judge Logan isn't the only attorney in the family;

7     correct?

8               MS. LOGAN:  No, he's not.

9               MR. CLARKE:  Okay.  So do you have any

10    legal background training, anything like that?

11              MS. LOGAN:  No.

12              MR. CLARKE:  And what about law

13    enforcement?  Anyone in your immediate family?

14              MS. LOGAN:  [Shook head.]

15              MR. CLARKE:  Is that a no?

16              MS. LOGAN:  No.  Sorry.  No.

17              MR. CLARKE:  And did you ever come and

18    watch any of Judge Logan's trials?

19              MS. LOGAN:  No, I didn't.  I was there when

20    he was brought into office or brought in to sit on

21    the bench, but other than that, the ceremony, no, I

22    never did.

23              MR. CLARKE:  How about the TV shows?  Do

24    you regularly watch NYPD Blue or CSI or anything like

25    that?

1            MS. LOGAN: I'm a channel surfer. I spend

2 more time, actually, on the Food Network.

3            MR. CLARKE: All right. Sir, you said you

4 don't use a computer much; is that right?

5            MR. KOELSCH: That's right. By the time I

6 type a five-letter word in, it done went back to the

7 screen and I have to start over.

8            MR. CLARKE: So it's been a waste of time

9 when you tried it? Is that what you're saying?

10            MR. KOELSCH: Right.

11            MR. CLARKE: All right. Do you have

12 anybody in the family who is law enforcement?

13            MR. KOELSCH: No.

14            MR. CLARKE: How about legal?

15            MR. KOELSCH: No.

16            MR. CLARKE: And what about TV viewing

17 habits? Do you watch TV much or --

18            MR. KOELSCH: I don't try to watch it a

19 lot. My wife watches it. I do see some of it, but

20 usually never in on a whole show.

21            MR. CLARKE: I don't have any additional

22 questions. Thank you, Judge.

23            THE COURT: All right. Thank you.

24            MR. STEVENS: I had a question. When you

25 were refreshing people about knowledge of people in

1     law enforcement, did that include lawyers too?

2                 THE COURT:  Sure.

3                 MR. STEVENS:  Two of my best friends are

4     lawyers, not connected with this case.  One is a

5     defense attorney, and another is a judge, and a

6     friend of mine from back was Bob Olson, who was a

7     colleague of Ms. Martin in this office here.  His son

8     and my son were best friends in our neighborhood, so

9     I wanted to mention that.

10                THE COURT:  Surely.  As to the other, was

11    Bob Olson the lawyer you were speaking of, or is

12    there another lawyer that you meant?

13                MR. STEVENS:  He was separate of the two.

14                THE COURT:  The other two by name or --

15                MR. STEVENS:  Steve Morakian and Steve

16    Howard.

17                THE COURT:  All right.  Thank you.  Any

18    questions based on that?

19                MS. MARTIN:  No, your Honor.

20                MR. CLARKE:  Briefly, your Honor.

21                THE COURT:  Surely.

22                MR. CLARKE:  Sir, you're friends with Steve

23    Morakian?

24                MR. STEVENS:  Yes.

25                MR. CLARKE:  He does defense work?

1          MR. STEVENS:  Yes.

2          MR. CLARKE:  Do you discuss cases with him?

3          MR. STEVENS:  In general sometimes.  We're

4     tennis partners, so we talk about stuff like that,

5     yeah.

6          MR. CLARKE:  Do you ever spar about cases

7     that he's worked on, or is it more kind of in

8     passing, this is the kind of case?

9          MR. STEVENS:  In passing.

10          MR. CLARKE:  Anything about your friendship

11     with him that you think would carry over into your

12     service if you were selected as a juror in this case?

13          MR. STEVENS:  No.

14          MR. CLARKE:  Thank you.

15          THE COURT:  All right.  Does the government

16     pass for cause?

17          MS. MARTIN:  Yes, your Honor.

18          THE COURT:  And does Mr. Frakes pass for

19     cause?

20          MR. CLARKE:  Yes, your Honor.

21          THE COURT:  Very well.  Ms. Scheurer, would

22     you please circulate between the tables for the

23     peremptory challenges.

24          Members of the jury, as I said, in addition to

25     cause challenges there are peremptory challenges.

1    There's 14 seats in the jury box and 32 of you.  That
2    means 18 have to go.  That's where we are now.  The
3    lawyers are assigned certain numbers of challenges
4    that they get to make, and I have told them they have
5    to exercise them.  I'm sure they would all say each
6    and every one of you is fine, but I'm making them say
7    18 of you have to go.  If you're among the 18
8    selected to go, don't take it personally.  It's not
9    like you've done something wrong.  Also, don't get
10   too carried away in celebrating until you get
11   outside.  This will take a few minutes because they
12   have to sort of check their notes and everything that
13   we have been talking about, all these questions, and
14   sort of assess that and see where things are.  So it
15   will take a couple minutes.  Once that's been done,
16   we will then excuse the people who are asked to step
17   down and I'll give a few more instructions to the
18   actual 14 who are going to try the case, and as to
19   that group we will take a recess at that particular
20   point.
21       As to the folks who are excused, which includes
22   those who haven't been called up at all, who I will
23   excuse at that point, please remember to call back in
24   this Friday, July 24, after 6:00 p.m., if you're not
25   actually seated as a part of this particular jury.

1    In the meantime, feel free to visit with each other.

2    Don't talk about what we're doing here, but relax.

3    It's going to be a couple minutes.  I'm going to be

4    quiet, and you all can talk among yourselves.

5                         * * * * *

6                   TUESDAY, JULY 21, 2009

7                   OPENING STATEMENTS

8         MS. MARTIN:  May it please the court,

9    counsel, members of the jury, the evidence in this

10   case will be that on March 12 of 2008 Detective John

11   Howe from the Independence Missouri Police Department

12   was working as a detective, and his job then, just as

13   it is now, was to investigate crimes involving child

14   pornography.  So Detective Howe sat down at his

15   computer, and he logged on, and he began searching

16   for people who were willing to share images and

17   movies of child pornography, and he found somebody.

18   On that day the detective was able to identify an

19   internet IP address.  That IP address was assigned to

20   a computer, and that computer was running Limewire

21   software.

22        The detective will explain that Limewire is a

23   software program that you can put on your computer,

24   and it allows computer users to share files with one

25   another, and he will explain how you install Limewire

1 on to your system and that once you install it onto

2 your system the software program creates what is

3 called a shared folder, and you can put things in

4 that shared folder.  You can put movies or documents

5 or anything you want to share with somebody else.

6 Once do you that, whatever you put into that shared

7 folder is available for other users of Limewire to

8 access and take from you, and that's the default

9 setting.  The default setting of Limewire would allow

10 other Limewire users to access your computer and to

11 take things from your computer that you put in your

12 shared folder.

13 So on March 12 Detective Howe saw that this IP

14 address that was assigned to this particular computer

15 was running Limewire, and it appeared that there were

16 movies in this person's shared folder that would be

17 indicative of child pornography.  One of the movie

18 titles that the detective saw was called PtHC Kimmy

19 14-year-old new.

20 What the detective will testify to is that PtHC

21 is a common term that's used in child pornography,

22 and it is stands for preteen hardcore.  The other

23 movie that the detective recognized or thought might

24 be a movie of child pornography was a file, 15

25 year-old-girl fingers 14-year-old friend.  Detective

1    Howe downloaded those two movies from that computer.

2    Then Detective Howe had to find out who that IP

3    address belonged to, what computer was assigned to

4    that IP address on the date and time that he

5    downloaded those movies. The detective found out

6    from AT&T that the IP address was assigned to a

7    computer whose account name was Pamela Frakes in

8    Atchison, Kansas. The detective realized that

9    Atchison, Kansas, was outside of his jurisdiction, so

10    he referred the case to another agency. Ultimately

11    Detective Terry Kelly from the Atchison Police

12    Department and Agent Jim Kanatzar from Immigration

13    and Customs Enforcement followed up the lead. The

14    two officers went by the Frakes residence. They got

15    a description of the residence, and they ultimately

16    applied for and were given a search warrant.

17    On June 10 of 2008 the agents went to the Frakes

18    house to serve the warrant. When they first got

19    there, nobody was home, so officers were sent to Ms.

20    Frakes' place of employment, and they told her that

21    they were there to execute a search warrant at her

22    house, and she came back to the house pretty shortly

23    thereafter. When she got to the house, she talked to

24    the agents who were there, and she told them that

25    they lived in the house with her two sons, Jason and

1    the defendant, Casey Frakes.  She said that the

2    computer in the house was one that she had purchased

3    through an excise program at her place of employment

4    and that she bought it using an employee deduction

5    but that her son Jason had actually paid her back for

6    it so that Jason had actually purchased the computer.

7    She told the agents that the computer was located in

8    Casey's bedroom, the defendant's bedroom, and that

9    she herself didn't use the computer very often.  She

10   used it to pay her pills and to balance her

11   checkbook.  She said she didn't know what Limewire

12   was and she had never downloaded anything from the

13   internet onto the computer.  And finally she told the

14   officers that her son Casey, the defendant in this

15   case, was the person who used the computer the most

16   in the house.

17       So next the agents went and interviewed Jason

18   Frakes, the defendant's brother and the other person

19   in the house who had access to the computer.  He told

20   the agents that he wasn't very computer knowledgeable

21   and that he used the computer primarily for online

22   bill paying also and to play computer games.  He said

23   that he knew that Limewire was on his computer and

24   that his brother was the one who used it the most,

25   and he said that -- in fact, I think he will testify

1       that when he got an MP3 player as a gift the

2       defendant had to download the music onto his MP3

3       player because he didn't know how.  In fact, I think

4       he will also testify that he told the agents that the

5       defendant was always on the computer and was always

6       downloading movies and music.

7           Agents then went and they interviewed the

8       defendant himself.  The defendant admitted that he

9       used Limewire and he knew that when he used Limewire

10      anything that he put in his shared folder would be

11      able to -- other people would have access to and they

12      could take things from his shared folder.  At first

13      the defendant denied that he ever downloaded any

14      child pornography; he said that he used Limewire to

15      download adult pornography.  But then he remembered

16      that he did see a video clip of a girl who could be

17      under the age of 14 and that she was dancing and

18      taking her clothes off in this movie.  The agents

19      asked him, how many pornography movies do you think

20      you had?  And the defendant said he thought he had

21      about a hundred, and ultimately he admitted to the

22      agents that he believed that between 10 and

23      15 percent of that video collection were videos of

24      child pornography.  As the agents were leaving, the

25      defendant spoke up and said, if anything comes of

1     this, leave my mom and my brother Jason out of this.

2     They didn't have anything to do with it.  And he

3     said, I'm as perverted as my older brother when it

4     comes to pornography.

5          Agent Kanatzar then took the computer that was

6     seized from the defendant's bedroom, and he analyzed

7     it, and what Agent Kanatzar found was that the

8     Limewire software had been installed under the

9     defendant's profile and it was set to start each and

10    every time the defendant turned on his computer and

11    logged on under his profile.  So each and every time

12    the defendant logged on using his profile, Limewire

13    would start and the share folder would be open and be

14    available for other people to access.  The agent also

15    found that the Limewire program wasn't installed

16    anywhere else on the computer; it wasn't installed

17    under mom's profile; it wasn't installed under

18    Jason's profile; and it wasn't installed under any of

19    the default users on the computer.  So Limewire was

20    only under the defendant's profile, which means if

21    the mother came to the computer and she turned it on

22    and she logged on using her profile, Limewire would

23    not start and no file sharing would be taking place.

24         Agent Kanatzar also then searched the

25    defendant's share folder to see what he had in there

1    that he was allowing other people to share, and he

2    found movies of child pornography, movies with titles

3    like PtHC nine-year-old Vicky stripping and sucking,

4    12-year-old boy fucks 12-year-old girl, Lolita, Vicky

5    willing bed rape, PtHC 11-year-old pedo, Vicky

6    compilation, PtHC ten-year-old kiddy reality child.

7    Those were the names of the movies that were located

8    in the shared folder in the Limewire software that

9    was loaded under the defendant's profile.  The agent

10   also found the two movies that were downloaded by

11   Detective Howe from the Independence Police

12   Department.  As you recall, those two movies were

13   called PtHC Kimmy 14-year-old new and 15-year-old

14   girl fingers 14-year-old friend.  Those two movies

15   that Detective Howe started the case with and

16   downloaded from that internet IP address were located

17   on the defendant's computer.

18       Now, after you have seen and heard all of this

19   evidence, I'm going to have to get back up here, and

20   I'm going to ask that you find the defendant did, in

21   fact, possess movies of child pornography and that he

22   did distribute those movies to other people,

23   including Detective Howe.  And because of those facts

24   I'm going to ask that you go back into the jury room

25   and find that the defendant is guilty as charged.

1       Thank you.

2           THE COURT:  All right.  Mr. Clarke?

3           MR. CLARKE:  Thank you, your Honor.  You

4       know, for the most part that's right, that is the

5       evidence you're going to hear in this particular

6       case.  So much of what you heard isn't going to be at

7       issue in this case now.  There's what the government

8       has to prove in the case and then there's what really

9       is at issue in the case.  The judge has already told

10      you what's at issue in the case, that is, whether or

11      not Mr. Frakes possessed child pornography and

12      whether or not he distributed child pornography.  Not

13      all the evidence you're going to hear today really

14      goes to the heart of the issue, or you're going to

15      hear during the course of this trial.

16         For example, quite frankly, there is no issue

17      that the evidence that you're going to hear in this

18      case is that Detective Howe got on the computer, got

19      on Limewire, did a search connected to a computer

20      that was in the Frakes home, downloaded a couple

21      videos off of it.  Those videos contained child

22      pornography, as Ms. Martin said.  The evidence is

23      going to show that thereafter he inquired with the

24      telephone company to find out who the subscriber was

25      that belonged to that IP address.  Based upon that

they went and got their search warrant, and as she
described, the evidence is going to be they went to
the home on June 10 and executed a search warrant,
and the evidence is going to be that in the course of
executing that search warrant they seized this
computer.  The most important stuff you're probably
going to hear concerning that search is going to be
what was on that computer.  Now, the agents will also
testify as to what else they found or did not find in
the course of that search.  One of the things you're
going to hear the agents tell you is that they did
not find any other evidence of child pornography in
that house.

Now, as Ms. Martin described, Mr. Frakes' family
was interviewed.  His mom was interviewed, one of his
older brothers was interviewed, and then the officers
went to Casey's job site.  He was actually there
building a retaining wall, and later on in the day
unexpectedly they showed up at his job site and they
questioned Casey.  I'll get to that in a minute.
Quite frankly, there's not going to be a lot at issue
on the stuff I just described.  The evidence is going
to be exactly what Ms. Martin said it was going to
be.

Now, the evidence concerning his examination of

1   the computer is also going to be exactly what she

2   described it to be.  He's going to testify that he

3   found these files on the computer, and he's going to

4   testify that the files that Detective Howe found on

5   the computer through the internet were the serial

6   number of the files that he found on the computer.

7   Now, those files, they have kind of a DNA.  You know,

8   they have a digital signature that you can look at

9   and tell if it's exactly the same file or not.  Quite

10  frankly, it's probably much more reliable than

11  sitting there looking at the picture and trying to

12  decide whether it's the same thing or not.  He will

13  testify to that.

14       Some of the things he's going to testify to

15  concern some of the things Ms. Martin mentioned, for

16  example, the profile she previewed, the fact that

17  this Limewire program was installed on the computer,

18  it was under Casey's profile.  I think the agent is

19  going to testify that when you set up a profile on a

20  computer it sets up preferences so that if it's Mike

21  Clarke's profile and I like, you know, certain setups

22  on some of the software programs when I log in, I

23  don't have to change the setups on those programs;

24  they will work the way I like it to.  If Ms. Martin

25  had a profile on that computer, when she logged in

1      under her profile, it would be set up the way she

2      liked it.  But I think the agent will testify that

3      none of these profiles -- in fact, there were five

4      profiles on the computer, and none of them were

5      password protected, okay?  What that means is that if

6      I had a profile on the computer and Ms. Martin had a

7      profile on the computer, I could log in under her

8      profile.  All I would have to do is click on the

9      profile, and boom, it would pop up on the screen and

10     I could use it.  Similarly, she could click on my

11     profile, boom, there it is on the computer.  She can

12     use it.  I think the agent will testify anybody in

13     the house that has access to that computer is going

14     to have access to that Limewire program.  I think the

15     evidence is going to be in the whole scheme of things

16     that's not going to matter a lot, quite frankly,

17     because the evidence is going to be that Mr. Frakes

18     did use this computer; Mr. Frakes did use Limewire;

19     and Mr. Frakes did use Limewire to look at

20     pornography.  In fact, he looked at a lot of

21     pornography on the computer.  You're going to hear

22     the agent testify -- and I keep calling him the agent

23     because otherwise I'm going to butcher his name.

24     He's going to testify that he found some 439 video

25     files on this computer, 439 video files that

1     contained pornography, and you're going to hear

2     evidence that the vast majority of these videos,

3     which are little snippets -- they are free videos

4     that can be downloaded off the computer.  They all

5     have names.  You're going to hear names like

6     masturbating female has great orgasm and bang busters

7     girls, blonde, sexy school teacher.  You're going to

8     hear there were 439 files of this nature on the

9     computer in the Limewire directory, which was

10    installed under Mr. Frakes' profile on the computer.

11    Of those 439 files, as you've heard, the government's

12    evidence will be that seven of those contained child

13    pornography; in other words, the evidence is going to

14    be that 1.5 percent of those files contained child

15    pornography.

16         The agent is going to testify, whether it be

17    Detective Howe, or maybe it will be -- the agent will

18    testify about the Limewire program and how you use

19    it.  You've heard some of it in terms of how it

20    installs and it has this default setting, which means

21    unless you change it this is what it's going to do.

22    By the way, the default setting is that when you set

23    it up it shares everything that you download; you

24    don't have to change anything; and, in fact, unless

25    you change something, as soon as you download it, the

1   evidence will be, it's then shared with everybody

2   else -- you don't have to do anything -- any time

3   that you're on the computer, at least under Casey's

4   profile, because that's the profile that it was

5   installed under.

6       Remember, the evidence is going to be that if

7   you're -- once you log in under Casey's profile, the

8   Limewire program starts up, so even if you're not

9   using Limewire, Limewire is going to be up and

10  running, and the agent will testify that means that

11  that file, that shared folder file, is going to be

12  accessible to other people wherever they are on the

13  internet.  You don't have to be using Limewire for it

14  to be accessible.

15      The agent is going to testify that when you use

16  Limewire you do a search just like an internet

17  search, Google, Yahoo, whatever.  You type in a

18  search term, Tour de France, you type it in, and it

19  will do a search, and results will come up on the

20  screen just like they would if you were using Yahoo.

21  And those results could be movie files, they could be

22  simply images, they could be music files.  You don't

23  see any pictures, all right?  The search results, all

24  they are going to show, the evidence will show, is

25  titles.  In fact, in order to see them, generally

1   what you do, I think the evidence is going to be, you

2   click on them, and it will download the files into

3   that shared filed folder that the installation set

4   up.  You didn't have to do anything separate.  As

5   soon as you install that program, it's setting up the

6   shared folder, and the files will go into that shared

7   folder.  In other words, to view the files, you have

8   to click and open up that file to see it, and I think

9   the evidence will be you could use any number of

10  players.  There's probably a default player it comes

11  with, with Limewire, but you could use the Windows

12  Media Player, whatever it is that's installed on the

13  computer.

14      Again, I think the agent is going to testify

15  that there's not a real way of knowing for sure who

16  would have downloaded a movie or an image or a music

17  file.  And there were lots of music files on here as

18  well.  It wasn't like -- I think he will testify

19  there was more than just pornography on there.  There

20  was lots of -- there might be movies on there of just

21  movies you go to at the normal theater; there were

22  music files on there.  You're going to hear evidence

23  that all these things were on there.  But there's

24  nothing that would indicate who downloaded these

25  files.  I think the agent will testify there's not

1    really anything that's reliable that's going to tell

2    you if that file was viewed or who viewed it.

3         Now, I don't anticipate the evidence is going to

4    be that Mr. Frakes never looked at any of the

5    pornography on the computer.  I think the evidence

6    probably will be that he looked at the pornography on

7    the computer, but you'll hear evidence about, meta

8    data, meta data, however, you pronounce it.  This is

9    the electronic information that you don't see about a

10   file.  You can -- using Windows, you can click on a

11   file, and I think the agent will testify it will give

12   you a file accessed date, file created date, things

13   of that nature.  I think he will explain to you what

14   that means, what it doesn't mean, how reliable it is.

15   For example, I think he will testify that the last

16   accessed date on a file doesn't necessarily mean that

17   the file was viewed by a human being.  For example,

18   it could be that there was virus software installed

19   on the computer and that the virus software scanned

20   that file and the act of scanning that file may have

21   accessed that file enough for purposes of the

22   computer that it decides that that means that that's

23   a new access date.  I think he will testify that

24   someone could have tried to click on that file.  It

25   doesn't mean it necessarily worked.  It could be a

1    corrupted file.  It could be a video clip that starts

2    and then stops, you know.

3        You're going to hear that this isn't exactly the

4    most up-to-date computer in the world.  It wasn't the

5    latest and greatest gaming machine out there that had

6    all the bells and whistles on it.  So, you know, his

7    testimony is going to be very important in this case.

8    We anticipate that his testimony is going to be

9    fairly unbiased.  He's going to tell it like is, and

10   some of it is going to be bad and some of it is going

11   to be good for us, no question about it.

12       In addition to not finding any other evidence of

13   child pornography in the home during the search, I

14   think the agent will also tell you that he didn't

15   find any evidence that Mr. Frakes had engaged in any

16   email communication about child pornography.  He's

17   going to testify that he didn't find any evidence

18   that there had been chats about pornography between

19   Mr. Frakes or anybody else using this computer

20   dealing with child pornography.  In fact, I

21   anticipate the agent will testify that there's no

22   evidence that Mr. Frakes or anybody else did anything

23   as we would describe it actively to distribute child

24   pornography.  It is exactly -- the allegation is

25   exactly as Ms. Martin described it, and that is this

1    passive distribution.  The evidence is not that

2    Mr. Frakes or anybody else gathered these files up

3    and packaged them and then, quote-unquote, advertised

4    them for people to come down and get or send them

5    out.  It's simply that they were in this folder on

6    the computer.  Remember, the evidence is that this

7    folder is installed automatically when you start

8    using this Limewire program.  It downloads on the

9    computer, and it sets up this folder.  It probably

10   asks you, do you want us to set up this folder?  It

11   asks you lots of things during the set up, but if you

12   just click and say, yes, I want to do the default and

13   all this stuff, it's going to set up this shared

14   folder, and then anything that you download is

15   available to everybody else unless you change the

16   default, unless you bother to change the default.

17   And the evidence is that nobody bothered to change

18   the default on this, so the distribution is simply

19   that it's on the computer and it was in this shared

20   file folder.

21        Now the evidence is also going to be that there

22   were -- doesn't appear to be any files deleted from

23   this folder.  There was no culling of what was

24   downloaded, and the evidence is going to be that

25   there was no grouping, organization of the files that

1    were on this computer.  So there's no subdirectory

2    that says this is the child porn; there's no

3    subdirectory that says this includes multiple

4    participants; there's no subdirectory that says this

5    is the really hard-core stuff.  It's just all there.

6         Again, when you are using Limewire, the evidence

7    is, you don't see it.  When you search for it, you

8    don't see it during the process of downloading.  It

9    all gets there before you ever see a lick of it.  You

10   don't ever have to look at it.  You wouldn't ever

11   have to know it was there and look at it other than

12   somebody had to make -- it is true somebody had to

13   make the affirmative action of actually clicking on

14   that file to download it.  It doesn't download by

15   itself, I think the evidence is going to be.  So you

16   have to click on it.  The evidence is also going to

17   be that there's a pattern on these downloads into

18   this folder, and the pattern is that the downloads

19   are in a really, using a military term, tight shot

20   group.  All right?  So there will be evidence that 25

21   files are downloaded, video files, and they all

22   downloaded in a period of six minutes.  So the

23   evidence is going to be that whoever was downloading

24   it -- chances are it was probably Mr. Frakes, is what

25   the evidence is going to show.  The evidence is going

1    to be that they are going through and clicking every

2    single file, and it's downloading into that computer.

3    And you don't have to take anybody's word for it

4    other than -- you know, the agent is not going to --

5    he's going to tell you exactly what it shows, and

6    that is that this tight shot group -- and the

7    evidence is going to show it's not every day.  At

8    most it was probably once a week that pornography is

9    being downloaded on the computer.  And then it's, you

10   know, usually 1:00 o'clock in the morning, or

11   something like that, the evidence is going to show,

12   and the files are downloading for a period of ten

13   minutes.  That is what the evidence is going to show.

14        Now, as Ms. Martin described and as I have

15   already alluded to, the officer and the agent, they

16   went to where Mr. Frakes was working.  They surprised

17   him there, quite frankly.

18        MS. MARTIN:  Your Honor, I'm going to

19   object to that as argument.

20        THE COURT:  I'm going to overrule the

21   objection.

22        MR. CLARKE:  They came to the work site and

23   interviewed Mr. Frakes.  He wasn't in custody.  I

24   think the agents will testify that he was free to go,

25   he was free to terminate the interview, but that he

1     did submit to talking to the officer and the agent

2     about what happened.  You know, he's going to testify

3     in this case, and he's going to be confronted about

4     what he said, and he's going to have an opportunity

5     to explain to you why he said what he did, and he is

6     going to have an opportunity to look you in the eye

7     and tell you, I didn't intentionally download child

8     pornography.  He's going to testify.  He's going to

9     look you in the eye and tell you, I didn't

10    intentionally distribute child pornography.  He's

11    going to tell you, yeah, I looked at a lot of

12    pornography, that's true; and yes, I said that my

13    older brother was just as perverted as I am about

14    looking at pornography.  And when you compare that to

15    what you're going to hear from his brother, for

16    example, the brother that lives at home, Jason, he's

17    going to testify, I don't look at any pornography

18    whatsoever.  I'm extremely conservative,

19    comparatively speaking.  I think the evidence will be

20    that Mr. Frakes is a lot different than his brother,

21    but ultimately you're going to have to make the

22    decision in this case.  I think actions speak louder

23    than words.  I think the most important evidence may

24    be in addition to what Mr. Frakes has to tell you

25    what this agent has to tell you about what was found

1    on the computer and what it really means.  That's

2    going to be very important, what does that

3    information mean?  That's going to be very important

4    evidence in this case.  Thank you.

5              THE COURT:  Thank you, counsel, for your

6    openings statements.  And with that, Ms. Martin, the

7    government may call its first witness.

8                        * * * * *

9                 THURSDAY, JULY 23, 2009

10                 CLOSING STATEMENTS

11             MS. MARTIN:  May it please the court,

12   counsel, members of the jury, in order for you to go

13   back into the jury room now and find the defendant

14   guilty of Count 1, I've had to prove to you five

15   different elements.  There are five different

16   elements of this offense, and they are listed in

17   Instruction No. 11.

18        The first element is that the defendant

19   knowingly distributed a visual depiction.  There's no

20   question in this case that these movies are, in fact,

21   a visual depiction, so the issue for you to focus on

22   as far as Element No. 1 is whether the defendant

23   knowingly distributed.  In other words, did he know

24   that his shared folder was going to be distributed to

25   other people?

1    Second, that the visual depiction was shipped or

2    transported in interstate or foreign commerce.

3    There's no issue here.  The defendant does not

4    dispute that the Kimmy image traveled in interstate

5    commerce by computer from Atchison, Kansas, to the

6    detective in Independence, Missouri, and he has no

7    dispute that the images in the shared folder were

8    available to be distributed to other people, anybody

9    who used the Limewire system around the entire world.

10   Element No. 2 has been satisfied.

11       The third one is that the production of the

12   visual depictions involved use of minors engaged in

13   sexually explicit conduct.  That also is not an issue

14   in dispute in this case.  The defendant doesn't

15   dispute that these movies -- that the people who

16   produced these videos used minors to produce them and

17   that the reason they produced those movies was to

18   have them engage in sexually explicit conduct.  So

19   Element No. 3 has also been met.

20       No. 4, that the visual depictions themselves

21   were of sexual conduct of these minors.  That's not

22   in dispute either.  The movies clearly show these

23   minors engaging in sexually explicit conduct.  So

24   Element No. 4 has also been met.

25       Five, that the defendant knew that at least one

1    of the participants in these movies was under the age

2    of 18 or was a minor.  Again, we have to focus on

3    what the defendant knew.  Did the defendant know that

4    he had movies on his computer in which the

5    participants were under the age of 18?

6    What this case boils down to, ladies and

7    gentlemen, is did the defendant know he had child

8    porn in his shared folder, and did he know the images

9    in his shared folder could be distributed to other

10    people?

11    Let's look now at the knowing distribution.  How

12    did the government prove that the defendant knew he

13    was distributing child pornography?  Instruction

14    No. 11.  First, the defendant doesn't have to

15    actively push child pornography on other people.  He

16    doesn't have to send it to somebody in an email

17    attachment, for instance.  And Instruction No. 13

18    says that it's enough -- the law says it is enough to

19    convict the defendant of distributing child

20    pornography if he allows access to his computer stash

21    of images and videos.  It is enough that the

22    defendant allows access to his computer stash of

23    images and videos.

24    Think of it like a self-service gas station.

25    The owner of a gas station doesn't have to be at the

1    gas station, and people can still come to the gas

2    station, pull up to the pump, swipe their card, and

3    fill their cars with gasoline.  There doesn't have to

4    be any attendant whatsoever at this gas station.  The

5    owner of that gas station is distributing gasoline,

6    and he's doing it knowingly.  He knows he's providing

7    the gasoline on the -- on site, on his property, and

8    he's allowing people to come and get it whenever they

9    want, and he's doing it knowingly even though he's

10   not present and even though he never meets the

11   customers.

12       Second, how else do we prove that he knowingly

13   distributed child pornography?  The defendant told us

14   he knew.  In 2008 when the agents went to talk to

15   him, he admitted that he knew the items in his shared

16   folder were available to other user of Limewire.  He

17   admitted it in 2008, and he admitted it when he

18   testified in open court during this trial.  In fact,

19   he said the reason, the reason, he installed Limewire

20   was so he could share folders, so he could share

21   files and sharing implicates a give and a take.

22       Now, he tried to testify -- he tried to say that

23   he knew he was going out and he was getting files

24   from other people but he didn't really know that

25   other people could come and get files from him, but

1  ultimately he had to admit that he did know because

2  that's how the system works and that's why he put it

3  on his computer in the first place.

4      The government has proved then that the

5  defendant knowingly distributed images of child

6  pornography, so that element has been met.

7      Let's look at Count 2.  Instruction No. 12 gives

8  you the elements of Count 2.  First we have to prove

9  that the defendant knowingly possessed one or more

10  images, visual depictions of minors.  Again, there's

11  no dispute that they were, in fact, visual

12  depictions; there's no dispute that he had one or

13  more of them; and there's no dispute that they were,

14  in fact, minors.  So the issue for you to focus on

15  is, what did the defendant know?  Did he know that

16  there were these images in his shared folder?

17      Second, that the production of the visual

18  depictions involved the use of minors engaging in

19  sexually explicit activities.  This is not in

20  dispute.  The defendant doesn't dispute that in order

21  to make these movies that people used minors and had

22  them engage in sexually explicit activity, so element

23  No. 2 of Count 2 has met.

24      Three, that the defendant knew the visual

25  depictions involved the use of minors engaged in

1    sexually explicit conduct.  There's no dispute that

2    these visual depictions showed minors engaging in

3    sexually explicit conduct.  The only issue for you to

4    decide is whether the defendant knew he had them.

5         Four, that the visual depiction has been mailed

6    or shipped or transported in interstate or foreign

7    commerce by any means, including a computer.  This

8    element is not in dispute.  We heard the testimony of

9    Todd Beard, the agent who investigated the Vicky

10   series, who indicated those movies had been produced

11   in Washington State.  We also heard the testimony of

12   Peter Latham, who investigated this particular

13   series, the Meg series, who said those images were

14   produced in Michigan.  This element has been met.

15        Let's go back to the final element on both

16   counts that you will have to decide.  How did the

17   government prove that the defendant knew that these

18   images -- that he had images of child pornography in

19   his shared folder?  First of all, the defendant had

20   490 movies on his computer, 490 pornographic movies,

21   and he had a share system that required him to double

22   click on each movie he wanted to put in his shared

23   folder.  Of those 490 movies, 91 of them, 91 of them,

24   had titles that would be indicative of child

25   pornography, 91.  So 91 times the defendant double

1     clicked, double clicked, double clicked, double

2     clicked on titles that would be indicative of child

3     pornography. Ninety-one times. The defendant wants

4     you to believe that he accidentally clicked 91 times

5     on titles that would indicate they were child

6     pornography and that those 91 times were accidental.

7     Ladies and gentlemen, 91 times is no accident. In

8     order for you to believe that the defendant

9     accidentally downloaded 91 titles indicative of child

10     pornography, you would have to believe that the

11     defendant is terribly unlucky, and you would have to

12     believe that both Agent Kanatzar and Detective Kelley

13     lied, because both Detective Kelley and Agent

14     Kanatzar testified that when they talked to the

15     defendant in June of 2008 he told them that he knew

16     he had images of child pornography on his computer.

17     He said he knew he had images of girls between 12 and

18     14 and that approximately 10 to 15 percent of his

19     pornography collection was child pornography. You

20     also have to believe that this defendant downloaded

21     these movies -- and let's just talk about the movies

22     that we introduced. One was downloaded on June 5 of

23     '07, more than a year before the investigation. The

24     others -- two of them, or three of them, on March 12

25     of 2007, almost a year to the date of the beginning

1    of the investigation.  The final one was in

2    November 1 of 2006, almost two years before the

3    investigation.  And so in order for you to believe

4    the defendant, you would have to believe that he

5    never, ever looked at them, that he downloaded these

6    movies, he put them in his shared folder, and he

7    never looked at them, and that the only time -- and

8    the first and only time he's ever seen them was here

9    in court.  That really defies logic, and it defies

10    common sense.  That would be like going to a movie

11    theater and buying a ticket and then going back home

12    and not watching the movie.  Why sit at your computer

13    for hours at a time and download movies that you

14    never want to watch?

15        But more than that, more than the fact that it

16    defies logic and common sense, we have this.  This

17    video is Government's Exhibit No. 8.  This exhibit

18    was found not only in the defendant's shared folder,

19    but it was found in his recent folder.  That means he

20    looked at it, he had viewed it sometime in the recent

21    past, and we actually know when that was because the

22    last accessed date was May 19 of '08, about a month

23    before the search warrant at 11:31 in the evening.

24        So what other evidence do you have that the

25    defendant knew what was in his shared folder?  Well,

1    he told us so.  He told us on June 10 of 2008 that he

2    had ten -- between 10 and 15 percent of his

3    collection would be child pornography.  That turns

4    out to be true.  He told the agents that he didn't

5    have any child porn movies that depicted girls as

6    young as five or six.  That also turned out to be

7    true.  He told the agents that he did have images of

8    girls between the ages of 12 and 14, and that turned

9    out to be true, although the Vicky series, I think

10   the agent testified she was only 11, but he was

11   telling the truth on June 10 of 2008.  He didn't lie

12   to the agents when they came and talked to him.

13        And Agent Kanatzar confirmed these statements.

14   When he analyzed the defendant's computer, when he

15   did his computer analysis, he confirmed there were no

16   children as young as five or six, there were children

17   12 to 14, and 91 movies out of 490 is roughly about

18   18 percent.  He didn't lie.  Now, if there's still

19   any question whether or not it was the defendant who

20   was downloading movies or somebody else in the house,

21   let's look at just this one movie, this one movie,

22   nine-year-old Vicky stripping and sucking kiddy pedo

23   illegal underage preteen.  It was created on June 5,

24   2007, at 2:55 in the morning.  Is it reasonable to

25   assume that the defendant's mother snuck into his

1    bedroom at 3:00 o'clock in the morning, sat at the

2    computer, and downloaded this movie?  Is it

3    reasonable to assume that his brother Jon snuck into

4    the house, where he didn't live, snuck into the

5    defendant's bedroom while he slept at 3:00 o'clock in

6    the morning, and downloaded this movie?  Is it

7    reasonable to assume that his brother Jason snuck

8    into his room at 3:00 o'clock in the morning and

9    downloaded this movie?  No.  The only reasonable

10    conclusion from this evidence is that it was, in

11    fact, the defendant who was downloading these movies

12    in his bedroom at 3:00 o'clock in the morning.

13    So, ladies and gentlemen of the jury, I believe

14    that the elements of knowing distribution have been

15    met.  The defendant knew he had these images on his

16    computer.  All of the elements that you need to find

17    have been met.  Find the defendant guilty.  Thank

18    you.

19    THE COURT:  All right.  You will have 15

20    minutes remaining for your rebuttal.

21    Mr. Clarke?

22    MR. CLARKE:  Thank you, your Honor.

23    In defending this case, we're obviously not

24    saying that child pornography is a good thing.  Child

25    pornography is a terrible thing.  It's awful.  And I

1     can't imagine that seeing those pictures right then

2     was really helpful to you to understand the

3     instructions that were underneath some of those

4     pictures. Were those pictures helpful? I submit to

5     you, I expect, no. And, in fact, for the most part

6     consideration of those pictures at this point isn't

7     really important in deciding whether or not

8     Mr. Frakes is guilty of the crimes that he's charged

9     with. Those pictures are -- they might make you

10     angry; they might make you sick; but the fact that

11     those pictures are so offensive does not mean that he

12     committed the crime.

13         I told you in opening statement the issue when

14     you boil all of the water out of the pot was going to

15     come down to, what did Mr. Frakes know? In fact, if

16     you look at Instruction No. 11 and you look at

17     Instruction No. 12, what really matters is whether or

18     not the government has proven that Mr. Frakes

19     knowingly distributed a visual depiction, whether or

20     not Mr. Frakes knew -- as it says in Element No. 5,

21     whether or not Mr. Frakes knowingly possessed.

22     That's what is at issue in this case. Yes, the

23     evidence shows minors. We didn't need to see 15

24     minutes, or however long it was, of the video

25     yesterday. We all knew what it showed after about 20

1      seconds.  We didn't need to see all that because

2      that's not really the issue.

3          Obviously, the judge is going to instruct you on

4      how to do the deliberations, but let me make a

5      suggestion.  Once you go through the initial picking

6      of the foreperson and all that, you ought to try to

7      give every single juror in there a voice to make sure

8      that you're heard.  So one way you can do this is you

9      simply go around the table and give each juror an

10     opportunity to speak before you start to deliberate,

11     exchange ideas, talk amongst yourselves.  What I

12     would submit you do is, you start -- and since

13     Mr. Frakes is entitled to the benefit of the doubt,

14     that each person start and say, this is the fact that

15     I think most strongly supports his innocence, and

16     then you go and you say, this is the fact that I

17     think most strongly supports his guilt.  And you go

18     around the room, and you give everybody an

19     opportunity to do that.

20         Now, on the issue of what fact do you think most

21     supports his innocence, you have a lot to choose

22     from.  It may be the fact that Mr. Frakes' computer

23     profile had no password protection on it; it was a

24     community computer and everybody had access to it.

25     It could be that Mr. Frakes got up and testified

1    yesterday that, in fact, he did not knowingly possess

2    child pornography.  It could be that you heard that

3    the agent said they went through the house, they

4    searched, and they didn't find any other evidence of

5    possession of child pornography or anything else of

6    relevance to the case.

7         Then when you turn it around and you say, these

8    are the facts that most strongly support his guilt,

9    quite frankly, I think you're going to find that your

10   options are much more limited because, again, the

11   issue is not whether or not there was child

12   pornography.  It's not really an issue.  The issue is

13   not necessarily what Jason did or what his mother

14   did.  The issue is, what did Casey Frakes know?  And

15   I submit the thing that's not going to help you

16   decide that, again, is the video images.  So no one's

17   going to get up there, I expect, and say, well, this

18   particular video, this is the one that makes me think

19   that -- this is the strongest piece of evidence

20   against him.  That's not going to be it.

21        It may be the statements that he allegedly gave

22   on June 10.  It may be the fact that Limewire was

23   installed under his profile on the computer.

24   Whatever it is, it's up to you to decide, but it's

25   not going to be those video images.

1          Now, the government just made a big deal out of

2     the fact about what Mr. Frakes said on June 10, and I

3     think June 10 -- his interview on June 10 is very

4     important for a number of reasons.  Mr. Frakes, you

5     heard, told the agents, no, I didn't download child

6     pornography.  Now, we know that this was probably

7     perhaps the most important day in Casey Frakes' life.

8     You can expect that he remembers that like no other

9     day in his life.  On the other hand, the law

10    enforcement involved, you heard how much experience

11    they have in this.  Chances are this was somewhat old

12    hat to them.  They weren't surprised that the

13    interview was taking place.  They chose the time,

14    date, and location of that interview, not Casey

15    Frakes.

16         Now, apparently at the end of that interview a

17    statement was attributed to Casey Frakes that's very

18    telling, and the statement allegedly was, if you find

19    child pornography on the computer, or words to that

20    effect, leave my mom and my brother out of it because

21    they didn't have anything to do with it.  I think

22    that statement was paraded out to somehow show some

23    guilty conscience, or I don't know what it was.

24    Leave my mom and my brother out of it.  But I submit

25    to you that's not the part of the statement that's

1    important to consider. It's the first part of that

2    statement. What does he say? If child pornography

3    is found on the computer. That's not a statement of

4    I know. If he knew child pornography was on that

5    computer, he would just simply say, hey, leave my mom

6    and my brother out of it. They don't have anything

7    to do with it. Right? He didn't have time to think

8    this through and be so clever as to say, I'll say it

9    this way so it sounds good. He didn't have that

10   opportunity. It just came out.

11       And third, you know, that photograph, they took

12   his picture, and that says -- said so many things.

13   One, it was interesting that you didn't hear about

14   them taking the paragraph from Detective Kelley or

15   Agent Kanatzar. The first time you heard of it was

16   from Casey Frakes. You know, there was no rebuttal

17   evidence to say that that was -- they didn't take his

18   picture. In fact, there was no rebuttal evidence

19   presented after Mr. Frakes testified, but maybe more

20   importantly, that really highlighted the fact of the

21   surprise element for Mr. Frakes and the fact that

22   there was no surprise element for these agents. You

23   know, think about it. They had been doing this for

24   months on this case. They had applied for the search

25   warrant. All right? They had gotten the records

1    from AT&T or Southwestern Bell.  They had driven by

2    the house.  I mean, this was all preplanned.  They

3    had plenty of opportunity.  In fact, they had so much

4    opportunity that they came to this interview with a

5    camera but no recorder.  Really?  I mean, do you

6    think that the way Casey Frakes looked on June 10 was

7    going to be important, or do you think what the issue

8    was going to be -- what was more important was what

9    he had to say?  I mean, you come, surprise the guy,

10   you take him into the middle of street, and you start

11   bombarding him with questions about whether or not he

12   possessed, knowingly possessed, child pornography,

13   and you don't record it?  The Atchison Police

14   Department just didn't have the resources to have a

15   pocket recorder, apparently, that you carry around.

16   Homeland Security doesn't have the budget,

17   apparently, to give everybody pocket recorders.  We

18   got cameras but no recorders.  The failure to record

19   that interview in and of itself should mean to you

20   that if you have any doubt in comparing what the

21   agent told you, what the detective told you, and what

22   Casey Frakes told you happened that day, it should be

23   resolved in Casey's favor.

24        Now that doesn't mean -- we're not saying that

25   the agent or the detective are lying.  What we're

1    saying is that Mr. Frakes' recollection of that day

2    is going to be more accurate, and to the extent that

3    there's some question, that question ought to be

4    resolved in his favor.

5        The numbers are significant in this case.  In

6    questioning, I think I used the number 435, number of

7    files.  The government just used the number of 490.

8    Either way, it's a big enough number to give you a

9    sense of some real important things because those

10   numbers really are kind of circumstantial evidence;

11   right?  And you take those numbers, and you compare

12   it to the seven.  One percent of those files had

13   child pornography on them, 1 percent.  Ninety files

14   apparently had some name that might be associated

15   with child pornography, or illegal pornography, I

16   suppose.  What that 91 tells you is that the names

17   really don't mean a whole lot.  Less than a

18   10 percent chance that even a file with a name that

19   suggests child pornography is actually going to have

20   child pornography on it.

21       And the government seems to make a big deal of

22   the fact that, well, Mr. Frakes, he knew how to

23   delete a file.  Well, yeah, that was pretty straight

24   forward and simple.  What does that mean?  Actually,

25   I don't think it means what the government would

1    suggest it means to you because -- let's think about

2    this.  If you're into child porn, are you going to

3    have just seven files?  Probably not.  But let's say

4    you're searching for child porn and you get 91 files

5    because you want that child porn.  So 91 files.  If

6    you really start going through those 91 files and

7    they don't have child porn on them, what are you

8    going to do with it?  Delete.  Right?  If you're not

9    getting what you're looking for, then you delete it.

10   So there's -- the government thinks that there's only

11   two possible hypotheses there, and under the

12   government's theory both support the conclusion that

13   he must have known, either he intentionally -- he

14   knew what it was and he intentionally put it on his

15   computer -- which, again, doesn't necessarily really

16   make any sense.  There's no organization of these

17   files.  There's no deletion of the nonchild

18   pornography files or -- the government's theory seems

19   to be that, let's say he inadvertently downloaded

20   this child porn, not -- that he didn't intentionally

21   click on the image.  That's pretty clear.  If he was

22   doing it, he had to do it intentionally.  He had to

23   intentionally click that file.  But that doesn't mean

24   you know what that file is until you open it up;

25   right?  So the government's theory is even in that

1  circumstance, he opens it up, he sees it's child

2  porn.  If he's not into it, what should he do?  What

3  would you do if you're not into it?  You delete.  But

4  they are still there.  So what would make sense?

5  What would make sense is that he didn't know they

6  were there at all because he didn't do anything with

7  those files.  He didn't organize them; he didn't

8  delete them; he didn't move them.  He acted like he

9  didn't know they were there.  He didn't

10  password-protect that profile; he didn't move them

11  into another folder.  He acted like he didn't know

12  they were there.

13       Now, you heard the assertion that he spent hours

14  on the computer downloading files.  Well, look at

15  Exhibit 14.  Exhibit 14 doesn't show hours

16  downloading files.  In fact, it says just the

17  opposite.  It shows minutes downloading files.

18  You'll see October 4, 2006, 22 files downloaded, five

19  minutes.  October 12, 2006, 61 files downloaded,

20  total of 17 minutes.  On and on just like that.

21  We're not talking hours.  We're talking click, click,

22  click, click.  They come down to the computer.  You

23  look at them afterwards.  What did he say once they

24  are on the computer?  I'm looking for the big files.

25  We may not be comfortable with the fact that he's

1   looking at porn; we may not like porn; we may not

2   approve of pornography; but adult pornography is

3   legal to look at that.

4         We heard some search terms.  That was

5   interesting for so many reasons, but it was

6   interesting that the agents all testified that they

7   had never actually used Limewire to search for adult

8   porn itself; they never tried an adult pornography

9   search term to find out whether or not the kid

10  pornography came up in that, the stuff with the kid

11  names.  All they ever did was search for child

12  pornography.  I'll come back to that more in a

13  minute.

14        But you heard the term kiddy porn, or something

15  like that, as a search term.  Well, you're not going

16  to see those terms in all those files.  You may not

17  find kiddy porn in there at all.  You're going to

18  find Lolita; you're going to find some files with

19  ages on them and stuff like that; you're also going

20  to find files talking about mothers and horses and

21  all kinds of crazy stuff.  But what we know is that

22  in terms of those search terms, those search terms

23  that were used, obviously, based upon the evidence

24  that was presented don't necessarily mean that those

25  terms were in the titles of the files.  We covered

1    yesterday -- it's Nos. 93 and 94 on Exhibit 14.  When

2    you look at those two files, they are downloaded

3    within the same minute.  Created time, 12:40:21;

4    created time, 12:40:29.  Neither one of those file

5    names is consistent with the other.  There's no

6    consistent mutual terms in those file names, so

7    obviously there was presumably, based upon a bare

8    review of that evidence, some other search terms

9    being used to get those files.

10        And, you know, the failure to search for adult

11   porn and see what happened is kind of indicative of

12   the investigation as a whole in that it seemed pretty

13   clear that very quickly it went from an investigation

14   of figuring out what happened to an investigation --

15   no, strike that.  It went to a project to collect

16   evidence to prove that Casey Frakes was guilty, and

17   there's a big difference between those two.

18        You know, we heard about those music files being

19   gone, and somehow that was significant because

20   somehow that meant that, I guess, Mr. Frakes knew how

21   to delete a file, but it was interesting that they

22   didn't bother to find out where those music files

23   went.  We heard testimony that there was no wiper

24   program on this computer, and so if they were

25   deleted, you would think that those files could have

1  been recovered.  If they were moved, those music

2  files were moved somewhere else on the computer.  It

3  would have been nice to know where they were moved

4  to.  Whose profile were they moved to if they were

5  moved?  You know, did they go into a folder that

6  belonged to Jon?  Did they go to a folder that

7  belonged to Jason?  They are music files.  Let's see,

8  who had the MP3 player?  Jason.  But, you know, that

9  part of it doesn't help convict Casey Frakes, so

10  we're not going to look at that.

11       It's interesting and relevant, I would submit.

12  The time frame for these files being created on this

13  computer doesn't start -- it isn't -- the evidence

14  that you heard was that the files started in August

15  of '06 and the last file, October of '07.  So nothing

16  is being done for almost a year between when this

17  computer is seized and when the movie file is being

18  on there.  That's somebody who is really, you know,

19  collecting -- actively collecting that child

20  pornography, aren't they?  They are at it all the

21  time.

22       You know -- it was almost confusing, I think,

23  because we were talking about -- during the

24  examination we talked about March 12 of '07; we

25  talked about March 12 of '08.  Of course, there's

1    nothing going on in terms of downloading files on

2    that computer.  It doesn't appear, at least not in

3    that shared folder, in March of 2008, but that's the

4    date that the government picked, and they presented

5    their evidence.  Casey Frakes on March 12, 2008,

6    wasn't working at Snow Creek, and he wasn't working

7    at Long John Silvers, so he must have been at home

8    doing the child porn thing.  Maybe that's the thought

9    process, but really what did we hear?

10        Limewire is active any time that profile is

11    active, so if anybody's on that computer under

12    Casey's profile, whether or not they were doing

13    Microsoft Money, surfing the internet, doing email,

14    that Limewire program was active as somebody offering

15    for distribution.  You know, the computer evidence,

16    when it was presented by the government, it always

17    seemed to only point in one direction.  It always

18    pointed towards this must mean Casey did something

19    wrong, that he's guilty of the offense.  And what we

20    found is there's lots of explanations for some of

21    this computer evidence.  You know, remember when the

22    agent was on the stand and he said, well -- his

23    answer was something along the lines that it meant

24    that it got downloaded by Limewire.  When I had an

25    opportunity to cross examination him, he couldn't

1    quickly enough get back, oh, yeah, I guess it could

2    have been that it could have been transferred from

3    another place on the computer to that folder too.

4        But, you know, there is always this rush to,

5    we're going to take every inference in the course of

6    this investigation against Casey Frakes.  Any time we

7    have an opportunity or a fork in the road where we

8    could have said, well, there might be another

9    explanation for this, we ought to investigate it

10   more, or we can simply say, well, that supports the

11   conclusion that he's guilty, it seems like we went

12   with the guilt.  The agent pretty clearly told you

13   that there's no evidence, there's no physical

14   evidence, that you could point to to say that these

15   files, any of them that were on the computer, were

16   actually viewed by a human being, whether it be Casey

17   Frakes, Jason Frakes, or anybody else.  You know, we

18   have virus software on this computer that scans the

19   files.  In fact, if you look at the files in terms of

20   the last accessed date, somewhere around 357 of

21   them -- obviously, that's the bulk -- were last

22   accessed on April 4 of 2008.  Does that mean that a

23   human being was looking at those files because they

24   were accessed?  Well, the time period for that last

25   access went from 11:35:05 to 11:37:57, so

1    approximately two and a half minutes.  Obviously, a

2    human is not looking at those files on that last

3    accessed date.

4         Now, obviously, the argument you just heard from

5    the prosecution, is, well, we have got that one file

6    that was in that recent history folder; that proves

7    that Casey Frakes was looking at it.  Why does it

8    prove Casey Frakes was looking at it?  Because it's

9    under his profile?  Does that mean his brother Jon

10   couldn't have gotten on the computer, started going

11   around through the file structure to look for

12   something, and, oh, I see these files, ooh, what's

13   that?  Click on it.  Ooh, I don't want to see that.

14   Close it.  But, of course, from the prosecution's

15   standpoint we're going to say that it must have been

16   Casey Frakes, not that we have any direct evidence of

17   that, nothing that we can point to and say

18   affirmatively that that proves that it was Casey

19   Frakes sitting at the computer at that time looking

20   at that.  But that's the argument they are going to

21   make.

22        You know, getting back to the interview of Casey

23   Frakes, there was no reason to rush that interview.

24   They could have gone back to the police department in

25   Atchison.  They have plenty of lap tops, apparently.

1     They could have shown him the video and said, have

2     you seen this?  Could have recorded it, figured out

3     some way to record it, gone to some police

4     department, apparently, and recorded the interview.

5     You know, Mr. Frakes told you that he himself started

6     to doubt during the course of that interview.  Prior

7     to being interviewed he didn't have any reason to

8     believe he had child pornography on that, but once

9     the agents told him that he had child pornography on

10    the computer and they are going to find it if it's

11    there and they are telling him, this is what we

12    found, he says that he starts to doubt himself.

13         You know, fortunately, you're not in the middle

14    of the street surprised by what's going on, and

15    hopefully you don't fall victim to not holding to

16    your convictions.  It is your duty, it's your job, to

17    hold to your convictions during the course of

18    deliberations.  You heard the evidence.  It is your

19    decision to make in this case.

20         In closing, I want to emphasize to you one of

21    the instructions that the judge has already read to

22    you because it's very important, and that is

23    Instruction No. 8.  If you think there's a real

24    possibility that the defendant is not guilty of the

25    crime charged, you must give him the benefit of the

1   doubt and find him not guilty of that crime.  Thank

2   you.

3              THE COURT:  All right.  Ms. Martin?

4              MS. MARTIN:  Thank you, your Honor.

5        First of all, I want to ask you to check your

6   own recollection of the record about what was said at

7   the end of that interview.  The defendant

8   characterized it as, "If you find child porn," but

9   what I recall the agent's testimony was is, "If

10  anything comes of this," if anything comes of this

11  investigation, not if you find child porn.  That's a

12  big difference.  The defendant wasn't saying he

13  wasn't sure they would find any.  He was saying, if

14  you're going to charge somebody, I'm the one who did

15  it.  Leave my mom and my brother out of it.

16       Now, he said that back in June of 2008.  But

17  when he testified here, what may be the most stunning

18  and striking part of the defendant's testimony is

19  that he couldn't even muster up the moral courage to

20  get his mother off the hook.  When I asked him if his

21  mother was the one who put child porn on the

22  computer, he said, well, I don't know.  When I asked

23  him again, I said, really?  Your mother?  You think

24  your mother put child porn on this computer?  And he

25  said, well, I don't have any reason to think so.

1    That's the best he could do for his own mother.  He

2    sat there, knowing that he was the one who went on

3    the internet and downloaded these images, and he

4    still couldn't muster in his soul to get his mother

5    off the hook.  It's one thing not to want to admit to

6    a group of strangers that I was out looking at

7    pornography of any kind, especially child

8    pornography, but it's a whole nother to try to cast

9    suspicion upon your own mother.

10    Now, the defendant apparently wants us to

11    believe that he sat at his computer and didn't look

12    and just clicked on every file list that came up and

13    that, again, he was unlucky enough by doing that to

14    come up with 91 separate titles of child pornography.

15    Instruction No. 27 asks that you use your common

16    sense and your good judgment in reaching your

17    verdict.  This isn't the kind of case -- this wasn't

18    the kind of software, as I said before, where you can

19    highlight 40, 50 titles and have them automatically

20    downloaded.  This is the kind of software where you

21    have to double click on each and every file that you

22    want.  So does your good sense and -- does your

23    common sense and good judgment tell you that the

24    defendant could have downloaded things that he didn't

25    know what they were?  Now, he said the agents should

1    have gone out and downloaded adult pornography, and,

2    frankly, I would like to see what their supervisor

3    has to say about that. We want you to go out and

4    download some adult pornography as part of your job.

5    The fact that these titles had ages in them,

6    nine-year-old Vicky, 13-year-old, 15-year-old, that's

7    what the defendant was hoping to get when he double

8    clicked on it. The fact that they turned out not to

9    be child pornography, that they were actually adult

10    pornography in some cases, means the defendant got

11    ripped off. He was looking for child pornography,

12    and he got something where maybe adults dressed as

13    children. That doesn't mean he wasn't trying to get

14    child pornography. And, okay, so he got this and it

15    wasn't child pornography. Why didn't he delete it?

16    Because he liked pornography, and even though it

17    wasn't really children, it might have been exciting

18    to him that they were adults dressed as children. So

19    he just kept it and didn't bother to delete it.

20        The defendant said that the interview on June 10

21    was the most important day of his entire life and

22    that he was going to remember that better than anyone

23    else. Well, first of all, the agents both sat down

24    immediately after the interview, wrote reports so

25    that when this case came to trial they would be able

1    to refer to those reports and refresh their

2    recollection.

3         MR. CLARKE:  Your Honor, I'm going to

4    object.  I don't recall that testimony being

5    presented.

6         THE COURT:  I recall it as to at least one

7    of the agents.  Members of the jury, I would simply

8    ask you to use your collective recollections as to

9    whether or not there is an evidentiary basis for

10   counsel's statement.  Her statement is not evidence.

11   You will recall what evidence collectively among you

12   was, in fact, introduced in the case.

13        MS. MARTIN:  Did the defendant?  Secondly,

14   that interview day was not even close to the most

15   important day of the defendant's life.  The most

16   important day of the defendant's life was when he sat

17   down at his computer and he looked at a list of

18   pornography and he saw nine-year-old Vicky and he

19   thought, that's a video I would like to have, and he

20   double clicked on it.  That was the decision that he

21   made.  That was the most important day in his life,

22   not the day that he was interviewed.

23        You get to decide who is telling the truth.  Did

24   the agents appear to have the demeanor that they

25   bullied the defendant?  Both of them testified that

1    it was a cordial conversation and they thanked him

2    for his time at the end.  The defendant asked you, if

3    there is a fork in the road and there's one road that

4    gives you the choice that would be he's not guilty,

5    if you have any doubt at all, you have to find him

6    not guilty.  If there's any doubt at all.  That's not

7    what the instructions say.  The instructions say a

8    reasonable doubt.  But I would submit to you that

9    there isn't any fork in the road.  All roads lead to

10   the defendant.

11       When they arrived to do the search warrant on

12   June 10, they weren't investigating this defendant.

13   They were investigating the computer at that

14   location.  That computer had child porn, and they

15   were going there to investigate.  The evidence

16   collected from that point on points to no one other

17   than this defendant.

18       The last accessed date on Government's Exhibit

19   No. 8, that was in May of 2008, and he said there's

20   no proof, no proof at all, that it was Casey.  It

21   could have been his brother Jason; it could have been

22   his brother Jon.  He left out the mother.  But if you

23   look at it, the time that it was accessed, 11:31 p.m.

24   Again, this computer is in this defendant's bedroom.

25   The defendant said that during the interview he

1    started to doubt himself, well, maybe there was child

2    porn.  I submit to you, no, what he started to

3    realize was that they were going to find it.  He

4    realized that his child pornography stash on his

5    computer was going to get discovered and he was going

6    to end up here.

7        Ladies and gentlemen, I went through all the

8    elements that you have to find in order to find the

9    defendant guilty.  I submit to you that they have all

10   been met.  We can't open up the defendant's brain and

11   look inside to see what exactly he did know, but all

12   the evidence that was presented in this case points

13   to the fact that he did know.  Why does somebody

14   collect pornography?  Why does somebody go on the

15   computer and download pornography if you're never

16   going to look at it?  His testimony isn't credible.

17   I would submit to you that all of the evidence --

18   because, again, because I can't look inside his

19   brain -- all the evidence about his knowledge has to

20   be circumstantial.  The times of the downloads that

21   show he did it.  The fact that he knew that Limewire

22   was a share program, knew he was distributing, and

23   the fact that in the recent file there was a

24   photograph, there was a movie of child pornography

25   that he had recently viewed, all of that shows the

1    defendant did know, and I ask that you find him

2    guilty.  Thank you.

3                    * * * * *

4              THURSDAY, JULY 23, 2009

5              ClOSING STATEMENTS

6        MS. MARTIN:  May it please the court,

7    counsel, members of the jury, in order for you to go

8    back into the jury room now and find the defendant

9    guilty of Count 1, I've had to prove to you five

10   different elements.  There are five different

11   elements of this offense, and they are listed in

12   Instruction No. 11.  The first element is that the

13   defendant knowingly distributed a visual depiction.

14   There's no question in this case that these movies

15   are, in fact, a visual depiction, so the issue for

16   you to focus on as far as Element No. 1 is whether

17   the defendant knowingly distributed.  In other words,

18   did he know what was in his shared folder was going

19   to be distributed to other people?

20       Second, that the visual depiction was shipped or

21   transported in interstate or foreign commerce.

22   There's no issue here.  The defendant does not

23   dispute that the Kimmy image traveled in interstate

24   commerce by computer from Atchison, Kansas, to the

25   detective in Independence, Missouri, and he has no

1 dispute that the images in the shared folder were

2 available to be distributed to other people, anybody

3 who used the Limewire system around the entire world.

4 Element No. 2 has been satisfied.

5   The third one is that the production of the

6 visual depictions involved use of minors engaged in

7 sexually explicit conduct.  That also is not an issue

8 in dispute in this case.  The defendant doesn't

9 dispute that these movies -- that the people who

10 produced these videos used minors to produce them and

11 that the reason they produced those movies was to

12 have them engage in sexually explicit conduct.  So

13 Element No. 3 has also been met.

14   No. 4, that the visual depictions themselves

15 were of sexual conduct of these minors.  That's not

16 in dispute either.  The movies clearly show these

17 minors engaging in sexually explicit conduct.  So

18 Element No. 4 has also been met.

19   Five, that the defendant knew that at least one

20 of the participants in these movies was under the age

21 of 18 or was a minor.  Again, we have to focus on

22 what the defendant knew.  Did the defendant know that

23 he had movies on his computer in which the

24 participants were under the age of 18?

25   What this case boils down to, ladies and

1    gentlemen, is, did the defendant know he had child

2    porn in his shared folder, and did he know the images

3    in his shared folder could be distributed to other

4    people?

5         Let's look now at the knowing distribution.  How

6    did the defendant prove that the defendant knew he

7    was distributing child pornography?  Instruction

8    No. 11.  First, the defendant doesn't have to

9    actively push child pornography on other people.  He

10   doesn't have to send it to somebody in an email

11   attachment, for instance.  And Instruction No. 13

12   says that it's enough -- the law says it is enough to

13   convict the defendant of distributing child

14   pornography if he allows access to his computer stash

15   of images and videos.  It is enough that the

16   defendant allows access to his computer stash of

17   images and videos.  Think of it like a self-service

18   gas station.  The owner of a gas station doesn't have

19   to be at the gas station, and people can still come

20   to the gas station, pull up to the pump, swipe their

21   card, and fill their cars with gasoline.  There

22   doesn't have to be any attendant whatsoever at this

23   gas station.  The owner of that gas station is

24   distributing gasoline, and he's doing it knowingly.

25   He knows he's providing the gasoline on the -- on

1    site, on his property, and he's allowing people to

2    come and get it whenever they want, and he's doing it

3    knowingly even though he's not present and even

4    though he never meets the customers.

5        Second, how else do we prove that he knowingly

6    distributed child pornography?  The defendant told us

7    he knew in 2008, when the agents went to talk to him,

8    he admitted that he knew the items in his shared

9    folder were available to other users of Limewire.  He

10    admitted it in 2008, and he admitted it when he

11    testified in open court during this trial.  In fact,

12    he said the reason, the reason, he installed Limewire

13    was so he could share folders, so he could share

14    files, and sharing indicates a give and a take.

15        Now, he tried to testify -- he tried to say that

16    he knew he was going out and he was getting files

17    from other people, but he didn't really know that

18    other people could come and get files from him, but

19    ultimately he had to admit that he did know because

20    that's how the system works and that's why he put it

21    on his computer in the first place.

22        The government has proved then that the

23    defendant knowingly distributed images of child

24    pornography, so that element has been met.

25        Let's look at Count 2.  Instruction No. 12 gives

1    you the elements of Count 2.  First we have to prove

2    that the defendant knowingly possessed one or more

3    images, visual depictions of minors.  Again, there's

4    no dispute that they were, in fact, visual

5    depictions; there's no dispute that he had one or

6    more of them; and there's no dispute that they were,

7    in fact, minors.  So the issue for you to focus on

8    is, what did the defendant know?  Did he know that

9    there were these images in his shared folder?

10        Second, that the production of the visual

11    depictions involved the use of minors engaging in

12    sexually explicit activities.  This is not in

13    dispute.  The defendant doesn't dispute that in order

14    to make these movies that people used minors and had

15    them engage in sexually explicit activity, so element

16    No. 2 of Count 2 has met.

17        Three, that the defendant knew the visual

18    depictions involved the use of minors engaged in

19    sexually explicit conduct.  There's no dispute that

20    these visual depictions showed minors engaging in

21    sexually explicit conduct.  The only issue for you to

22    decide is whether the defendant knew he had them.

23        Four, that the visual depiction has been mailed

24    or shipped or transported in interstate or foreign

25    commerce by any means, including a computer.  This

1    element is not in dispute.  We heard the testimony of

2    Todd Beard, the agent who investigated the Vicky

3    series, who indicated those movies had been produced

4    in Washington State.  We also heard the testimony of

5    Peter Latham, who investigated this particular

6    series, the Meg series, who said those images were

7    produced in Michigan.  This element has been met.

8         Let's go back to the final element on both

9    counts that you will have to decide.  How did the

10   government prove that the defendant knew that these

11   images -- that he had images of child pornography in

12   his shared folder?

13        First of all, the defendant had 490 movies on

14   his computer, 490 pornographic movies, and he had a

15   share system that required him to double click on

16   each movie he wanted to put in his shared folder.  Of

17   those 490 movies, 91 of them, 91 of them, had titles

18   that would be indicative of child pornography, 91.

19   So 91 times the defendant double clicked, double

20   clicked, double clicked, double clicked on titles

21   that would be indicative of child pornography.

22   Ninety-one times.  The defendant wants you to believe

23   that he accidentally clicked 91 times on titles that

24   would indicate they were child pornography and that

25   those 91 times were accidental.  Ladies and

1 gentlemen, 91 times is no accident.  In order for you

2 to believe that the defendant accidentally downloaded

3 91 titles indicative of child pornography, you would

4 have to believe that the defendant is terribly

5 unlucky, and you would have to believe that both

6 Agent Kanatzar and Detective Kelley lied, because

7 both Detective Kelley and Agent Kanatzar testified

8 that when they talked to the defendant in June of

9 2008 he told them that he knew he had images of child

10 pornography on his computer.  He said he knew he had

11 images of girls between 12 and 14 and that

12 approximately 10 to 15 percent of his pornography

13 collection was child pornography.  You also have to

14 believe that this defendant downloaded these

15 movies -- and let's just talk about the movies that

16 we introduced.  One was downloaded on June 5 of '07,

17 more than a year before the investigation.  The

18 others -- two of them, or three of them, on March 12

19 of 2007, almost a year to the date of the beginning

20 of the investigation.  The final one was in

21 November 1 of 2006, almost two years before the

22 investigation.  And so in order for you to believe

23 the defendant, you would have to believe that he

24 never, ever looked at them, that he downloaded these

25 movies, he put them in his shared folder, and he

1 never looked at them, and that the only time -- and

2 the first and only time he's ever seen them was here

3 in court. That really defies logic, and it defies

4 common sense. That would be like going to a movie

5 theater and buying a ticket and then going back home

6 and not watching the movie. Why sit at your computer

7 for hours at a time and download movies that you

8 never want to watch?

9    But more than that, more than the fact that it

10 defies logic and common sense, we have this. This

11 video is Government's Exhibit No. 8. This exhibit

12 was found not only in the defendant's shared folder,

13 but it was found in his recent folder. That means he

14 looked at it, he had viewed it sometime in the recent

15 past, and we actually know when that was because the

16 last accessed date was May 19 of '08, about a month

17 before the search warrant at 11:31 in the evening.

18 So what other evidence do you have that the defendant

19 knew what was in his shared folder? Well, he told us

20 so. He told us on June 10 of 2008 that he had ten --

21 between 10 and 15 percent of his collection would be

22 child pornography. That turns out to be true. He

23 told the agents that he didn't have any child porn

24 movies that depicted girls as young as five or six.

25 That also turned out to be true. He told the agents

1      that he did have images of girls between the ages of

2      12 and 14, and that turned out to be true, although

3      the Vicky series, I think the agent testified she was

4      only 11, but he was telling the truth on June 10 of

5      2008.  He didn't lie to the agents when they came and

6      talked to him.  And Agent Kanatzar confirmed these

7      statements.  When he analyzed the defendant's

8      computer, when he did his computer analysis, he

9      confirmed there were no children as young as five or

10     six, there were children 12 to 14, and 91 movies out

11     of 490 is roughly about 18 percent.  He didn't lie.

12          Now, if there's still any question whether or

13     not it was the defendant who was downloading movies

14     or somebody else in the house, let's look at just

15     this one movie, this one movie, nine-year-old Vicky

16     stripping and sucking kiddy pedo illegal underage

17     preteen.  It was created on June 5, 2007, at 2:55 in

18     the morning.  Is it reasonable to assume that the

19     defendant's mother snuck into his bedroom at 3:00

20     o'clock in the morning, sat at the computer, and

21     downloaded this movie?  Is it reasonable to assume

22     that his brother Jon snuck into the house where he

23     didn't live, snuck into the defendant's bedroom while

24     he slept at 3:00 o'clock in the morning and

25     downloaded this movie?  Is it reasonable to assume

1   that his brother Jason snuck into his room at 3:00

2   o'clock in the morning and downloaded this movie?

3   No.  The only reasonable conclusion from this

4   evidence is that it was, in fact, the defendant who

5   was downloading these movies in his bedroom at 3:00

6   o'clock in the morning.

7        So, ladies and gentlemen of the jury, I believe

8   that the elements of knowing distribution have been

9   met.  The defendant knew he had these images on his

10  computer.  All of the elements that you need to find

11  have been met.  Find the defendant guilty.  Thank

12  you.

13           THE COURT:  All right.  You will have 15

14  minutes remaining for your rebuttal.

15       Mr. Clarke?

16           MR. CLARKE:  Thank you, your Honor.

17       In defending this case, we're obviously not

18  saying that child pornography is a good thing.  Child

19  pornography is a terrible thing.  It's awful.  And I

20  can't imagine that seeing those pictures right then

21  was really helpful to you to understand the

22  instructions that were underneath some of those

23  pictures.  Were those pictures helpful?  I submit to

24  you, I expect, no.  And, in fact, for the most part

25  consideration of those pictures at this point isn't

1   really important in deciding whether or not

2   Mr. Frakes is guilty of the crimes that he's charged

3   with.  Those pictures are -- they might make you

4   angry; they might make you sick.  But the fact that

5   those pictures are so offensive does not mean that he

6   committed the crime.

7       I told you in opening statement the issue when

8   you boil all of the water out of the pot was going to

9   come down to, what did Mr. Frakes know?  In fact, if

10  you look at Instruction No. 11 and you look at

11  Instruction No. 12, what really matters is whether or

12  not the government has proven that Mr. Frakes

13  knowingly distributed a visual depiction, whether or

14  not Mr. Frakes knew, as it says in Element No. 5,

15  whether or not Mr. Frakes knowingly possessed.

16  That's what is at issue in this case.  Yes, the

17  evidence shows minors.  We didn't need to see 15

18  minutes, or however long it was, of the video

19  yesterday.  We all knew what it showed after about 20

20  seconds.  We didn't need to see all that because

21  that's not really the issue.

22      Obviously, the judge is going to instruct you on

23  how to do the deliberations, but let me make a

24  suggestion.  Once you go through the initial picking

25  of the foreperson and all that, you ought to try to

1       give every single juror in there a voice to make sure

2       that you're heard.  So one way you can do this is you

3       simply go around the table and give each juror an

4       opportunity to speak before you start to deliberate,

5       exchange ideas, talk amongst yourselves.  What I

6       would submit you do is, you start -- and since

7       Mr. Frakes is entitled to the benefit of the doubt,

8       that each person start and say, this is the fact that

9       I think most strongly supports his innocence, and

10      then you go and you say, this is the fact that I

11      think most strongly supports his guilt.  And you go

12      around the room, and you give everybody an

13      opportunity to do that.

14          Now, on the issue of what fact do you think most

15      supports his innocence, you have a lot to choose

16      from.  It may be the fact that Mr. Frakes' computer

17      profile had no password protection on it; it was a

18      community computer and everybody had access to it.

19      It could be that Mr. Frakes got up and testified

20      yesterday that, in fact, he did not knowingly possess

21      child pornography.  It could be that you heard that

22      the agent said they went through the house, they

23      searched, and they didn't find any other evidence of

24      possession of child pornography or anything else of

25      relevance to the case.

1          Then when you turn it around and you say, these

2     are the facts that most strongly support his guilt,

3     quite frankly, I think you're going to find that your

4     options are much more limited because, again, the

5     issue is not whether or not there was child

6     pornography.  It's not really an issue.  The issue is

7     not necessarily what Jason did or what his mother

8     did.  The issue is, what did Casey Frakes know?  And

9     I submit the thing that's not going to help you

10    decide that, again, is the video images.  So no one's

11    going to get up there, I expect, and say, well, this

12    particular video, this is the one that makes me think

13    that -- this is the strongest piece of evidence

14    against him.  That's not going to be it.

15         It may be the statements that he allegedly gave

16    on June 10.  It may be the fact that Limewire was

17    installed under his profile on the computer.

18    Whatever it is, it's up to you to decide, but it's

19    not going to be those video images.

20         Now, the government just made a big deal out of

21    the fact about what Mr. Frakes said on June 10, and I

22    think June 10 -- his interview on June 10 is very

23    important for a number of reasons.  Mr. Frakes, you

24    heard, told the agents, no, I didn't download child

25    pornography.  Now, we know that this was probably

1    perhaps the most important day in Casey Frakes' life.

2    You can expect that he remembers that like no other

3    day in his life.  On the other hand, the law

4    enforcement involved, you heard how much experience

5    they have in this.  Chances are this was somewhat old

6    hat to them.  They weren't surprised that the

7    interview was taking place.  They chose the time,

8    date, and location of that interview, not Casey

9    Frakes.

10        Now, apparently at the end of that interview a

11   statement was attributed to Casey Frakes that's very

12   telling, and the statement allegedly was, if you find

13   child pornography on the computer, or words to that

14   effect, leave my mom and my brother out of it because

15   they didn't have anything to do with it.  I think

16   that statement was paraded out to somehow show some

17   guilty conscience, or I don't know what it was, leave

18   my mom and my brother out of it, but I submit to you

19   that's not the part of the statement that's important

20   to consider.  It's the first part of that statement.

21   What does he say?  If child pornography is found on

22   the computer.  That's not a statement of "I know."

23   If he knew child pornography was on that computer, he

24   would just simply say, hey, leave my mom and my

25   brother out of it.  They don't have anything to do

1    with it.  Right?  He didn't have time to think this

2    through and be so clever as to say, I'll say it this

3    way so it sounds good.  He didn't have that

4    opportunity.  It just came out.

5        And third, you know, that photograph, they took

6    his picture, and that says -- said so many things.

7    One, it was interesting that you didn't hear about

8    them taking the photograph from Detective Kelley or

9    Agent Kanatzar.  The first time you heard of it was

10    from Casey Frakes.  You know, there was no rebuttal

11    evidence to say that that was -- they didn't take his

12    picture.  In fact, there was no rebuttal evidence

13    presented after Mr. Frakes testified, but maybe more

14    importantly, that really highlighted the fact of the

15    surprise element for Mr. Frakes and the fact that

16    there was no surprise element for these agents.

17        You know, think about it.  They had been doing

18    this for months on this case.  They had applied for

19    the search warrant.  All right?  They had gotten the

20    records from AT&T or Southwestern Bell.  They had

21    driven by the house.  I mean, this was all

22    preplanned.  They had plenty of opportunity.  In

23    fact, they had so much opportunity that they came to

24    this interview with a camera but no recorder?

25    Really?  I mean, do you think that the way Casey

1  Frakes looked on June 10 was going to be important,

2  or do you think what the issue was going to be what

3  was more important was what he had to say?  I mean,

4  you come, surprise the guy, you take him into the

5  middle of street, and you start bombarding him with

6  questions about whether or not he possessed,

7  knowingly possessed, child pornography, and you don't

8  record it?  The Atchison Police Department just

9  didn't have the resources to have a pocket recorder,

10 apparently, that you carry around.  Homeland Security

11 doesn't have the budget, apparently, to give

12 everybody pocket recorders.  We got cameras but no

13 recorders.  The failure to record that interview in

14 and of itself should mean to you that if you have any

15 doubt in comparing what the agent told you, what the

16 detective told you, and what Casey Frakes told you

17 happened that day, it should be resolved in Casey's

18 favor.  Now that doesn't mean -- we're not saying

19 that the agent or the detective are lying.  What

20 we're saying is that Mr. Frakes' recollection of that

21 day is going to be more accurate, and to the extent

22 that there's some question, that question ought to be

23 resolved in his favor.

24     The numbers are significant in this case.  In

25 questioning I think I used the number 435, number of

1  files.  The government just used the number of 490.

2  Either way, it's a big enough number to give you a

3  sense of some real important things because those

4  numbers really are kind of circumstantial evidence,

5  right?  And you take those numbers, and you compare

6  it to the seven.  One percent of those files had

7  child pornography on them, 1 percent.  Ninety files,

8  apparently, had some name that might be associated

9  with child pornography, or illegal pornography, I

10  suppose.  What that 91 tells you is that the names

11  really don't mean a whole lot.  Less than a

12  10 percent chance that even a file with a name that

13  suggests child pornography is actually going to have

14  child pornography on it.

15      And the government seems to make a big deal of

16  the fact that, well, Mr. Frakes he knew how to delete

17  a file.  Well, yeah, that was pretty straight forward

18  and simple.  What does that mean?  Actually, I don't

19  think it means what the government would suggest it

20  means to you.  Let's think about this.  If you're

21  into child porn, are you going to have just seven

22  files?  Probably not.  But let's say you're searching

23  for child porn and you get 91 files because you want

24  that child porn, so 91 files, if you really start

25  going through those 91 files and they don't have

child porn on them, what are you going to do with it?
Delete.  Right?  If you're not getting what you're
looking for, then you delete it.  So there's -- the
government thinks that there's only two possible
hypotheses there, and under the government's theory
both support the conclusion that he must have known,
either he intentionally -- he knew what it was and he
intentionally put it on his computer, which, again,
doesn't necessarily really make any sense.  There's
no organization of these files.  There's no deletion
of the nonchild pornography files or -- the
government's theory seems to be that, let's say he
inadvertently downloaded this child porn, not that he
didn't intentionally click image.  That's pretty
clear.  If he was doing it, he had to do it
intentionally.  He had to intentionally click that
file.  But that doesn't mean you know what that file
is until you open it up; right?  So the government's
theory is even in that circumstance -- he opens it
up; he sees it's child porn.  If he's not into it,
what should he do?  What would you do if you're not
into it?  You delete.  But they are still there.  So
what would make sense?  What would make sense is that
he didn't know they were there at all because he
didn't do anything with those files.  He didn't

1    organize them; he didn't delete them; he didn't move

2    them.  He acted like he didn't know they were there.

3    He didn't password protect that profile; he didn't

4    move them into another folder.  He acted like he

5    didn't know they were there.

6        Now, you heard the assertion that he spent hours

7    on the computer downloading files.  Well, look at

8    Exhibit 14.  Exhibit 14 doesn't show hours

9    downloading files.  In fact, it says just the

10   opposite.  It shows minutes downloading files.

11   You'll see October 4, 2006, 22 files downloaded, five

12   minutes.  October 12, 2006, 61 files downloaded,

13   total of 17 minutes.  On and on just like that.

14   We're not talking hours.  We're talking click, click,

15   click, click.  They come down to the computer.  You

16   look at them afterwards.  What did he say once they

17   are on the computer?  I'm looking for the big files.

18   We may not be comfortable with the fact that he's

19   looking at porn; we may not like porn; we may not

20   approve of pornography; but adult pornography is

21   legal to look at that.

22       We heard some search terms.  That was

23   interesting for so many reasons, but it was

24   interesting that the agents all testified that they

25   had never actually used Limewire to search adult porn

1    itself.  They never tried an adult pornography search

2    term to find out whether or not the kid pornography

3    came up in that, the stuff with the kid names.  All

4    they ever did was search for child pornography.  I'll

5    come back to that more in a minute.

6        But you heard the term kiddy porn, or something

7    like that, as a search term.  Well, you're not going

8    to see those terms in all those files.  You may not

9    find kiddy porn in there at all.  You're going to

10   find Lolita; you're going to find some files with

11   ages on them and stuff like that.  You're also going

12   to find files talking about mothers and horses and

13   all kinds of crazy stuff.  But what we know is that

14   in terms of those search terms, those search terms

15   that were used, obviously, based upon the evidence

16   that was presented, don't necessarily mean that those

17   terms were in the titles of the files.  We covered

18   yesterday -- and it's Nos. 93 and 94 on Exhibit 14.

19   Ninety-three is female ejaculation Tabetha Stevens

20   squirt, and No. 94 is amateurcreampies-madison yada

21   yada yada.  And when you look at those two files,

22   they are downloaded within the same minute: created

23   time, 12:40:21; created time 12:40:29.  Neither one

24   of those file names is consistent with the other.

25   There's no consistent mutual terms in those file

1   names, so obviously there was presumably, based upon

2   a bare review of that evidence, some other search

3   terms being used to get those files.

4       And, you know, the failure to search for adult

5   porn and see what happened is kind of indicative of

6   the investigation as a whole in that it seemed pretty

7   clear that very quickly it went from an investigation

8   of figuring out what happened to an investigation --

9   no, strike that.  It went to a project to collect

10  evidence to prove that Casey Frakes was guilty.  And

11  there's a big difference between those two.

12      You know, we heard about those music files being

13  gone, and somehow that was significant because

14  somehow that meant that, I guess, Mr. Frakes knew how

15  to delete a file, but it was interesting that they

16  didn't bother to find out where those music files

17  went.  We heard testimony that there was no wiper

18  program on this computer, and so if they were

19  deleted, you would think that those files could have

20  been recovered.  If they were moved -- those music

21  files were moved somewhere else on the computer.  It

22  would have been nice to know where they were moved

23  to.  Whose profile were they moved to if they were

24  moved?  You know, did they go into a folder that

25  belonged to Jon?  Did they go to a folder that

1  belonged to Jason?  They are music files.  Let's see,

2  who had the MP3 player?  Jason.  But, you know, that

3  part of it doesn't help convict Casey Frakes, so

4  we're not going to look at that.

5       It's interesting and relevant, I would submit,

6  the time frame for these files being created on this

7  computer doesn't it start -- it isn't -- the evidence

8  that you heard was that the files started in August

9  of '06 and the last file, October of '07.  So nothing

10  being done for almost a year between when this

11  computer is seized and when the movie file is being

12  on there.  That's somebody who is really, you know,

13  collecting -- actively collecting that child

14  pornography, aren't they?  They are at it all the

15  time.

16       You know -- it was almost confusing, I think,

17  because we were talking about -- during the

18  examination we talked about March 12 of '07; we

19  talked about March 12 of '08.  Of course, there's

20  nothing going on in terms of downloading files on

21  that computer, it doesn't appear, at least not in

22  that shared folder, in March of 2008, but that's the

23  date that the government picked, and they presented

24  their evidence.  Casey Frakes on March 12, 2008,

25  wasn't working at Snow Creek, and he wasn't working

1      at Long John Silvers, so he must have been at home

2      doing the child porn thing.  Maybe that's the thought

3      process, but, really, what did we hear?  Limewire is

4      active any time that profile is active, so if

5      anybody's on that computer under Casey's profile,

6      whether or not they were doing Microsoft Money,

7      surfing the internet, doing email, that Limewire

8      program was active as somebody -- somebody offering

9      for distribution.

10          You know, the computer evidence, when it was

11     presented by the government, it always seemed to only

12     point in one direction.  It always pointed towards

13     this must mean Casey did something wrong, that he's

14     guilty of the offense.  And what we found is there's

15     lots of explanations for some of this computer

16     evidence.  You know, remember when the agent was on

17     the stand and he said, well -- his answer was

18     something along the lines that it meant that it got

19     downloaded by Limewire.  When I had an opportunity to

20     cross examination him, he couldn't quickly enough get

21     back, oh, yeah, I guess it could have been that it

22     could have been transferred from another place on the

23     computer to that folder too.  But, you know, there is

24     always this rush to, we're going to take every

25     inference in the course of this investigation against

1     Casey Frakes.  Any time we have an opportunity or a

2     fork in the road where we could have said, well,

3     there might be another explanation for this, we ought

4     to investigate it more, or we can simply say, well,

5     that supports the conclusion that he's guilty, it

6     seems like we went with the guilt.  The agent pretty

7     clearly told you that there's no evidence, there's no

8     physical evidence, that you could point to to say

9     that these files, any of them that were on the

10    computer, were actually viewed by a human being,

11    whether it be Casey Frakes, Jason Frakes, or anybody

12    else.  You know, we have virus software on this

13    computer that scans the files, okay.  And, in fact,

14    if you look at the files in terms of the last

15    accessed date, somewhere around 357 of them,

16    obviously, that's the bulk, were last accessed on

17    April 4 of 2008.  Does that mean that a human being

18    was looking at those files because they were

19    accessed?  Well, the time period for that last

20    accessed went from 11:35:05 to 11:37:57, so

21    approximately two and a half minutes.  Obviously, a

22    human is not looking at those files on that last

23    accessed date.

24         Now, obviously, the argument you just heard from

25    the prosecution, well, we have got that one file that

1    was in that recent history folder.  That proves that

2    Casey Frakes was looking at it.  Why does it prove

3    Casey Frakes was looking at it?  Because it's under

4    his profile?  Does that mean his brother Jon couldn't

5    have gotten on the computer, started going around

6    through the file structure to look for something,

7    and, oh, I see these files, ooh, what's that?  Click

8    on it.  Ooh, I don't want to see that, close it.

9    But, of course, from the prosecution's standpoint

10   we're going to say that it must have been Casey

11   Frakes, not that we have any direct evidence of that,

12   nothing that we can point to and say affirmatively

13   that proves that it was Casey Frakes sitting at the

14   computer at that time looking at that, but that's the

15   argument they are going to make.

16        You know, getting back to the interview of Casey

17   Frakes, there was no reason to rush that interview.

18   They could have gone back to the police department in

19   Atchison.  They have plenty of lap tops, apparently.

20   They could have shown him the video and said, have

21   you seen this?  Could have recorded it, figured out

22   some way to record it, gone to some police

23   department, apparently, and recorded the interview.

24   You know, Mr. Frakes told you that he himself started

25   to doubt during the course of that interview.  Prior

1   to being interviewed he didn't have any reason to

2   believe he had child pornography on that, but once

3   the agents told him that he had child pornography on

4   the computer and they are going to find it if it's

5   there and they are telling him, this is what we

6   found, he says that he starts to doubt himself.

7       You know, fortunately, you're not in the middle

8   of the street surprised by what's going on, and

9   hopefully you don't fall victim to not holding to

10  your convictions.  It is your duty, it's your job, to

11  hold to your convictions during the course of

12  deliberations.  You heard the evidence.  It is your

13  decision to make in this case.

14      In closing, I want to emphasize to you one of

15  the instructions that the judge has already read to

16  you because it's very important, and that is

17  Instruction No. 8.  If you think there's a real

18  possibility that the defendant is not guilty of the

19  crime charged, you must give him the benefit of the

20  doubt and find him not guilty of that crime.  Thank

21  you.

22          THE COURT:  All right.  Ms. Martin?

23          MS. MARTIN:  Thank you, your Honor.  First

24  of all, I want to ask you to check your own

25  recollection of the record about what was said at the

1    end of that interview.  The defendant characterized

2    it as "if you find child porn," but what I recall the

3    agent's testimony was is, "if anything comes of

4    this," if anything comes of this investigation, not

5    if you find child porn.  That's a big difference.

6    The defendant wasn't saying he wasn't sure they would

7    find any.  He was saying, if you're going to charge

8    somebody, I'm the one who did it.  Leave my mom and

9    my brother out of it.

10       Now, he said that back in June of 2008.  But

11    when he testified here, what may be the most stunning

12    and striking part of the defendant's testimony is

13    that he couldn't even muster up the moral courage to

14    get his mother off the hook.  When I asked him if his

15    mother was the one who put child porn on the

16    computer, he said, well, I don't know.  When I asked

17    him again, I said, really?  Your mother?  You think

18    your mother put child porn on this computer?  And he

19    said, well, I don't have any reason to think so.

20    That's the best he could do for his own mother.  He

21    sat there knowing that he was the one who went on the

22    internet and downloaded these images, and he still

23    couldn't muster in his soul to get his mother off the

24    hook.  It's one thing not to want to admit to a group

25    of strangers that I was out looking at pornography of

1      any kind, especially child pornography, but it's a

2      whole nother to try to cast suspicion upon your own

3      mother.

4          Now, the defendant apparently wants us to

5      believe that he sat at his computer and didn't look

6      and just clicked on every file list that came up and

7      that he was unlucky enough by doing that to come up

8      with 91 separate titles of child pornography.

9          Instruction No. 27 asks that you use your common

10     sense and your good judgment in reaching your

11     verdict.  This isn't the kind of case -- this wasn't

12     the kind of software, as I said before, where you can

13     highlight 40, 50 titles and have them automatically

14     downloaded.  This is the kind of software where you

15     have to double click on each and every file that you

16     want.  So does your good sense and -- does your

17     common sense and good judgment tell you that the

18     defendant could have downloaded things that he didn't

19     know what they were?

20         Now, he said the agents should have gone out and

21     downloaded adult pornography, and, frankly, I would

22     like to see what their supervisor has to say about

23     that.  We want you to go out and download some adult

24     pornography as part of your job.

25         The fact that these titles had ages in them,

1     nine-year-old Vicky, 13-year-old, 15-year-old, that's

2     what the defendant was hoping to get when he double

3     clicked on it.  The fact that they turned out not to

4     be child pornography, that they were actually adult

5     pornography in some cases, means the defendant got

6     ripped off.  He was looking for child pornography,

7     and he got something where maybe adults dressed as

8     children.  That doesn't mean he wasn't trying to get

9     child pornography.  And, okay, so he got this and it

10     wasn't child pornography.  Why didn't he delete it?

11     Because he liked pornography.  And even though it

12     wasn't really children, it might have been exciting

13     to him that they were adults dressed as children.  So

14     he just kept it and didn't bother to delete it.

15         The defendant said that the interview on June 10

16     was the most important day of his entire life and

17     that he was going to remember that better than anyone

18     else.  Well, first of all, the agents both sat down

19     immediately after the interview, wrote reports so

20     that when this case came to trial they would be able

21     to refer to those reports and refresh their

22     recollection.

23         MR. CLARKE:  Your Honor, I'm going to

24     object.  I don't recall that testimony being

25     presented.

1        THE COURT:  I recall it as to at least one

2    of the agents.  Members of the jury, I would simply

3    ask you to use your collective recollections as to

4    whether or not there is an evidentiary basis for

5    counsel's statement.  Her statement is not evidence.

6    You will recall what evidence collectively among you

7    was, in fact, introduced in the case.

8        MS. MARTIN:  Did the defendant?  Secondly,

9    that interview day was not even close to the most

10   important day of the defendant's life.  The most

11   important day of the defendant's life was when he sat

12   down at his computer and he looked at a list of

13   pornography and he saw nine-year-old Vicky and he

14   thought, that's a video I would like to have, and he

15   double clicked on it.  That was the decision that he

16   made.  That was the most important day in his life,

17   not the day that he was interviewed.

18       You get to decide who is telling the truth.  Did

19   the agents appear to have the demeanor that they

20   bullied the defendant?  Both of them testified that

21   it was a cordial conversation and they thanked him

22   for his time at the end.  The defendant asked you, if

23   there is a fork in the road and there's one road that

24   gives you one choice that would be he's not guilty,

25   if you have any doubt at all, you have to find him

1    not guilty, if there's any doubt at all.  That's not

2    what the instructions say.  The instructions say "a

3    reasonable doubt."  But I would submit to you that

4    there isn't any fork in the road.  All roads lead to

5    the defendant.

6        When they arrived to do the search warrant on

7    June 10, they weren't investigating this defendant.

8    They were investigating the computer at that

9    location.  That computer had child porn, and they

10   were going there to investigate.  The evidence

11   collected from that point on points to no one other

12   than this defendant.

13       The last accessed date on Government's Exhibit

14   No. 8, that was in May of 2008, and he said there's

15   no proof, no proof at all, that it was some -- that

16   it was Casey; it could have been his brother Jason;

17   it could have been his brother Jon.  He left out the

18   mother.  But if you look at it, the time that it was

19   accessed is 11:31 p.m.  Again, this computer is in

20   this defendant's bedroom.  The defendant said that

21   during the interview he started to doubt himself.

22   Well, maybe there was child porn.  I submit to you,

23   no, what he started to realize was that they were

24   going to find it.  He realized that his child

25   pornography stash on his computer was going to get

1    discovered and he was going to end up here.

2         Ladies and gentlemen, I went through all the

3    elements that you have to find in order to find the

4    defendant guilty.  I submit to you that they have all

5    been met.  We can't open up the defendant's brain and

6    look inside to see what exactly he did know, but all

7    the evidence that was presented in this case points

8    to the fact that he did know.  Why does somebody

9    collect pornography?  Why does somebody go on the

10   computer and download pornography if you're never

11   going to look at it?  His testimony isn't credible.

12   I would submit to you that all of the evidence --

13   because, again, because I can't look inside his

14   brain -- all the evidence about his knowledge has to

15   be circumstantial.  The times of the downloads that

16   show he did it, the fact that he knew that Limewire

17   was a share program, knew he was distributing, and

18   the fact that in the recent file there was a

19   photograph -- there was a movie of child pornography

20   that he had recently viewed.  All of that shows the

21   defendant did know, and I ask that you find him

22   guilty.  Thank you.

23                    * * * * *

24

25

1

2                        CERTIFICATE

3   STATE OF KANSAS          |

4                            |   ss

5   COUNTY OF JOHNSON        |

6

7           I, Rebecca Ryder, RMR, CRR, a Certified

8   Shorthand Reporter and official reporter for the United

9   States District Court, District of Kansas, do hereby

10  certify that as such official reporter I was present at

11  and reported in machine shorthand the above and foregoing

12  proceedings.

13          I further certify that a transcript of my

14  shorthand notes was prepared and that the foregoing

15  transcript is a true and correct transcript of my notes in

16  said case to the best of my knowledge and ability.

17

18                         S/REBECCA S. RYDER
                           REBECCA S. RYDER, RMR, CRR
19

20

21

22

23

24

25